POMERANTZ LLP
Gustavo F. Bruckner
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
gfbruckner@pomlaw.com

*Attorney for Plaintiff*

- additional counsel on signature page -

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| BENOIT ALBIGES, Individually and On Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| ENDO INTERNATIONAL PLC, PAUL V. CAMPANELLI, BLAISE COLEMAN, and MARK T. BRADLEY, | |
| Defendants. | |

Plaintiff Benoit Albiges ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Endo International plc ("Endo" or the "Company"), analysts'

1

reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired Endo securities between August 8, 2017, and June 10, 2020, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Endo was founded in 1920 and is headquartered in Dublin, Ireland.  The Company manufactures and sells generic and branded pharmaceuticals in the U.S. and internationally, including both generic and branded opioid products.

3.      Endo operates through several subsidiaries engaged in the opioid market, including Endo Health Solutions Inc. ("EHS"), Endo Pharmaceuticals, Inc. ("EPI"), Par Pharmaceutical Companies, Inc. ("PPCI"), and  Par Pharmaceutical, Inc. ("PPI").

4.      Endo and its subsidiaries have been substantial manufacturers of opioids in the U.S., with the State of New York ("New York") comprising a significant part of Endo's opioid market.  Opioids sales constituted a substantial portion of Endo's overall revenues.  Opioids sales were responsible for roughly $403 million of Endo's overall revenues in 2012, $657 million in 2014, and $486 million of Endo's $4 billion in sales in 2016.  Its branded opioid, Opana ER, yielded revenue of $1.15 billion from 2010 to 2013, and it alone accounted for 10% of Endo's total revenue in 2012.

5.     As opioid sales, marketing, distribution, and prescription practices grew out of control in the U.S., the rising death toll associated with opioids prompted them to be termed an epidemic.  This opioid epidemic constituted a public health crisis in the U.S., with more than 400,000 deaths linked to opioid-related drug abuse since 1997, and with costs to the U.S. economy estimated in the hundreds of billions of dollars.

6.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (i) the full scope of Endo's and/or its subsidiaries' contributions to the opioid crisis, including, but not limited to, their opioid products' disproportionately negative impact on New York, one of the most populous states in the U.S., as well as the fraud that Defendants perpetrated on the New York insurance market; (ii) part of that contribution to the crisis included Endo publishing and disseminating false information to health care providers regarding the risks and benefits of opioids; (iii) that the foregoing, once revealed, was foreseeably likely to subject Endo and/or its subsidiaries to increased regulatory scrutiny and enforcement, as well as significant financial and/or reputational harm, particularly with respect to New York; and (iv) that, as a result, the Company's public statements were materially false and misleading at all relevant times.

7.     On June 10, 2020, New York Governor Andrew Cuomo ("Governor Cuomo") announced that the New York Department of Financial Services ("DFS") had filed administrative charges against Endo in connection with its role in the opioid crisis, alleging that Endo fraudulently misrepresented the safety and efficacy of its opioid drugs while minimizing the risk of addiction and other ill effects.  That same day, DFS issued its own press release specifically announcing that it "has filed charges and initiated administrative proceedings against Endo . . . and its subsidiaries,

[EHS], [EPI], and [PPCI]" in connection with "DFS' ongoing investigation into the entities that created and perpetuated the opioid crisis"; that "[t]he DFS' statement of charges alleges that, like other opioid Manufactures, Endo . . . [k]nowingly furthered a false narrative to legitimize opioids as appropriate for broad treatment of pain by downplaying their long-known addictive nature and risks"; and that Endo and its subsidiaries "[m]isrepresented the safety and efficacy of opioids, without legitimate scientific substantiation," and "[d]eployed a large sales force to target healthcare providers directly with these misrepresentations."

8.      On this news, Endo's Ordinary share price fell $0.66 per share, or 14.63%, to close at $3.85 per share on June 10, 2020.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

12.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Pursuant to Endo's most recent annual report on Form 10-K, as of February 18, 2020, there were 226,833,617 Ordinary shares of the Company's stock outstanding.  The Company's Ordinary shares trade on the Nasdaq Global Select Market ("NASDAQ").  Accordingly, there are presumably hundreds, if not thousands, of investors in

Endo's Ordinary shares located within the U.S., some of whom undoubtedly reside in New Jersey. Additionally, Endo maintains facilities within this Judicial District at 7 Clarke Drive, Cranbury, New Jersey 08512. Pursuant to the Company's most recent annual report on Form 10-K, this facility is believed to be a manufacturing property within Endo's Branded Pharmaceuticals segment.

13.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.     Plaintiff, as set forth in the attached Certification, acquired Endo securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15.     Defendant Endo is organized under the laws of Ireland, with principal executive offices located at First Floor, Minerva House, Simmonscourt Road, Ballsbridge, Dublin 4, Ireland. The Company's U.S. headquarters are located in Malvern, Pennsylvania. Additionally, the Company maintains a facility in Cranbury, New Jersey. Endo's Ordinary shares trade in an efficient market on the NASDAQ under the ticker symbol "ENDP."

16.     Defendant Paul V. Campanelli ("Campanelli") served as Endo's President and Chief Executive Officer ("CEO") from before the start of the Class Period until March 2020, and currently serves as the Company's Chairman of the Board of Directors.

17.     Defendant Blaise Coleman ("Coleman") served as Endo's Executive Vice President ("EVP") and Chief Financial Officer ("CFO") from before the start of the Class Period until March 2020, and has since served as Endo's President, CEO, and a Director of the Company.

18.     Defendant Mark T. Bradley ("Bradley") has served as Endo's EVP and CFO since March 2020.

19.     Defendants Campanelli, Coleman, and Bradley are sometimes referred to herein as the "Individual Defendants."

20.     The Individual Defendants possessed the power and authority to control the contents of Endo's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Endo's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Endo, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

21.     Endo and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

22.     Endo was founded in 1920.  The Company manufactures and sells generic and branded pharmaceuticals in the U.S. and internationally, including both generic and branded opioid

products.  The Company sells its branded pharmaceuticals and generics to specialty physicians, retailers, clinics, government agencies, doctors, retail and specialty pharmacies, and specialty distributors.

23.     Endo operates through several subsidiaries engaged in the opioid market, including EHS, a Delaware corporation with its principal place of business in Malvern, Pennsylvania, which is a wholly owned subsidiary of Endo; EPI, a Delaware corporation with its principal place of business in Malvern, Pennsylvania, which is a wholly owned subsidiary of EHS; PPCI, a Delaware corporation with its principal place of business located in Chestnut Ridge, New York; and  PPI, a Delaware corporation with its principal place of business located in Chestnut Ridge, New York. PPI is a wholly owned subsidiary of PPCI.  Endo acquired PPCI and PPI in September 2015.

24.     Endo and its subsidiaries have been substantial manufacturers of opioids in the U.S., with New York comprising a significant market for the Company's opioids.  Opioids sales constituted a substantial portion of Endo's overall revenues.  Opioids sales were responsible for roughly $403 million of Endo's overall revenues in 2012, $657 million in 2014, and $486 million of Endo's $4 billion in sales in 2016.  Its branded opioid, Opana ER, yielded revenue of $1.15 billion from 2010 to 2013, and it alone accounted for 10% of Endo's total revenue in 2012.

25.     As opioid sales, marketing, distribution, and prescription practices grew out of control in the U.S., the rising death toll associated with opioids prompted them to be termed an epidemic.  This opioid epidemic constituted a public health crisis in the U.S., with more than 400,000 deaths linked to opioid-related drug abuse since 1997, and with costs to the U.S. economy estimated in the hundreds of billions of dollars.  In this Judicial District, which covers the State of New Jersey, for example, there were 1,486,295 opioid prescriptions dispensed in the state between January 1, 2020, and May 31, 2020, alone, with 1,339 suspected overdose deaths in that period.

Between 2013 and 2019, there were a total of approximately 34,620,760 opioid prescriptions dispensed in New Jersey, with 15,324 suspected overdose deaths in the state over that period.

**Materially False and Misleading Statements Issued During the Class Period**

26.     The Class Period begins on August 8, 2017, when Endo filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2017 (the "2Q17 10-Q").   In a section entitled "Opioid-Related Litigations, Subpoenas and Document Requests," the 2Q17 10-Q discussed the various legal proceedings and investigations to which Endo and its subsidiaries were subject in connection with their marketing and sales practices with respect to opioid products.  The 2Q17 10-Q touted Endo's "cooperati[on] with each of the investigations described" and represented that the Company "intend[s] to contest the lawsuits identified . . . vigorously," thereby downplaying the scope of the Company's wrongdoing and potential liability with respect to those proceedings and investigations.

27.     With specific respect to opioid-related legal proceedings and investigations initiated in New York, the 2Q17 10-Q stated, in relevant part, that, "[i]n August 2016, the County of Suffolk, New York filed suit in New York Supreme Court (Suffolk County) against multiple defendants, including [Endo's] subsidiaries EHS[] and EPI, for alleged violations of state false and deceptive advertising and other statutes, public nuisance, common law fraud and unjust enrichment based on opioid sales and marketing practices"; that "[t]he County of Suffolk is seeking compensatory damages, interest, costs, disbursements, punitive damages, treble damages, penalties and attorneys' fees"; that, "[i]n February 2017, Broome County, New York, and Erie County, New York, filed similar suits in New York Supreme Court (Broome County and Erie County, respectively)"; and that, "[b]etween May and June 2017, several other New York counties also filed similar suits in New York Supreme Court within their respective counties," including

"Orange County, Dutchess County, Seneca County, Sullivan County, Nassau County and Schenectady County."

28.     With respect to these proceedings, the 2Q17 10-Q assured investors that "Defendants, including our subsidiaries, filed motions to dismiss and to stay in January 2017," with "[t]he hearing on those motions is scheduled for September 2017"; and that "Defendants also filed motions to dismiss in Broome and Erie Counties."  The foregoing statements clearly indicated to investors that Endo and its subsidiaries believed these lawsuits were meritless.

29.     Additionally, the 2Q17 10-Q contained generic, boilerplate representations regarding Endo's supposed view of the risks associated with these opioid-related legal proceedings and investigations, including, among others, that "[i]nvestigations and lawsuits similar to the foregoing matters may be brought by others"; that Defendants "are unable to predict the outcome of these investigations or litigations, which may involve additional requests for information"; that Defendants "are also unable to predict [their] ultimate legal and financial liability, if any"; that, "at this time [Defendants] cannot reasonably estimate the possible loss or range of loss for these investigations or litigations, if any, but will explore all options as appropriate in our best interests"; that "[Endo] and certain of [its] subsidiaries are involved in various claims, legal proceedings, internal and governmental investigations (collectively, proceedings) that arise from time to time in the ordinary course of [its] business, including, among others, those relating to product liability . . . . regulatory compliance and commercial matters"; that, "[w]hile [Defendants] cannot predict the outcome of these proceedings and [they] intend to defend vigorously [their] position, an adverse outcome in any of these proceedings could have a material adverse effect on [Endo's] current and future financial position, results of operations and cash flows"; that "[m]atters that are not being disclosed herein [in the 2Q17 10-Q] are, in the opinion of [Endo's] management,

immaterial both individually and in the aggregate with respect to [its] financial position, results of operations and cash flows"; and that, "[i]f and when such matters, in the opinion of [Endo's] management, become material either individually or in the aggregate, [Defendants] will disclose such matters."  Plainly, the foregoing risk warnings were generic "catch-all" provisions that were not tailored to Endo's actual known risks with respect to the significant potential for further opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud.

30.     Appended as exhibits to the 2Q17 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Campanelli and Coleman certified that "[t]he [2Q17 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [2Q17 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

31.     The statements referenced in ¶¶ 26-30 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (i) the full scope of Endo's and/or its subsidiaries' contributions to the opioid crisis, including, but not limited to, their opioid products' disproportionately negative impact on New York, one of the most populous states in the U.S., as well as the fraud that Defendants perpetrated on the New York insurance market; (ii) part of that contribution to the crisis included Endo publishing and disseminating false information to health care providers regarding the risks and benefits of opioids; (iii) that the foregoing, once revealed, was foreseeably likely to subject Endo and/or its subsidiaries to increased regulatory scrutiny and enforcement, as well as significant financial and/or reputational

harm, particularly with respect to New York; and (iv) that, as a result, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Begins to Emerge

32.    On November 6, 2017, during intraday trading hours, *Reuters* reported that Kentucky was the latest state to sue Endo over its role in the opioid epidemic (the "November 2017 Press Release").  Specifically, that press release stated, in relevant part, that "Kentucky accused units of Endo International Plc on Monday of contributing to drug overdoses and an opioid epidemic by deceptively marketing its painkiller Opana ER, the latest lawsuit by state or local governments against the drugmaker"; that "Kentucky Attorney General Andy Beshear said the lawsuit would seek to hold Endo responsible for illegally building a market for the long-term use of opioids in the state as part of an effort to boost corporate profits"; and that "[t]he lawsuit, filed in a state court in Kentucky, said Endo sought to overstate the benefits of using Opana for the long-term treatment of chronic pain while downplaying the risk of addiction, helping to fuel a public health epidemic."

33.    On this news, Endo's Ordinary share price fell $0.08 per share, or 1.27%, to close at $6.24 per share on November 6, 2017.  As the market continued to digest this information, the Company's shares fell an additional $0.31 per share, or 4.97%, to close at $5.93 per share on November 7, 2017—a total decline 6.17% over two trading days.  Despite this drop in the price of Endo's Ordinary shares, those shares continued to trade at artificially inflated prices throughout the remainder of the Class Period as a result of Defendants' continued misstatements and omissions related to the true scope and magnitude of Endo's wrongdoing and liability with respect to the opioid epidemic.

34.     For example, the November 2017 Press Release quoted Endo's Chief Legal Officer, Matthew Maletta, who stated that allegations that Endo was trying to profit at the expense of people's health was "patently offensive," and that Endo "intend[s] to vigorously defend the company against the claims set forth in [the Kentucky] lawsuit."

35.     Then, on January 11, 2018, during pre-market hours, Endo issued a press release announcing that it had "received a grand jury subpoena from the United States Attorney's Office for the Southern District of Florida seeking documents and information relating to products containing oxymorphone" (the "January 2018 Press Release"). That press release disclosed, in relevant part:

> The subpoena broadly requests documents including, among others, those produced in past or pending lawsuits and those relating to product safety and efficacy, overdoses, diversion, thefts, overprescribing, abuse/misuse, dependency or tolerance, withdrawal, addictiveness, adverse events and manipulation. The subpoena also requests distribution and other third party agreements, together with sales and marketing, training, financial, compensation and corporate information, as well as documents relating to interactions with various government agencies, including the U.S. Food and Drug Administration, Drug Enforcement Administration, Veterans Administration, Federal Trade Commission, Department of Health & Human Services, Medicare and Medicaid. Endo and EPI intend to be responsive to the subpoena and cooperate with any related government investigation.

36.     On this news, Endo's Ordinary share price fell $0.15 per share, or 1.86%, to close at $7.92 per share on January 11, 2018. Despite this drop in the price of Endo's Ordinary shares, those shares continued to trade at artificially inflated prices throughout the remainder of the Class Period as a result of Defendants' continued misstatements and omissions related to the true scope and magnitude of Endo's wrongdoing and liability with respect to the opioid epidemic.

37.     For example, in the same January 2018 Press Release in which it disclosed receipt of the grand jury subpoena, Endo also assured investors that, "[i]n all circumstances, it is Endo's

policy to comply with applicable laws, rules, regulations and industry guidance governing the sale and marketing of pharmaceutical products."

38.     Additionally, on February 27, 2018, Endo filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2017 (the "2017 10-K").  The 2017 10-K touted the performance of Endo's U.S. Generic Pharmaceuticals segment, stating, in relevant part, that this segment "accounted for 66%, 64% and 51% of total revenues in 2017, 2016 and 2015, respectively"; that "[t]he product offerings of this segment consist of a differentiated product portfolio including solid oral extended-release, solid oral immediate-release, abuse-deterrent products, liquids, semi-solids, patches, powders, ophthalmics, sprays and sterile injectables," which "include products in the [*inter alia*] pain management . . . markets, among others"; that Endo's "U.S. Generic Pharmaceuticals segment is among the largest U.S. generics company [*sic*] based on market share"; that Endo's "largest U.S. Generic Pharmaceuticals manufacturing sites are in Chestnut Ridge, New York; Irvine, California; Rochester, Michigan; and Chennai, India; which handle the production, assembly, quality assurance testing and packaging of [its] products"; and that "[t]he majority of the products [Defendants] manufacture are produced in [their] U.S. facilities."

39.     The 2017 10-K also touted the performance of Endo's U.S. Branded Pharmaceuticals segment, stating, in relevant part, that this segment "accounted for 28%, 29% and 39% of [Endo's] total revenues in 2017, 2016 and 2015, respectively"; that it "includes a variety of branded prescription products to treat and manage conditions in [*inter alia*] . . . pain"; and that "[t]his segment consists of [Endo's] legacy branded business together with the branded products obtained through . . . acquisition of . . . a fully integrated specialty pharmaceutical company with a focus on developing and commercializing innovative products for specific patients' needs in

orthopedics, dermatology and other therapeutic areas, and [Endo's] September 25, 2015 acquisition of Par."

40.     In a section entitled "Opioid-Related Matters," the 2017 10-K again recited the various legal proceedings and investigations to which Endo and its subsidiaries were subject in connection with their marketing and sales practices with respect to opioid products.   The 2017 10-K represented that Endo and its subsidiaries "will continue to vigorously defend the foregoing matters and to explore other options as appropriate in [their] best interests" and "are cooperating with these investigations," again downplaying the scope of the Company's wrongdoing and potential liability with respect to those proceedings and investigations.

41.     With specific respect to opioid-related legal proceedings and investigations initiated in New York, the 2017 10-K noted that New York was one of thirty-eight states wherein "approximately 465 cases [were] filed by counties, cities, Native American tribes and/or other government-related persons or entities."   According to the 2017 10-K, "[t]he complaints in the cases assert a variety of claims including, but not limited to, claims for alleged violations of public nuisance, consumer protection, unfair trade practices, racketeering, Medicaid fraud and/or drug dealer liability statutes and/or common law claims for public nuisance, fraud/misrepresentation, strict liability, negligence and/or unjust enrichment"; "[t]he claims are generally based on alleged misrepresentations and/or omissions in connection with the sale and marketing of prescription opioid medications and/or an alleged failure to take adequate steps to prevent abuse and diversion"; and "[p]laintiffs generally seek declaratory and/or injunctive relief; compensatory, punitive and/or treble damages; restitution, disgorgement, civil penalties, abatement, attorneys' fees, costs and/or other relief."   The 2017 10-K also noted that, "[i]n September 2017, the Department of Justice for the State of Oregon and the Office of the Attorney General for the Commonwealth of

14

Massachusetts issued CIDs to EHS[] and EPI on behalf of a multistate group" comprised of thirty-three states, one of which was New York, and that Endo's "subsidiaries are currently cooperating with this investigation."

42. With respect to these proceedings, the 2017 10-K informed investors that "Defendants, including the company's subsidiaries, have filed motions to dismiss in certain cases." This clearly indicated to investors that Endo and its subsidiaries believed these lawsuits were meritless.

43. The 2017 10-K also contained substantively the same boilerplate risk warnings as referenced in ¶ 29 above, in addition to warning that the legal proceedings and investigations disclosed "may be expanded" or "result in litigation," all of which were plainly generic "catch-all" provisions that were not tailored to Endo's actual known risks with respect to the significant potential for further opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud.

44. The 2017 10-K also contained additional generic, boilerplate representations specifically advising investors that Defendants "have been, continue to be and may be the subject of . . . significant litigation matters, government investigations or product recalls . . . ." In this respect, the 2017 10-K warned, in relevant part, that Endo's "business exposes [it] to significant potential risk from . . . significant litigation matters, government investigations or product recalls, including, but not limited to, such matters associated with the testing, manufacturing, marketing and sale of [their] products"; that Defendants "have been, continue to be and may be subject to various . . . significant litigations and government investigations"; that Defendants "along with other manufacturers of prescription opioid medications, are the subject of lawsuits and have received subpoenas and other requests for information from various state and local government

agencies regarding the sales and marketing of opioid medications"; that, "[i]n addition to direct expenditures for damages, settlement and defense costs, there is a possibility of adverse publicity, loss of revenues and disruption of business as a result of . . . litigation matters"; that, "[i]n addition, it may be necessary for [Defendants] to voluntarily or mandatorily recall or withdraw products that do not meet approved specifications or which subsequent data demonstrate may be unsafe or ineffective or misused"; that "[a]ny such recall or withdrawal could result in adverse publicity, costs connected to the recall and loss of revenue"; that "[i]f [Defendants] are found liable . . . in connection with . . . litigation matters, including those related to sales, marketing or pricing practices, government investigations or product recalls," Defendants "could suffer substantial costs, reputational damage and/or restrictions on [their] product use, and [Defendants] could incur losses, any of which could materially and adversely impact our business, financial condition, results of operations and cash flows and/or the price of [Endo's] ordinary shares"; and that Defendants' "pharmaceutical . . . products may cause, or may appear to cause, serious adverse side effects or potentially dangerous drug interactions if misused, [or] improperly prescribed . . . ." Plainly, these risk warnings, too, were generic "catch-all" provisions that were not tailored to Endo's actual known risks with respect to the significant potential for further opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud.

45. Additionally, the 2017 10-K downplayed the scope of Defendants' wrongdoing and responsibility for the risks described in ¶ 44 above by attributing, in part, the Company's litigation risk to, *inter alia*, potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than to Defendants' own misconduct. For example, in the same discussion, the 2017 10-K asserted that, "in the age of social media, plaintiffs' attorneys have a wide variety of tools to advertise their

16

services and solicit new clients for litigation, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool"; that, "[f]or these or other reasons, any significant product liability or mass tort litigation in which [Defendants] are a defendant could have a larger number of plaintiffs than such actions have seen historically and [Defendants] could also see an increase in number of cases filed against [them] because of the increasing use of widespread and media-varied advertising"; and that, "a ruling against other pharmaceutical companies in product liability or mass tort litigation in which we are not a defendant could have a negative impact on pending litigation where we are a defendant."

46.    The 2017 10-K also attributed the reputational risks related to Endo's and its subsidiaries' opioid products to the media, rather than acknowledging the Defendants' role in the opioid epidemic.  For example, the 2017 10-K asserted, in relevant part, that "unfavorable media coverage of opioid pharmaceuticals could negatively affect [Defendants'] business, financial condition and results of operations"; that, "[i]n recent years, opioid drug abuse has received a high degree of media coverage"; that "[u]nfavorable publicity regarding, for example, the use or misuse of oxycodone or other opioid drugs, the limitations of abuse-deterrent forms (ADFs), public inquiries and investigations into prescription drug abuse, litigation or regulatory activity could adversely affect our reputation"; that "[s]uch negative publicity could have an adverse effect on the potential size of the market for our drug candidates and decrease revenues and royalties, which would adversely affect our business and financial status"; that "such increased scrutiny of opioids generally, whether focused on [Defendants'] products or otherwise, could negatively impact [their] relationship with healthcare providers and other members of the healthcare community"; and that Defendants "are dependent on market perceptions, and negative publicity associated with product quality, patient illness or other adverse effects resulting from, or perceived to be resulting from,

[their] products, or [their] partners' and suppliers' manufacturing facilities," which "could have a material adverse effect on [their] business, results of operations, financial condition and cash flows."

47.     Finally, the 2017 10-K contained substantively the same SOX certifications as referenced in ¶ 30 above, with such certifications signed by Defendants Campanelli and Coleman.

48.     The statements referenced in ¶¶ 34 and 37-47 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (i) the full scope of Endo's and/or its subsidiaries' contributions to the opioid crisis, including, but not limited to, their opioid products' disproportionately negative impact on New York, one of the most populous states in the U.S., as well as the fraud that Defendants perpetrated on the New York insurance market; (ii) part of that contribution to the crisis included Endo publishing and disseminating false information to health care providers regarding the risks and benefits of opioids; (iii) that the foregoing, once revealed, was foreseeably likely to subject Endo and/or its subsidiaries to increased regulatory scrutiny and enforcement, as well as significant financial and/or reputational harm, particularly with respect to New York; and (iv) that, as a result, the Company's public statements were materially false and misleading at all relevant times.

49.     On March 29, 2018, during after-market hours, *Reuters* reported that "Arkansas' attorney general on Thursday joined the widening mass of litigation against opioid manufacturers, accusing three drugmakers," including Endo, "of promoting addictive painkillers in ways that falsely denied or trivialized their risks." According to *Reuters*, "[t]he lawsuit contended the drugmakers spent millions of dollars on promotional activities that downplayed the risks of

addiction associated with opioids while falsely touting the benefits of using the drugs to treat chronic pain."

50.     On this news, Endo's Ordinary share price fell $0.27 per share, or 4.55%, to close at $5.67 per share the following trading day, on April 2, 2018.

51.     On August 16, 2018, *Reuters* reported during intraday trading hours that President Donald J. Trump's ("Trump") administration "proposed that U.S. drugmakers cut production quotas of the six most abused opioids by 10 percent next year to fight a nationwide addiction crisis"; that, "[i]n a statement, the U.S. Justice Department and Drug Enforcement Administration (DEA) said the proposed cut would be in keeping with President Donald Trump's effort to cut opioid prescription fills by one-third within three years"; and that "Trump on Thursday also pressed U.S. Attorney General Jeff Sessions to sue drug manufacturers over the opioid crisis." The *Reuters* article also mentioned four manufacturers of opioids by name, one of which was Endo, noting in tandem that "[h]undreds of lawsuits have been filed by states, counties and cities against opioid manufacturers."

52.     Over two trading days, Endo's Ordinary share price fell $0.42 per share, or 2.62%, to close at $15.64 per share on August 17, 2018.  Despite this drop in the price of Endo's Ordinary shares, those shares continued to trade at artificially inflated prices throughout the remainder of the Class Period as a result of Defendants' continued misstatements and omissions related to the true scope and magnitude of Endo's wrongdoing and liability with respect to the opioid epidemic.

53.     For example, on February 28, 2019, Endo filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2018 (the "2018 10-K").    The 2018 10-K touted the performance of Endo's U.S. Generic Pharmaceuticals segment, stating, in relevant part, that this segment "accounted for

approximately 34%, 44% and 50% of total revenues in 2018, 2017 and 2016, respectively"; that this segment "consists of a differentiated product portfolio including solid oral extended-release, solid oral immediate-release, liquids, semi-solids, patches, powders, ophthalmics and sprays and includes products in the [*inter alia*] pain management . . . markets, among others"; that Endo's "U.S. Generic Pharmaceuticals segment is among the largest U.S. generics companies based on market share"; and that Endo's "largest U.S. Generic Pharmaceuticals manufacturing sites, which handle the production, assembly, quality assurance testing and packaging of our generic products, are located in Chestnut Ridge, New York; Irvine, California and Chennai, India."

54.     The 2018 10-K also touted the performance of Endo's "U.S. Branded - Specialty & Established Pharmaceuticals' segment, stating, in relevant part, that this segment "accounted for approximately 29%, 28% and 29% of total revenues in 2018, 2017 and 2016, respectively"; and that this segment "includes a variety of branded prescription products to treat and manage conditions in [*inter alia*] . . . pain."

55.     In a section entitled "Opioid-Related Matters," the 2018 10-K again recited the various legal proceedings and investigations to which Endo and its subsidiaries were subject in connection their marketing and sales practices with respect to opioid products.    The 2018 10-K represented that Endo and its subsidiaries "will continue to vigorously defend the foregoing matters and to explore other options as appropriate in [their] best interests" and "are cooperating with these investigations," again downplaying the scope of the Company's wrongdoing and potential liability with respect to those proceedings and investigations.

56.     With specific respect to opioid-related legal proceedings and investigations initiated in New York, the 2018 10-K noted that, "[i]n some jurisdictions, such as [*inter alia*] . . . New York . . . certain state court cases have been transferred to a single court within their respective

state court systems for coordinated pretrial proceedings"; and that "[t]he state cases are generally at the pleading and/or discovery stage with certain of these cases scheduled for trial beginning in 2020."  According to the 2018 10-K, "[t]he complaints in the cases assert a variety of claims including, but not limited to, claims for alleged violations of public nuisance, consumer protection, unfair trade practices, racketeering, Medicaid fraud and/or drug dealer liability statutes and/or common law claims for public nuisance, fraud/misrepresentation, strict liability, negligence and/or unjust enrichment"; "[t]he claims are generally based on alleged misrepresentations and/or omissions in connection with the sale and marketing of prescription opioid medications and/or an alleged failure to take adequate steps to prevent abuse and diversion"; and that "[p]laintiffs generally seek declaratory and/or injunctive relief; compensatory, punitive and/or treble damages; restitution, disgorgement, civil penalties, abatement, attorneys' fees, costs and/or other relief."

57.     The 2018 10-K also contained substantively the same boilerplate risk warnings as referenced in ¶¶ 29 and 43-44 above, which were plainly generic "catch-all" provisions that were not tailored to Endo's actual known risks with respect to the significant potential for further opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud.

58.     In discussing risks related to "lawsuits, product liability claims, other significant legal proceedings, government investigations or product recalls," the 2018 10-K provided additional generic, boilerplate representations that "[n]umerous claims against opioid manufacturers have been and may continue to be filed by or on behalf of states, counties, cities, Native American tribes, other government-related persons or entities, hospitals, health systems, unions, health and welfare funds, other third-party payers and/or individuals"; that, "[i]n these cases, plaintiffs seek various remedies, including without limitation, declaratory and/or injunctive

21

relief; compensatory, punitive and/or treble damages; restitution, disgorgement, civil penalties, abatement, attorneys' fees, costs and/or other relief"; that Endo "and other manufacturers of prescription opioid medications have been, and will likely continue to be, subject to negative publicity and press, which could harm our brand and the demand for our products"; that "[t]here are also regulatory and legislative proposals being made that could impact [Endo] and other manufacturers of prescription opioid medications"; and that "[a]ny failure to effectively identify, analyze, report and protect adverse event data and/or to fully comply with relevant laws, rules and regulations around adverse event reporting could expose the Company to penalties, fines and reputational damage."  Plainly, these risk warnings, too, were generic "catch-all" provisions that were not tailored to Endo's actual known risks with respect to the significant potential for further opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud.

59.    Additionally, the 2018 10-K contained generic, boilerplate representations specifically related to "[p]ublic concern around the abuse of opioids, including law enforcement concerns over diversion and marketing of opioids, and regulatory efforts to combat abuse," which "could result in costs to [Endo's] business."  In this regard, the 2018 10-K represented, in relevant part, that "[m]edia stories regarding prescription drug abuse and the diversion of opioids and other controlled substances are commonplace"; that "[a]ggressive enforcement and unfavorable publicity regarding, for example, the use or misuse of opioid drugs," including "the limitations of abuse-deterrent formulations," "the ability of drug abusers to discover previously unknown ways to abuse our products," "public inquiries and investigations into prescription drug abuse," and "litigation or regulatory activity regarding sales, marketing, distribution or storage of opioids could have a material adverse effect on [Endo's] reputation and impact on the results of litigation"; that

"[m]anufacturers of prescription opioid medications have been the subject of significant civil and criminal investigatory and enforcement action even in cases where such medications have received approval from the FDA or similar regulatory authorities"; that "numerous governmental and private persons and entities are pursuing civil litigation against opioid manufacturers and distributors, invoking current laws and regulations relating to opioids and/or other prescription medicines, as well as novel uses of other laws that seek to hold accountable opioid manufacturers for opioid misuse"; that "[r]egulatory actions at the federal, state and local level may seek to limit or restrict the manufacturing, distribution or sale of opioids, both directly and indirectly, and/or to impose novel policy or regulatory mechanisms regarding the manufacturing, distribution or sales of opioids"; that "various government entities, including Congress, state legislatures or other policy-making bodies may hold hearings, conduct investigations and/or issue reports calling attention to the opioid crisis, and may mention or criticize the role of manufacturers, including [Endo], in the opioid crisis"; and that "press organizations have and likely will continue to report on these issues, and such reporting may result in adverse publicity for manufacturers, including [Endo]." The foregoing risk warnings were also generic "catch-all" provisions that were not tailored to Endo's actual known risks with respect to the significant potential for further opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud.

60. The 2018 10-K also continued to downplay Defendants' wrongdoing and responsibility for risks concerning opioid-related investigations and proceedings with substantively the same statements as referenced in ¶¶ 45-46 above by attributing such risks, at least in part, to potential plaintiffs, their lawyers, other pharmaceutical companies, and the media.

61.     Finally, the 2018 10-K contained substantively the same SOX certifications as referenced in ¶ 30 above, with such certifications signed by Defendants Campanelli and Coleman.

62.     The statements referenced in ¶¶ 53-61 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational, and compliance policies.     Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (i) the full scope of Endo's and/or its subsidiaries' contributions to the opioid crisis, including, but not limited to, their opioid products' disproportionately negative impact on New York, one of the most populous states in the U.S., as well as the fraud that Defendants perpetrated on the New York insurance market; (ii) part of that contribution to the crisis included Endo publishing and disseminating false information to health care providers regarding the risks and benefits of opioids; (iii) that the foregoing, once revealed, was foreseeably likely to subject Endo and/or its subsidiaries to increased regulatory scrutiny and enforcement, as well as significant financial and/or reputational harm, particularly with respect to New York; and (iv) that, as a result, the Company's public statements were materially false and misleading at all relevant times.

63.     On September 5, 2019, during intraday trading hours, Endo issued a press release announcing that its subsidiaries EPI, EHS, PPI, and PPCI had executed a settlement agreement with two counties in Ohio and related persons in connection with what the Company termed "Track 1 Cases," which included claims "arising from or otherwise relating to the manufacturing, marketing, distribution, supply, sale, prescribing, use and/or abuse of branded and generic opioid medications."   According to that press release:

> Under the Settlement Agreement, Endo will pay a total sum of $10 million and will provide up to $1 million of its Vasostrict® and Adrenalin® products free of charge, to be initially allocated by and between the two plaintiff counties as follows: Cuyahoga County will receive $6.2 million in cash and up to $620,000 of

24

Vasostrict® and/or Adrenalin®; and Summit County will receive $3.8 million in cash and up to $380,000 of Vasostrict® and/or Adrenalin®. The two plaintiff counties may further apportion and use the foregoing amounts in their sole discretion.  Further, in the event of a comprehensive resolution of government-related opioid claims, the Company has agreed that the two plaintiff counties will receive the value they would have received under such resolution less the total value of the Settlement Agreement. The Settlement Agreement includes no admission of wrongdoing, fault or liability of any kind by the Endo Entities and avoids litigation risk and associated costs.  It is important to note that the value of the Settlement Agreement should not be extrapolated to any other opioid-related cases or claims.

64.     On this news, Endo's Ordinary share price fell $0.08 per share, or 3.28%, to close at $2.36 per share on September 5, 2019.

65.     A few days later, on September 10, 2019, Governor Cuomo issued a press release announcing that DFS was "taking action against the opioid manufacturers, distributors and pharmacy benefit managers to secure $2 billion for New York consumers who have shouldered the cost of the ongoing opioid epidemic in the form of higher insurance premiums" (the "September 2019 Press Release").  That press release disclosed, in relevant part, that "[t]he [DFS] has determined that New York consumers have overpaid an estimated $2 billion in insurance premiums over the past 10 years"; that "[t]his overpayment is due to the costs associated with opioid manufacturers misrepresenting the safety and efficacy of opioids - which in turn has resulted in the over-prescription of opioids, additional addiction treatment and treatment of other adverse health effects associated with opioid addiction"; that "DFS will seek fines and restitution from the opioid industry, and is directing insurers to fully cooperate with these actions"; that "DFS will be holding hearings across the state to expose the problem to consumers and generate transparency with respect to the impact on the health insurance system"; that "DFS has issued subpoenas and other document requests to opioid manufacturers and distributors, New York State-licensed insurers and pharmacy benefit managers -- or PBMs - to seek restitution against the industry as thousands of small businesses and millions of New Yorkers shelled out over a billion

25

dollars in rising premiums and their costs borne from the opioid crisis"; and that, as "the regulator of health insurance in New York," DFS has "clear statutory authority to impose fines of up to $5,000 per offense in addition to the amount of the fraudulent claim."

66.     The September 2019 Press Release also listed the opioid manufacturers and distributors implicated by the announcement, including EHS, EPI, PPCI, and PPI.  However, given that at least thirty other opioid manufacturers and distributors were listed alongside Endo's subsidiaries in the press release, that no specific acts of wrongdoing were assigned to any one of those entities in particular, and that Endo itself (*i.e.*, Endo International plc) was not mentioned within the September 2019 Press Release, the extent of Endo's role in the opioid epidemic and the magnitude of the risks that the Company accordingly faced remained unknown to investors. Accordingly, the Company's share price did not decline following the press release's publication, and continued to trade at artificially inflated prices throughout the remainder of the Class Period, while being further buoyed by Defendants' continued misstatements and omissions.

67.     For example, on February 26, 2020, Endo filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2019 (the "2019 10-K").  The 2019 10-K touted the performance of Endo's Generic Pharmaceuticals segment, stating, in relevant part, that this "segment includes a product portfolio of approximately 150 generic prescription product families including solid oral extended-release, solid oral immediate-release, liquids, semi-solids, patches . . ., powders, ophthalmics . . . and sprays and includes products in the [*inter alia*] pain management . . . markets, among others"; and that Endo's "[g]eneric products are the pharmaceutical and therapeutic equivalents of branded products"; that these generic products are "substantially the same as branded products in dosage form, safety, efficacy, route of administration, quality, performance characteristics and intended

use"; and that these products "are generally sold at prices below those of the corresponding branded products and thus represent cost-effective alternatives for consumers."

68.    The 2019 10-K also touted the performance of Endo's Branded Pharmaceuticals segment, stating, in relevant part, that "current treatment offerings [of Endo's Established Products Portfolio] primarily relate to two distinct areas," one of which is  "pain management, including products in the opioid analgesics and osteoarthritis pain segments and for the treatment of pain associated with post-herpetic neuralgia."  The 2019 10-K also downplayed the risks associated with Endo's marketing of these products in  the U.S. by touting that "[t]he Company's pain products, including opioid products, are managed as mature brands and are not and have not been actively promoted for years," and that, "[i]n December 2016, the Company announced the elimination of its entire U.S. pain product field sales force."

69.    In a section entitled "Opioid-Related Matters," the 2019 10-K again recited the various legal proceedings and investigations to which Endo and its subsidiaries were subject in connection with their marketing and sales practices with respect to opioid products.    The 2019 10-K represented that Endo and its subsidiaries "will continue to vigorously defend the foregoing matters and to explore other options as appropriate in [their] best interests" and "are cooperating with the investigations," again downplaying the scope of the Company's wrongdoing and potential liability with respect to those proceedings and investigations.

70.    With specific respect to opioid-related legal proceedings and investigations initiated in New York, the 2019 10-K stated that, "[i]n September 2019, EPI, EHS[], PPI and PPCI received subpoenas from the [DFS] seeking documents and information regarding the marketing, sale and distribution of opioid medications in New York," and that Defendants "are providing information responsive to these subpoenas"—although without disclosing further details

27

concerning the scope of the Company's wrongdoing or potential liability with respect to DFS's investigation.

71.     The 2019 10-K also contained substantively the same boilerplate risk warnings as referenced in ¶¶ 29, 43-44, and 58-59 above, in addition to warning that "[n]umerous governmental and private persons and entities are pursuing litigation against opioid manufacturers, including [Endo] . . . seeking to hold the defendants accountable for, among other things, societal costs associated with the misuse and abuse of prescription opioid medications as well as non-prescription opioids"; that "[t]here is a risk [Defendants] will be subject to similar investigations, enforcement actions or litigations in the future, that [they] will suffer adverse decisions or verdicts of substantial amounts or that we will enter into monetary settlements"; that "[a]ny unfavorable outcomes as a result of such proceedings could have a material adverse effect on [Endo's] business, financial condition, results of operations and cash flows"; and that "[v]arious government entities, including the U.S. Congress, state legislatures or other policy-making bodies in the U.S. or elsewhere may . . . criticize the role of manufacturers, including [Endo], in supplying or marketing opioid medications or failing to take adequate steps to detect or report suspicious orders or to prevent abuse and diversion"; all of which were plainly generic "catch-all" risk warnings that were not tailored to Endo's actual known risks with respect to the significant potential for further opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud.

72.     The 2019 10-K also continued to downplay Defendants' wrongdoing and responsibility for risks concerning opioid-related investigations and proceedings with substantively the same statements as referenced in ¶¶ 45-46 above by attributing such risks, at least in part, to potential plaintiffs, their lawyers, other pharmaceutical companies, and the media.

28

73.     Finally, the 2019 10-K contained substantively the same SOX certifications as referenced in ¶ 30 above, with such certifications signed by Defendants Campanelli and Coleman.

74.     On May 5, 2020, Endo filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2020 (the "1Q20 10-Q").  In a section entitled "Opioid-Related Matters," the 1Q20 10-Q again recited the various legal proceedings and investigations to which Endo and its subsidiaries were subject in connection with their marketing and sales practices with respect to opioid products.   The 1Q20 10-Q represented that Endo and its subsidiaries "will continue to vigorously defend the foregoing matters and to explore other options as appropriate in our best interests" and "are cooperating with the investigations," again downplaying the scope of the Company's wrongdoing and potential liability with respect to those proceedings and investigations.

75.     With specific respect to opioid-related legal proceedings and investigations initiated in New York, the 1Q20 10-Q noted that, "[i]n September 2019, EPI, EHSI, PPI and PPCI received subpoenas from the [DFS] seeking documents and information regarding the marketing, sale and distribution of opioid medications in New York," and that Defendants "are providing information responsive to these subpoenas"—although without disclosing further details concerning the scope of the Company's wrongdoing or potential liability with respect to DFS's investigation.

76.     The 1Q20 10-Q also contained substantively the same boilerplate risk warnings as referenced in ¶¶ 44 and 58 above, which were plainly generic "catch-all" provisions that were not tailored to Endo's actual known risks with respect to the significant potential for further opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud.

77.     Additionally, the 1Q20 10-Q continued to downplay Defendants' wrongdoing and responsibility for risks concerning opioid-related investigations and proceedings with substantively the same statements as referenced in ¶ 45 above by attributing such risks, at least in part, to potential plaintiffs, their lawyers, and other pharmaceutical companies.

78.     Finally, the 1Q20 10-Q contained substantively the same SOX certifications as referenced in ¶ 30 above, with such certifications signed by Defendants Coleman and Bradley.

79.     The statements referenced in ¶¶ 67-78 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational, and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (i) the full scope of Endo's and/or its subsidiaries' contributions to the opioid crisis, including, but not limited to, their opioid products' disproportionately negative impact on New York, one of the most populous states in the U.S., as well as the fraud that Defendants perpetrated on the New York insurance market; (ii) part of that contribution to the crisis included Endo publishing and disseminating false information to health care providers regarding the risks and benefits of opioids; (iii) that the foregoing, once revealed, was foreseeably likely to subject Endo and/or its subsidiaries to increased regulatory scrutiny and enforcement, as well as significant financial and/or reputational harm, particularly with respect to New York; and (iv) that, as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Fully Emerges**

80.     On June 10, 2020, Governor Cuomo announced that DFS had filed administrative charges against Endo in connection with its role in the opioid crisis, alleging that Endo fraudulently misrepresented the safety and efficacy of its opioid drugs while minimizing the risk of addiction

and other ill effects.  That same day, DFS issued its own press release specifically announcing that it "has filed charges and initiated administrative proceedings against Endo . . . and its subsidiaries, [EHS], [EPI], and [PPCI]" in connection with "DFS' ongoing investigation into the entities that created and perpetuated the opioid crisis"; that "[t]he DFS' statement of charges alleges that, like other opioid Manufactures, Endo . . . [k]nowingly furthered a false narrative to legitimize opioids as appropriate for broad treatment of pain by downplaying their long-known addictive nature and risks"; and that Endo and its subsidiaries "[m]isrepresented the safety and efficacy of opioids, without legitimate scientific substantiation," and "[d]eployed a large sales force to target healthcare providers directly with these misrepresentations."

81.    The DFS press release included a link to the agency's Statement of Charges and Notice of Hearing issued against Endo, dated June 8, 2020 (the "Statement of Charges"). The Statement of Charges noted that, according to data from the Automation of Reports and Consolidated Orders Systems, a database maintained by the U.S. Drug Enforcement Administration that tracks the movement of controlled substances around the nation, Endo and its subsidiaries manufactured approximately 18.4% of the opioids that flooded New York from 2006 to 2014.  These opioids accounted for approximately 7.9% of the total morphine milligram equivalents introduced to New York via opioid products during this period, and included extended release Opana ER, as well as generic oxycodone, oxymorphone, hydromorphone, and hydrocodone products offered by Endo and/or its subsidiaries, which constituted roughly $403 million of Endo's overall revenues in 2012, $657 million in 2014, and $486 million of Endo's $4 billion in sales in 2016.

82.    The Statement of Charges disclosed that Endo and its subsidiaries "spent vast sums of money on a variety of false and misleading marketing and promotional activities"; that these

"activities included developing and disseminating seemingly truthful scientific and educational and marketing materials that misrepresented the safety and efficacy of long-term use of opioids," "paying sales representatives to deliver misleading messages about opioids to healthcare professionals," "recruiting and funding healthcare providers to draft misleading studies and present deceptive and misleading continuing medical education programs," and "helping develop and fund seemingly independent, objective advocacy groups," which the Statement of Charges refers to as "front groups," that "themselves developed false and misleading educational materials and treatment guidelines that promoted long-term opioid use."

83. The Statement of Charges went on to detail how Endo's "efforts were designed to convince healthcare professionals and patients, falsely, that the benefits of using opioids to treat chronic pain outweighed the risks and that opioids could be safely used by most patients"; that "[s]uch efforts featured numerous material misrepresentations about opioids"; that "these efforts repeatedly overstated the benefits of long-term opioid treatment and failed to disclose the lack of evidence supporting such use," "downplayed the risks of negative outcomes for patients, including the risk of addiction and abuse and the difficulty of withdrawal," "falsely masked the signs of addiction by calling them 'pseudoaddiction,'" and "overstated opioids' success versus other, less dangerous pain relief alternatives"; that, as a result of Endo's and its subsidiaries' efforts, "the prescription of opioid medications dramatically increased over time" and "[o]pioid prescriptions doubled between 1980 and 2000 and just kept rising thereafter"; that "[b]ut for the misleading information disseminated by . . . Endo [and its subsidiaries], doctors would not have, in most instances, prescribed opioids as medically necessary or reasonably required to treat chronic pain"; that "[i]t is well known that a strong correlation exists between opioid use and abuse, and the sharp increase in opioid use caused by the opioid manufacturers' actions, including those of . . . Endo

[and its subsidiaries], predictably led directly to a dramatic increase in opioid abuse, addiction, overdoses, and death"; and that, "[i]n sum, the causal chain is straightforward" and "[t]he intentional falsehoods of . . . Endo [and its subsidiaries], about the safety and efficacy of opioids were successful in creating over-prescription of opioids on a massive scale," which "resulted in an epidemic of abuse and addiction of opioids that itself has caused devastation in human and financial terms."

84.      The Statement of Charges also addressed specific instances where Endo and its subsidiaries had misrepresented information concerning their opioids to prescribers and patients. For example, the Statement of Charges detailed how, "[b]etween 2009 and 2013, Endo paid its pain-specific sales force to deliver misleading messages about opioids to healthcare professionals" and "targeted 27,000 healthcare providers in the United States; sending its sales representatives to New York providers on over 164,000 occasions"; that, "[t]o overcome physicians' long-held resistance to prescribing opioids, [Endo] trained these sales representatives to make statements and sales pitches that diminished and distorted the risk of addiction and other side effects associated with opioids generally and Opana ER in particular"; and that "[n]otes by sales representatives detailing their interactions with physicians show how Endo trained them to minimize the perception that opioids were harmful and to make statements downplaying the addictive nature of opioids and the connection between addiction and physical dependence and tolerance to therapy."

85.      The Statement of Charges also discussed how, "[f]rom 2004-2014, [Endo] produced a wide variety of seemingly truthful, unbiased, and educational and marketing materials related to the safety and efficacy of opioids when used to treat chronic pain," which "were deceptively misleading and false and/or without basis," as exemplified by Endo's website for Opana, www.Opana.com, which contained a page called "About Opioids" that told consumers that

33

"[m]ost doctors who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," even though "[t]he website provide[d] no scientific support for this unsubstantiated claim."  According to the Statement of Charges, "[t]he same misleading message was contained in a guide [Endo] developed for caregivers" called "*Living with Someone with Chronic Pain*," which stated that "[m]ost healthcare providers who treat people with pain agree that most people do not develop an addiction problem" when taking opioids, and which "was available, including to New York consumers, on the Opana.com website as well as in brochure format."

86.    Additionally, the Statement of Charges detailed how Endo also employed a tactic where it would "fund seemingly independent advocacy groups, or front groups, that would develop and disseminate unsubstantiated and misleading educational materials and treatment guidelines that promoted long-term opioid use."  According to the Statement of Charges, Endo "funded, and exercised editorial control over, deceptive and misleading messages that front group American Pain Foundation" ("APF") "conveyed through its National Initiative on Pain Control" ("NIPC") "and its website www.PainKnowledge.com"; that Endo "provided substantial financial support to NIPC and selected APF to manage NIPC, even as [Endo] obscured its own involvement"; and that "upon [DFSs'] information and belief, [Endo] was one of the biggest financial supporters of APF, giving APF nearly $6 million between 1999 and 2012."

87.    The Statement of Charges also provided specific examples of misstatements that Endo had disseminated to prescribers through APF, including claims such as "[p]eople who take opioids as prescribed usually do not become addicted," which misled physicians into believing that the risks attendant to opioid treatment were minimal; a brochure available on PainKnowledge.com entitled "*Pain: Opioid Facts*," which stated that "people who have no history

of drug abuse, including tobacco, and use their opioid medication as directed will probably not become addicted," which was "yet another example of the manner in which [Endo] misled physicians by fostering the idea that the risk of opioid addiction is minimal"; sweeping claims that with opioids "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse," which was provided on APF's website; the APF website's touting that improved quality of life was a benefit of opioid therapy without scientific data to back the claim; and a series of continuing medical education courses entitled "Persistent Pain in the Older Patient," which misleadingly and without scientific support claimed that chronic opioid therapy has been shown to "improve depressive symptoms and cognitive functioning," and which was available via webcast to New York physicians.

88.     The Statement of Charges also provided specific examples of misstatements that Endo provided directly to prescribers, which "repeated[ly] minimize[ed] . . . the risk of addiction" and "was intentionally misleading to make providers more comfortable with prescribing opioids and patients more comfortable with taking them."  For example, the Statement of Charges noted that, "[o]n [Endo's] website," and in "Dear Healthcare Professional" marketing pamphlets distributed to prescribers, "Endo relied extensively on the Hale 12-week Low Back Pain Study but intentionally omitted adverse events described in that study," which "showed that 5.7% of patients who took the drug in the 'treatment' phase of the study experienced pain exacerbation, and 6.9% of patients who were given the drug experienced opioid withdrawal symptoms after discontinuing."  According to the Statement of Charges, Endo "entirely omitted these adverse events from 'Dear Healthcare Professional' pamphlets it distributed to prescribers in New York."

89.     These were far from the only materials that DFS pointed to as providing false and/or misleading information to prescribers. For example, the Statement of Charges also disclosed how Endo "instructed its sales representatives to deliver to doctors misleading messages about the pseudoscientific concept of 'pseudoaddiction,'"; that a 2006 sales force training manual defined "pseudoaddiction" as "a term used to describe iatrogenic phenomenon in which a patient with undertreated pain is perceived by healthcare professionals to exhibit behaviors similar to those seen in addiction but is not truly addicted"; that sales training documents advised sales representatives that the "physician can differentiate addiction from pseudoaddiction by speaking to the patient about his/her pain and increasing the patient's opioid dose to increase pain relief"; and that "[p]seudoaddiction behaviors such as clock watching (counting down the time until the next dose) will resolve when the pain is properly treated."

90.     The Statement of Charges also disclosed that Endo "spent hundreds of thousands of dollars buying copies of a book written by a physician," called "Responsible Opioid Prescribing" (2007), which was distributed by Endo's sales force; that Endo "and others recruited and funded the physician to draft this book which asserted that behaviors such as 'requesting drugs by name,' 'demanding or manipulative behavior,' seeing more than one doctor to obtain opioids, and hoarding, are all signs of 'pseudoaddiction'"; that "[t]he book went on to claim that though sometimes people behave as though they are addicted, what they are really in need of is more medication, and the indicated treatment is a higher dose of medicine"; that Endo distributed another book entitled "*Avoiding Opioid Abuse While Managing Pain*," which told healthcare providers that, in the face of drug-seeking behavior, increasing the patient's opioid dosage "in most cases . . . should be the clinician's first response"; that "*A Clinical Guide to Opioid Analgesia*" authored by physicians who were Endo "Key Opinion Leaders" ("KOLs") stated that

"[p]seudoaddiction refers to the development of abuse like behaviors that are driven by desperation surrounding unrelieved pain and are eliminated by measures that relieve the pain, such as increase in medication dose"; that "[a] 2013 sales force training guide reiterated this approach by dismissing legitimate addiction concerns as pseudoaddiction" and taught Endo's sales representatives that "[p]seudoaddiction is a pattern of drug-seeking behavior among pain patients with unrelieved pain," that "[d]ifferentiating between addiction and pseudoaddiction can be challenging and may often take multiple patients encounters," and that "[o]ne key difference from addiction is that in pseudoaddiction, the patient's drug seeking behavior stops once his or her pain has been effectively treated"; that Endo "also promoted the idea, including through its speakers program, that there is no maximum or ceiling dose for its opioid products, other than that imposed by the patient's ability to tolerate side effects, again without disclosing the increased risks of taking higher doses of opioids"; and that Endo's "marketing for Opana ER emphasized the availability of seven different dosage strengths and advised doctors to increase the dosage until adequate pain relief was achieved without disclosing the increased risks of taking higher doses of opioids."

91.     Additionally, the Statement of Charges included statements from former Endo KOLs, who "recanted their pro-opioid marketing messages and acknowledged that the pro-opioid marketing went too far."  For example, one prominent KOL admitted that he "gave innumerable lectures in the late 1980s and '90s about addiction that weren't true," and which falsely claimed that fewer than 1% of patients would become addicted to opioids;  that because the primary goal was to "destigmatize" opioids, he and other doctors promoting them overstated their benefits and glossed over their risks; and that "[d]ata about the effectiveness of opioids does not exist."  This KOL also stated: "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation? Well, . . . I guess I did."

92.     In addition to detailing allegedly false and/or misleading statements with respect to Opana ER, which was already the subject of a prior securities fraud class action lawsuit styled *Bier v. Endo International, plc et al*, 2:17-cv-03711 (E.D. Pa.), which has since settled, the Statement of Charges also detailed false and misleading representations that Endo made directly to insurers. For example, the Statement of Charges stated that, "[d]uring its 2012 campaign to promote Reformulated Opana, [Endo] engaged in direct and concerted efforts to woo insurance companies to favor Reformulated Opana over other opioids," and "directly mislead[] insurers about Opana's crush-resistance properties," while "falsely presenting Reformulated Opana ER as a panacea to the opioid crisis"; that, "[i]n setting up presentation appointments, [Endo] admitted that there was an opioid epidemic in America yet misleadingly tried to leverage the opioid crisis into a selling point for Reformulated Opana"; that Endo "tout[ed] the benefits of abuse-deterrent and abuse-resistant opioid formulation directly to insurers"; and that Endo's "insurer-directed marketing falsely and misleadingly touted the benefits of crush-resistant opioids that were not in fact crush-resistant."

93.     In connecting Endo's and its subsidiaries' actions to insurance fraud, the Statement of Charges stated that they had "caused tremendous financial harm to New York's commercial health insurance companies and the consumers who pay their premiums"; that "New York commercial health plans have paid millions of claims for opioid prescriptions that were not medically necessary, legitimate, and/or appropriate, and to cover treatment for opioid-related abuse such as overdose, addiction counseling, emergency room visits, and anti-overdose medication that resulted from the opioid epidemic"; and that, "[i]n the past 10 years, New York consumers of commercial health insurance have overpaid an estimated $1.8 billion in premiums as a result of the opioid epidemic."

94.     Specifically, with respect to Count I of the Statement of Charges, DFS alleged that Endo had committed a "fraudulent insurance act"; that, "[a]t least since the mid-2000s, [Endo and its subsidiaries] have knowingly and with intent to defraud caused to be presented to an insurer or any agent thereof written statements or other physical evidence as part of or in support of claims for payment, services or other benefit pursuant to a health insurance policy or private or public health plan," which "they knew to (a) contain materially false information concerning any material fact thereto; or (b) conceal, for the purpose of misleading, information concerning any factor material thereto"; that Endo "knowingly and with intent to defraud made numerous misrepresentations, directly or through third parties, concerning the safety and efficacy of opioids"; that "[t]hose misrepresentations caused healthcare providers to present false claims for payment to insurers regulated by DFS on multiple and continuous occasions over the past decades in the form of written prescriptions for opioid medications and related documentation"; that "[s]uch prescriptions carried with them express and/or implied representations that the opioid drugs being prescribed were medically necessary, legitimate and/or appropriate"; that Endo and its subsidiaries "were aware that such representations were, for the majority of the opioid prescriptions written during the relevant time period, false," and "[t]he falsity of these representations was material to the successful claims for payment"; and that, "[i]n the alternative, to the extent that third parties engaged in conduct that violated" New York laws, "including without limitation prescribing doctors who wrote fraudulent prescriptions and patients who sought and obtained such fraudulent prescriptions," Endo and its subsidiaries "are liable for such conduct because they, knowingly and with an intent to defraud, solicited, requested, commanded, importuned and/or intentionally aided such third parties in such conduct."

95.     The Statement of Charges concluded Count I by stating that Endo and its subsidiaries "have committed a fraudulent insurance act as that term is defined in New York Insurance Law §403"; that DFS "is entitled to levy a civil penalty not to exceed five thousand dollars ($5,000) plus the amount of each claim paid, for each violation"; and that, "[i]n this case, each fraudulent prescription constitutes an independent violation."  The Statement of Charges issued by DFS thereby revealed to investors for the first time the full scope and magnitude of a previously unknown, substantial legal liability that Endo itself specifically faced, which was unknown before the full Statement of Charges was made publicly available.

96.     Similarly, with respect to Count II of the Statement of Charges, DFS alleged that "through their marketing, promotion, manufacture and supply of opioids drugs to patients for whom such drugs were not medically necessary, legitimate, and appropriate," Endo and its Subsidiaries "committed acts of intentional fraud or intentional misrepresentation of material facts with respect to claims for insurance products or services or involving any person offering to provide or providing financial products or services"; that they, "with the intent to defraud, made knowingly false representations about the safety and efficacy of opioid drugs"; that "[t]hese misrepresentations were made with the intent of increasing the demand for opioids into areas of treatment that were not medically necessary, legitimate, and appropriate"; that Endo and its subsidiaries "were aware that the increase in demand would cause fraudulent claims to be made to insurance companies"; and concluded that, as a result, Endo and its subsidiaries "committed intentional fraud and/or made intentional misrepresentations of material facts with respect to a financial product or service and are thus liable to pay a civil penalty of up to five thousand dollars ($5,000) per offense," with "each fraudulent prescription constitut[ing] an independent offense"; thereby also revealing to investors for the first time the full scope and magnitude of a previously

unknown, substantial legal liability that Endo itself specifically faced, which was similarly unknown before the full Statement of Charges was made publicly available.

97.    On this news, Endo's Ordinary share price fell $0.66 per share, or 14.63%, to close at $3.85 per share on June 10, 2020.

98.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

99.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Endo securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

100.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Endo securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Endo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

101.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

102.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

103.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Endo;

- whether the Individual Defendants caused Endo to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Endo securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

104.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

105.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Endo securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Endo securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

106.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

107.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

108.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

109.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

110.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Endo securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Endo securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

111.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Endo securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Endo's finances and business prospects.

112.     By virtue of their positions at Endo, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended

thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

113. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Endo, the Individual Defendants had knowledge of the details of Endo's internal affairs.

114. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Endo. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Endo's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Endo securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Endo's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Endo securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

115.    During the Class Period, Endo securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Endo securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Endo securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Endo securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

116.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

117.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

118.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

119.    During the Class Period, the Individual Defendants participated in the operation and management of Endo, and conducted and participated, directly and indirectly, in the conduct of Endo's business affairs.  Because of their senior positions, they knew the adverse non-public information about Endo's misstatement of income and expenses and false financial statements.

120.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Endo's financial condition and results of operations, and to correct promptly any public statements issued by Endo which had become materially false or misleading.

121.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Endo disseminated in the marketplace during the Class Period concerning Endo's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Endo to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Endo within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Endo securities.

122.    Each of the Individual Defendants, therefore, acted as a controlling person of Endo. By reason of their senior management positions and/or being directors of Endo, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Endo to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Endo and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

123.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Endo.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  June 19, 2020                          Respectfully submitted,

                                               POMERANTZ LLP


                                               */s/ Gustavo F. Bruckner*
                                               Gustavo F. Bruckner
                                               Jeremy A. Lieberman
                                               (*pro hac vice* application forthcoming)
                                               J. Alexander Hood II
                                               (*pro hac vice* application forthcoming)
                                               600 Third Avenue, 20th Floor
                                               New York, New York 10016
                                               Telephone: (212) 661-1100
                                               Facsimile: (917) 463-1044
                                               gfbruckner@pomlaw.com
                                               jalieberman@pomlaw.com
                                               ahood@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
(*pro hac vice* application forthcoming)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

BRONSTEIN, GEWIRTZ & GROSSMAN,
LLC
Peretz Bronstein
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com

*Attorneys for Plaintiff*