POMERANTZ LLP
Gustavo F. Bruckner
Jeremy A. Lieberman (admitted *pro hac vice*)
J. Alexander Hood II (admitted *pro hac vice*)
Brian Calandra
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
gfbruckner@pomlaw.com
jalieberman@pomlaw.com
ahood@pomlaw.com
bcalandra@pomlaw.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CURTIS LAASKO<br><br>     Lead Plaintiff<br><br>and<br><br>BENOIT ALBIGES, Individually and On<br>Behalf of All Others Similarly Situated,<br><br>     Named Plaintiff,<br><br>    v.<br><br>ENDO INTERNATIONAL PLC, PAUL V.<br>CAMPANELLI, BLAISE COLEMAN,<br>MARK T. BRADLEY, and MATTHEW J.<br>MALETTA,<br><br>     Defendants. | Civil Action No.: 20-07536 (MCA)(MAH)<br><br><u>Amended Class Action Complaint for<br>Violations of the Federal Securities Laws</u><br><br><u>JURY TRIAL DEMANDED</u> |

# TABLE OF CONTENTS

I.   NATURE OF THE ACTION ..................................................................................... 1

II.  JURISDICTION AND VENUE ............................................................................... 9

III. PARTIES ................................................................................................................ 10

IV.  SUBSTANTIVE ALLEGATIONS ........................................................................ 12

    A.        Background ................................................................................................ 12

    B.        The Opioid Epidemic ............................................................................... 14

    C.        Endo's Marketing Exaggerated the Benefits of Opioids and Downplay their Risks ............................................................................................. 16

            i.        Endo's Use of Sales Representatives ......................................... 17

            ii.       Endo's "Use of Front Groups" .................................................. 19

            iii.     Endo's Use of Key Opinion Leaders ......................................... 23

            iv.     Endo's Educational and Marketing Materials............................ 25

    D.        Endo Trained Its Sales Representatives to Focus On Healthcare Providers Most Likely to Write the Most Opioid Prescriptions............................... 26

    E.        Endo Lacked an Effective System for Identifying Fraudulent Prescriptions ....... 30

    F.        Endo Falsely Promoted Opana ER Knowing That It Had an Increased Risk of Abuse .............................................................................................. 37

            i.        Endo Falsely Promoted Opana ER to Private Insurance Companies ....... 43

    G.        Endo Ceases Marketing Endo Opioids and Withdraws Opana ER ..................... 46

    H.        Endo's Precarious Financial Condition Meant That The Company Did Not Have Liquidity Sufficient to Satisfy Judgments in Opioid-Related Actions........ 47

    I.         Minimize Endo's Misconduct and Downplay the Scope of the Company's Liability As a Result of its Role in the Opioid Crisis ........................................... 50

V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD............................................................................................... 56

A.      2017 Misstatements ..................................................................... 57

B.      2018 Misstatements ..................................................................... 67

C.      2019 Misstatements ..................................................................... 84

D.      2020 Misstatements ................................................................... 104

VI.   THE TRUTH SLOWLY EMERGES ................................................. 115

VII.  LOSS CAUSATION........................................................................... 126

VIII. ADDITIONAL SCIENTER ALEGATIONS ..................................... 127

IX.   PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)............. 133

X.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ....................................... 135

XI.   PLAINTIFFS' CLASS ACTION ALLEGATIONS........................................... 136

XII.  COUNT I ....................................................................................... 138

(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated
Thereunder Against All Defendants) .................................................. 138

XIII. COUNT II ...................................................................................... 141

(Violations of Section 20(a) of the Exchange Act
Against the Individual Defendants) .................................................... 141

XIV.  PRAYER FOR RELIEF ..................................................................... 142

XV.   DEMAND FOR TRIAL BY JURY .................................................. 143

Lead Plaintiffs Curtis Laasko and Named Plaintiffs Benoit Albiges ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, (i) a review of the Defendants' public documents, (ii) conference calls and announcements made by Defendants, Endo International plc's public filings with the United States ("U.S.") Securities and Exchange Commission ("SEC"), (iii) wire and press releases published by and regarding the Company, (iv) securities analyst reports and advisories regarding the Company, (v) interviews with confidential witnesses, (vi) publicly available trading information regarding Endo securities, (vii) articles on Endo in the general press, and (viii) and information readily obtainable on the Internet.

## I.     NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class (the "Class") of persons and entities that purchased or otherwise acquired Endo securities between August 8, 2017, and June 9, 2020, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

2.      Endo International plc ("Endo" or the "Company") is a pharmaceutical company that, for tax purposes, is incorporated in Ireland and whose U.S. headquarters is in Malvern, Pennsylvania. The Company operates through several subsidiaries, including Endo Health Solutions Inc. ("EHS"), Endo Pharmaceuticals, Inc. ("EPI"), Par Pharmaceutical Companies, Inc. ("PPCI") and Par Pharmaceutical, Inc. ("PPI," and together with PPCI, "Par"). Endo and its

subsidiaries manufacture, market, and/or sell generic and branded pharmaceuticals in the U.S. and internationally. These pharmaceuticals include both generic and branded opioids.

3. In the mid-to-late 1990s, opioid manufacturers, marketers, and distributors, including Endo, developed and began to market powerful synthetic opioids. Rather than characterize opioids for what they were—dangerous, highly addictive substances with limited medical use—these companies engaged in a campaign to convince patients, healthcare providers, insurance companies, and others that opioids were safe and effective treatments for chronic pain.

4. These companies were shockingly callous in their willingness to push opioids. For example, in September 2019, the Washington Post published the following January 2009 email exchange between a national account manager for opioid manufacturer Mallinckrodt Pharmaceuticals and a vice president for opioid distributor KeySource Medical, Inc. When the Mallinckrodt account manager emailed the vice president that 1,200 bottles of opioids had been shipped, the vice president responded "***It's like people are addicted to these things or something. Oh, wait, people are***," and the account manager replied: "***Just like Doritos keep eating, we'll make more***."

5. Endo and its peer opioid manufacturers and distributors' wildly successful campaign came at a horrific cost to public health. From 1999 to 2018 nearly ***450,000*** people in the U.S. died from overdoses involving an opioid, including prescription and illicit opioids. The cost to the U.S. economy of this opioid epidemic has been estimated to be in the hundreds of billions of dollars. These deaths are directly attributable to the opioid manufacturers and distributors' campaign to portray of opioids as safe and effective.

6. As a result of Endo's participation in this campaign, over ***2,500 lawsuits*** have been filed against the Company during the Class Period seeking to hold it accountable for its

contributions to the opioid epidemic. These lawsuits allege that the Company's use of deceptive, unsubstantiated and scientifically baseless claims to market its opioids violated laws against public nuisances, consumer protection, unfair trade practices, racketeering, and, most recently, insurance fraud ("opioid-related actions").

7.     As these cases were being filed, Defendants knew that Endo and/or its subsidiaries had (i) engaged in deceptive advertising in promoting Endo Opioids; (ii) trained the Company's sales representatives specifically to target healthcare professionals most likely to prescribe the most opioids regardless of whether those prescriptions were legitimate; (iii) failed to implement a meaningful or effective system to identify and report opioid orders that had the hallmarks the government associated with "drug diversion"[1]; (iv) promoted one of Endo's most profitable opioids, Opana ER, as safe and resistant to tampering when the Company knew it was ***impossible*** to prevent abusers from liquifying and injecting the drug; and (v) insufficient liquidity to resolve the billions in liability that the Company potentially faced. Nevertheless, Defendants misleadingly downplayed the allegations in opioid-related actions and told investors that the cases were merely the result of "negative publicity" and opportunistic attorneys who were bringing suits by manipulating the legal system.

8.     Defendants also knew that Endo was exposed to liability for insurance fraud in New York because the Company had allowed millions of fraudulent prescriptions to be written by healthcare providers for Endo's opioids that were reimbursed by unsuspecting insurers. In fact, Endo had directly promoted Opana ER to insurers as safer and less susceptible to abuse, and thus, by implication, worked to convince those insurers to reimburse Opana ER prescriptions more

---

[1] "Drug diversion" or "diversion" refers to attempts to obtain or use prescription medicines illegally.

readily because those prescriptions were likely legitimate and not likely to be for abusers. Although Defendants knew about Endo's misconduct, Defendants **never** apprised investors of the Company's exposure to claims for insurance fraud. When investors learned the truth about the scope Endo's role in the opioid crisis, the Company's precarious financial situation, and the full extent of the liability the Company faced, the Company's stock plummeted, causing significant damage to investors.

9.      Opioids manufactured and sold by Endo included generic oxycodone, oxymorphone, hydromorphone, and hydrocodone, as well as the "branded" opioids Opana; Opana ER; Belbuca; Percodan; Percocet; and Zydone. Endo reaped hundreds of millions of dollars in revenues selling these and other opioids. For example, opioid sales were responsible for roughly $403 million of Endo's overall revenues in 2012, $657 million in 2014, and $486 million in 2016. Opana ER alone garnered the Company revenue of $1.15 billion from 2010 to 2013 and accounted for 10% of Endo's total revenue in 2012.

10.     Throughout the 2000s and early-to-mid-2010s Endo knowingly furthered false narratives to legitimize dangerously powerful opioid products as an appropriate treatment for pain. In particular, Endo downplayed the risks of opioids and increased acceptance of opioids as medically legitimate, necessary, and appropriate by patients and medical professionals. For example, complaints in opioid-related actions filed in Kentucky, Michigan, Tennessee, Ohio, and elsewhere have revealed that Endo had trained its sales representatives to "distinguish addiction from 'pseudoaddiction,' a purported condition in which patients exhibit drug-seeking behavior that resembles but is not the same as addiction." These lawsuits also revealed that Endo misleadingly promoted opioids through "Key Opinions Leaders" ("KOLs") and "Front Groups" that

disseminated educational materials containing unsubstantiated and misleading claims promoting opioids.

11.     In addition, actions filed in Michigan, Ohio and Tennessee during the Class Period revealed that the Company had specifically instructed its sales representatives to market Endo Opioids to healthcare providers who wrote the most opioid prescriptions, without regard to whether those providers were writing prescriptions for opioid abusers or were not experienced in using opioids to treat chronic pain. This sales strategy resulted in massive amounts of prescriptions being written for opioid abusers and under other false pretenses. These complaints identify specific doctors who later pled guilty to writing fraudulent prescriptions. Endo's sales strategy not only dramatically worsened the opioid epidemic by increasing prescriptions written for Endo Opioids, but it also substantially increased the likelihood that private insurers would reimburse prescriptions written under false pretenses, which exposed Endo to insurance fraud claims.

12.     Similarly, during the Class Period it was revealed that Endo and/or its subsidiaries had failed to implement an effective system for identifying opioid orders indicative of diversion, *i.e.*, of being obtained under false pretenses, in violation of the U.S. Controlled Substances Act ("CSA"). *See* 21 C.F.R. §1301.74. In fact, as alleged below, Endo subsidiary Par did not have ***any*** system for identifying opioid orders bearing the hallmarks of diversion ***at the same time*** that Par was flooding the prescription opioid market with nearly ***12 billion*** opioid pills, or ***15.7%*** of the opioid pills sold in the United States.

13.     In late 2016, Endo began reducing its footprint in the opioid market. On December 13, 2016, Endo announced that it had given up the rights to its branded opioid Belbuca, had laid off the entire 375-person sales staff for Endo Opioids, and would no longer engage in "field sales promotion" those products. In other words, while Endo would continue to manufacture Endo

Opioids, including Opana ER, it would no longer promote those opioids to healthcare providers. Six months later, on June 8, 2017, in response to shocking reports of abuse, the FDA requested that Endo remove Opana ER from the market, and the Company complied in July 2017.

14.     As Endo was reducing its opioid footprint, states, counties, municipalities, individuals, and others filed ***thousands*** of lawsuits against the Company to hold it accountable for the devastation that the opioid epidemic had wrought. As a result of removing Opana ER and abandoning opioid marketing, however, Endo's revenues had declined sharply. For example, while the Company reported $4.01 billion in revenues in 2016, just before the start of the Class Period, it only reported $2.91 billion in revenues in 2019, a decline of 27.4%. To make matters worse, in the years prior to the Class Period, Endo had borrowed extensively to fund corporate acquisitions, and its debt almost doubled from $4.1 billion in 2014 to over $8 billion in 2015. The Company's debt remained above $8 billion throughout the Class Period. These pressures meant that, throughout the Class Period, unbeknownst to investors, Endo's financial position was precarious and the Company did not have the liquidity and/or capital to withstand the liability it was potentially facing in opioid-related actions.

15.     Rather than disclose the truth—that Endo had engaged in a litany of deceptive marketing practices and that the Company potentially faced billions in liability, including for insurance fraud, that could cause serious financial strain on Endo, which the Company did not have the capital to absorb—Defendants downplayed the allegations to investors.

16.     For example, at the start of the Class Period, on August 8, 2017, Endo disclosed in its quarterly report on Form 10-Q for the second quarter of 2017 ("2Q17 10-Q") that at least 13 different actions had been filed by state and local governments against Endo in connection with the Company's sales and marketing practices for opioids. The 2Q17 10-Q gave no hint of the

Company's misdeeds in marketing and selling Endo Opioids or the tsunami of liability facing the Company and downplayed the allegations in the actions by stating unequivocally that "*[w]e intend to contest the lawsuits identified above vigorously*."

17.     This pattern of downplaying opioid-related actions against Endo, refusing to acknowledge Endo's misconduct, and downplaying the extent of liability facing the Company for its sales and marketing of Endo Opioids continued throughout the Class Period. For example, on November 6, 2017, after the state of Kentucky announced that it had filed a lawsuit to "seek to hold Endo responsible for illegally building a market for the long-term use of opioids in the state as part of an effort to boost corporate profits," Defendant Maletta responded to *Reuters*, which was covering the lawsuit, that the accusations were "*patently offensive*." Similarly, in December 2018, by which point over *1,500* cases had been filed by states, counties, municipalities, hospitals and individuals, Defendant Maletta told *The Philadelphia Inquirer*, which was covering opioid litigation involving Endo, that "*[o]ur view is that we've done everything properly*," and "[w]e deny the allegations in the complaints and we're proud to talk about our business practices."

18.     Even when the Company did begin to advise investors, mid-way through the Class Period, that opioid-related actions could affect the Company's revenues, it attributed that litigation to negative publicity and overzealous media, not Endo's own misconduct. Endo's annual report on Form 10-K for the year 2017, which was filed on February 27, 2018, for example, included a "Risk Factor" advising investors that, "*unfavorable media coverage* of opioid pharmaceuticals could negatively affect our business, financial condition and results of operations. In recent years, opioid drug abuse has received *a high degree of media coverage* . . . . *such negative publicity* could have an adverse effect on the potential size of the market for our drug candidates." These and other statements by Defendants to investors misleadingly downplayed the extent of the

Company's misconduct in marketing and selling opioids and utterly failed to apprise investors that the Company had engaged in insurance fraud in New York.

19.     The truth about the Company's misconduct and the meritorious nature of the actions slowly leaked into the market throughout the Class Period, in connection with the over *2,500* cases detailing the Company's misconduct filed against Endo during that time. The truth fully emerged on June 10, 2020, when New York Governor Andrew Cuomo announced that the DFS had filed administrative charges against Endo in connection with the Company's role in the opioid crisis, alleging that Endo had fraudulently misrepresented the safety and efficacy of its opioid drugs, minimized the risk of addiction and other ill effects, and, among other things committed insurance fraud (the "NYDFS Charges"). In addition, the NYDFS charges revealed to investors, for the first time, that Endo had actually fraudulently marketed Reformulated Opana ER to insurance companies as safer and less susceptible to abuse in the hopes that insurance companies would be more likely to accept and reimburse prescriptions for Reformulated Opana ER, no questions asked. On this news, Endo's Ordinary share price fell $0.66 per share, or 14.63%, to close at $3.85 per share on June 10, 2020.

20.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that the Company had (i) engaged in deceptive advertising in promoting its opioids; (ii) trained its sales representatives specifically to target healthcare professionals most likely to prescribe the most opioids without regardless of whether those prescriptions were legitimate; (iii) failed to implement a meaningful or effective system to identify and report opioid orders that had the hallmarks the government associated with drug diversion; (iv) promoted one of its most profitable opioids,

Opana ER, as safe and resistant to tampering when the Company knew it was *impossible* to prevent abusers from liquifying and injecting the drugs; (v) insufficient liquidity to address liabilities arising from opioid-related actions; and (vi) that, as a result, the Company's public statements were materially false and misleading at all relevant times.

21.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II.     <u>JURISDICTION AND VENUE</u>

22.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

23.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

24.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Pursuant to Endo's most recent annual report on Form 10-K, as of February 18, 2020, there were 226,833,617 Ordinary shares of the Company's stock outstanding. The Company's Ordinary shares trade on the Nasdaq Global Select Market ("NASDAQ"). Accordingly, there are presumably hundreds, if not thousands, of investors in Endo's Ordinary shares located within the U.S., some of whom undoubtedly reside in New Jersey. Additionally, Endo maintains facilities within this Judicial District at 7 Clarke Drive, Cranbury, New Jersey, 08512.

25.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.   PARTIES

26.    Lead Plaintiff Curtis Laasko acquired Endo securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

27.    Named Plaintiff Benoit Albiges acquired Endo securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

28.    Defendant Endo develops, manufactures, markets, and distributes pharmaceutical products and generic drugs primarily in the U.S. and Canada. Endo was founded in 1997 when it acquired certain pharmaceutical products, related rights, and assets from The DuPont Merck Pharmaceutical Company. To avoid paying U.S. taxes, the Company reincorporated in Ireland in 2014, and is technically headquartered in Dublin, Ireland. Its U.S. headquarters are located at 1400 Atwater Drive, Malvern, Pennsylvania. Endo also maintains a facility in Cranbury, New Jersey. Endo's stock trades on the NASDAQ Global Select Market ("NASDAQ") in the U.S. under the ticker symbol "ENDP."

29.    In its most recent Form 10-K filed with the SEC, Endo stated that its sales and marketing activities are primarily based in the U.S., and that its U.S. business segments accounted for more than 96% of the company's $2.9 billion in total net revenue during the year ended December 31, 2019. Endo regularly conducts business in this district.

30.    Defendant Paul V. Campanelli ("Campanelli") joined Endo in 2015 as head of its U.S. Generics business when Endo acquired Par. Campanelli served as President of the Par Pharmaceuticals segment of Endo from September 25, 2015 until September 23, 2016, when he was named Endo's President, Chief Executive Officer ("CEO") and a member of Endo's Board of

Directors ("Board"). Defendant Campanelli served in that role until March 2020. He currently serves as Endo's Chairman of the Board. Prior to joining Endo, Defendant Campanelli joined Par in November 2001, was Par's Chief Operating Officer from January 2010 to September 2012, and was Par's CEO from September 2012 to September 2015.

31.     When Defendant Campanelli was named President and CEO of Endo, and to the Board, on September 23, 2016, he also entered into an employment agreement with Endo ("2016 Campanelli Agreement"). Under that agreement, Defendant Campanelli could be terminated if, among other things, he "makes, or is found to have made, a false certification relating to the Company's financial statements that [he] knows is false" or "engage[d] . . . in misconduct that has caused, or in the good faith judgment of the Board may cause if not discontinued, material harm (financial or otherwise) to the Company or any of its affiliates." On April 24, 2019, *i.e.*, before the 2016 Campanelli Agreement expired, Campanelli entered into a second employment agreement ("2019 Campanelli Agreement"), under which he would be Endo's President and CEO and a member of the Board until September 23, 2022. The terms of the 2019 Campanelli Agreement were substantively similar to the terms of the 2016 Campanelli Agreement. On November 4, only six months after the 2019 Campanelli Agreement, and, as described below, only eight weeks after the state of New York announced that it was investigating Endo for insurance fraud, Endo abruptly announced that Defendant Campanelli was resigning as the Company's President and CEO.

32.     Defendant Blaise Coleman ("Coleman") served as Endo's Executive Vice President ("EVP") and Chief Financial Officer ("CFO") from December 19, 2016 to March 6, 2020, when he replaced Defendant Campanelli as Endo's President and CEO and a member of Endo's Board. Coleman has been Endo's CEO and a Director of the Company from March 6, 2020 to present.

11

33.     Defendant Mark T. Bradley ("Bradley") has served as Endo's EVP and CFO since March 2020.

34.     Defendant Matthew J. Maletta ("Maletta") has served as Endo's EVP and Chief Legal Officer since May 2015.

35.     Defendants Campanelli, Coleman, Bradley and Maletta are sometimes referred to herein as the "Individual Defendants."

36.     The Individual Defendants possessed the power and authority to control the contents of Endo's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Endo's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Endo, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

37.     Endo and the Individual Defendants are collectively referred to herein as "Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.  Background

38.     Endo was founded as the Intravenous Products of America, Inc. in 1920 and changed its name to Endo Products in 1935. In 1970, E.I. du Pont de Nemours and Company ("DuPont") acquired Endo. In 1994, Endo was established as a separate entity within a joint venture between DuPont and Merck & Company ("Merck") and re-named Endo Laboratories

L.L.C. Endo Laboratories, L.L.C. was DuPont Merck's generic division. In 1997, a private equity investment firm purchased all of Endo Laboratories L.L.C.'s generic products, along with twelve branded products, including Percocet and Percodan, and renamed the company Endo Pharmaceuticals, Inc. In 2000, Endo Pharmaceuticals, Inc. acquired Algos Pharmaceutical Corporation and became a publicly traded company with the following business segments: U.S. Branded Pharmaceuticals; U.S. Generic Pharmaceutical; and International Pharmaceuticals. On February 28, 2014, the Company reincorporated in Ireland under the name Endo International plc, but retained its U.S. headquarters in Malvern, Pennsylvania. Endo employs more than 4,600 people worldwide.

39.     Endo, including its subsidiaries, are or have been in the business of manufacturing, selling, promoting, and/or distributing both brand name and generic opioids throughout the United States. Today, Endo continues to manufacture and sell generic and branded pharmaceuticals, including opioids, in the U.S. and internationally, although it ceased marketing opioids in December 2016. The Company sells its branded pharmaceuticals and generics to specialty physicians, retailers, clinics, government agencies, doctors, retail and specialty pharmacies, and specialty distributors.

40.     Endo operates through several subsidiaries that are or have been engaged in the opioid market, including EHS, a Delaware corporation with its principal place of business in Malvern, Pennsylvania, which is a wholly owned subsidiary of Endo; EPI, a Delaware corporation with its principal place of business in Malvern, Pennsylvania, which is a wholly owned subsidiary of EHS; PPCI, a Delaware corporation with its principal place of business located in Chestnut Ridge, New York; and  PPI, a Delaware corporation with its principal place of business located in

Chestnut Ridge, New York. PPI is a wholly owned subsidiary of PPCI. Endo acquired PPCI and PPI ("Par") in September 2015.

**B. The Opioid Epidemic**

41.     Opioids are a class of narcotic painkilling drugs that are either derived from opium or have effects similar to opium. "Opiates" are generally opium-derived drugs such as morphine, codeine, and heroin. Conversely, "opioids" are different from opiates and are newer, mostly synthetic drugs like oxycodone, hydrocodone, and fentanyl.

42.     In the mid-to-late 1990s, opioid manufacturers and distributors, including Endo, developed and began to market powerful synthetic opioids. To promote these products, Endo and other opioid manufacturers and distributors, including Purdue Pharma Inc. ("Purdue"), Johnson & Johnson ("J&J"), Mallinckrodt plc ("Mallinckrodt"), Teva Pharmaceutical Industries, Limited ("Teva") and Allergan plc ("Allegan"), and other manufacturers and distributors embarked upon a marketing and promotional campaign to intentionally create a misperception of the danger and addictive quality of opioids. These opioid manufacturers and distributors sought to convince physicians and other healthcare professionals that opioids were safe and effective treatments for chronic pain.

43.     This campaign by Endo and other companies in the opioid industry to push healthcare providers to prescribe opioids was a stunning success. According to one study, prescriptions for pain increased by **73%** between 2000 and 2010, even though over that period the number of visits to physicians for pain-related issues did not increase and prescriptions for non-opioid pain medications decreased. Although Opioid prescriptions peaked in approximately 2012, when more than 280 million prescriptions were issued (roughly a one-month supply for every American adult), opioid prescription levels have remained astonishingly high. In this Judicial District, which covers the State of New Jersey, for example, there were a total of approximately

34,620,760 opioid prescriptions dispensed between 2013 and 2019. In fact, there were 1,486,295 opioid prescriptions dispensed in the New Jersey between January 1, 2020, and May 31, 2020 *alone*.

44.     The success of Endo and its peer companies at convincing physicians to prescribe opioids came at a terrible cost to public health. Nearly ***450,000*** people in the United States died from overdoses involving any opioid, including prescription and illicit opioids, from 1999-2018. For example, in 2014, 47,000 Americans died drug overdose deaths attributable to prescription opioids or heroin (which is often used as a cheaper substitute for opioids by addicts who can no longer afford prescriptions). The following year, in 2015, more than 52,000 Americans died of drug overdoses. In 2016, the nearly 64,000 drug overdose deaths outnumbered every other cause of accidental fatalities. In 2018, there were 67,367 drug overdose deaths in the United States, 46,802 (or 69.5%) of which directly involved opioids.[2]

45.     While the cost to the U.S. economy of these overdoses is estimated to be in the hundreds of billions of dollars, overdoses have also resulted in an astonishing increase in healthcare expenditures. The opioid crisis has resulted in an estimated ***$11.3 billion*** annually in additional spending in the U.S. healthcare system—or approximately 1% of all expenditures. These costs are also borne by insurance companies, patients who have seen their premiums increase to cover these expenses, and government programs like Medicare and Medicaid. For example, in 2015, the Centers for Disease Control and Prevention ("CDC") estimated that healthcare costs directly related to opioid abuse totaled ***$28 billion in that year alone***. The average

---

[2] New Jersey saw a wave of overdoses during this time as well. Between 2013 and 2019 there were 15,324 suspected overdose deaths in the state. Indeed, the horrific death toll continues to this day: there were over 1,339 suspected overdose deaths in New Jersey from January 1, 2020, to May 31, 2020.

costs for private payors in 2015 for a patient with an opioid abuse or dependence diagnosis was almost *$16,000 higher* than the average per-patient cost based on all patients' claims.

### C. Endo's Marketing Exaggerated the Benefits of Opioids and Downplay their Risks

46.     Endo and its subsidiaries have been substantial manufacturers, marketers and sellers of opioids in the United States. Indeed, the Company's history with opioids, and opioid abuse, dates back to 1959, when the Company launched the painkiller Numorphan (oxymorphone). Within a decade, problems with abuse had been reported, and Endo stopped marketing a tablet version of Numorphan in 1971 and officially withdrew the drug from the market in 1982.

47.     Endo's opioids included generic oxycodone, oxymorphone, hydromorphone, and hydrocodone, as well as the "branded" opioids Opana (oxymorphone hydrochloride); Opana ER (extended release Opana); Belbuca (buprenorphine); Percodan (oxycodone and aspirin); Percocet (oxycodone and acetaminophen); and Zydone (hydrocodone and acetaminophen) ("Endo Opioids"). Endo Opioids are devastatingly strong. Opana ER, for example, has been estimated to be between three and ten times more potent than morphine.

48.     Endo reaped billions in revenues from these opioids. Sales of Endo Opioids comprised roughly $403 million of Endo's overall revenues in 2012, more than 10% of Endo's total revenue that year alone. Endo's opioid revenue was $657 million in 2014, and $486 million of Endo's $4 billion in sales in 2016. Endo's best-selling opioid was Opana ER, which produced *$1.15 billion* from 2010 to 2013, and $198 million in 2014. In late 2018, Defendant Maletta acknowledged to a reporter for The Philadelphia Inquirer that that Opana ER generated "well over $100 million a year for us [Endo]." The Philadelphia Inquirer reported that, from its launch in 2006 until 2017, when Defendants voluntarily withdrew the drug from the market at the request of the FDA after reports of abuse, Opana and Opana ER generated more than *$2 billion* in sales for Endo.

49.     Endo reaped these outsized profits, and ushered in the opioid epidemic, by conspiring with its peer opioid manufacturers to drive physicians to overprescribe opioids under false pretenses. To that end, Endo, among other things, disseminated patient education and advertising materials that falsely denied or downplayed the risks of opioids and overstated the benefits of their long-term use in treating chronic pain. Endo used its sales representatives, physicians perceived to be "key opinion leaders" ("KOLs") and ostensibly neutral professional societies and patient advocacy groups ("Front Groups") to disseminate these messages.

50.     Throughout the 2000s and early-to-mid-2010s Endo knowingly furthered false narratives to legitimize dangerously powerful opioid products as appropriate for a broad spectrum of pain. As a result, demand for opioids soared to unprecedented levels as did the crisis of addiction and abuse that resulted from overprescribing.

        i.     *Endo's Use of Sales Representatives*

51.     Endo's sales representatives spread misinformation to healthcare providers about the safety and efficacy of Endo Opioids through the use of "detailing." Detailing refers to one-on-one visits by pharmaceutical sales representatives with healthcare providers. During a detailing visit, the sales representative purportedly educates the healthcare provider about the pharmaceutical company's products in the hopes that the healthcare provider will prescribe the company's products more often. According to documents that were unsealed in 2019 in connection with cases brought against Endo and other opioid manufacturers that were consolidated into a multi-district litigation in Ohio,[3] Endo's marketing materials pointedly observed, in connection with its opioids and other pain medication, that "[s]ales force detailing is ***the most impactful tactic***, detailing accounts for ~35-65% of all sales & marketing impact."

_____

[3] *In Re: National Prescription Opiate Litigation*, No. 17-md-02804 (N.D. Ohio) ("Ohio MDL").

52.     It is thus unsurprising that Endo spent millions sending its sales representatives on detailing visits. For example, Endo spent over *$10 million* detailing branded Endo Opioids in 2014 alone. In addition, from 2009 to 2013, Endo sales representatives made over *164,000 visits* to healthcare providers in New York state to promote Opana and Opana ER. According to the NYDFS Charges, Endo not only allegedly paid bonuses to sales representatives based on prescriptions written by healthcare providers, it also "made extensive payments to [the healthcare providers] in the form of speakers' fees, lunches, and dinners."

53.     Numerous actions filed against Endo, including an action filed by the State of Kentucky in November 2017, described how Endo trained its sales reps to "distinguish addiction from 'pseudoaddiction.'" "Pseudoaddiction," Endo (and other pharmaceutical companies) claimed, was a condition in which "patients exhibit drug-seeking behavior that resembles but is not the same as addiction." Endo and its sales representatives suggested to healthcare providers that pseudoaddiction could be treated by simply writing more prescriptions for stronger opioids. According to these actions, "Endo's Vice President for Pharmacovigilance and Risk Management testified to . . . that he was not aware of any research validating the 'pseudoaddiction' concept."

54.     Endo's improper use of its sales force is also evident from the sales materials that the Company provided to its sales representatives. For example, an Endo 2013 training guide instructed sales representatives that "[p]seudoaddiction is a pattern of drug-seeking behavior among pain patients with unrelieved pain. Differentiating between addiction and pseudoaddiction can be challenging and may often take multiple patients encounters. One key difference from addiction is that in pseudoaddiction, the patient's drug seeking behavior stops once his or her pain has been effectively treated." Sales representatives then passed this message on to healthcare professionals during detailing visits.

ii.   *Endo's "Use of Front Groups"*

55.   Endo also extensively used opioid advocacy groups, or "Front Groups," to disseminate materials containing unsubstantiated and misleading claims about opioids. On December 9, 2019, *The Washington Post* published an expose entitled, "Inside the Industry's Marketing Machine" (the "Marketing Article"). The article was based on "recently unsealed corporate documents and plaintiffs attorneys suing two dozen drug companies in a landmark federal case in Cleveland," *i.e.*, the Ohio MDL.

56.   The Marketing Article identified Alliance for Patient Access as a potential Front Group. The Marketing Article stated that in June 2017, the alliance's list of "associate members and financial supporters includ[ed] Johnson & Johnson, Endo, Mallinckrodt, Purdue Pharma and Teva, all opioid manufacturers." The article pointed noted that in the alliance's "marketing plans [which] are now part of the court file, the companies referred to the doctors and other pain experts who promoted opioids for pain as 'Key Opinion Leaders.'" As alleged in Section IV.a.iii below, Endo's use of KOLs was instrumental in its efforts to use unsubstantiated and biased evidence to convince patients and healthcare providers that opioids were a safe and effective way to treat pain. The Marketing Article had been published before Endo's share price had closed the prior trading day at $4.84 per share. In response to The Washington Post article, opened trading down $0.08 per share—or 1.7%—and closed the day at $4.59 per share, down $0.25, or a total of 5.2%.

57.   In addition, other cases filed against Endo and opioid manufacturers and distributors arising out of their contributions to the opioid epidemic confirm Endo's use of Front Groups to promote opioids. These cases alleged, for example, that between 2007 to 2012, Endo provided nearly $6 million to the American Pain Foundation ("APF"), a Front Group that promoted opioid use through its National Initiative on Pain Control ("NIPC") and the NIPC's website www.PainKnowledge.com. Visitors to PainKnowledge.com were falsely informed, among other

things, that "[p]eople who take opioids as prescribed usually do not become addicted." Endo funded NIPC projects, developed content for the initiative, and distributed NIPC materials.

58.     Endo also sponsored an NIPC continuing medical education ("CME") program in 2009 entitled "Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia." According to an action filed by the State of Kentucky in November 2017, the CME promoted pseudoaddiction by teaching that aberrant or usual behavior by a patient using opioids was the result of untreated pain. Endo was also the sole sponsor, through NIPC, of a series of CMEs entitled "Persistent Pain in the Older Patient." The CME's webcast claimed—without any scientific support—that opioid "therapy" has been "shown to reduce pain and improve depressive symptoms and cognitive functioning."

59.     APF also issued education guides for patients, reporters, and policymakers that touted the benefits of opioids and minimized their risks. APF also launched a campaign using radio, television and internet to educate patients about their "right" to pain treatment, *i.e.*, opioids. Endo helped fund the distribution of *Exit Wounds*, a 2009 publication that purports to be the personal narrative of a military veteran. The veteran informs readers that opioids are "underused" and the "gold standard of pain medications," but neglects to mention addiction, overdose, or injury, or the side effects of opioids, including decreased testosterone, nausea, sleep apnea, immune system changes, and birth defects.

60.     APF also developed The Pain Care Forum ("PCF"), which purportedly offered "a setting where multiple organizations can share information" and "promote and support taking collaborative action regarding federal pain policy issues." PCF is mostly made up of representatives from Endo and other opioid manufacturers and distributors; Front Groups; pro-opioid professional organizations; and healthcare professionals that support prescribing opioids.

61.     Endo also provided extensive grants to the Federation of State Medical Boards ("FSMB"), a trade organization representing state medical boards across the U.S. In 1998, the FSMB developed what it purported were "Model Guidelines for the Use of Controlled Substances for the Treatment of Pain" ("FSMB Guidelines"). The FSMB Guidelines, which FSMB admitted were produced "in collaboration with pharmaceutical companies," stated that opioids were "essential" for treatment of chronic pain and did not disclose the risk of overdose. The guidelines also represented that "inadequate understandings" of addiction can lead to "inadequate pain control." From 2001 to 2012 the FSMB received at least $820,000 in payments from pharmaceutical manufacturers, including at least $370,000 in payments from Endo.

62.     The claims were repeated in the 2007 book *Responsible Opioid Prescribing*, which was adapted from the FSMB Guidelines. Endo gave at least $40,000 specifically to finance publication of *Responsible Opioid Prescribing*. The book stated that, among other things, patients who "request[ed] drugs by name," engaged in "demanding or manipulative behavior," saw more than one doctor to obtain opioids, and hoarded opioids were merely exhibiting pseudoaddiction, not addiction. The book also stated that the appropriate treatment was to prescribe *higher doses of opioids*. The book also made the false claim that relief of pain by opioids in and of itself improved patients' function. In all, 163,131 copies of were distributed to state medical boards (and through the boards, to practicing doctors). The 2012 edition of *Responsible Opioid Prescribing*, which remains available for sale online, continued to claim that pseudoaddiction is real.

63.     Endo also used a Front Group named The Academy of Integrative Pain Management ("AIPM") to spread misinformation about the safety and efficacy of opioids. Endo, together with other opioid manufacturers, funded a purported medical education guide, *Opioid Prescribing: Clinical Tools and Risk Management Strategies* ("*Opioid Prescribing*") which was

authored by three members of the board of directors of AIPM. The guide claimed that "fear of addiction and abuse prevents physicians from properly prescribing opioids, particularly for those with a substance abuse history who could benefit from opioids." It also instructed healthcare providers to give patients exhibiting pseudoaddiction higher or more frequent dosages of opioids because "[w]hen pain is treated appropriately, aggressive drug-seeking behavior ceases." In addition, *Opioid Prescribing* also reiterated that "behaviors that suggest abuse," may not be signs of addiction, but rather "pain that is untreated."

64.     Finally, the American Geriatrics Society ("AGS"), a nonprofit purporting to serve healthcare professionals for the elderly, disseminated guidelines regarding the use of opioids for chronic pain. These guidelines included the 2002 publication *The Management of Persistent Pain in Older Persons* and the 2009 publication *Pharmacological Management of Persistent Pain in Older Persons*. The latter publication recommended that "All patients with moderate to severe pain . . . should be considered for opioid therapy" and "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse." AGS had contracted with Endo and other opioid manufacturers to distribute *Pharmacological Management of Persistent Pain in Older Persons* and sponsor CMEs based on them. In 2009 AGS also issued new guidelines that recommended prescribing opioids for all patients with moderate-to-severe pain and that over-the-counter pain relievers like ibuprofen or naproxen only should be used rarely. The chairman of the task force that wrote the guidelines was Bruce Ferrell, MD, a UCLA geriatrics specialist. While Ferrell claimed that he had "no significant relationships with commercial interests," he had delivered messages supporting use of the painkillers in venues funded by the firms. In 2007, Ferrell wrote favorably about opioids as part of a continuing medical education course on treating pain in

the elderly that was funded by Endo Pharmaceuticals, an opioid maker. In 2010, a year after the guidelines came out, Ferrell was listed as a paid speaker for Endo Pharmaceuticals.

### iii. *Endo's Use of Key Opinion Leaders*

65. Endo also misleadingly promoted its opioids through KOLs. KOLs were physicians who supported aggressively using opioids to treat chronic pain that Endo recruited to tout using opioids to treat chronic pain at conferences, educational sessions for healthcare providers and other marketing events. KOLs touted opioids at the direction of Endo (and other opioid manufacturers) even though the KOLs knew that there was not sufficient evidence to support prescribing and using opioids so aggressively.

66. Endo knew that KOLs were very effective. Endo's Former Senior Director of Oral Pain Solutions Group, Demir Bingol, testified in a deposition in an opioid-related action in the Ohio MDL that KOLs "help legitimize" the message that opioids can be more widely prescribed. During his deposition he agreed that "Endo could drive business with speakers programs."

67. One prominent KOL used by Endo was Dr. Russell Portenoy, a former Chairman of the Department of Pain Medicine Palliative Care at Beth Israel Medical Center in New York. Among other things, Dr. Portenoy spread misrepresentations about opioids during frequent media appearances. For example, during an appearance on Good Morning America in 2010, he claimed: "Addiction, when treating pain, is distinctly uncommon. If a person does not have a history, a personal history, of substance abuse, and does not have a history in the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that that person is not going to become addicted." Dr. Portenoy later admitted during an interview that these and many other statements were false. Dr. Portenoy acknowledged that had admitted that he "gave innumerable lectures in the late 1980s and '90s about addiction that weren't true," and which falsely claimed that fewer than 1% of patients would become addicted to opioids. Specifically, Dr.

Portenoy said, "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation? . . . I guess I did." Dr. Portenoy has also since conceded that "[d]ata about the effectiveness of opioids does not exist."

68.     According to multiple lawsuits, including an action filed by the state of Kentucky in November 2017, Endo also distributed a pamphlet edited by a KOL entitled "Understanding Your Pain: Taking Oral Opioid Analgesics," which Endo initially published in 2004. The pamphlet contained a question and answer section, in which a "question" stated, "If I take the opioid now, will it work later when I really need it?" The corresponding "answer" advised, "The dose can be increased . . . You won't 'run out' of pain relief." In this way, Endo used KOLs to further the message that opioids should be used constantly and in ever-increasing doses.

69.     Endo also had KOLs draft a paper entitled "*A Clinical Guide to Opioid Analgesia*." The paper stated that "[p]seudoaddiction refers to the development of abuse like behaviors that are driven by desperation surrounding unrelieved pain and are eliminated by measures that relieve the pain, such as increase in medication dose." In other words, Endo's KOLs lent the imprimatur of their "expertise" to further the message that if a patient appeared to be addicted to a drug, including, the solution was to simply feed the patient's addiction, *i.e.*, prescribe the patient more opioids.

70.     Endo, and other opioid manufacturers and advocacy groups, even sought to overturn the criminal conviction of a doctor who had been found guilty of illegally prescribing opioids. In an amicus brief, Endo (and the other entities signing on to the brief), argued to the United States Fourth Circuit Court of Appeals that "patients rarely become addicted to prescribed opioids," citing research by Dr. Portenoy. The amicus brief also argued that "there is no 'ceiling dose," for opioids, *i.e.*, patients simply could not be prescribed too many opioids.

<em>iv.</em> <u><em>Endo's Educational and Marketing Materials</em></u>

71. Endo also created and distributed its own publications as part of its campaign to misrepresent the risks of opioids to patients, healthcare professionals, insurers and others. For example, The Marketing Article revealed that in 2012, Endo had stated on its website for Opana and Opana ER that "most healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted."

72. The article further disclosed that PainKnowledge.com, a website funded in part by Endo, informed visitors, "'Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them.'" The article also described how Endo had created a patient education pamphlet entitled "Understanding Your Pain: Taking Oral Opioid Analgesics," which told patients that "taking opioids as prescribed for pain relief is not addiction."

73. Actions brought against Endo for its misconduct in connection with marketing opioids also revealed that Endo had distributed a pamphlet with the Endo logo entitled "Living with Someone with Chronic Pain." The pamphlet inaccurately informed readers that "[m]ost health care providers who treat people with pain agree that most people do not develop an addiction problem." The actions further described how Endo paid for a 2007 supplement in the Journal of Family entitled "Pain Management Dilemmas in Primary Care: Use of Opioids," which claimed that individuals at risk of opioid addiction could be either screened out by healthcare providers and/or safely prescribed opioids using a "maximally structured approach" involving pill counts. The actions also described how Endo distributed a book entitled *Avoiding Opioid Abuse While Managing Pain*, which sought to convince healthcare providers that, when a patient exhibited signs of drug-seeking behavior, *increasing* the patient's opioid dosage "in most cases . . . should be the clinician's first response."

25

### D. Endo Trained Its Sales Representatives to Focus On Healthcare Providers Most Likely to Write the Most Opioid Prescriptions

74.     In addition to generally using marketing materials containing unsubstantiated and biased claims to convince patients and healthcare providers that opioids were a safe and effective way to treat pain, Endo also specifically trained its sales representatives to market Endo Opioids to healthcare providers most likely to write the most opioid prescriptions, regardless of whether those prescriptions were legitimate or whether the healthcare providers had experience in treating pain. This sales strategy resulted in massive amounts of prescriptions being written for opioid abusers and under other false pretenses. Indeed, complaints filed by states, counties, municipalities, and other entities against Endo during the Class Period identified specific doctors who later pled guilty to writing such fraudulent prescriptions. Endo's sales strategy not only dramatically worsened the opioid epidemic by increasing prescriptions written for Endo Opioids, but it also substantially increased the likelihood that private insurers would reimburse prescriptions written under false pretenses, which exposed Endo to insurance fraud claims in New York and elsewhere.

75.     For example, in an action filed in October 2017 by the Michigan counties of Oakland and Wayne,[4] revealed that in 2015 and 2016, "sales representatives in Detroit received from Endo a list of doctors to target—referred to internally as 'the universe.'" Endo trained its sales representatives to "put their heads down and ignore problematic remarks from doctors and their staff regarding their prescription practices." In fact, "at no time were sales representatives provided a do not call list of problematic prescribers." The Wayne Complaint further alleged that the list of doctors included not only "pain clinics and anesthesiologists," who might have

---

[4] *County of Wayne, et al., v. Purdue Pharmaceuticals, et al.*, No. 2:17-cv-13334-JCO-EAS (E.D. Mich.), ECF No. 1 ("Wayne Complaint").

experience treating chronic pain, but also general and family practitioners, who were less experienced and thus more likely to credit and/or be influenced by unsubstantiated claims put forth by Endo's sales representatives. The Wayne Complaint further alleged that "some of the doctors on the list were clearly engaged in problematic prescribing of opioids, including a Detroit internal medicine doctor who wrote so many opioid prescriptions that he was eventually shut down."

76.      The allegations in the Wayne Complaint were corroborated by allegations in a complaint filed by the state of Tennessee under seal in May 2019 against certain Endo subsidiaries.[5] The Tennessee Complaint revealed that Endo also "routinely gave health care providers letter grades for their prescribing habits as a quick way for its sales representatives to identify who to prioritize for sales calls." According to the Tennessee Complaint, which was based on documents that state officials had obtained directly from Endo, Endo gave prescribers "A" letter grades "for their unrestrained prescribing habits and encouraged [Endo] sales representatives to prioritize and make more frequent sales calls to them." The Tennessee Complaint further alleged that "Endo's sales teams outpaced even Purdue with tactics that included marketing directly to doctors and patients alike, targeting addicts and winking at pill mills that prescribed more drugs than people per square mile." The complaint also specifically identified multiple healthcare providers who had "disciplinary actions taken against their medical licenses or pleaded guilty to crimes related to their prescribing of controlled substances."

77.      For example, the Tennessee Complaint identified Dr. Yuchun Han of Chattanooga, Tennessee as Grade "A" prescriber of Endo Opioids and alleged that Endo sales representatives visited him 31 times in 2008 alone. In 2014, Han, a neurologist, was reprimanded for leaving the

---

[5] Complaint, *Tennessee, et al. v. Endo Health Solutions Inc., et al.*, No. 1-174-19 (Tenn. Cir. Ct. Knox Cnty.) ("Tennessee Complaint")

country and leaving pre-signed blank prescription forms with his staff. Similarly, Dr. Samson Orusa, of Clarksville, Tennessee was another Endo Grade "A" prescriber who was later indicted by the federal government indicted for 22 counts of unlawful distribution of a controlled substance outside the boundaries of professional medical practice; 13 counts of health-care fraud; and nine counts of money laundering. The state's complaints alleged that Dr. Orusa wrote prescriptions for 50-60 patients a day.

78.     The Tennessee Complaint was unsealed on Friday, June 7, 2019, and, on this news, Endo's share price declined that day from its opening price of $5.11 per share to close at $4.89, or 4.3%. Over the next two trading days, Endo's share price fell still further to $4.49 per share, or a total decline of 12.1%.

79.     Endo also knew that the more often their sales representatives visited a healthcare provider, the more likely that healthcare provider was to prescribe Endo Opioids. According to the Tennessee Complaint, Endo's chief marketing executive for Opana ER stated that "OPANA ER is in a ***promotionally sensitive*** market"—*i.e.*, a market where more sales calls meant more prescriptions. According to documents obtained by Tennessee officials, Endo's return on investment for each sales call was "projected as high as a 4:1 revenue to-cost ratio."

80.     Endo also had its sales staff focus on health care providers who already prescribed large amounts of Endo Opioids and pushed those prescribers to write still more prescriptions. For example, according to the Tennessee Complaint, a document titled "2009 Opana Brand Strategic Plan," revealed that Endo wanted to "***increase the writing intensity*** of current OPANA ER prescribers and ***increase the product trial with mid-deciles prescribers*** via comprehensive and focused detailing and excellence in overall promotional execution." In layman's terms, this meant that Endo was identifying the healthcare providers who write the most Opana ER prescriptions,

(*i.e.*, "decile 10 prescribers") and then having its sales representatives visit the healthcare providers who wrote the most Opana ER (*i.e.*, Endo Opioid) prescriptions precisely because those healthcare providers were more likely to write still more prescriptions. The Tennessee Complaint confirmed this by citing an internal Endo document, that showed that "the Company's return on investment for sales calls for the decile 10 prescribers was significantly higher than those who wrote fewer Opana ER prescriptions." An internal Endo marketing document cited in the Tennessee Complaint also confirmed that Endo's strategy for its sales representatives was working. The document stated, among other things, the "[t]hose [healthcare providers] who have tried [Opana ER] were largely persuaded to do so by a rep, successful referrals" and "[m]ain messages are resonating." In addition, the Tennessee Complaint cited documents demonstrating that Endo emphasized marketing to physician assistants and nurse practitioners "who generally have less pain management expertise." In documents cited by the Tennessee Complaint Endo stated that nurse practitioners and physician assistants were a "key driver of [sales] performance." Endo's documents "pressed its sales force to consistently 'focus on NPs and PAs.'" Endo was targeting these less experienced healthcare professionals because the Company had "data showing they were '3x times more responsive than MDs to details' and that '96% of prescriptions are written without physician consult (60% are for therapy initiation).'"

81.     Endo's strategy of indiscriminately marketing to healthcare providers, regardless of whether those doctors were prescribing opioids legitimately was further corroborated by documents and testimony in the Ohio MDL. For example, Endo sales representatives ignored warning signs that an Akron, Ohio, doctor, Adolph Harper, was writing fraudulent prescriptions for Endo Opioids. According to a sworn declaration filed by one of Dr. Harper's receptionists, Ramona Harrison, an Endo sales representative made weekly visits to "Dr. Harper during regular

office hours and would have witnessed the waiting room packed with individuals who appeared to be drug addicts. He would have seen some patients who appeared to be high or who were sleeping." Dr. Harper was called on 110 times by Endo sales representatives promoting Opana ER from 2008 to 2012, was later indicted for running a "pill mill," and is currently incarcerated.

82.    Similarly, documents unsealed in the Ohio MDL also show that Endo sales representatives visited a healthcare provider, Dr. Guang Yang, 180 times from late 2008 to 2016 to encourage him to write prescriptions for Opana and Opana ER. At the time, Dr. Yang was the second-highest opioid prescriber in the country.

83.    These allegations were further corroborated by an expert report filed by the plaintiffs in the Ohio MDL. The expert report, which was created by former FDA commissioner David A. Kessler, stated that "Endo 'incentivized' its sales reps to meet the goal of 'pushing higher doses,'" and specifically referenced the Endo opioid "Percocet, which contains oxycodone." According to Kessler, such rewards "'increased steeply' along with sales. Endo held a 'Grand Prix Contest' in which the top prize was a BMW for use as a company car."

**E. Endo Lacked an Effective System for Identifying Fraudulent Prescriptions**

84.    In addition, news reports and complaints filed against Endo during the Class Period reveal that from approximately 2000–2016, Endo and/or its subsidiaries were in violation of their duties, under the United States Controlled Substances Act ("CSA") to maintain effective controls against diversion of Endo Opioids. The CSA requires "registrants" to design, implement, and operate a suspicious ordering monitoring system that can identify suspicious orders and report suspicious orders to the DEA ("SOM System"). Endo's failure to implement an effective SOM System not only dramatically worsened the opioid epidemic by allowing enormous amounts of fraudulent prescriptions to be written for Endo Opioids, but it also substantially increased the

likelihood that private insurers would reimburse prescriptions written under false pretenses, which exposed Endo to insurance fraud claims in New York and elsewhere.

85.    Under the CSA, all "registrants" must design and operate a system to disclose suspicious orders of controlled substances and notify the DEA of any suspicious orders. "Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. §1301.74(b). Under the CSA, a registrant is "as any person who is registered with the DEA under 21 U.S.C. §823." 21 C.F.R. §1300.02(b). Section 823, in turn, requires manufacturers of Schedule II controlled substances to register with the DEA.

86.    According to documents and testimony obtained in connection with the Ohio MDL, at least two Endo subsidiaries, Par and Qualitest Pharmaceuticals ("Qualitest"), a generic pharmaceuticals manufacturer acquired by Endo in 2010, were "registrants" under the CSA. In addition, the documents revealed that Endo, although not technically a registrant under the CSA, nevertheless had a duty to maintain effective controls against diversion and had represented to the government, including the DEA, that it would "monitor orders and distribution for signs of diversion, including suspicious orders."

87.    In spite of these obligations, it was revealed during the Class Period that Par, Qualitest and/or Endo had failed to create or operate a meaningful system in connection with their manufacturing, marketing, and/or distribution of opioids to disclose suspicious orders of controlled substances and failed to notify the DEA of suspicious orders.

88.    For example, on July 27, 2019, The Washington Post published an expose on opioid marketing entitled, "Little-Known Makers of Generic Drugs Played Central Role in Opioid Crisis, Records Show" ("Monitoring Article"). The Monitoring Article revealed that auditors from the

management consulting firm BuzzeoPDMA had warned Par as early as May 2010—when Defendant Campanelli was Par's Chief Operating Officer—that the company was "not meeting federal requirements for deleting suspicious orders." The article reported that the auditors concluded that "[t]here is no Suspicious Ordering Monitoring System in place," at Par, and told the Par that "[a] program must be instituted based on customers' sales volumes, seasonal fluctuations, etc., with a firm statistical analysis as the basis for such a program."

89.     The Monitoring Article further reported that, "Par did not act on that advice for years, records show. Instead, employees inside Par's sales department were responsible for monitoring orders, according to company documents and an executive at Par's current parent company, Endo Pharmaceuticals." The Monitoring Article further stated that "[a]s late as 2015, though, the outside auditors still had concerns about Par's oversight of opioid sales. The auditor noted that federal regulators might take issue with the company's method for vetting orders."

90.     In addition to the Monitoring Article, separate reporting from The Washington Post on July 16, 2019 ("Manufacturing Article") revealed that at approximately the time that its auditors had concluded that Par did not have a system in place to monitor suspicious orders, Par was the third largest manufacturer of prescription opioids. According to the Manufacturing Article, from 2006 to 2012, Par manufactured *11,996,780,781* opioid pills, or nearly *15.7%* of the opioid pills sold in the United States. In short, Par was flooding the United States with opioids without a meaningful SOM System in place, which not only dramatically worsened the opioid epidemic by allowing enormous amounts of fraudulent prescriptions to be written for Endo Opioids, but it also substantially increased the likelihood that private insurers would reimburse prescriptions written under false pretenses, which exposed Endo to insurance fraud claims in New York and elsewhere.

91.     The allegations in the Monitoring Article are corroborated by documents and testimony unsealed in December 2019 in the Ohio MDL. These documents and testimony revealed that Par, Qualitest and Endo lacked any meaningful SOM System during much of the time Endo was flooding the market with opioids.

92.     For example, the plaintiffs in the Ohio MDL elicited testimony from Endo's Senior Vice President of Global Supply Chain, Stephen Macrides, during a March 2019 deposition pursuant to Federal Rule of Civil Procedure 30(b)(6), that Par's first "standard operating procedure" ("SOP") for an SOM system was not implemented until April 2012 ("2012 SOP"), and, even then, the 2012 SOP was woefully insufficient and did not "define what a 'suspicious order' was or explain when and how to report suspicious orders to the DEA." Documents produced in the Ohio MDL also confirmed that auditors of Par's SOM process in 2015 had found that "Par's current SOM system as it currently operates may be difficult to explain and defend during a DEA review." Specifically, the audit noted that while under Par's SOM "'Sales Operations' is responsible for ensuring that Par Pharm is 'in line' with DEA requirements. . . . If customers order more than would be expected, a sales person would interview the customer to determine whether there is a legitimate reason for the order," the auditor recommended that the "SOM decisions should be managed by regulatory officials rather than sales officials or customer service account representatives" and that "[a]ny employees that receive incentives for controlled substance orders should not be involved in evaluating either accounts or orders"), rather than regulatory employees, which was "viewed as a conflict of interest by the DEA."

93.     According to additional information unsealed as part of the Ohio MDL, after Endo acquired Par, Qualitest's DEA compliance unit took responsibly for Par's SOMs, but Par conducted no customer due diligence "other than confirming the customer held a DEA license,"

and there was no reliable review for unusual size, pattern, or frequency. Specifically, an April 2015 audit report indicated that "[Par's] SOP does not contain instructions for reporting suspicious orders. Instead there is a section, which is 'bolded' which states that 'Criminal Activities' will be reported to federal and state agencies." Par's outside auditor then warned Par that this "should be corrected as soon as possible, since it misses the point of the regulations[,]" which is that "[s]uspicious orders should be reported as soon as they are identified." According to documents unsealed in the Ohio MDL, "Par did not identify or report any suspicious orders from 2010 through 2012," and while "[b]etween 2013 and 2017, a multitude of orders were flagged by its SOM system," "they were all cleared to ship," and there is "no indication Par reported any suspicious orders to the DEA prior to 2015."

94.     Nor did Qualitest maintain an effective SOM System. For example, according to documents in the Ohio MDL, during an August 2008 audit, the auditor, a former DEA official, stated that "[t]he Qualitest system for reporting suspicious orders to DEA needs to be improved to comply with 21 CFR 1301.74." In addition, the audit found that Qualitest's employees were "not aware that in addition to notifying DEA of sales that were above established thresholds and suspicious, they are expected to report to DEA suspicious orders, even if the sale was declined by Qualitest." Documents unsealed in the Ohio MDL also showed that, in 2012, there were at least two occasions in which "controlled product [*i.e.*, opioids, was] released that should not have been." Qualitest's SOM program continued to have deficiencies well into 2013, including that it "only applie[d] to the retail side of the business[,]" despite Qualitest's knowledge that the "DEA requires it to apply to all customers." In addition, "Orders were flagged only on the basis of 'historical purchases by an individual customer (thresholds),' and not by size, pattern, or frequency as required by CSA regulations." Additional documents in the Ohio MDL showed that a 2009

Qualitest SOM audit review found that Qualitest's employees modifying large orders to ensure that they cleared Qualitest's SOM thresholds: "[t]he review of Order Release Requests showed that many requests were made for quantities of drugs that were several times greater than the current limit set in the order monitoring system. In most of those instances, the size of the order was cut down and the order was approved to be released, with some increase to the limit in the Order Monitoring System." In addition, "[a]lthough the original order requested a quantity of controlled substances that was larger than [Qualitest] was willing to ship to the customer, no report of a suspicious order was sent to the DEA as required by 21 CFR 1301.74(b)." The documents in the Ohio MDL showed that Qualitest lacked sufficient SOM-related SOPs until late 2013, "[n]o mandatory, routine DEA training exist[ed] for employees handling controlled substances" and "[k]nowledge of DEA regulations [wa]s not incorporated in employee's job descriptions or performance reviews," which was alarming considering that approximately 70% of Qualitest's business was controlled substances. In fact, at a March 2013 meeting with Qualitest, the DEA Staff Coordinator stated that "Qualitests' [sic] current [SOM] system as explained to him and as seen on their ARCOS data is inadequate to say the least[.]" The staff coordinator's conclusion was shared by external consultants who had reviewed Qualitest's SOM program in January 2013, and "concluded that [Qualitest's] 'current SOM program, systems and procedures do not meet the regulatory requirements[.]'"

95.    Not only did Par and Qualitest fail to maintain an effective SOM System during much of the time the entities flooded the market with opioids, but Endo failed to maintain such a system as well. According to documents and testimony in the Ohio MDL, the SOM System Endo purported to offer "was ineffective controls against diversion because it employed a rigid 'excessive orders' system operated by sales and customer service personnel, never looked to

available data on its customers' customers, and failed to conduct any meaningful due diligence of its customers." Incredibly, Endo's purported SOM System "*never determined any order to be suspicious, nor did it report any orders flagged by its SOM program to the DEA*."

96.     The documents and testimony in the Ohio MDL stated that, until at least mid-2014, "Endo's internal order review system was admittedly a 'limited' system using a rudimentary algorithm that was designed only to identify 'excessive' orders from a commercial perspective, rather than suspicious orders based on unusual volume, frequency, or pattern." The system looked at Endo's wholesale "customers' 3 month and 12 month history and if any order [wa]s above the 3 or 12-month it [went] on hold until it [wa]s reviewed by Customer Service." Endo used this limited system because it believed that UPS, *i.e.*, the United Parcel Service, which processed and shipped orders for Endo, had its own SOM System." But the unsealed documents and testimony in the action indicated that, according to a 2013 audited conducted by Endo and Qualitest of UPS's SOM system, "UPS had not reported any Endo/Qualitest product orders as 'suspicious orders' to any agency, did not visit customers, lacked the functionality to visit or know customers' customers, and did not utilize chargeback data, trending analyses, or modify its program based on current diversion trends." The plaintiffs in the Ohio MDL also claimed, citing documents and testimony, that "at one point, Endo asked UPS whether it could carry out the due diligence on Endo's behalf, but UPS made it clear it could not carry out Endo's 'know your customer' duties."

97.     The documents and testimony in the Ohio action also indicate that while Endo began to adjust its algorithm for identifying suspicious orders in May 2014, Endo never utilized "chargeback data or IMS/IQVIA data,[6] to which it had access, as part of its internal order review

---

[6] IQVIA (formerly IMS Health Holdings, Inc.) is a data vendor that collects data to measure the volume of pharmaceuticals sold by manufacturers and wholesalers to pharmacies, hospitals and other settings. According to an action filed in March 2019 by the State of New York against

process for its branded opioids," nor did it conduct "due diligence site visits of its customers, despite recognizing the importance of such visits."

98.     Although Endo's review system was purportedly handled by employees in its customer service department, Endo's Director of Distribution and Customer Service, Lisa Walker, testified in a deposition in December 2018, which was not unsealed until December 2019, that in the twenty years she had worked for Endo, she could not recall *a single order being determined to be "suspicious"* by her, her team, or UPS. In addition, a witness identified to testify on behalf of Endo during a deposition pursuant to Federal Rule of Civil Procedure 30(b)(6), stated that "We did not have any orders that we deemed suspicious during th[e] time period [from 1999 to 2019]." Moreover, Walker testified that neither Endo nor UPS ever reported a suspicious order for Endo's products to the DEA.

**F.  Endo Falsely Promoted Opana ER Knowing That It Had an Increased Risk of Abuse**

99.     Endo also made egregiously misrepresented the safety and susceptibility to abuse of its biggest selling opioid, Opana, which also led directly to overprescription, abuse, and, by extension, insurance fraud. Opana, and especially its extended release formula, Opana ER, had quickly become among Endo's highest grossing products after the FDA approved them in 2006. By 2010, Opana ER was Endo's second largest revenue generator, with nearly $240 million in sales. Opana ER sales surged in ensuing years, with over $384 million in sales in 2011 and nearly

---

Endo and other drug manufacturers, Endo used data from IQVIA containing details regarding the drugs prescribed by HCPs and the pharmacies that dispensed those drugs, to track the prescribing practices of individual HCPs in order to select them for detailing. *New York v. Purdue Pharma L.P., et al.*, No. 400016/2018 (N.Y. Sup. Ct. Suffolk Cnty.). The action alleges that Endo, and other co-defendants, "could have—but did not—use this data to identify inappropriate prescribing and potential diversion."

$300 million in 2012. In all, from 2006 to 2017, Opana and Opana ER generated more than *$2 billion* in sales for Endo.

100.    To combat competition from generics, and to address concerns that patients were abusing Opana ER by chewing or crushing and snorting the drug, Endo developed a new formulation of Opana ER, which the FDA approved on December 9, 2011 ("Reformulated Opana ER"). Endo began selling Reformulated Opana ER in February 2012.

101.    Endo touted Reformulated Opana ER as safer than original Opana ER and its generic alternatives, in part because Opana ER had a hard coating that purportedly made it "crush resistant" and thus more difficult to grind up. Endo referred to this hard coating as "INTAC Technology." Endo and its executives, however, knew that Reformulated Opana ER was actually *more* dangerous than original Opana ER and its associated generics because it was not only *not* crush resistant, but also because opioid addicts could liquify the new painkiller and inject it intravenously, and *there was no way to stop this from occurring*.

102.    Endo had attempted to support its claims about the efficacy and safety of Reformulated Opana ER by relying on, among other things, studies conducted in 2009 and 2010, including bioequivalence studies comparing Reformulated Opana ER to original Opana ER, a clinical pharmacokinetic study called "Study 108," human abuse potential studies called "Study 109," two bench top attractiveness studies called "Study 901" and "Study 902," and in vitro manipulation and chemical extraction studies, that were designed to assess whether the drug was tamper-resistant.

103.    Study 108's results showed that it was possible to grind, cut, chew or otherwise tamper with Reformulated Opana ER, which allowed a user to feel the full load of the drug's *12 hours'* worth of opioids immediately. Study 109 showed that Reformulated Opana ER tablets

could be chewed, which also affected the drug's controlled release mechanism and produced a "high." Since these studies were conducted in 2009 and 2010, Endo knew by 2011, or shortly after Reformulated Opana ER was approved by the FDA, that Reformulated Opana ER was no safer than the original formulation of Opana. Endo and its executives did not disclose these results.

104.    Studies 901 and 902 were conducted between December 2009 and February 2010 to test Endo's claims that Reformulated Opana ER was tamper-resistant. FDA reviewers concluded that, based on the results of Studies 901 and 902, "concerns have been raised regarding the [redacted] tamper-resistant features of this product's formulation" because the product can still be cut or chewed. The FDA reviewers also noted that "after chewing [redacted] the product acts like an immediate-release oxymorphone pill and this places certain patient populations, particularly the elderly and/or cognitively impaired, at high risk of overdose." In light of their findings, FDA reviewers were "concerned that any reference to the product's incremental improvement in tamper resistance could be misleading" and recommended that: (i) Reformulated Opana ER's "product label not include language asserting that [it] provides resistance to crushing," as well as other things that were, and remain, redacted from public view; and (ii) Endo conduct a study to determine if ground Reformulated Opana ER could be administered intranasally.

105.    Not only did Endo know that Reformulated Opana ER could be crushed, it also knew that it easily could be liquified and injected. The Tennessee Complaint, which was unsealed in June 2019, revealed that in 2012, only months after Endo had begun selling Reformulated Opana ER, Endo's Vice President of Pharmacovigilance and Risk Management & Senior Clinical Advisor, in response to internal questions, admitted that it was *impossible* to prevent intravenous use of Opana ER:

> "the tablets are placed in water and the drug dissolves into the water. This is then drawn up and injected. This method of abuse existed

with the old tablets and was predicted by the nonclinical studies to be a potential route of abuse with these tablets. Because oxymorphone is water soluble, ***there is no way to prevent this***."

106.    Evidence appeared almost immediately indicating that the Reformulated Opana ER was not tamper-resistant and was subject to widespread abuse. For example, in July 2012, USA Today reported that Reformulated Opana ER had become "the drug of choice" for Opioid addicts, and that in Nassau County alone hundreds of people each month were seeking treatment for addiction to Opana ER.

107.    The FDA then warned Endo in a May 10, 2013 letter from Janet Woodcock, M.D., the Director of the FDA's Center for Drug Evaluation and Research, to Robert Balio, Endo's Vice President, Regulatory Affairs. Dr. Woodcock's letter stated that Opana ER tablets' "extended-release features can be compromised, causing the medication to 'dose dump,' [*i.e.*, release the full amount of the drug stored in the tablet] when subject to . . . forms of manipulation such as cutting, grinding, or chewing, followed by swallowing."

108.    In 2015, the Indiana Department of Public Health determined that an HIV outbreak in southeastern Indiana was linked to injection of Reformulated Opana ER, the first documented HIV outbreak in the United States associated with injection of a prescription painkiller. The CDC also issued CDC issued a public health alert on April 24, 2015 announcing its investigation into a cluster of HIV-infections reported in Indiana associated with individuals who abused Reformulated Opana ER intravenously. The alert stated that:

> From November 2014 to January 2015, ISDH [Indiana State Department of Health] identified 11 new HIV infections in a rural southeastern county where fewer than 5 infections have been identified annually in the past. As of April 21, 2015, an on-going investigation by ISDH with assistance from CDC has identified 135 persons with newly diagnosed HIV infections in a community of 4,200 people; 84% were also HCV infected. Among 112 persons interviewed thus far, 108 (96%) injected drugs; all reported dissolving and injecting tablets of the prescription-type opioid

40

oxymorphone (OPANA® ER) using shared drug preparation and injection equipment.

109.    Endo and its executives also had access to information that refuted their claims about Reformulated Opana ER. The National Addictions Vigilance Intervention and Prevention Program ("NAVIPPRO"), a national program that Endo helped found in 2005 as the first industry sponsor, performs surveillance of substance abuse. NAVIPPRO data, which was available to Endo and its executives, and which Endo used and analyzed, showed that there was a decline in snorting of Reformulated Opana ER after it became available as well as an enormous increase in intravenous abuse beginning in 2013. In particular, this data showed that, as compared to original Opana ER, rates of abuse by intravenous injection for Reformulated Opana ER were nearly *five times higher* than rates of abuse by snorting the drug.

110.    The NAVIPPRO data was corroborated by data from the Researched Abuse Diversion and Addiction-Related Surveillance System ("RADARS"). RADARS provides surveillance data to meet the needs of pharmaceutical companies, policy makers, regulatory agencies, medical/public health officials, and the public in addressing the concerns of prescription drug abuse. RADARS data also showed a marked increase in Reformulated Opana ER abuse via injection following the introduction of the reformulated product. Endo and its executives had access to the RADARS Reformulated Opana ER data and used and analyzed that data.

111.    In addition, data reported to the FDA's Adverse Event Report System ("FAERS") database also demonstrated a significant rise in the rate of abuse after the introduction of Reformulated Opana ER to the market. FAERS data also revealed fifty-nine cases of thrombotic microangiopathy, or "TMA," associated with Reformulated Opana ER use between December 2011 and June 2016. TMA is a serious condition caused by intravenous drug users that was unique to intravenous abuse of Reformulated Opana ER.

41

112.    Finally, during a deposition taken March 19, 2019 in the Ohio MDL, Defendant Campanelli admitted that he was "unaware" of "*any scientific data* for Opana ER or [Reformulated] Opana ER . . . that had low abuse potential."

113.    Even though Endo had actual knowledge that Reformulated Opana ER was not safer than original Opana ER or generics and could easily be manipulated for intravenous injection, the Company nevertheless promoted Opana ER to healthcare providers—many of whom were strategically selected because they were not as experienced in treating chronic pain—as safer and less susceptible to abuse. Endo had long known that healthcare providers would respond to this type of false promotion. A 2007 internal Endo presentation, which had been emailed by Endo employee Larry Romaine to the "Opana 4 brand IQ team," and which was unsealed as part of the Ohio MDL, for example, stated that "Potential sales of Opana ER depend directly on prescribers' comfort level with the risk of abuse and diversion."

114.    Armed with this insight, Endo instructed its sales representatives to market Reformulated Opana ER as safer and less susceptible to abuse. For example, the Tennessee Complaint revealed that Endo's strategy the from the moment reformulated Opana ER hit the market was to position the drug as being less susceptible to abuse that competing extended release opioids, even though the Company knew that the drug could be crushed and that it was impossible to prevent abusers from liquifying the drug and injecting it intravenously. For example, the Tennessee Complaint cited a "2011 Endo document titled 'Opana™ ER Playbook' [which] described the franchise vision for Opana ER to 'become the branded oral-solid [Long-Acting Opioid] of choice based on the most *complete array of tamper-resistant properties and attributes* combined with the heritage of oxymorphone."

115.    The Tennessee Complaint further revealed that, starting in September 2015, Endo sales representatives also distributed a "sell sheet" identified internally as "OP-02294b(1)" to health care providers. "OP-02294b(1)" that used the term "Opana ER with INTAC," which alone misleading suggested that Reformulated Opana ER contained proprietary technology that made it safer and more difficult to tamper with. The sheet then "conveyed the claim that the Opana ER tablet stayed intact and was difficult to abuse by injection when this was not the case." According to the Tennessee Complaint, "Endo's sales representatives used this sell sheet during interactions with providers until at least March 24, 2017."

i.    *Endo Falsely Promoted Opana ER to Private Insurance Companies*

116.    Endo not only directed its false and misleading marketing of Reformulated Opana ER at healthcare providers, it also used this false and misleading claims to promoted the opioid to commercial insurers. These promotions opened a devastating new avenue of liability for the Company, insurance fraud.

117.    Under Section 403 of the New York Insurance Law, the New York Department of Financial Services ("DFS") can levy civil penalties upon any person who has committed a fraudulent insurance act, as defined in Section 176.05 of the New York Penal Law, up to $5,000 and the amount of the claim—per fraudulent claim.

118.    Under New York Penal Law Section 176.05, a fraudulent insurance act is an act "committed by any person who, knowingly and with intent to defraud presents [or] causes to be presented . . . to or by an insurer . . . or any agent thereof: . . . a claim for payment, services or other benefit pursuant to [a health insurance] policy, contract or plan that he or she knows to: (a) contain materially false information concerning any material fact thereto; or (b) conceal, for the purpose of misleading, information concerning any fact material thereto. Finally, under Sections 404 and 408(a)(1)(A) of the New York Financial Services Law, the Superintendent has the

authority to levy civil penalties upon any person who has committed any intentional fraud or intentional misrepresentation of a material fact with respect to a financial product or service or involving any person offering to provide or providing financial products or services, up to $5,000 per offense. "Financial product or service" includes, among other things, any financial product or service provided by person regulated by the Superintendent under the New York Insurance Law. This includes commercial health insurance plans.

119.    According to charges filed by the DFS, when Endo was marketing Reformulated Opana ER in 2012, it "engaged in direct and concerted efforts to woo insurance companies to favor Reformulated Opana over other opioids." The DFS alleged that these efforts directly misled insurers "about Opana's crush-resistance properties and falsely present[ed] Reformulated Opana ER as a panacea to the opioid crisis." The NYDFS Charges stated that Endo's Health Outcomes and Pharmacoeconomics team had given a presentation to numerous insurers entitled "Prescription Opioid Abuse: Impact and Interventions for Health Plans and Systems." According to the charges, Endo admitted to the existence of an opioid epidemic in the United States when setting up the meetings, but misleadingly tried to "leverage the opioid crisis into a selling point for Reformulated Opana [ER] by [telling insurers] that: 'As we all know, opioid prescription abuse has become somewhat of an epidemic within the United States. At Endo, we are doing our part to try to limit abuse of our long acting opioid where possible. In 2012, we launched Opana ER with INTAC technology which is designed to be crush resistant.'"

120.    According to the DFS, the insurer presentation included slides "depicting in granular detail the gravity of the opioid crisis in America." For example:

> In Slide 11 of the presentation, Endo presented a graph showing the sharply rising trend of "opioid analgesics contributing to drug poisoning" between the years 1999-2008. In slide 15, Endo calculated the "Annual societal costs of opioid abuse, dependence,

and misuse in the United States" at $55.7 billion. Endo concluded
the presentation by touting the benefits of abuse-deterrent and abuse
resistant opioid formulation directly to insurers.

121.    These representations to insurers were especially startling because they created

serious liability for Endo. Endo knew that the costs for a sizeable number of prescriptions related

to abuse of Endo Opioids were almost certainly reimbursed by private insurance companies,

including insurance providers in New York. Under Section 403 of New York insurance law, the

Superintendent of the DFS had the authority to levy civil penalties of to $5,000 and the amount of

the associated insurance claim, upon any person who participated in insurance fraud. Endo also

knew that it had intentionally marketed Reformatted Opana ER as safer and less susceptible to

abuse in the hopes that the companies would view Reformatted Opana ER prescriptions as

legitimate and thus be more likely  to reimburse those prescriptions, no questions asked. Since

Endo's marketing practices and sales representatives had enabled doctors to write and be

reimbursed from insurance companies for enormous numbers of fraudulent opioid prescriptions,

the Company would face potentially billions in liability under New York's insurance law.

122.    Although Endo ultimately settled claims brought by New York State Attorney

General in 2016 that the Company had improperly marketed Reformulated Opana ER as "crush

resistant," when the Company's studies indicated that the pill could be crushed and ground and

had improperly instructed its sales representatives to diminish and distort risks associated with

Opana ER, Endo neither admitted nor denied those allegations. It was thus not until the Tennessee

Complaint was unsealed and allegations, documents and testimony from other cases filed during

the Class Period became public that investors understood that the Company had marketed Opana

ER to healthcare professionals as safer and less susceptible to abuse when the Company had actual

knowledge that it was *impossible* to prevent intravenous abuse of Opana ER. In addition, investors

never knew that the Company had made these false representations to insurance providers until June 2020, when the DFS unveiled the NYDFS Charges.

### G.  Endo Ceases Marketing Endo Opioids and Withdraws Opana ER

123.    In late 2016, Endo began to reduce its footprint in the opioid market. On December 8, 2016, for example, the Company announced that it had entered into an agreement to return the rights to its opioid Belbuca to BioDelivery Sciences International, Inc. (BDSI). In the press release ("December 2016 Release"), Defendant Campanelli commented that Belbuca "no longer aligns with Endo's U.S. Branded segment strategy and our focus on core assets." The release also announced that Endo was terminating all 375 members of its sales force for its branded opioids, which included Reformulated Opana ER. In other words, while Endo would continue to **manufacture** Endo Opioids, including Opana ER, it would no longer **promote** those opioids to healthcare providers.

124.    Notably, the December 2016 Release quoted Defendant Campanelli as advising that "We are continuing our product-by-product portfolio assessment and the development of our full corporate strategy, which we plan to discuss in greater detail when we provide our fourth quarter and full year 2016 results in February 2017." In other words, Defendant Campanelli disclosed that Endo, and he personally, were reviewing each Endo Opioid, the Company's efforts to promote those opioids.

125.    Four months later, in March 2017, the FDA heard devastating testimony at an advisory committee meeting about the addictive properties of Reformulated Opana ER and the drug's susceptibility for abuse. In the wake of the meeting, on June 8, 2017, the FDA requested that Endo remove Reformulated Opana ER from the market, and the Company complied one month later. It was the first time the FDA had taken steps to stop sales of a currently marketed opioid because of the consequences of abuse.

**H. Endo's Precarious Financial Condition Meant That The Company Did Not Have Liquidity Sufficient to Satisfy Judgments in Opioid-Related Actions**

126. As Endo ceased marketing Endo Opioids and withdrew Reformulated Opana ER, states, counties, municipalities and individuals filed ***thousands*** of lawsuits against the Company to hold it accountable for the devastation that the opioid epidemic had wrought. Unbeknownst to investors, however, the scope of Endo's wrongdoing, the Company's increased debt from pre-class period acquisitions, and the Company's reduced revenues as a result of its reduced footprint in the opioid market created a significant risk that the Company would not have sufficient capital or liquidity to address liabilities arising from opioid-related actions.

127. In its annual report on Form 10-K for 2014, the Company reported approximately $4.1 billion in long-term debt. That debt doubled in 2015, however, to approximately ***$8.3 billion*** in connection with, among other things, the Company's 2015 acquisition of Par for $8 billion.

128. This increase in debt meant that the Company needed to adjust its debt load to continue operating. Just before the start of the Class Period, as part of these efforts, on April 27, 2017, the Company and certain of its subsidiaries entered into a new credit agreement (the 2017 Credit Agreement) that included (i) a five-year $1 billion revolving credit facility and a $3.4 billion term loan. According to the Company's quarterly report on Form 10-Q for the second quarter of 2017 ("2Q17 10-Q").

> "The 2017 Credit Agreement contains affirmative and negative covenants that the Company believes to be usual and customary for a senior secured credit facility of this type. The negative covenants include, among other things, limitations on asset sales, mergers and acquisitions, indebtedness, liens, dividends, investments and transactions with the Company's affiliates."

129. During the Class Period, Endo's financial position deteriorated as its revenues decreased, its outstanding debt stayed constant, and it drew down on the 2017 Credit Agreement.

130.    For example, in February 2018, Endo filed its 2017 10-K, which reported the Company's financial results for 2017, which included the start of the Class Period. The 2017 10-K reported that the Company's revenues had declined from approximately $4.01 billion in 2016 to approximately $3.47 billion in 2017, or 13.5%. The 2017 10-K further reported that the Company's debt had ticked up from $8,14 billion in 2016 to $8.24 billion in 2017.

131.    The Company's financial picture worsened the following year. In February 2019, Endo filed its 2018 10-K, which reported the Company's financial results for 2018. The 2018 10—K reported that the Company's revenues had plummeted even further from $3.47 billion in 2017 to $2.94 billion in 2018, or 15.3%. In addition, the company's net cash flows from operating activities had plummeted from $554 million in 2017 to $267.2 million in 2018, or ***by nearly 52%***. The Company's shocking declines in revenue and cash flows had no effect on the Company's debt, however, which remained flat at $8.2 billion.

132.    The Company's financial picture did not improve in 2019. In February 2020, near the end of the Class Period, the Company filed its 2019 10-K, which reported the Company's 2019 financial results. The 2019 10-K reported that the Company's revenues had ticked downward from $2.95 billion to $2.91 billion, or 1.4%, or a total of 27.4% from 2017. In addition, while the Company's debt ticked upward from $8.2 billion in 2018 to $8.36 billion in 2019, the Company's net cash flows from operating activities had plummeted from $267.2 million in 2018 to $98.1 million in 2019, a staggering decline of 63%, and a total decline of 82% since 2017.

133.    To make matters still worse, in 2019, Endo "maxed out" the 2017 Credit Facility. Late in the day on June 28, 2019, a Friday, Endo filed an 8-K (the "July 2019 8-K"), which was signed by Defendant Maletta. The 8-K announced that Endo had drawn—*i.e.*, borrowed—$300 million from the 2017 Credit Facility through its subsidiary Endo Luxembourg Finance Company

I S.à r.l. Defendant Campanelli, as Endo's CEO, and Defendant Coleman, as Endo's CFO, made the decision to draw on the facility.

134.    The 8-K further disclosed that Endo's draw had effectively "maxed out" the credit facility because covenants in the Company's credit agreements contained "certain conditions that limit the Company's ability to incur additional secured indebtedness" beyond what Endo had just drawn on the revolver. While Defendants coyly disclosed that the Company "expects to use the proceeds from the borrowing under the Revolving Credit Facility for purposes consistent with the Company's previously stated capital allocation priorities, including for general corporate purposes" and to "provide additional flexibility and strategic optionality," Defendants had plainly maxed out the credit facility to pay for any opioid-related settlements.

135.    The investment press quickly questioned the Company's timing and reasons for drawing on the credit facility. On July 1, 2019, *i.e.*, the following Monday, Bloomberg Senior Credit Analyst Mike Holland told investors that "[a]nnouncing a max revolver drawing late on a summer Friday without any explanation generally doesn't bode well for a company's stock and bond prices Monday morning." And on July 15, 2019 Barron's Online published an article noting pointedly that "the company did not respond to our query if the loan was taken to pay for an opioid settlement."

136.    In short, throughout the Class Period, the Company was bringing in less money, while reaching the borrowing limit for the 2017 Credit Facility, not paying down its debt and watching its cash flows from operating activities bottom out. In addition, the Company did not disclose that it had reserved ***any*** funds to pay for opioid related settlements. At the same time, Endo remained exposed to ***billions*** in liability in connection with the over ***2,500*** opioid-related actions pending against it. In fact, while the Company settled only claims brought by a small subset

of the Plaintiffs in the Ohio MDL (the "Track 1 cases") and claims brought by the state of Oklahoma, the settlements contained escalator clauses requiring Endo to increase its payouts should any of the other over *2,500* cases involve larger settlements. In short, unbeknownst to investors, Endo's precarious financial condition made the imposition of any sizeable judgment against it an extinction-level event for the Company since its declining revenues and increased leverage meant that the Company lacked sufficient capital to address liabilities arising from opioid-related actions.

## I. Minimize Endo's Misconduct and Downplay the Scope of the Company's Liability As a Result of its Role in the Opioid Crisis

137.    Rather than acknowledge the truth—that Endo had engaged in a litany of deceptive marketing practices and that the Company potentially faced billions in liability, including for insurance fraud—Defendants instead misleadingly downplayed the allegations and failed to disclose that Endo had (i) engaged in deceptive advertising in promoting its opioids; (ii) trained their sales representatives specifically to target healthcare professionals most likely to prescribe the most opioids without regardless of whether those prescriptions were legitimate; (iii) failed to implement a meaningful or effective system to identify and report opioid orders that had the hallmarks the government associated with drug diversion (*i.e.*, attempts to obtain or use prescription medicines illegally); and (iv) promoted one of its most profitable opioids, Opana ER, as safe and resistant to tampering when the Company knew it was *impossible* to prevent abusers from liquifying and injecting the drug.

138.    For example, at the start of the Class Period, on August 8, 2017, Endo disclosed in its quarterly report on Form 10-Q for the second quarter of 2017 ("2Q17 10-Q") that at least 13 different actions had been filed by state and local governments against Endo in connection with the Company's sales and marketing practices for opioids. The 2Q17 10-Q gave no hint of the

Company's misdeeds in marketing and selling Endo Opioids or the tsunami of liability facing the Company and downplayed the allegations by simply stating unequivocally that "*[w]e intend to contest the lawsuits identified above vigorously*."

139.    This pattern of false and misleading statements to investors that downplayed the allegations in opioid-related actions against Endo, refused to acknowledge Endo's misconduct, and did not fully convey the extent of liability facing the Company for its sales and marketing of Endo Opioids continued throughout the Class Period. For example, on November 6, 2017, after the state of Kentucky announced that it had filed a lawsuit to "seek to hold Endo responsible for illegally building a market for the long-term use of opioids in the state as part of an effort to boost corporate profits," Defendant Maletta responded to *Reuters*, which was covering the lawsuit, that the accusations were "*patently offensive*." Similarly, in December 2018, by which point over *1,500* cases had been filed by states, counties, municipalities, hospitals and individuals, Defendant Maletta told *The Philadelphia Inquirer*, which was covering opioid litigation involving Endo, that "*[o]ur view is that we've done everything properly*," he added. "*We deny the allegations in the complaints and we're proud to talk about our business practices*."

140.    The extent of Endo's exposure to liability was a chief concern for investors throughout the Class Period.  For example, on November 9, 2017, an analyst for Mizuho Securities USA asked Defendants Campanelli and Coleman directly, "The opioid litigation *tends to be pretty scary to people*, and quite frankly, I just wanted to see if we can just get our arms around what is it that the range of risks is. And so is it just off-label marketing on your branded opioid products such as OPANA and PERCOCET over a particular period of time? Is it something else? Is it something more punitive or criminal?" Rather than disclose the truth, however, Defendants declined to comment.

51

141.    Similarly, on May 21, 2018, Defendant Campanelli participated in the "UBS Global Healthcare Conference." During a question-and-answer session, an attendee asked Defendant Campanelli to "talk about the various stages of litigation and any upcoming catalyst that may come out of those?" Rather than disclose the truth about the Company's misconduct with regard to marketing Endo Opioids and the liability Endo faced, including for insurance fraud, Defendant Campanelli stated that he did not believe that the litigation, which sought to hold Endo accountable for its role in creating and furthering the opioid epidemic, was an effective way to respond to the opioid epidemic. Specifically, Defendant Campanelli said,

> The one that most people are focused on is on opioids, as you would expect. And I would say we are, from the magnitude of a societal issue, we really are at a very early stage with respect to potential resolution. We've gotten a lot of questions over this morning, meeting some one on ones in terms how we kind of view that . . . . So it's early. It's a little bit of staying in tune and having belief that all parties can settle the societal issue because ***I don't believe that litigation is a means to dealing with the opioid issue in the United States***. I mean, this is a large, seriously challenging issue for a lot of people in this great country and we really just need to get our hands wrapped around it from a -- from really, in my opinion, a societal point of view.

Defendant Campanelli's self-serving description of the opioid litigation was plainly designed to downplay the extent of Endo's wrongdoing to attendees, but also to suggest that the actions, which sought to hold Endo and its executives accountable for their role in the opioid crisis were actually *preventing* recovery from the opioid epidemic.

142.    Similarly, on February 28, 2019, on an earnings call to report the Endo's earnings for the fourth quarter and full year 2018, another analyst asked Defendants Campanelli and Coleman, another analyst asked, "One question I have is ***we got a lot of thoughts on people on this opioid litigation trial that's coming up***. I don't know if the date has been changed, but last we checked, it was September 3. So just curious, what are your expectations here? And ***how can***

*you help us think about the potential liability to you*?" Defendant Campanelli again downplayed the allegations and omitted the Company's exposure to insurance fraud claims and responded, "[W]e're not going to be able to quantify. We're—*that's something that we're not going to do*. We always like to say that we've had discussions. And *if there's a way to settle, that's always something that we would consider*. But at this point in time, *we need to be prepared to go to trial if we are a part of track 1*."

143.    Defendant Campanelli's reference to a potential settlement did not give investors any sense of the merit to the claims asserted by plaintiffs in the opioid actions, or the scope of Endo's wrongdoing, because Endo's annual report on Form 10-K, which was filed with the SEC on the same day and signed by Defendants Campanelli and Coleman, advised investors that the Company "*may also voluntarily settle cases even if we believe that we have meritorious defenses because of the significant legal and other costs that may be required to defend such actions*." Read in conjunction with that warning, Defendant Campanelli's statements to investors downplayed the opioid-related actions by suggesting that the Company would consider settling the plaintiffs' claims in those actions simply to avoid costly litigation.

144.    Even when the Company did begin to advise investors, mid-way through the Class Period, that opioid-related actions could affect the Company's revenues, it attributed that litigation to negative publicity and overzealous journalists, not Endo's own misconduct. Endo's annual report on Form 10-K for the year 2017, which was filed on February 27, 2018, for example, included a "Risk Factor" advising investors that, "*unfavorable media coverage* of opioid pharmaceuticals could negatively affect our business, financial condition and results of operations. In recent years, opioid drug abuse has received *a high degree of media coverage* . . . . *such negative publicity* could have an adverse effect on the potential size of the market for our drug

candidates." These and other statements to investors by Defendants misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and utterly failed to apprise investors of the Company's exposure to claims for insurance fraud in New York and elsewhere.

145.    In addition, as opioid-related actions continued to be filed against Endo, the Company's Board released an "Independent Directors Report" on November 30, 2018 ("Directors' Report"), designed to assure patients, healthcare providers, insurers and investors that the Company was taking opioid-related actions seriously and had always had systems in place to identify problems with Endo Opioids.

146.    The Directors' Report assured investors that the Board was "oversee[ing] the management of risks associated with the evolving opioid litigation," and that, as part of that oversight, Defendant Maletta, as CLO, "provide[d] the Board with a comprehensive report of all material litigation matters affecting Endo on at least a quarterly basis" and separately engage[d] in regular discussions with individual Board members on litigation matters." In addition, the Directors' Report, emphasized that Defendant Campanelli, as CEO, held "regular teleconferences with individual Board members and a teleconference with the full Board on at least a monthly basis" where he discussed "the risks associated with the evolving opioid litigation."

147.    Finally, Directors' Report admitted that the Company had always known about adverse events associated with Opana ER and other Endo Opioids because, "[w]hen the Company promoted its opioid medications to [healthcare providers], it also monitored a number of secondary surveillance databases (including the NAVIPPRO and RADARS databases) and the FDA Adverse Reporting System for signs of potential abuse and/or misuse of certain branded opioid products."

148.   Defendant Campanelli was rewarded for—personally and on Endo's behalf—downplaying the allegations against Endo in the opioid-related actions and downplaying how the Company had fraudulently promoted Endo Opioids, trained its sales staff to push Endo Opioids on healthcare providers who were at high risk of writing fraudulent prescriptions or were not experienced in treating chronic paid, and failed to implement a meaningful system for identifying potentially fraudulent prescriptions. In May 2019, journalists covering the pharmaceutical industry reported that Campanelli had received a special $5 million bonus from Endo's Board, which had awarded the bonus in 2017, but actually granted the bonus in 2018. The bonus had struck industry observers as odd because "Endo's stock price hasn't at all recovered from a sharp decline thanks to generics price erosion and a gloomy outlook for the company's business," and "Endo's total revenues dropped 15% [in 2018] to $2.95 billion." The potential for the special bonus clearly gave Defendant Campanelli the motivation to downplay the opioid litigation against Endo to investors, obfuscate Endo's wrongdoing, and conceal Endo's potentially enormous liability for insurance fraud, as the Board would not have granted him that bonus had the Company's stock price not been inflated by Defendants' misrepresentations.

149.   The truth about the Company's misconduct and its liability for that misconduct slowly leaked into the market throughout the Class Period, as over *2,500* cases detailing the Company's misconduct were filed during the Class Period. They were also belied by Endo's suddenly sharp increase in disclosure of fatalities regarding opioids. On April 10, 2019, the Philadelphia Inquirer reported that from "Endo suddenly began to tell the FDA about a tidal wave of fatalities associated with Opana, and painkillers made by other companies. From November 2017 through August 2018, Endo reported 20,115 deaths to the FDA."

150.     Then, on September 10, 2019, the Governor of New York, Andrew Cuomo, announced that the New York State Department of Financial Services ("DFS") was "taking action" against, among others, the opioid manufacturers and distributors "to secure $2 billion for New York consumers who have shouldered the cost of the ongoing opioid epidemic in the form of higher insurance premiums." This announcement thus put Defendants on notice that DFS was going to investigate the Company's role in the opioid epidemic, in particular its training of sales representatives to market Endo Opioids, including Opana ER, to healthcare professionals and insurers. The announcement also confirmed for Defendants that Endo faced billions in liability for insurance fraud since the announcement stated that DFS has "clear statutory authority to impose fines of up to *$5,000 per offense in addition to the amount of the fraudulent claim*." Accordingly, all the Individual Defendants had to do to understand the scope of the liability the Company faced was to review records to which they had access to identify representations made to private insurance providers and the number of prescriptions filled by private insurers.

151.     The truth fully emerged on June 10, 2020, when New York Governor Andrew Cuomo announced the NYDFS Charges against Endo in connection with Endo's role in the opioid crisis. The DFS alleged that Endo had fraudulently misrepresented the safety and efficacy of its opioid drugs, minimizing the risk of addiction and other ill effects, and, among other things committed insurance fraud. On this news, Endo's Ordinary share price fell $0.66 per share, or 14.63%, to close at $3.85 per share on June 10, 2020.

## V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

152.     Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations and prospects. Specifically, Defendants failed to disclose that Endo had (i) engaged in

deceptive advertising in promoting its opioids; (ii) trained their sales representatives specifically to target healthcare professionals most likely to prescribe the most opioids without regardless of whether those prescriptions were legitimate; (iii) failed to implement a meaningful or effective system to identify and report opioid orders that had the hallmarks the government associated with drug diversion (*i.e.*, attempts to obtain or use prescription medicines illegally); and (iv) promoted one of its most profitable opioids, Opana ER, as safe and resistant to tampering when the Company knew it was ***impossible*** to prevent abusers from liquifying and injecting the drugs; and (v) that, as a result, the Company's public statements were materially false and misleading at all relevant times.

## A.    2017 Misstatements

153.    The Class Period begins on August 8, 2017, when the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2017 (the "2Q17 10-Q"). The 2Q17 10-Q was signed by Defendants Campanelli and Coleman.

154.    In a section entitled "Opioid-Related Litigations, Subpoenas and Document Requests," the 2Q17 10-Q listed at least 13 specific actions pending nationwide against Endo and its subsidiaries concerning the Company's marketing and sales practices with respect to opioid products. At the end of the list, the 2Q17 10-Q stated unequivocally that "***[w]e intend to contest the lawsuits identified above vigorously***." Elsewhere in the 2Q17 10-Q, however, with regard to other litigation that did ***not*** concern Endo's opioid products, Endo took pains to advise investors that "[i]n certain of these matters, ***the Company believes that a loss is probable*** and we have incorporated our best estimate of this loss into our reserve for loss contingencies." The 2Q17 10-Q, however, did not use this qualification in advising investors of the opioid-related actions facing the Company.

155.    Defendants' statements misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made because:

- Defendants knew that Endo had engaged in an over decade-long campaign to misrepresent the safety, efficacy and addictiveness of Endo Opioids by using sales representatives, KOLs, Front Groups, [CMEs], books, patient materials and print and web-advertising based to convince patients, healthcare providers, and insurers that the risks of opioid addiction were insignificant, patients that exhibited signs of addiction were actually suffering from "pseudoaddiction," which could be effectively treated, and patients most likely to become addicted could be identified and managed;

- Defendants knew that Endo had trained its sales representatives specifically to target healthcare professionals most likely to prescribe the most opioids without regardless of whether those prescriptions were legitimate;

- Defendants knew that Endo and/or its subsidiaries had failed to implement a meaningful or effective system to identify and report opioid orders that had the hallmarks the government associated with drug diversion (*i.e.*, attempts to obtain or use prescription medicines illegally), as required by the CSA;

- Defendants knew that Endo had engaged in a years-long campaign to specifically misrepresent the safety and efficacy of Opana ER that included (i) falsely portraying Opana ER as "crush-resistant," when it was not, (ii) misrepresenting that Endo had evidence to support its contention that Reformulated Opana ER was less susceptible to abuse than the original Opana ER, when Endo knew it was ***impossible*** to prevent opioid abusers from liquifying and injecting Opana ER intravenously.

- Defendants knew that although the Company faced potentially billions in liability in connection with opioid-related actions, its precarious financial position as a result of its declining revenues and increased leverage meant that the Company lacked sufficient capital to address liabilities arising from opioid-related actions.

156.    Additionally, the 2Q17 10-Q contained generic, boilerplate representations regarding Endo's supposed view of the risks associated with these opioid-related legal proceedings and investigations. For example, the 2Q 2017 10-Q advised investors that:

> We and certain of our subsidiaries are involved in various claims, legal proceedings, internal and governmental investigations (collectively, proceedings) that arise from time to time in the ordinary course of our business, including, among others, those relating to product liability, intellectual property, regulatory compliance and commercial matters. While we cannot predict the outcome of these proceedings and we intend to defend vigorously our position, an adverse outcome in any of these proceedings could have a material adverse effect on our current and future financial position, results of operations and cash flows. Matters that are not being disclosed herein are, in the opinion of our management, immaterial both individually and in the aggregate with respect to our financial position, results of operations and cash flows. If and when such matters, in the opinion of our management, become material either individually or in the aggregate, we will disclose such matters.

The 2Q 2017 10-Q advised investors that:

> Investigations and lawsuits similar to the foregoing matters may be brought by others. We are unable to predict the outcome of these investigations or litigations, which may involve additional requests for information. We are also unable to predict the ultimate legal and financial liability, if any, and at this time cannot reasonably estimate the possible loss or range of loss for these investigations or litigations, if any, but will explore all options as appropriate in our best interests.

157.    The warnings in paragraph 156 above were generic "catch-all" provisions that were not tailored to Endo's actual known risks with respect to the significant potential for further opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud, and were materially false or misleading for the reasons alleged above at paragraph 155.

158.    The 2Q17 10-Q also attributed, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than to

Defendants' own misconduct. For example, in a section entitled "Risk Factors," the 2Q17 10-Q asserted that, "in the age of social media, plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients for litigation, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool"; that, "[f]or these or other reasons, any significant product liability or mass tort litigation in which [Defendants] are a defendant could have a larger number of plaintiffs than such actions have seen historically and [Defendants] could also see an increase in number of cases filed against [them] because of the increasing use of widespread and media-varied advertising."

159.   The statements alleged above in paragraph 158 characterizing Endo's litigation risk as merely a reflection of the fact that "plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool," rather than the Company's misconduct, communicated to or gave investors the impression that the claims in opioid-related actions were a result of greater advertising capabilities of plaintiffs' lawyers rather than Endo's significant misconduct in promoting Endo Opioids, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced billions in liability in New York (and elsewhere). The statements were false and misleading when made for the reasons alleged above at paragraph 155.

160.   Additionally, the 2Q17 10-Q contained generic, boilerplate representations regarding Endo's supposed view of its liquidity risks. The 2Q17 10-Q disclosed that:

> We expect cash generated from operations together with our cash, cash equivalents, restricted cash and the revolving credit facilities to be sufficient to cover cash needs for working capital and general corporate purposes, contingent liabilities, payment of contractual obligations, principal and interest payments on our indebtedness, capital expenditures, ordinary share repurchases and any regulatory

and/or sales milestones that may become due over the next year. However, on a longer term basis, we may not be able to accurately predict the effect of certain developments on the rate of sales growth, such as the degree of market acceptance, patent protection and exclusivity of our products, the impact of competition, the effectiveness of our sales and marketing efforts and the outcome of our current efforts to develop, receive approval for and successfully launch our product candidates. Additionally, we may not be successful in implementing, or may face unexpected changes or expenses in connection with our strategic direction, including the potential for opportunistic corporate development transactions. Any of the above could adversely affect our future cash flows.

161.    The warning in paragraph 160 above was a generic "catch-all" provision that was not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud. The statements were materially false or misleading. Defendants knew that although the Company faced potentially billions in liability in connection with opioid-related actions, its precarious financial position as a result of its declining revenues and increased leverage meant that the Company lacked sufficient capital to address liabilities arising from opioid-related actions.

162.    Appended as exhibits to the 2Q17 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Campanelli and Coleman certified that "[t]he [2Q17 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [2Q17 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the 2Q17 10-Q, as set forth in paragraphs 154-161 above, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced liability in opioid-related actions due to its misconduct, as well as billions in liability in New York

for insurance fraud, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

163.   On August 31, 2017, The Philadelphia Inquirer reported that Pennsylvania municipality Bensalem Township had sued opioid manufacturers, including Endo, to force the companies to "change their practices and reimburse localities for expenses such as police activity related to addiction." The article stated that when asked for comment, an Endo spokeswoman said in an email that

> At Endo . . . our top priorities include patient safety and ensuring that patients with chronic pain have access to safe and effective therapeutic options. We share in the FDA's goal of appropriately supporting the needs of patients with chronic pain while preventing misuse and diversion of opioid products. It is Endo's policy not to comment on current litigation.'"

164.   As Campanelli, as Endo's then-CEO, Coleman, as Endo's then-CFO and Maletta, as Endo's then-CLO, had ultimate authority over the Endo spokeswoman's statement. The spokeswoman's statement communicated to or gave investors the impression to investors that the Company's highest priority was patient safety, yet failed to acknowledge that for at least a decade, it had initiated and funded a campaign which deceitfully marketed Endo Opioids, trained its sales representatives to market Endo Opioids to healthcare providers that were not experienced in treating chronic paid and without regard to whether those healthcare providers were writing legitimate prescriptions, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 155.

165.    On November 9, 2017, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2017 (the "3Q17 10-Q"). The 3Q17 10-Q was signed by Defendants Campanelli and Coleman.

166.    In a section entitled "Opioid-Related Matters," the 3Q17 10-Q listed dozens specific actions pending nationwide against Endo and its subsidiaries concerning the Company's marketing and sales practices with respect to opioid products. At the end of the list, the 3Q17 10-Q flatly stated that "***We intend to contest the lawsuits identified above vigorously***." Elsewhere in the 3Q17 10-Q, with regard to other litigation that did ***not*** concern Endo's opioid products, Endo took pains to advise investors that "[i]n certain of these matters, ***the Company believes that a loss is probable*** and we have incorporated our best estimate of this loss into our reserve for loss contingencies." The 3Q17 10-Q, however, did not use this qualification in advising investors of the opioid-related actions facing the Company.

167.    Defendants' statements misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 155.

168.    Additionally, the 3Q17 10-Q contained generic, boilerplate representations regarding Endo's supposed view of the risks associated with these opioid-related legal proceedings and investigations. For example, the 3Q 2017 10-Q advised investors that:

> We and certain of our subsidiaries are involved in various claims, legal proceedings, internal and governmental investigations (collectively, proceedings) that arise from time to time in the ordinary course of our business, including, among others, those relating to product liability, intellectual property, regulatory compliance and commercial matters. While we cannot predict the

outcome of these proceedings and we intend to defend vigorously our position, an adverse outcome in any of these proceedings could have a material adverse effect on our current and future financial position, results of operations and cash flows. Matters that are not being disclosed herein are, in the opinion of our management, immaterial both individually and in the aggregate with respect to our financial position, results of operations and cash flows. If and when such matters, in the opinion of our management, become material either individually or in the aggregate, we will disclose such matters.

The 3Q 2017 10-Q advised investors that:

Additional investigations and lawsuits similar to the foregoing matters may be brought by others or the foregoing matters may be expanded. We are unable to predict the outcome of these investigations or litigations, which may involve additional requests for information. We are also unable to predict the ultimate legal and financial liability, if any, and at this time cannot reasonably estimate the possible loss or range of loss for these investigations or litigations, if any, but will explore all options as appropriate in our best interests.

169. The warnings in paragraph 168 above were generic "catch-all" provisions that were not tailored to Endo's actual known risks with respect to the significant potential for further opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud, and were materially false or misleading for the reasons alleged above at paragraph 155.

170. Additionally, the 3Q17 10-Q contained generic, boilerplate representations regarding Endo's supposed view of its liquidity risks. The 3Q17 10-Q, modified the disclosure in the 2Q17 10-Q, disclosed that:

We expect cash generated from operations together with our cash, cash equivalents, restricted cash, restricted cash equivalents and the revolving credit facilities to be sufficient to cover our principal liquidity requirements over the next year. However, on a longer term basis, we may not be able to accurately predict the effect of certain developments on our sales and gross margins, such as the degree of market acceptance, patent protection and exclusivity of our products, pricing pressures (including those due to the impact of competition), the effectiveness of our sales and marketing efforts

and the outcome of our current efforts to develop, receive approval for and successfully launch our product candidates. We may also face unexpected expenses in connection with our business operations, ***including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities***. Furthermore, we may not be successful in implementing, or may face unexpected changes or expenses in connection with our strategic direction, including the potential for opportunistic corporate development transactions. Any of the above could adversely affect our future cash flows.

171.    The language in bold in paragraph 170 above was a generic "catch-all" provision that was not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud. The generic statement that the Company's ability to fund its operations because of a variety of issue, "including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities" was materially false or misleading because Defendants knew that although the Company faced potentially billions in liability in connection with opioid-related actions, its precarious financial position as a result of its declining revenues and increased leverage meant that the Company lacked sufficient capital to address liabilities arising from opioid-related actions.

172.    The 3Q17 10-Q also attributed, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than to Defendants' own misconduct. For example, in a section entitled "Risk Factors," the 3Q17 10-Q asserted that, "in the age of social media, plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients for litigation, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool"; that, "[f]or these or other reasons, any significant product liability or mass tort litigation in which [Defendants] are a defendant could have a larger number of plaintiffs than such actions have seen historically and

[Defendants] could also see an increase in number of cases filed against [them] because of the increasing use of widespread and media-varied advertising"; and that, "a ruling against other pharmaceutical companies in product liability or mass tort litigation in which we are not a defendant could have a negative impact on pending litigation where we are a defendant."

173.    The statements alleged above in paragraph 172 characterizing Endo's litigation risk as merely a reflection of the fact that "plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool," rather than the Company's misconduct, communicated to or gave investors the impression that the claims in opioid-related actions were a result of greater advertising capabilities of plaintiffs' lawyers rather than Endo's significant misconduct in promoting Endo Opioids, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced billions in liability in New York for insurance fraud. The statements were false and misleading when made for the reasons alleged above at paragraph 155.

174.    Appended as exhibits to the 3Q17 10-Q were signed certifications pursuant to SOX, wherein Defendants Campanelli and Coleman certified that "[t]he [3Q17 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [3Q17 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the 3Q17 10-Q, as set forth in paragraphs 166–73 above, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced liability in opioid-related actions due to its misconduct, as well as billions in liability in New York for insurance fraud, and thus did

not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

175.    On November 6, 2017, the State of Kentucky filed a lawsuit accusing Endo of using deceptive marketing to sell Opana ER. On that same day, *Reuters* published an article describing the lawsuit and its allegations. The article quoted Defendant Maletta as responding that allegations that Endo was trying to profit at the expense of people's health were "patently offensive," and that Endo "intend[s] to vigorously defend the company against the claims set forth in [the Kentucky] lawsuit."

176.    Defendant Maletta's statements in paragraph 175 above misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 155.

**B.     2018 Misstatements**

177.    On January 11, 2018, during pre-market hours, Endo issued a press release announcing that it had "received a grand jury subpoena from the United States Attorney's Office for the Southern District of Florida seeking documents and information relating to products containing oxymorphone" (the "January 2018 Press Release"). That press release disclosed, in relevant part:

> The subpoena broadly requests documents including, among others, those produced in past or pending lawsuits and those relating to product safety and efficacy, overdoses, diversion, thefts, overprescribing, abuse/misuse, dependency or tolerance, withdrawal, addictiveness, adverse events and manipulation. The subpoena also requests distribution and other third party agreements, together with sales and marketing, training, financial,

compensation and corporate information, as well as documents relating to interactions with various government agencies, including the U.S. Food and Drug Administration, Drug Enforcement Administration, Veterans Administration, Federal Trade Commission, Department of Health & Human Services, Medicare and Medicaid. Endo and EPI intend to be responsive to the subpoena and cooperate with any related government investigation.

178.    Although Defendants knew that Endo had engaged in a campaign for over a decade to falsely market its opioids as safe and non-addictive and turned a blind eye to opioid abuse, they nevertheless in the January 2018 Press Release falsely assured investors that, "[i]n all circumstances, it is Endo's policy to comply with applicable laws, rules, regulations and industry guidance governing the sale and marketing of pharmaceutical products."

179.    By unequivocally informing investors that it was Endo's policy to comply "*[i]n all circumstances*" with the rules and regulations governing the pharmaceutical industry, Defendants statement communicated to or gave investors the impression that the company complied with the law with respect to its marketing and sale of opioids, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 155.

180.    On February 27, 2018, the Company filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K was signed by Defendants Campanelli and Coleman.

181.    In a section entitled "Opioid-Related Matters," the 2017 10-K disclosed that:

Since 2014, multiple U.S. states, counties, other governmental persons or entities and private plaintiffs have filed suit against our subsidiaries EHSI and EPI, in some instances the Company and/or

our subsidiary Par Pharmaceutical, Inc. (PPI), and/or various other manufacturers, distributors and/or others, asserting claims relating to defendants' alleged sales, marketing and/or distribution practices with respect to prescription opioid medications, including certain of our products. As of February 20, 2018, the cases of which we were aware include, but are not limited to, cases filed by the states of Delaware, Kentucky, Mississippi, Missouri, New Mexico and Ohio; approximately *465 cases* filed by counties, cities, Native American tribes and/or other government-related persons or entities in Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Washington, West Virginia, Wisconsin and Puerto Rico; approximately *25 cases* filed by hospitals, health systems, unions, health and welfare funds or other third-party payers; and approximately *eight cases* alleging personal injury and/or wrongful death.

182.    After this disclosure, the 2017 10-K unequivocally stated that "***We will continue to vigorously defend the foregoing matters and to explore other options as appropriate in our best interests***." Defendants' statement misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 155.

183.    The 2017 10-K also attributed, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than to Defendants' own misconduct. For example,  in a section entitled "Risk Factors," the 2017 10-K asserted that, "in the age of social media, plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients for litigation, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool"; that, "[f]or these or

other reasons, any significant product liability or mass tort litigation in which [Defendants] are a defendant could have a larger number of plaintiffs than such actions have seen historically and [Defendants] could also see an increase in number of cases filed against [them] because of the increasing use of widespread and media-varied advertising"; and that, "a ruling against other pharmaceutical companies in product liability or mass tort litigation in which we are not a defendant could have a negative impact on pending litigation where we are a defendant."

184.    The statements alleged above in paragraph 183 characterizing Endo's litigation risk as merely a reflection of the fact that "plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool," rather than the Company's misconduct, communicated to or gave investors the impression that the claims in opioid-related actions were a result of greater advertising capabilities of plaintiffs' lawyers rather than Endo's significant misconduct in promoting Endo Opioids, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced billions in liability in New York for insurance fraud. The statements were false and misleading when made for the reasons alleged above at paragraph 155.

185.    The 2017 10-K also attributed the Company's risks arising out of the opioid crisis to negative media coverage, rather than Endo's own misconduct. For example, the 2017 10-K stated that:

> unfavorable media coverage of opioid pharmaceuticals could negatively affect our business, financial condition and results of operations. In recent years, opioid drug abuse has received a high degree of media coverage. Unfavorable publicity regarding, for example, the use or misuse of oxycodone or other opioid drugs, the limitations of abuse-deterrent forms (ADFs), public inquiries and investigations into prescription drug abuse, litigation or regulatory activity could adversely affect our reputation. Such negative

> publicity could have an adverse effect on the potential size of the market for our drug candidates and decrease revenues and royalties, which would adversely affect our business and financial status. Additionally, such increased scrutiny of opioids generally, whether focused on our products or otherwise, could negatively impact our relationship with healthcare providers and other members of the healthcare community.

186.    The statements alleged above in paragraph 185 characterizing Endo's business risk as merely a reflection of "a high degree of media coverage," "unfavorable publicity," and "increased scrutiny of opioids generally"—rather than the Company's severe misconduct—downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not apprise investors that the Company's prior conduct could result in billions in liability in New York (and elsewhere). By making these statements, which attributed the risk to Endo from the opioid epidemic to media coverage, Defendants had an obligation to disclose all facts necessary to make their statements not misleading. In addition, the statements were false and misleading when made for the reasons alleged above at paragraph 155.

187.    Additionally, the 2017 10-K contained generic, boilerplate representations regarding Endo's supposed view of its liquidity risks. The 3Q17 10-Q, modified the disclosure in the 2Q17 10-Q, disclosed that:

> We expect cash generated from operations together with our cash, cash equivalents, restricted cash and the revolving credit facilities to be sufficient to cover cash needs for working capital and general corporate purposes, contingent liabilities, payment of contractual obligations, principal and interest payments on our indebtedness, capital expenditures, ordinary share repurchases and any regulatory and/or sales milestones that may become due over the next year. However, on a longer term basis, we may not be able to accurately predict the effect of certain developments on the rate of sales growth, such as the degree of market acceptance, patent protection and exclusivity of our products, pricing pressures (including those due to the impact of competition), the effectiveness of our sales and marketing efforts and the outcome of our current efforts to develop, receive approval for and successfully launch our product candidates. We may also face unexpected expenses in connection with our

business operations, ***including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities***. Furthermore, we may not be successful in implementing, or may face unexpected changes or expenses in connection with our strategic direction, including the potential for opportunistic corporate development transactions. Any of the above could adversely affect our future cash flows.

188.    The warning in bold in paragraph 187 above was a generic "catch-all" provision that was not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud. The generic statement that the Company's ability to fund its operations because of a variety of issue, "including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities" was materially false or misleading because Defendants knew that although the Company faced potentially billions in liability in connection with opioid-related actions, its precarious financial position as a result of its declining revenues and increased leverage meant that the Company lacked sufficient capital to address liabilities arising from opioid-related actions.

189.    Appended as exhibits to the 2017 10-K were signed certifications pursuant to SOX, wherein Defendants Campanelli and Coleman certified that "[t]he [2017 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [2017 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the 2017 10-K, as set forth in paragraphs 177–188 above, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced liability in opioid-related actions due to its misconduct, as well as billions in liability in New York for insurance fraud, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

190.    On May 8, 2018, the Company filed a quarterly report on Form 10-Q with the SEC,

reporting the Company's financial and operating results for the quarter ended March 31, 2018 (the

"1Q18 10-Q"). The 1Q18 10-Q was signed by Defendants Campanelli and Coleman.

191.    In a section entitled "*Opioid-Related Matters*" the 1Q18 10-Q disclosed that:

> Since 2014, multiple U.S. states, counties, other governmental
> persons or entities and private plaintiffs have filed suit against our
> subsidiaries Endo Health Solutions Inc. (EHSI) and EPI, in some
> instances the Company and/or our subsidiaries Par Pharmaceutical,
> Inc. (PPI), Vintage Pharmaceuticals, LLC and/or Generics Bidco I,
> LLC, and/or various other manufacturers, distributors and/or others,
> asserting claims relating to defendants' alleged sales, marketing
> and/or distribution practices with respect to prescription opioid
> medications, including certain of our products. As of May 1, 2018,
> the cases of which we were aware include, but are not limited to,
> approximately *10 cases* filed by states; approximately *780 cases*
> filed by counties, cities, Native American tribes and/or other
> government-related persons or entities; approximately *50 cases*
> filed by hospitals, health systems, unions, health and welfare funds
> or other third-party payers; and approximately *20 cases* filed by
> individuals.

192.    After this disclosure, the 1Q18 10-Q unequivocally stated that "*We will continue*

*to vigorously defend the foregoing matters and to explore other options as appropriate in our*

*best interests*." Elsewhere in the 1Q18 10-Q, with regard to other litigation that did *not* concern

Endo's opioid products, Endo took pains to advise investors that the Company had concluded "*that*

*a loss is probable* with respect to these matters." The 1Q18 10-Q, however, did not use this

qualification in advising investors of the opioid-related actions facing the Company.

193.    Defendants' statements misleadingly downplayed the allegations in the actions, did

not fully apprise investors of the extent of the Company's misconduct in marketing and selling

opioids, and did not advise investors that the Company faced billions in liability in New York for

insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements

were false and misleading when made, however, for the reasons alleged above at paragraph 155.

194.    Additionally, the 1Q18 10-Q directed investors to the 2017 10-K "[f]or a discussion of our risk factors, see the information in Item 1A. 'Risk Factors' in our Annual Report on Form 10-K for the year ended December 31, 2017 (Annual Report). There have been no material changes in our risk factors from those described in our Annual Report, except as set forth below." The 1Q18 10-Q thus incorporated the risk factor in the 2017 10-K that attributed, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than to Defendants' own misconduct as described in paragraphs 185–86 above. The 1Q18 10-Q also incorporated the risk factor in the 2017 10-K that attributed, in part, the risks to the Company's business from the opioid epidemic to negative media publicity. Accordingly, by incorporating the disclosure from the 2017 10-K the 1Q18 10-Q misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. The statements were false and misleading when made for the reasons alleged above at paragraph 155.

195.    Additionally, the 1Q18 10-Q contained generic, boilerplate representations regarding Endo's supposed view of its liquidity risks. The 1Q18 10-Q, disclosed that:

> We expect cash generated from operations together with our cash, cash equivalents, restricted cash and the revolving credit facilities to be sufficient to cover cash needs for working capital and general corporate purposes, contingent liabilities, payment of contractual obligations, principal and interest payments on our indebtedness, capital expenditures, ordinary share repurchases and any regulatory and/or sales milestones that may become due over the next year. However, on a longer term basis, we may not be able to accurately predict the effect of certain developments on the rate of sales growth, such as the degree of market acceptance, patent protection and exclusivity of our products, pricing pressures (including those due to the impact of competition), the effectiveness of our sales and

marketing efforts and the outcome of our current efforts to develop, receive approval for and successfully launch our product candidates. We may also face unexpected expenses in connection with our business operations, ***including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities.*** Furthermore, we may not be successful in implementing, or may face unexpected changes or expenses in connection with our strategic direction, including the potential for opportunistic corporate development transactions. Any of the above could adversely affect our future cash flows.

196. The warning in bold in paragraph 195 above was a generic "catch-all" provision that was not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud. The generic statement that the Company's ability to fund its operations because of a variety of issue, "including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities" was materially false or misleading because Defendants knew that although the Company faced potentially billions in liability in connection with opioid-related actions, its precarious financial position as a result of its declining revenues and increased leverage meant that the Company lacked sufficient capital to address liabilities arising from opioid-related actions.

197. Appended as exhibits to the 1Q18 10-Q were signed certifications pursuant to the SOX, wherein Defendants Campanelli and Coleman certified that "[t]he [1Q18 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [1Q18 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the 1Q18 10-Q, as set forth in paragraphs 181–96 above, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced liability in opioid-related actions

due to its misconduct, as well as billions in liability in New York for insurance fraud, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

198.    On August 8, 2018, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2018 (the "2Q18 10-Q"). The 2Q18 10-Q was signed by Defendants Campanelli and Coleman.

199.    In a section entitled "Opioid-Related Matters" the 2Q18 10-Q disclosed that:

> Since 2014, multiple U.S. states, counties, other governmental persons or entities and private plaintiffs have filed suit against certain of our subsidiaries, including Endo Health Solutions Inc. (EHSI), EPI, Par Pharmaceutical, Inc. (PPI), Par Pharmaceutical Companies, Inc. (Par), Vintage Pharmaceuticals, LLC and/or Generics Bidco I, LLC and, in some instances, the Company, as well as various other manufacturers, distributors and/or others, asserting claims relating to defendants' alleged sales, marketing and/or distribution practices with respect to prescription opioid medications, including certain of our products. As of July 31, 2018, the cases of which we were aware include, but are not limited to, approximately *11 cases* filed by states; approximately *1,221 cases filed* by counties, cities, Native American tribes and/or other government-related persons or entities; approximately *78 cases* filed by hospitals, health systems, unions, health and welfare funds or other third-party payers; and approximately *26 cases* filed by individuals. Certain of the cases have been filed as putative class actions.

200.    After this disclosure, the 2Q18 10-Q unequivocally stated that "*We will continue to vigorously defend the foregoing matters and to explore other options as appropriate in our best interests*." Elsewhere in the 2Q18 10-Q, with regard to other litigation that did *not* concern Endo's opioid products, Endo took pains to advise investors that the Company had concluded "*that a loss is probable* with respect to these matters." The 2Q18 10-Q, however, did not use this qualification in advising investors of the opioid-related actions facing the Company.

201.    Defendants' statements misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 155.

202.    Additionally, the 2Q18 10-Q directed investors to the 2017 10-K and 1Q18 10-Q "[f]or a discussion of our risk factors . . . . There have been no material changes in our risk factors from those described therein." The 2Q18 10-Q thus incorporated the risk factor in the 2017 10-K that attributed, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than to Defendants' own misconduct as described in paragraph 185 above. The 2Q18 10-Q also incorporated the risk factor in the 2017 10-K that attributed, in part, the risks to the Company's business from the opioid epidemic to negative media publicity. Accordingly, by incorporating the disclosures from the 2017 10-K and the 1Q18 10-Q, the 2Q18 10-Q Defendants' statements misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. By making these statements, which attributed the risk to Endo from the opioid epidemic to media coverage, Defendants had an obligation to disclose all facts necessary to make their statements not misleading. In addition, the statements were false and misleading when made for the reasons alleged above at paragraph 155.

203.    Additionally, the 2Q18 10-Q contained generic, boilerplate representations regarding Endo's supposed view of its liquidity risks. The 2Q18 10-Q, disclosed that:

We expect cash generated from operations together with our cash, cash equivalents, restricted cash and the revolving credit facilities to be sufficient to cover our principal liquidity requirements over the next year. However, on a longer term basis, we may not be able to accurately predict the effect of certain developments on our sales and gross margins, such as the degree of market acceptance, patent protection and exclusivity of our products, pricing pressures (including those due to the impact of competition), the effectiveness of our sales and marketing efforts and the outcome of our current efforts to develop, receive approval for and successfully launch our product candidates. We may also face unexpected expenses in connection with our business operations, ***including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities***. Furthermore, we may not be successful in implementing, or may face unexpected changes or expenses in connection with our strategic direction, including the potential for opportunistic corporate development transactions. Any of the above could adversely affect our future cash flows.

204.    The warning in bold in paragraph 203 above was a generic "catch-all" provision that was not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud. The generic statement that the Company's ability to fund its operations because of a variety of issue, "including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities" was materially false or misleading because Defendants knew that although the Company faced potentially billions in liability in connection with opioid-related actions, its precarious financial position as a result of its declining revenues and increased leverage meant that the Company lacked sufficient capital to address liabilities arising from opioid-related actions.

205.    Appended as exhibits to the 2Q18 10-Q were signed certifications pursuant to the SOX, wherein Defendants Campanelli and Coleman certified that "[t]he [2Q18 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [2Q18 10-Q] fairly presents, in all material respects,

the financial condition and results of operations of the Company." These statements were false and misleading because the 2Q18 10-Q, as set forth in paragraphs 199–204 above, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced liability in opioid-related actions due to its misconduct, as well as billions in liability in New York for insurance fraud, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

206.    On November 8, 2018, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2018 (the "3Q18 10-Q"). The 3Q18 10-Q was signed by Defendants Campanelli and Coleman.

207.    In a section entitled "Opioid-Related Litigations, Subpoenas and Document Requests,"

> Since 2014, multiple U.S. states, counties, other governmental persons or entities and private plaintiffs have filed suit against certain of our subsidiaries, including Endo Health Solutions Inc. (EHSI), EPI, Par Pharmaceutical, Inc. (PPI), Par Pharmaceutical Companies, Inc. (Par), Vintage Pharmaceuticals, LLC and/or Generics Bidco I, LLC and, in some instances, the Company, as well as various other manufacturers, distributors and/or others, asserting claims relating to defendants' alleged sales, marketing and/or distribution practices with respect to prescription opioid medications, including certain of our products. As of November 1, 2018, the cases of which we were aware include, but are not limited to, approximately *11 cases* filed by or on behalf of states; approximately *1,505 cases* filed by counties, cities, Native American tribes and/or other government-related persons or entities; approximately *112 cases* filed by hospitals, health systems, unions, health and welfare funds or other third-party payers; and approximately *48 cases* filed by individuals. Certain of the cases have been filed as putative class actions.

208.    After this disclosure, the 3Q18 10-Q unequivocally stated that "***We will continue to vigorously defend the foregoing matters and to explore other options as appropriate in our best interests***."

209.    Defendants' statement misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 155.

210.    Additionally, the 3Q18 10-Q downplayed the scope of Defendants' wrongdoing and responsibility for the opioid-related actions by attributing, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than to Defendants' own misconduct. For example, in a section entitled "Risk Factors," the 3Q18 10-Q asserted that, "in the age of social media, plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients for litigation, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool"; that, "[f]or these or other reasons, any significant product liability or mass tort litigation in which [Defendants] are a defendant could have a larger number of plaintiffs than such actions have seen historically and [Defendants] could also see an increase in number of cases filed against [them] because of the increasing use of widespread and media-varied advertising"; and that, "a ruling against other pharmaceutical companies in product liability or mass tort litigation in which we are not a defendant could have a negative impact on pending litigation where we are a defendant."

211.    The statements alleged above in paragraph 210 characterizing Endo's litigation risk as merely a reflection of the fact that "plaintiffs' attorneys have a wide variety of tools to advertise

their services and solicit new clients, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool," rather than the Company's misconduct, rather than the Company's misconduct, communicated to or gave investors the impression that the claims in opioid-related actions were a result of greater advertising capabilities of plaintiffs' lawyers rather than Endo's significant misconduct in promoting Endo Opioids, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced billions in liability in New York for insurance fraud. The statements were false and misleading when made for the reasons alleged above at paragraph 155.

212.   The 3Q18 10-Q also included a "risk factor" that attributed risks to Endo's business from the opioid epidemic to "public concern," "media stories," and "novel" uses of laws by "government and private persons and entities," rather than Defendants' own misconduct. The 3Q18 10-Q stated that:

> ***Public concern around the abuse of opioids, including law enforcement concerns over diversion and marketing of opioids, and regulatory efforts to combat abuse, could result in costs to our business.***
>
> Media stories regarding prescription drug abuse and the diversion of opioids and other controlled substances are commonplace. Aggressive enforcement and unfavorable publicity regarding, for example, the use or misuse of opioid drugs; the limitations of abuse-deterrent formulations; the ability of drug abusers to discover previously unknown ways to abuse our products; public inquiries and investigations into prescription drug abuse; litigation; or regulatory activity regarding sales, marketing, distribution or storage of opioids could have a material adverse effect on our reputation and impact on the results of litigation.
>
> Opioid manufacturers have been the subject of significant current civil and criminal investigatory and enforcement action. In addition, numerous governmental and private persons and entities are pursuing civil litigation against opioid manufacturers and distributors, invoking current laws and regulations relating to

opioids and/or other prescription medicines, as well as novel uses of other laws that seek to hold accountable opioid manufacturers for opioid misuse.

213.    The statements alleged above in paragraph 212 characterizing Endo's business risk as merely a reflection of "*[p]ublic concern around the abuse of opioids*," "*media stories* regarding prescription drug abuse and the diversion of opioids," and "civil litigation against opioid manufacturers and distributors, invoking current laws and regulations relating to opioids and/or other prescription medicines, as well *as novel uses of other laws*," rather than the Company's severe misconduct, misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. By making these statements, which attributed the risk to Endo from the opioid epidemic to media coverage, Defendants had an obligation to disclose all facts necessary to make their statements not misleading. In addition, the statements were false and misleading when made for the reasons alleged above at paragraph 155.

214.    Additionally, the 3Q18 10-Q contained generic, boilerplate representations regarding Endo's supposed view of its liquidity risks. The 3Q18 10-Q, disclosed that:

> We expect cash generated from operations together with our cash, cash equivalents, restricted cash, restricted cash equivalents and the revolving credit facilities to be sufficient to cover our principal liquidity requirements over the next year. However, on a longer term basis, we may not be able to accurately predict the effect of certain developments on our sales and gross margins, such as the degree of market acceptance, patent protection and exclusivity of our products, pricing pressures (including those due to the impact of competition), the effectiveness of our sales and marketing efforts and the outcome of our current efforts to develop, receive approval for and successfully launch our product candidates. We may also face unexpected expenses in connection with our business operations, *including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities*. Furthermore, we may not be successful in

implementing, or may face unexpected changes or expenses in connection with our strategic direction, including the potential for opportunistic corporate development transactions. Any of the above could adversely affect our future cash flows.

215.    The warning in bold in paragraph 214 above was a generic "catch-all" provision that was not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud. The generic statement that the Company's ability to fund its operations because of a variety of issue, "including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities" was materially false or misleading because Defendants knew that although the Company faced potentially billions in liability in connection with opioid-related actions, its precarious financial position as a result of its declining revenues and increased leverage meant that the Company lacked sufficient capital to address liabilities arising from opioid-related actions.

216.    Appended as exhibits to the 3Q18 10-Q were signed certifications pursuant to SOX, wherein Defendants Campanelli and Coleman certified that "[t]he [3Q18 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [3Q18 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the 3Q18 10-Q, as set forth in paragraphs 207–15 above, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced liability in opioid-related actions due to its misconduct, as well as billions in liability in New York for insurance fraud, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

217.    On December 7, 2018, the Philadelphia Inquirer published an article entitled, "Managing the Risks of Opioids: Endo outlines how it takes accountability in selling addictive drugs." The article quoted Defendant Maletta as saying, "Our view is that *we've done everything properly*," he added. "We deny the allegations in the complaints and we're proud to talk about our business practices. Hopefully, other companies will follow suit."

218.    Defendants Maletta's statement that "*we've done everything properly*" and "*[w]e deny the allegations* in the complaints,*" communicated to or gave investors the impression that Endo had not engaged in any misconduct in connection with the opioid crisis, misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 155.

## C.    2019 Misstatements

219.    On February 28, 2019, the Company filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Campanelli and Coleman.

220.    In a section entitled "Opioid-Related Matters," the 2018 10-K listed disclosed that:

> Since 2014, multiple U.S. states, counties, other governmental persons or entities and private plaintiffs have filed suit against us and/or certain of our subsidiaries, including Endo Health Solutions Inc. (EHSI), EPI, Par Pharmaceutical, Inc. (PPI), Par Pharmaceutical Companies, Inc., Vintage Pharmaceuticals, LLC, Generics Bidco I, LLC and DAVA Pharmaceuticals, LLC, as well as various other manufacturers, distributors and/or others, asserting claims relating to defendants' alleged sales, marketing and/or distribution practices with respect to prescription opioid

medications, including certain of our products. As of February 21, 2019, the cases of which we were aware include, but are not limited to, approximately *12 cases* filed by or on behalf of states; approximately *1,711 cases* filed by counties, cities, Native American tribes and/or other government-related persons or entities; approximately *121 cases* filed by hospitals, health systems, unions, health and welfare funds or other third-party payers and approximately *56 cases* filed by individuals. Certain of the cases have been filed as putative class actions.

221. After this disclosure, the 2018 10-K unequivocally stated that "*We will continue to vigorously defend the foregoing matters and to explore other options as appropriate in our best interests*."

222. Defendants' statement misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 155.

223. The 2018 10-K also attributed the Company's risks arising out of the opioid crisis to negative media coverage, rather than Endo's own misconduct. For example, the 2018 10-K stated that:

unfavorable media coverage of opioid pharmaceuticals could negatively affect our business, financial condition and results of operations. In recent years, opioid drug abuse has received a high degree of media coverage. Unfavorable publicity regarding, for example, the use or misuse of oxycodone or other opioid drugs, the limitations of abuse-deterrent forms, public inquiries and investigations into prescription drug abuse, litigation or regulatory activity could adversely affect our reputation. Such negative publicity could have an adverse effect on the potential size of the market for our drug candidates and decrease revenues and royalties, which would adversely affect our business and financial status. Additionally, such increased scrutiny of opioids generally, whether focused on our products or otherwise, could negatively impact our relationship with healthcare providers and other members of the healthcare community.

224.    The statements alleged above in paragraph 223 characterizing Endo's business risk as merely a reflection of "a high degree of media coverage," "unfavorable media coverage," "negative publicity" and "increased scrutiny of opioids generally"—rather than the Company's severe misconduct—downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not apprise investors that the Company's prior conduct could result in billions in liability in New York (and elsewhere). By making these statements, which attributed the risk to Endo from the opioid epidemic to media coverage, Defendants had an obligation to disclose all facts necessary to make their statements not misleading. In addition, the statements were false and misleading when made for the reasons alleged above at paragraph 155.

225.    Additionally, the 2018 10-K downplayed the scope of Defendants' wrongdoing and responsibility for the opioid-related actions by attributing, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than to Defendants' own misconduct. For example, in a section entitled "Risk Factors," the 2018 10-K asserted that, "in the age of social media, plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients for litigation, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool"; that, "[f]or these or other reasons, any significant product liability or mass tort litigation in which [Defendants] are a defendant could have a larger number of plaintiffs than such actions have seen historically and [Defendants] could also see an increase in number of cases filed against [them] because of the increasing use of widespread and media-varied advertising"; and that, "a ruling against other pharmaceutical companies in product liability or mass tort litigation in which we are not a defendant could have a negative impact on pending litigation where we are a defendant."

226.    The statements alleged above in paragraph 225 characterizing Endo's litigation risk as merely a reflection of the fact that "plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool," rather than the Company's misconduct, communicated to or gave investors the impression that the claims in opioid-related actions were a result of greater advertising capabilities of plaintiffs' lawyers rather than Endo's significant misconduct in promoting Endo Opioids, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced billions in liability in New York for insurance fraud. The statements were false and misleading when made for the reasons alleged above at paragraph 155.

227.    The 2018 10-K also included a "risk factor" that attributed risks to Endo's business from the opioid epidemic to "public concern," "media stories," and "novel" uses of laws by "government and private persons and entities," rather than Defendants' own misconduct. The 2018 10-K stated that:

> *Public concern around the abuse of opioids, including law enforcement concerns over diversion and marketing of opioids, and regulatory efforts to combat abuse, could result in costs to our business.*
>
> Media stories regarding prescription drug abuse and the diversion of opioids and other controlled substances are commonplace. Aggressive enforcement and unfavorable publicity regarding, for example, the use or misuse of opioid drugs; the limitations of abuse-deterrent formulations; the ability of drug abusers to discover previously unknown ways to abuse our products; public inquiries and investigations into prescription drug abuse; litigation or regulatory activity regarding sales, marketing, distribution or storage of opioids could have a material adverse effect on our reputation and impact on the results of litigation.
>
> Manufacturers of prescription opioid medications have been the subject of significant civil and criminal investigatory and enforcement action even in cases where such medications have

received approval from the FDA or similar regulatory authorities. In addition, numerous governmental and private persons and entities are pursuing civil litigation against opioid manufacturers and distributors, invoking current laws and regulations relating to opioids and/or other prescription medicines, as well as novel uses of other laws that seek to hold accountable opioid manufacturers for opioid misuse. See Note 15. Commitments and Contingencies in the Consolidated Financial Statements included in Part IV, Item 15 of this report for more information.

228.     The statements alleged above in paragraph 227 characterizing Endo's business risk as merely a reflection of "*[p]ublic concern around the abuse of opioids*," "*media stories* regarding prescription drug abuse and the diversion of opioids," and "civil litigation against opioid manufacturers and distributors, invoking current laws and regulations relating to opioids and/or other prescription medicines, as well *as novel uses of other laws*," rather than the Company's severe misconduct, misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. By making these statements, which attributed the risk to Endo from the opioid epidemic to media coverage, Defendants had an obligation to disclose all facts necessary to make their statements not misleading. In addition, the statements were false and misleading when made for the reasons alleged above at paragraph 155.

229.     The 2018 10-K, for the first time, included the following risk factor:

> *Our ability to fund our operations, maintain liquidity and meet our financing obligations is reliant on our operations, which are subject to significant risks and uncertainties.*
>
> We rely on cash from operations as well as access to the financial markets to fund our operations, maintain liquidity and meet our financial obligations. Our operations are subject to many significant risks and uncertainties, such as the risks described in this "Risk Factors" section, several of which may be outside of our control.
>
> . . . .

Additionally, we face significant risks and uncertainties relating to our outstanding and future legal proceedings and governmental investigations, including those related to our sale, marketing and/or distribution of prescription opioid medications. See the risk factor "We have been, continue to be and may be the subject of lawsuits, product liability claims, other significant legal proceedings, government investigations or product recalls for which we may be unable to obtain or maintain insurance adequate to cover potential liabilities" for more information.

. . . .

If we are unable to fund our operations and liquidity needs, such as future capital expenditures and payment of our indebtedness, we may be required to refinance all or part of our then-existing indebtedness, sell assets, reduce or delay capital expenditures, seek to raise additional capital, pursue one or more internal reorganizations and/or other restructuring activities, strategic corporate alignment and cost-saving initiatives or other significant corporate transactions, any of which could have a material adverse effect on our operations and financial condition. Any refinancing of our substantial indebtedness could be at significantly higher interest rates, which will depend on the conditions of the markets and our financial condition at such time, and may require us to comply with more onerous covenants, which could further restrict our business operations. In addition, the terms of existing or future debt agreements may restrict us from adopting any of these alternatives. Likewise, any internal reorganizations and/or other restructuring activities, strategic corporate alignment and cost-saving initiatives or other significant corporate transactions may be complex, could entail significant costs and charges or could otherwise negatively impact shareholder value and there can be no assurance that we will be able to accomplish any of these alternatives on terms acceptable to us, or at all. The failure to generate sufficient liquidity or to achieve any of these alternatives could materially adversely affect our business, financial condition and results of operations.

230.    Additionally, the 2018 10-K contained generic, boilerplate representations regarding Endo's supposed view of its liquidity. The 2018 10-K, disclosed that:

We expect cash generated from operations together with our cash, cash equivalents, restricted cash, restricted cash equivalents and the revolving credit facilities to be sufficient to cover our principal liquidity requirements over the next year. However, on a longer term basis, we may not be able to accurately predict the effect of certain developments on our sales and gross margins, such as the degree of

89

market acceptance, patent protection and exclusivity of our products, pricing pressures (including those due to the impact of competition), the effectiveness of our sales and marketing efforts and the outcome of our current efforts to develop, receive approval for and successfully launch our product candidates. We may also face unexpected expenses in connection with our business operations, *including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities*. Furthermore, we may not be successful in implementing, or may face unexpected changes or expenses in connection with our strategic direction, including the potential for opportunistic corporate development transactions. Any of the above could adversely affect our future cash flows.

231.    Read together, the warnings above in paragraphs 229–30 above were not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud. The statement "we face significant risks and uncertainties relating to our outstanding and future legal proceedings and governmental investigations, including those related to our sale, marketing and/or distribution of prescription opioid medications" directed investors to a risk factor that misleadingly attributed the Company's exposure to liability to overzealous plaintiffs' attorneys and downplayed the Company's misconduct. In addition, the warnings were misleading because they did not disclose that Defendants knew that the Company already lacked sufficient liquidity to address the full scope of the liability it was facing in opioid-related actions.

232.    Appended as exhibits to 2018 10-K were signed certifications pursuant to SOX, wherein Defendants Campanelli and Coleman certified that "[t]he [2018 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [2018 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the 2018 10-K, as set forth in paragraphs 220–31 above, downplayed the scope of the

Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced liability in opioid-related actions due to its misconduct, as well as billions in liability in New York for insurance fraud, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

233.    On April 10, 2019, The Philadelphia Inquirer reported that Endo had "suddenly" begun "tell[ing] the FDA about a tidal wave of fatalities associated with Opana, and painkillers made by other companies." The article went on to state that after reporting only approximately *250* deaths over the prior ten years, "[f]rom November 2017 through August 2018, Endo reported *20,115 deaths* to the FDA." The article stated that "the thousands of deaths span roughly two decades" and noted that Endo had begun submitting the reports two months after it had voluntarily discontinued Opana ER at the FDA's request. In the article, Endo spokesperson Heather Zoumas Lubeski denied that all the reports concerned Endo's products. She also stated that Endo, ***"is vigorously defending these lawsuits, denies that it has any liability to the plaintiffs***, and continues to work with the FDA to submit appropriate reports." Defendant Campanelli, as Endo's CEO, Defendant Coleman, as Endo's CFO, and Defendant Maletta, as CLO had ultimate authority over Lubeski's statement because they authorized her to make it and approved its content.

234.    Defendants statements, made through Lubeski, that Endo "***is vigorously defending these lawsuits [and] denies that it has any liability to the plaintiffs***" misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 155.

235.    On May 9, 2019, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2019 (the "1Q19 10-Q"). The 1Q19 10-Q was signed by Defendants Campanelli and Coleman.

236.    In a section entitled "*Opioid-Related Matters*" the 1Q18 10-Q disclosed that:

> Since 2014, multiple U.S. states, counties, other governmental persons or entities and private plaintiffs have filed suit against us and/or certain of our subsidiaries, including Endo Health Solutions Inc. (EHSI), EPI, PPI, Par Pharmaceutical Companies, Inc. (PPCI), Vintage Pharmaceuticals, LLC, Generics Bidco I, LLC and DAVA Pharmaceuticals, LLC, as well as various other manufacturers, distributors and/or others, asserting claims relating to defendants' alleged sales, marketing and/or distribution practices with respect to prescription opioid medications, including certain of our products. As of May 2, 2019, the cases of which we were aware include, but are not limited to, approximately *13 cases* filed by or on behalf of states; approximately *1,925 cases* filed by counties, cities, Native American tribes and/or other government-related persons or entities; approximately *136 cases* filed by hospitals, health systems, unions, health and welfare funds or other third-party payers and approximately *59 cases* filed by individuals. Certain of the cases have been filed as putative class actions.

237.    After this disclosure, the 1Q19 10-Q unequivocally stated that "***We will continue to vigorously defend the foregoing matters and to explore other options as appropriate in our best interests***."

238.    Defendants' statement misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 155.

239.    Additionally, the 1Q19 10-Q downplayed the scope of Defendants' wrongdoing and responsibility for the opioid-related actions by attributing, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical

companies, rather than to Defendants' own misconduct. For example, in a section entitled "Risk Factors," the 1Q19 10-Q asserted that, "in the age of social media, plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients for litigation, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool"; that, "[f]or these or other reasons, any significant product liability or mass tort litigation in which [Defendants] are a defendant could have a larger number of plaintiffs than such actions have seen historically and [Defendants] could also see an increase in number of cases filed against [them] because of the increasing use of widespread and media-varied advertising"; and that, "a ruling against other pharmaceutical companies in product liability or mass tort litigation in which we are not a defendant could have a negative impact on pending litigation where we are a defendant." Moreover, the 1Q19 attributed the risks to Endo's business as a result of the opioid epidemic to negative publicity, rather than the Company's own conduct, stating that "we and other manufacturers of prescription opioid medications have been, and will likely continue to be, subject to negative publicity and press, which could harm our brand and the demand for our products."

240.     The statements alleged above in paragraph 239 characterizing Endo's litigation risk as merely a reflection of the fact that "plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool," rather than the Company's misconduct, communicated to or gave investors the impression that the claims in opioid-related actions were a result of greater advertising capabilities of plaintiffs' lawyers rather than Endo's significant misconduct in promoting Endo Opioids, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced billions in liability in New York for insurance fraud. The statements were false

and misleading when made for the reasons alleged above at paragraph 155. In addition, by making these statements, which attributed the risk to Endo from the opioid epidemic to media coverage, Defendants had an obligation to disclose all facts necessary to make their statements not misleading.

241. Additionally, the 1Q19 10-Q contained generic, boilerplate representations regarding Endo's supposed view of its liquidity risks. The 1Q19 10-Q, disclosed that:

> We expect cash generated from operations together with our cash, cash equivalents, restricted cash, restricted cash equivalents and the Revolving Credit Facility to be sufficient to cover our principal liquidity requirements over the next year. However, on a longer term basis, we may not be able to accurately predict the effect of certain developments on our sales and gross margins, such as the degree of market acceptance, patent protection and exclusivity of our products, pricing pressures (including those due to the impact of competition), the effectiveness of our sales and marketing efforts and the outcome of our current efforts to develop, receive approval for and successfully launch our product candidates. We may also face unexpected expenses in connection with our business operations, ***including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities***. Furthermore, we may not be successful in implementing, or may face unexpected changes or expenses in connection with our strategic direction, including the potential for opportunistic corporate development transactions. Any of the above could have a material adverse effect on our business, financial condition, results of operations and cash flows.

242. The statement in bold in paragraph 241 above, when read together with the statements in paragraphs 229–30 above, which were incorporated by reference from the 2018 10-K, were not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud. The statement "we face significant risks and uncertainties relating to our outstanding and future legal proceedings and governmental investigations, including those related to our sale, marketing and/or distribution of

prescription opioid medications" directed investors to a risk factor that misleadingly attributed the Company's exposure to liability to overzealous plaintiffs' attorneys and downplayed the Company's misconduct. In addition, the warnings were misleading because they did not disclose that Defendants knew that the Company already lacked sufficient liquidity to address the full scope of the liability it was facing in opioid-related actions.

243. Appended as exhibits to the 1Q19 10-Q were signed certifications pursuant to the SOX, wherein Defendants Campanelli and Coleman certified that "[t]he [1Q19 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [1Q19 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the 1Q19 10-Q, as set forth in paragraphs 236–42 above, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced liability in opioid-related actions due to its misconduct, as well as billions in liability in New York for insurance fraud, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

244. Late in the day on June 28, 2019, a Friday, Endo filed an 8-K (the "July 2019 8-K"), which was signed by Defendant Maletta. The 8-K announced that Endo had drawn—*i.e.*, borrowed—$300 million from its $1 billion revolving credit facility through its subsidiary Endo Luxembourg Finance Company I S.à r.l. Defendant Campanelli, as Endo's CEO, and Defendant Coleman, as Endo's CFO, made the decision to draw on the revolving credit facility.

245. The 8-K stated that Endo's draw had effectively "maxed out" the credit facility because covenants in the Company's credit agreements contained "certain conditions that limit the

Company's ability to incur additional secured indebtedness" beyond what Endo had just drawn on the revolver. The 8-K also stated that Endo "expects to use the proceeds from the borrowing under the Revolving Credit Facility for purposes consistent with the Company's previously stated capital allocation priorities, including for general corporate purposes." The Company also told the market that it had borrowed the $300 million to "provide additional flexibility and strategic optionality."

246.    The investment press quickly questioned the Company's timing and reasons for drawing on the credit facility. On July 1, 2019, *i.e.*, the following Monday, Bloomberg Senior Credit Analyst Mike Holland told investors that "[a]nnouncing a max revolver drawing late on a summer Friday without any explanation generally doesn't bode well for a company's stock and bond prices Monday morning." And on July 1, 2019 Barron's Online published an article noting pointedly that while one analyst had claimed to believe that the drawdown was not related to the opioid settlement, "the company did not respond to [Barron's] query if the loan was taken to pay for an opioid settlement."

247.    Defendants' statements in the July 2019 8-K were false and misleading because the loan was clearly to provide the Company with the liquidity it needed to enter into opioid settlements. Describing the loan as for settlement purposes would have disclosed to the market that Defendants knew that the Company faced extensive liability for its role in the opioid crisis. Once Defendants decided to explain *why* it was taking out the loan, Defendants had an obligation to disclose the full truth about the loan. Defendants violated this duty by failing to disclose that it was, in whole or in part, for the purposes of resolving claims against Endo for its role in the opioid crisis.

248.    On August 5, 2019, the Company filed a quarterly report on Form 10-Q with the

SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2019

(the "2Q19 10-Q"). The 2Q19 10-Q was signed by Defendants Campanelli and Coleman.

249.    In a section entitled "*Opioid-Related Matters*" the 1Q18 10-Q disclosed that:

> Since 2014, multiple U.S. states, counties, other governmental
> persons or entities and private plaintiffs have filed suit against us
> and/or certain of our subsidiaries, including Endo Health Solutions
> Inc. (EHSI), EPI, PPI, Par Pharmaceutical Companies, Inc. (PPCI),
> Endo Generics Holdings, Inc. (EGHI), Vintage Pharmaceuticals,
> LLC, Generics Bidco I, LLC and DAVA Pharmaceuticals, LLC, as
> well as various other manufacturers, distributors and/or others,
> asserting claims relating to defendants' alleged sales, marketing
> and/or distribution practices with respect to prescription opioid
> medications, including certain of our products. As of July 29, 2019,
> the cases of which we were aware include, but are not limited to,
> approximately **18 cases** filed by or on behalf of states;
> approximately **2,300 cases** filed by counties, cities, Native
> American tribes and/or other government-related persons or entities;
> approximately **153 cases** filed by hospitals, health systems, unions,
> health and welfare funds or other third-party payers and
> approximately **131 cases** filed by individuals. Certain of the cases
> have been filed as putative class actions.

250.    After this disclosure, the 2Q19 10-Q unequivocally stated that "***We will continue

to vigorously defend the foregoing matters and to explore other options as appropriate in our

best interests***."

251.    Defendants' statement misleadingly downplayed the allegations in the actions, did

not fully apprise investors of the extent of the Company's misconduct in marketing and selling

opioids, and did not advise investors that the Company faced billions in liability in New York for

insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements

were false and misleading when made, however, for the reasons alleged above at paragraph 155.

252.    The 2Q19 10-Q also included a "risk factor" that attributed risks to Endo's business

from the opioid epidemic to "public concern," "media stories," and "novel" uses of laws by

"government and private persons and entities," rather than Defendants' own misconduct. The

2Q19 10-Q stated that:

> ***Public concern around the abuse of opioids, including law enforcement concerns over diversion and marketing of opioids, and regulatory efforts to combat abuse, could result in costs to our business.***
>
> Media stories regarding prescription drug abuse and the diversion of opioids and other controlled substances are commonplace. Aggressive enforcement and unfavorable publicity regarding, for example, the use or misuse of opioid drugs; the limitations of abuse-deterrent formulations; the ability of drug abusers to discover previously unknown ways to abuse our products; public inquiries and investigations into prescription drug abuse; litigation or regulatory activity regarding sales, marketing, distribution or storage of opioids could have a material adverse effect on our reputation, on the results of litigation and on our ability to attract or maintain relationships with third-party partners, including suppliers, vendors, advisors, distributors, manufacturers, collaboration partners, administrators and agents.
>
> Manufacturers of prescription opioid medications have been the subject of significant civil and criminal investigatory and enforcement action even in cases where such medications have received approval from the FDA or similar regulatory authorities. In addition, numerous governmental and private persons and entities are pursuing civil litigation against opioid manufacturers and distributors, invoking current laws and regulations relating to opioids and/or other prescription medicines, as well as novel uses of other laws that seek to hold accountable opioid manufacturers for opioid misuse.

253.    The statements alleged above in paragraph 252 characterizing Endo's business risk

as merely a reflection of "*[p]ublic concern around the abuse of opioids*," "*media stories* regarding

prescription drug abuse and the diversion of opioids," and "civil litigation against opioid

manufacturers and distributors, invoking current laws and regulations relating to opioids and/or

other prescription medicines, as well *as novel uses of other laws*," rather than the Company's

severe misconduct, misleadingly downplayed the allegations in the actions, did not fully apprise

investors of the extent of the Company's misconduct in marketing and selling opioids, and did not

advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. By making these statements, which attributed the risk to Endo from the opioid epidemic to media coverage, Defendants had an obligation to disclose all facts necessary to make their statements not misleading. In addition, the statements were false and misleading when made for the reasons alleged above at paragraph 155.

254. Additionally, the 2Q19 10-Q directed investors to the 2018 10-K:

> For a discussion of our risk factors, see the information in Part 1, Item 1A. 'Risk Factors' in our Annual Report and the information in Part II, Item 1A under the caption "Risk Factors" of our Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2019. There have been no material changes in our risk factors from those described in our Annual Report, except as set forth below.

The 2Q19 10-Q thus incorporated the risk factor in the 2018 10-K that attributed, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than to Defendants' own misconduct as described in paragraphs 227–28 above. The 2Q19 10-Q also incorporated the risk factor in the 2018 10-K that attributed, in part, the risks to the Company's business from the opioid epidemic to negative media publicity. Accordingly, by incorporating the disclosure from the 2018 10-K, the 2Q19 10-Q misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. The statements were false and misleading when made for the reasons alleged above at paragraph 155.

255. Additionally, the 2Q19 10-Q contained generic, boilerplate representations regarding Endo's supposed view of its liquidity risks. The 2Q19 10-Q, disclosed that:

> We expect our operating cash flows, together with our cash, cash equivalents, restricted cash and restricted cash equivalents to be

sufficient to cover our principal liquidity requirements over the next year. However, on a longer term basis, we may not be able to accurately predict the effect of certain developments on our sales and gross margins, such as the degree of market acceptance, patent protection and exclusivity of our products, pricing pressures (including those due to the impact of competition), the effectiveness of our sales and marketing efforts and the outcome of our current efforts to develop, receive approval for and successfully launch our product candidates. We may also face unexpected expenses in connection with our business operations, ***including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities***. Furthermore, we may not be successful in implementing, or may face unexpected changes or expenses in connection with our strategic direction, including the potential for opportunistic corporate development transactions. Any of the above could have a material adverse effect on our business, financial condition, results of operations and cash flows.

256.    The statements in bold in paragraph 255 above, when read together with the statements in paragraphs 229–30 above, which were incorporated by reference from the 2018 10-K, were not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud. The statement "we face significant risks and uncertainties relating to our outstanding and future legal proceedings and governmental investigations, including those related to our sale, marketing and/or distribution of prescription opioid medications" directed investors to a risk factor that misleadingly attributed the Company's exposure to liability to overzealous plaintiffs' attorneys and downplayed the Company's misconduct. In addition, the warnings were misleading because they did not disclose that Defendants knew that the Company already lacked sufficient liquidity to address the full scope of the liability it was facing in opioid-related actions.

257.    Appended as exhibits to the 2Q19 10-Q were signed certifications pursuant to the SOX, wherein Defendants Campanelli and Coleman certified that "[t]he [2Q19 10-Q] fully

complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [2Q19 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the 2Q19 10-Q, as set forth in paragraphs 249–56 above, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced liability in opioid-related actions due to its misconduct, as well as billions in liability in New York for insurance fraud, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

258.     On November 4, 2019, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2019 (the "3Q19 10-Q"). The 3Q19 10-Q was signed by Defendants Campanelli and Coleman.

259.     In a section entitled "*Opioid-Related Matters*" the 3Q18 10-Q disclosed that:

> Since 2014, multiple U.S. states, counties, other governmental persons or entities and private plaintiffs have filed suit against us and/or certain of our subsidiaries, including Endo Health Solutions Inc. (EHSI), EPI, PPI, Par Pharmaceutical Companies, Inc. (PPCI), Endo Generics Holdings, Inc. (EGHI), Vintage Pharmaceuticals, LLC, Generics Bidco I, LLC and DAVA Pharmaceuticals, LLC, as well as various other manufacturers, distributors, pharmacies and/or others, asserting claims relating to defendants' alleged sales, marketing and/or distribution practices with respect to prescription opioid medications, including certain of our products. As of October 29, 2019, the cases of which we were aware include, but are not limited to, approximately *18 cases* filed by or on behalf of states; approximately *2,500 cases* filed by counties, cities, Native American tribes and/or other government-related persons or entities; approximately *240 cases* filed by hospitals, health systems, unions, health and welfare funds or other third-party payers and approximately *140 cases* filed by individuals. Certain of the cases have been filed as putative class actions.

260.    After this disclosure, the 3Q19 10-Q unequivocally stated that "*We will continue to vigorously defend the foregoing matters and to explore other options as appropriate in our best interests*."

261.    Defendants' statements misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 155.

262.    Additionally, the 3Q19 10-Q directed investors to the 2018 10-K, 2Q19 10-Q and 1Q19 10-Q:

> For a discussion of our risk factors, see the information in Part 1, Item 1A. "Risk Factors" in the Annual Report and the information in Part II, Item 1A under the caption "Risk Factors" of our Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2019 and June 30, 2019.

The 3Q19 10-Q thus incorporated risk factors in the 2018 10-K, 2Q19 10-Q and 1Q19 10-Q, set forth in paragraphs 227–28, 252–53, and 239–40 above that attributed, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than to Defendants' own misconduct. The 3Q19 10-Q also incorporated the risk factor in the 2018 10-K that attributed, in part, the risks to the Company's business from the opioid epidemic to negative media publicity. Accordingly, by incorporating the disclosure from the 2018 10-K, 2Q19 10-Q and 1Q19 10-Q, the 3Q10 10-Q misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis.

The statements were false and misleading when made for the reasons alleged above at paragraph 155.

263.   Additionally, the 3Q19 10-Q contained generic, boilerplate representations regarding Endo's supposed view of its liquidity risks. The 3Q19 10-Q, disclosed that:

> We expect our operating cash flows, together with our cash, cash equivalents, restricted cash and restricted cash equivalents to be sufficient to cover our principal liquidity requirements over the next year. However, on a longer term basis, we may not be able to accurately predict the effect of certain developments on our sales and gross margins, such as the degree of market acceptance, patent protection and exclusivity of our products, pricing pressures (including those due to the impact of competition), the effectiveness of our sales and marketing efforts and the outcome of our current efforts to develop, receive approval for and successfully launch our product candidates. We may also face unexpected expenses in connection with our business operations, ***including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities***. Furthermore, we may not be successful in implementing, or may face unexpected changes or expenses in connection with our strategic direction, including the potential for opportunistic corporate development transactions. Any of the above could have a material adverse effect on our business, financial condition, results of operations and cash flows.

264.   The statements in bold in paragraph 263 above, when read together with the statements in paragraphs 229–30 above, which were incorporated by reference from the 2018 10-K, were not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud. The statement "we face significant risks and uncertainties relating to our outstanding and future legal proceedings and governmental investigations, including those related to our sale, marketing and/or distribution of prescription opioid medications" directed investors to a risk factor that misleadingly attributed the Company's exposure to liability to overzealous plaintiffs' attorneys and downplayed the

Company's misconduct. In addition, the warnings were misleading because they did not disclose that Defendants knew that the Company already lacked sufficient liquidity to address the full scope of the liability it was facing in opioid-related actions.

265.    Appended as exhibits to the 3Q19 10-Q were signed certifications pursuant to SOX, wherein Defendants Campanelli and Coleman certified that "[t]he [3Q19 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [3Q19 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the 3Q19 10-Q, as set forth in paragraphs 259–64 above, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced liability in opioid-related actions due to its misconduct, as well as billions in liability in New York for insurance fraud, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

### D.    2020 Misstatements

266.    On February 26, 2020, the Company filed a quarterly report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2019 (the "2019 10-K"). The 2019 10-K was signed by Defendants Campanelli and Coleman.

267.    In a section entitled "*Opioid-Related Matters*" the 2019 10-K disclosed that:

> Since 2014, multiple U.S. states and other governmental persons or entities and private plaintiffs in the U.S. and Canada have filed suit against us and/or certain of our subsidiaries, including EHSI, EPI, PPI, PPCI, Endo Generics Holdings, Inc. (EGHI), Vintage Pharmaceuticals, LLC, Generics Bidco I, LLC and DAVA Pharmaceuticals, LLC, and in Canada, Paladin, as well as various other manufacturers, distributors, pharmacies and/or others,

asserting claims relating to defendants' alleged sales, marketing and/or distribution practices with respect to prescription opioid medications, including certain of our products. As of February 18, 2020, the cases in the U.S. of which we were aware include, but are not limited to, approximately *20 cases* filed by or on behalf of states; approximately *2,700 cases* filed by counties, cities, Native American tribes and/or other government-related persons or entities; approximately *280 cases* filed by hospitals, health systems, unions, health and welfare funds or other third-party payers and approximately *160 cases* filed by individuals. Certain of the cases have been filed as putative class actions.

268.    After this disclosure, the 2019 10-K stated unequivocally that "***We will continue to vigorously defend the foregoing matters and to explore other options as appropriate in our best interests***."

269.    Defendants' statements misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 155.

270.    The 2019 10-K also attributed the Company's risks arising out of the opioid crisis to negative media coverage, rather than Endo's own misconduct. For example, the 2019 10-K stated that:

In recent years, opioid abuse has received a high degree of media coverage. Unfavorable publicity regarding, for example, the use or misuse of oxycodone or other prescription opioid medications, the limitations of abuse-deterrent forms, public inquiries and investigations into drug abuse, including the abuse of prescription products, litigation or regulatory activity could adversely affect our reputation. Additionally, increased scrutiny of opioids generally, whether focused on our products or otherwise, could negatively impact our relationship with healthcare providers and other members of the healthcare community. Such negative publicity could have an adverse effect on the potential size of the market for new or existing products and could decrease revenues and royalties, any of which could have a material adverse effect on our business,

financial condition, results of operations and cash flows.

271.    The statements alleged above in paragraph 270 characterizing Endo's business risk as merely a reflection of "a high degree of media coverage," "unfavorable media coverage," "negative publicity" and "increased scrutiny of opioids generally"—rather than the Company's severe misconduct—downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not apprise investors that the Company's prior conduct could result in billions in liability in New York (and elsewhere). By making these statements, which attributed the risk to Endo from the opioid epidemic to media coverage, Defendants had an obligation to disclose all facts necessary to make their statements not misleading. In addition, the statements were false and misleading when made for the reasons alleged above at paragraph 155.

272.    The 2019 10-K also included a "risk factor" that attributed risks to Endo's business from the opioid epidemic to "public concern" and "media stories," rather than Defendants' own misconduct. The 2019 10-K stated that:

> **Public concern around the abuse of opioids or other products, including without limitation law enforcement concerns over diversion or marketing practices, regulatory efforts to combat abuse, and litigation could result in costs to our business.**
>
> Media stories regarding drug abuse and diversion, including the abuse and diversion of prescription opioid medications and other controlled substances, are commonplace. Aggressive enforcement and unfavorable publicity regarding, for example, the use or misuse of opioids, the limitations of abuse-deterrent formulations, the ability of abusers to discover previously unknown ways to abuse our products, public inquiries and investigations into drug abuse or litigation or regulatory or enforcement activity regarding sales, marketing, distribution or storage of opioids could have a material adverse effect on our reputation, on the results of litigation and on our ability to attract or maintain relationships with third-party partners, including suppliers, vendors, advisors, distributors, manufacturers, collaboration partners, administrators and agents.

Manufacturers of prescription opioid medications have been the subject of significant civil and criminal investigatory and enforcement actions even in cases where such medications have received approval from the FDA or similar regulatory authorities. Numerous governmental and private persons and entities are pursuing litigation against opioid manufacturers, including us, as well as distributors and others, asserting alleged violations of various laws and regulations relating to opioids and/or other prescription medicines, relying on common law theories, and seeking to hold the defendants accountable for, among other things, societal costs associated with the misuse and abuse of prescription opioid medications as well as non-prescription opioids

273.   The statements alleged above in paragraph 272 characterizing Endo's business risk as merely a reflection of "*[p]ublic concern around the abuse of opioids*," and "***media stories*** regarding prescription drug abuse and the diversion of opioids" misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. By making these statements, which attributed the risk to Endo from the opioid epidemic to media coverage, Defendants had an obligation to disclose all facts necessary to make their statements not misleading. In addition, the statements were false and misleading when made for the reasons alleged above at paragraph 155.

274.   Additionally, the 2019 10-K downplayed the scope of Defendants' wrongdoing and responsibility for the opioid-related actions by attributing, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than to Defendants' own misconduct. For example, in a section entitled "Risk Factors," the 2019 10-K asserted that, "in the age of social media, plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients for litigation, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool"; that, "[f]or

these or other reasons, any significant product liability or mass tort litigation in which [Defendants] are a defendant could have a larger number of plaintiffs than such actions have seen historically and [Defendants] could also see an increase in number of cases filed against [them] because of the increasing use of widespread and media-varied advertising"; and that, "a ruling against other pharmaceutical companies in product liability or mass tort litigation in which we are not a defendant could have a negative impact on pending litigation where we are a defendant."

275.    The statements alleged above in paragraph 274 characterizing Endo's litigation risk as merely a reflection of the fact that "plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool," rather than the Company's misconduct, communicated to or gave investors the impression that the claims in opioid-related actions were a result of greater advertising capabilities of plaintiffs' lawyers rather than Endo's significant misconduct in promoting Endo Opioids, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced billions in liability in New York for insurance fraud. The statements were false and misleading when made for the reasons alleged above at paragraph 155.

276.    The 2019 10-K also included the following risk factor:

> *Our ability to fund our operations, maintain liquidity and meet our financing obligations is reliant on our operations, which are subject to significant risks and uncertainties.*
>
> We rely on cash from operations as well as access to the financial markets to fund our operations, maintain liquidity and meet our financial obligations. Our operations are subject to many significant risks and uncertainties, such as the risks described in this "Risk Factors" section, several of which may be outside of our control.
>
> . . . .
>
> Additionally, we face significant risks and uncertainties relating to

our outstanding and future legal proceedings and governmental
investigations, including those related to our sale, marketing and/or
distribution of prescription opioid medications. See the risk factor
"We have been, continue to be and may be the subject of lawsuits,
product liability claims, other significant legal proceedings,
government investigations or product recalls for which we may be
unable to obtain or maintain insurance adequate to cover potential
liabilities" for more information.

. . . .

If we are unable to fund our operations and liquidity needs, such as
future capital expenditures and payment of our indebtedness, we
may be required to refinance all or part of our then-existing
indebtedness, sell assets, reduce or delay capital expenditures, seek
to raise additional capital, pursue one or more internal
reorganizations and/or other restructuring activities, strategic
corporate alignment and cost-saving initiatives or other significant
corporate transactions, any of which could have a material adverse
effect on our operations and financial condition. Any refinancing of
our substantial indebtedness could be at significantly higher interest
rates, which will depend on the conditions of the markets and our
financial condition at such time, and may require us to comply with
more onerous covenants, which could further restrict our business
operations. In addition, the terms of existing or future debt
agreements may restrict us from adopting any of these alternatives.
Likewise, any internal reorganizations and/or other restructuring
activities, strategic corporate alignment and cost-saving initiatives
or other significant corporate transactions may be complex, could
entail significant costs and charges or could otherwise negatively
impact shareholder value and there can be no assurance that we will
be able to accomplish any of these alternatives on terms acceptable
to us, or at all. The failure to generate sufficient liquidity or to
achieve any of these alternatives could materially adversely affect
our business, financial condition and results of operations.

277.    Additionally, the 2019 10-K contained generic, boilerplate representations

regarding Endo's supposed view of its liquidity risks. The 2019 10-K, disclosed that:

We expect cash flows from operations together with our cash, cash
equivalents, restricted cash, restricted cash equivalents and the
revolving credit facilities to be sufficient to cover our principal
liquidity requirements over the next year. However, on a longer term
basis, we may not be able to accurately predict the effect of certain
developments on our sales and gross margins, such as the degree of
market acceptance, patent protection and exclusivity of our

products, pricing pressures (including those due to the impact of competition), the effectiveness of our sales and marketing efforts and the outcome of our current efforts to develop, receive approval for and successfully launch our product candidates. We may also face unexpected expenses in connection with our business operations, ***including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities***. Furthermore, we may not be successful in implementing, or may face unexpected changes or expenses in connection with our strategic direction, including the potential for opportunistic corporate development transactions. Any of the above could adversely affect our future cash flows.

278.    Read together, the statements in paragraphs 276–77 above were not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud. The statement "we face significant risks and uncertainties relating to our outstanding and future legal proceedings and governmental investigations, including those related to our sale, marketing and/or distribution of prescription opioid medications" directed investors to a risk factor that misleadingly attributed the Company's exposure to liability to overzealous plaintiffs' attorneys and downplayed the Company's misconduct. In addition, the warnings were misleading because they did not disclose that Defendants knew that the Company already lacked sufficient liquidity to address the full scope of the liability it was facing in opioid-related actions.

279.    Appended as exhibits to the 2019 10-K were signed certifications pursuant to SOX, wherein Defendants Campanelli and Coleman certified that "[t]he [2019 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [2019 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the 2019 10-K, as set forth in paragraphs 267–78 above, downplayed the scope of the

Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced liability in opioid-related actions due to its misconduct, as well as billions in liability in New York for insurance fraud, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

280.   On May 7, 2020, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2020 (the "1Q20 10-Q"). The 1Q20 10-Q was signed by Defendants Coleman and Bradley.

281.   In a section entitled "*Opioid-Related Matters*" the 1Q20 10-Q disclosed that:

> Since 2014, multiple U.S. states as well as other governmental persons or entities and private plaintiffs in the U.S. and Canada have filed suit against us and/or certain of our subsidiaries, including Endo Health Solutions Inc. (EHSI), Endo Pharmaceuticals Inc. (EPI), Par Pharmaceutical, Inc. (PPI), Par Pharmaceutical Companies, Inc. (PPCI), Endo Generics Holdings, Inc. (EGHI), Vintage Pharmaceuticals, LLC, Generics Bidco I, LLC and DAVA Pharmaceuticals, LLC, and in Canada, Paladin, as well as various other manufacturers, distributors, pharmacies and/or others, asserting claims relating to defendants' alleged sales, marketing and/or distribution practices with respect to prescription opioid medications, including certain of our products. As of April 30, 2020, filed cases in the U.S. of which we were aware include, but are not limited to, approximately *20 cases* filed by or on behalf of states; approximately *2,780 cases* filed by counties, cities, Native American tribes and/or other government-related persons or entities; approximately *280 cases* filed by hospitals, health systems, unions, health and welfare funds or other third-party payers and approximately *160 cases* filed by individuals.

282.   After this disclosure, the 1Q20 10-Q unequivocally stated that "***We will continue to vigorously defend the foregoing matters and to explore other options as appropriate in our best interests***."

283.   Defendants' statement misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for

insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 155.

284.    The 1Q20 10-Q also attributed, in part, the risks to the Company's business from the opioid epidemic to negative media publicity. The 1Q20 stated, "we and other manufacturers of prescription opioid medications have been, and will likely continue to be, subject to negative publicity and press, which could harm our brand and the demand for our products."

285.    The statements alleged above in paragraph 284 characterizing Endo's business risk as merely a reflection of "*negative publicity and press*" misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. By making these statements, which attributed the risk to Endo from the opioid epidemic to media coverage, Defendants had an obligation to disclose all facts necessary to make their statements not misleading. In addition, the statements were false and misleading when made for the reasons alleged above at paragraph 155.

286.    Additionally, the 1Q20 10-Q downplayed the scope of Defendants' wrongdoing and responsibility for the opioid-related actions by attributing, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than to Defendants' own misconduct. For example, in a section entitled "Risk Factors," the 1Q20 10-Q asserted that, "in the age of social media, plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients for litigation, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool"; that, "[f]or these or other reasons, any significant product liability or mass tort litigation in which

[Defendants] are a defendant could have a larger number of plaintiffs than such actions have seen historically and [Defendants] could also see an increase in number of cases filed against [them] because of the increasing use of widespread and media-varied advertising"; and that, "a ruling against other pharmaceutical companies in product liability or mass tort litigation in which we are not a defendant could have a negative impact on pending litigation where we are a defendant."

287.    The statements alleged above in paragraph 286 characterizing Endo's litigation risk as merely a reflection of the fact that "plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool," rather than the Company's misconduct, communicated to or gave investors the impression that the claims in opioid-related actions were a result of greater advertising capabilities of plaintiffs' lawyers rather than Endo's significant misconduct in promoting Endo Opioids, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced billions in liability in New York for insurance fraud. The statements were false and misleading when made for the reasons alleged above at paragraph 155.

288.    Additionally, the 2019 10-K contained generic, boilerplate representations regarding Endo's supposed view of its liquidity risks. The 2019 10-K, disclosed that:

> We expect cash flows from operations together with our cash, cash equivalents, restricted cash, restricted cash equivalents and the revolving credit facilities to be sufficient to cover our principal liquidity requirements over the next year. However, on a longer term basis, we may not be able to accurately predict the effect of certain developments on our sales and gross margins, such as the degree of market acceptance, patent protection and exclusivity of our products, pricing pressures (including those due to the impact of competition), the effectiveness of our sales and marketing efforts and the outcome of our current efforts to develop, receive approval for and successfully launch our product candidates. We may also face unexpected expenses in connection with our business

operations, ***including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities***. Furthermore, we may not be successful in implementing, or may face unexpected changes or expenses in connection with our strategic direction, including the potential for opportunistic corporate development transactions. Any of the above could adversely affect our future cash flows.

289.    The statements in bold in paragraph 288 above, when read together with the statements in paragraphs 276–77 above, which were incorporated by reference from the 2019 10-K, were not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud. The statement "we face significant risks and uncertainties relating to our outstanding and future legal proceedings and governmental investigations, including those related to our sale, marketing and/or distribution of prescription opioid medications" directed investors to a risk factor that misleadingly attributed the Company's exposure to liability to overzealous plaintiffs' attorneys and downplayed the Company's misconduct. In addition, the warnings were misleading because they did not disclose that Defendants knew that the Company already lacked sufficient liquidity to address the full scope of the liability it was facing in opioid-related actions.

290.    Appended as exhibits to the 1Q20 10-Q were signed certifications pursuant to the SOX, wherein Defendants Coleman and Bradley certified that "[t]he [1Q20 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [1Q20 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." statements were false and misleading because the 1Q20 10-Q, as set forth in paragraphs 281–89 above, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced liability in opioid-related actions

due to its misconduct, as well as billions in liability in New York for insurance fraud, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

## VI.      THE TRUTH SLOWLY EMERGES

291.    Facts contradicting Defendants' misrepresentations and omissions leaked out to the investing public slowly over the course of the Class Period, beginning on November 6, 2017. During intraday trading hours, *Reuters* reported that Kentucky was the latest state to sue Endo over its role in the opioid epidemic. Specifically, the article stated that "Kentucky accused units of Endo International Plc on Monday of contributing to drug overdoses and an opioid epidemic by deceptively marketing its painkiller Opana ER, the latest lawsuit by state or local governments against the drugmaker"; that "Kentucky Attorney General Andy Beshear said the lawsuit would seek to hold Endo responsible for illegally building a market for the long-term use of opioids in the state as part of an effort to boost corporate profits"; and that "[t]he lawsuit, filed in a state court in Kentucky, said Endo sought to overstate the benefits of using Opana for the long-term treatment of chronic pain while downplaying the risk of addiction, helping to fuel a public health epidemic."

292.    On this news, Endo's Ordinary share price fell $0.08 per share, or 1.27%, to close at $6.24 per share on November 6, 2017. As the market continued to digest this information, the Company's shares fell an additional $0.31 per share, or 4.97%, to close at $5.93 per share on November 7, 2017—a total decline 6.17% over two trading days. Despite this drop in the price of Endo's Ordinary shares, those shares continued to trade at artificially inflated prices throughout the remainder of the Class Period as a result of Defendants' continued misstatements and omissions related to the true scope and magnitude of Endo's wrongdoing and liability with respect to the opioid epidemic, including, but not limited to, Defendant Maletta's forceful repudiation of the merits of the case as described in paragraphs 175–76 above.

293.     Then, on January 11, 2018, during pre-market hours, Defendants issued the January 2018 Press Release, which disclosed that Endo had "received a grand jury subpoena from the United States Attorney's Office for the Southern District of Florida seeking documents and information relating to products containing oxymorphone," but denied that the Company had engaged in any wrongdoing, assuring investors that, "[i]n all circumstances, it is Endo's policy to comply with applicable laws, rules, regulations and industry guidance governing the sale and marketing of pharmaceutical products."

294.     On this news, Endo's Ordinary share price fell $0.15 per share, or 1.86%, to close at $7.92 per share on January 11, 2018. Despite this drop in the price of Endo's Ordinary shares, those shares continued to trade at artificially inflated prices throughout the remainder of the Class Period as a result of Defendants' continued misstatements and omissions related to the true scope and magnitude of Endo's wrongdoing and liability with respect to the opioid epidemic. As set forth in paragraphs 177–89, the misstatements that continued to artificially inflate Endo's share price included those in the 2017 10-K.

295.     On March 29, 2018, during after-market hours, *Reuters* reported that "Arkansas' attorney general on Thursday joined the widening mass of litigation against opioid manufacturers, accusing three drugmakers," including Endo, "of promoting addictive painkillers in ways that falsely denied or trivialized their risks." According to *Reuters*, "[t]he lawsuit contended the drugmakers spent millions of dollars on promotional activities that downplayed the risks of addiction associated with opioids while falsely touting the benefits of using the drugs to treat chronic pain." On this news, Endo's Ordinary share price fell $0.27 per share, or 4.55%, to close at $5.67 per share the following trading day, on April 2, 2018.

296.   On August 16, 2018, *Reuters* reported during intraday trading hours that President Donald J. Trump's ("Trump") administration "proposed that U.S. drugmakers cut production quotas of the six most abused opioids by 10 percent next year to fight a nationwide addiction crisis"; that, "[i]n a statement, the U.S. Justice Department and Drug Enforcement Administration (DEA) said the proposed cut would be in keeping with President Donald Trump's effort to cut opioid prescription fills by one-third within three years"; and that "Trump on Thursday also pressed U.S. Attorney General Jeff Sessions to sue drug manufacturers over the opioid crisis." The *Reuters* article also mentioned four manufacturers of opioids by name, one of which was Endo, noting in tandem that "[h]undreds of lawsuits have been filed by states, counties and cities against opioid manufacturers." Over two trading days, Endo's Ordinary share price fell $0.42 per share, or 2.62%, to close at $15.64 per share on August 17, 2018. Despite this drop in the price of Endo's Ordinary shares, those shares continued to trade at artificially inflated prices throughout the remainder of the Class Period as a result of Defendants' continued misstatements and omissions related to the true scope and magnitude of Endo's wrongdoing and liability with respect to the opioid epidemic. As set forth in paragraphs 219–31, the misstatements that continued to artificially inflate Endo's share price included those in the 2018 10-K.

297.   News of Endo's precarious financial condition in the face of the opioid-related actions was revealed to investors on March 4, 2019, when Reuters reported that opioid manufacturer "Purdue Pharma LP is exploring ***filing for bankruptcy to address potentially significant liabilities*** from roughly 2,000 lawsuits alleging the drugmaker contributed to the deadly opioid crisis sweeping the United States." The article further reported that "[s]hares of Endo International Plc and Insys Therapeutics Inc, two companies that like Purdue have been named in

117

lawsuits related to the U.S. opioid epidemic, **closed down 17 percent** and more than 2 percent, respectively," in the wake of the report.

298.   The next day, March 5, 2019, an analyst with SVB Leerink LLC Research downgraded Endo from "outperform" to "market perform" in part because "it is clear that Endo is front and center in terms of exposure to this headline risk, and while Endo may not be a specific plaintiff in the state cases and multi-district litigation (MDL) expected to kick off later this year, **we believe case updates are more likely than not to be negative** read-through for Endo. Further, we see few other positive catalysts for Endo this year." The analyst then emphasized that

> In the event of a penalty ensuing from the an opioid trial or settlement, Endo **may need to raise additional capital** which may be costly: Endo currently trades at 8x EV/'20E EBITDA and **it is already ~5.5x levered**, and so **this leaves very little equity value cushion to raise incremental debt to fund potential payments ensuing from an opioid trial/ settlement**. We believe that Endo's term loan covenants allow for additional unsecured indebtedness arising out of judgments, but given the current >11% yield of Endo's notes, **we see risk of an additional debt raise at a substantial interest rate**. We also do not rule out the possibility of an equity component in a capital raise depending on the size of the liability.

On this news, Endo's share price fell from $9.33 on March 4, 2019 to $8.72 on March 5, 2019, a decline of 6.5%.

299.   On April 10, 2019, the market began to better understand that Endo may have downplayed its role in the opioid crisis, as well as its knowledge of the harm caused by its opioids, when *The Philadelphia Inquirer* reported that Endo had "suddenly" begun "tell[ing] the FDA about a tidal wave of fatalities associated with Opana, and painkillers made by other companies." The article went on to state that after reporting only approximately **250** deaths over the prior ten years, "[f]rom November 2017 through August 2018, Endo reported **20,115 deaths** to the FDA." The article stated that "the thousands of deaths span roughly two decades" and noted that Endo had begun submitting the reports two months after it had voluntarily discontinued Opana ER at

the FDA's request. Although the article quoted Endo's spokesperson Heather Zoumas Lubeski as denying that all the reports concerned Endo's products, the market clearly understood that Endo was acknowledging to a government regulator that the Company's chief opioid had been directly associated with thousands of deaths. In the two days following the article, Endo's share price plummeted from $8.31 per share to $7.54 per share, or 9.3%.

300. The Tennessee Complaint was unsealed on Friday, June 7, 2019, and, on this news, Endo's share price declined that day from its opening price of $5.11 per share to close at $4.89, or 4.3%. Over the next two trading days, Endo's share price fell still further to $4.49 per share, or a total decline of 12.1%. In addition, on July 4, 2019, *The Jackson [Tennessee] Sun* published an expose based in part on allegations in the Tennessee Complaint ("TTP Article"). The TTP Article revealed that Endo Pharmaceuticals had "specifically advertised the reformulated Opana ER as safer and harder to abuse than the drug's original formulation, which it introduced to compete with Purdue Pharma's popular opioid painkiller OxyContin." The article reported that, in spite of this, however, in August 2012, only six months after Endo began selling Opana ER in February 2012, a nephrologist had reported a startling increase in thrombotic thrombocytopenic purpura ("TTP"), a rare disorder associated with intravenous drug use that could lead to sepsis, seizures, coma or loss of limbs. According to the article, all but one of the TTP sufferers had recently injecting dissolved tablets of Opana ER. The article also reported that "[b]y the time the Tennessee cases were reported, Endo already had received two reports of similar cases in North Carolina," according to a recently unsealed lawsuit. In addition, at about the same time, Endo Vice President for Regulatory Affairs Robert Barto submitted to the FDA a communication that summarized the TTP cases and indicated that, despite advertising otherwise, "Endo knew the tablet could be dissolved and injected." On this news, Endo's share price declined from $4.61 to $4.34, or 5.9%.

301.    On the July 15, 2019, Morgan Stanley analyst David Risinger release a report downgrading Endo from "Underweight" to "Equal-weight" and described the Company and its peer, Teva Pharmaceuticals, as "potentially more exposed to opioid litigation because they ***promoted brands to physicians/patients*** and have more concerning financial leverage." Because of this, Risinger said, he was cutting his price target for Endo from $8 to $3, which was the lowest on Wall Street at the time. That day, Bloomberg reported that "Endo shares sank as much as 8.9% after Risinger downgraded his rating." Over the next three trading sessions, Endo's share price plummeted from $3.95 to $3.34 per share, or 15.4%. Risinger's downgrade in part confirmed for the market what Defendants had been denying, *i.e.*, that the Company had engaged in misconduct with regard to the opioid epidemic, that Defendants' denial of those allegations was likely false and misleading, and that Company was likely to face massive liability for its role in the opioid crisis.

302.    On August 26, 2019, an Oklahoma Judge state court judge ruled after a bench trial that J&J had violated the state of Oklahoma's public nuisance law by intentionally "downplayed any risks" and "overstate[d] the efficacy" of opioids, and ordered J&J to pay Oklahoma $572 million in damages. While damages aware was much lower than what the state had requested at trial, the court's ruling partially disclosed the breathtaking scope of the liability Endo faced and contradicted Defendants' consistent downplaying of the allegations in the opioid actions against Endo. In the wake of the announcement, Endo's share price plummeted from $2.91 to $2.41 over the next two trading days, or 17.2%.

303.    The investment media immediately noted the plunge in Endo's share price and attributed it to investors beginning to understand, in spite of Defendants' consistent denials, the scope of liability the Company faced. For example, on August 27, 2019, Bloomberg reported that

"Teva Pharmaceutical Industries Ltd. and Endo International Plc reversed initial gains to trade near recent lows on Tuesday as Wall Street came to grips with just how much the opioid crisis could cost the manufacturers of those drugs." The article reported that, "Endo fell as much as 10%" and "almost 20% of Endo shares [available for trading] are being shorted."

304.    On September 5, 2019, during intraday trading hours, Endo issued a press release announcing that its subsidiaries EPI, EHS, PPI, and PPCI had executed a settlement agreement with two counties in Ohio and related persons in connection with what the Company termed "Track 1 Cases," which included claims "arising from or otherwise relating to the manufacturing, marketing, distribution, supply, sale, prescribing, use and/or abuse of branded and generic opioid medications." According to that press release:

> Under the Settlement Agreement, Endo will pay a total sum of $10 million and will provide up to $1 million of its Vasostrict® and Adrenalin® products free of charge, to be initially allocated by and between the two Plaintiffs counties as follows: Cuyahoga County will receive $6.2 million in cash and up to $620,000 of Vasostrict® and/or Adrenalin®; and Summit County will receive $3.8 million in cash and up to $380,000 of Vasostrict® and/or Adrenalin®. The two Plaintiffs counties may further apportion and use the foregoing amounts in their sole discretion. Further, in the event of a comprehensive resolution of government-related opioid claims, the Company has agreed that the two Plaintiffs counties will receive the value they would have received under such resolution less the total value of the Settlement Agreement. The Settlement Agreement includes no admission of wrongdoing, fault or liability of any kind by the Endo Entities and avoids litigation risk and associated costs. It is important to note that the value of the Settlement Agreement should not be extrapolated to any other opioid-related cases or claims.

On this news, Endo's Ordinary share price fell $0.08 per share, or 3.28%, to close at $2.36 per share on September 5, 2019. The announcement further alerted investors to the Company's misconduct with regard to the opioid crisis, that Defendants' denial of those allegations was likely

false and misleading, and that Company was likely to face massive liability for its role in the opioid crisis.

305.    A few days later, on September 10, 2019, Governor Cuomo announced that DFS was investigating opioid manufacturers and distributors, among others, for insurance fraud. The September 2019 Press Release also listed the opioid manufacturers and distributors implicated by the announcement, including EHS, EPI, PPCI, and PPI. However, given that at least thirty other opioid manufacturers and distributors were listed alongside Endo's subsidiaries in the press release, that no specific acts of wrongdoing were assigned to any one of those entities in particular, and that Endo itself (*i.e.*, Endo International plc) was not mentioned within the September 2019 Press Release, the extent of Endo's role in the opioid epidemic and the magnitude of the risks that the Company accordingly faced remained unknown to investors. Accordingly, the Company's share price did not decline following the press release's publication, and continued to trade at artificially inflated prices throughout the remainder of the Class Period, while being further buoyed by Defendants' continued misstatements and omissions.

306.    The following spring, on February 26, 2020, investors gained new information that illuminated how the Company lacked the liquidity to withstand a major award in opioid-related actions. The Company's 10-K, filed that day, indicated that the Company had approximately $1.45 billion in cash on hand. During an earnings call before the markets opened for trading that day, an analyst asked Defendants, "[i]t seems that settlement talks for others that seem to have gotten traction tend to involve either the use of *a ton of cash* or on the case of Purdue and Mallinckrodt, *the tool of bankruptcy*. So, I guess my question is, *do you see flexibility* for companies to deal with this liability without either of those things?" Defendant Coleman responded:

> at this stage, we've been fairly clear on what our strategy is, which
> is to remain open to a constructive resolution and defend as needed.

> In terms of the tools and options that are available to people, what may be needed, what may not be needed, *we know what our strategy is. We feel good about our flexibility that we have to deal with that.* And so, that's exactly how we're going to move forward.

307.     Investors understood that Defendant Coleman's statement was designed to communicate that the Company had the $1.45 billion cash on hand to settle the opioid cases, which was a fraction of the overall liability the Company faced. For example, FiercePharma, a website covering the pharmaceutical industry, published an article the date of the call entitled, "Endo Touts Financial 'Flexibility' as Massive Opioid Settlements Mount Industrywide." The article stated that "With the industry favoring massive opioid settlements—and, increasingly, bankruptcy—Endo's new leader [Coleman] thinks the drugmaker has the formula to weather the storm" and reported that "Coleman said he expected to stay the course on Endo's opioid plan with $1.5 billion in cash reserves on hand at year-end." Investors saw Coleman's statement for what it was, an acknowledgement that the Company may not have the liquidity to withstand the massive liability it was facing in the opioid-related cases. On that news, Endo's share price fell from $6.53 per share to $6.35, a decline of 2.8%. The following day, as the markets digested Defendant Coleman's statement, the Company's share price sank from $6.35 to $5.63 per share, or 11%. In total, the Company's share price fell nearly 14% in the wake of Coleman's disclosure.

308.     The truth fully emerged on June 10, 2020, when Governor Cuomo announced the NYDFS Charges against Endo in connection with its role in the opioid crisis. The charges alleging that Endo fraudulently misrepresented the safety and efficacy of its opioid drugs while minimizing the risk of addiction and other ill effects. Specifically, DFS alleged that Endo had committed a "fraudulent insurance act"; that, "[a]t least since the mid-2000s, [Endo and its subsidiaries] have knowingly and with intent to defraud caused to be presented to an insurer or any agent thereof written statements or other physical evidence as part of or in support of claims for payment,

services or other benefit pursuant to a health insurance policy or private or public health plan," which "they knew to (a) contain materially false information concerning any material fact thereto; or (b) conceal, for the purpose of misleading, information concerning any factor material thereto"; that Endo "knowingly and with intent to defraud made numerous misrepresentations, directly or through third parties, concerning the safety and efficacy of opioids"; that "[t]hose misrepresentations caused healthcare providers to present false claims for payment to insurers regulated by DFS on multiple and continuous occasions over the past decades in the form of written prescriptions for opioid medications and related documentation"; that "[s]uch prescriptions carried with them express and/or implied representations that the opioid drugs being prescribed were medically necessary, legitimate and/or appropriate"; that Endo and its subsidiaries "were aware that such representations were, for the majority of the opioid prescriptions written during the relevant time period, false," and "[t]he falsity of these representations was material to the successful claims for payment"; and that, "[i]n the alternative, to the extent that third parties engaged in conduct that violated" New York laws, "including without limitation prescribing doctors who wrote fraudulent prescriptions and patients who sought and obtained such fraudulent prescriptions," Endo and its subsidiaries "are liable for such conduct because they, knowingly and with an intent to defraud, solicited, requested, commanded, importuned and/or intentionally aided such third parties in such conduct."

309.    The NYDFS Charges also alleged that Endo and its subsidiaries "have committed a fraudulent insurance act as that term is defined in New York Insurance Law §403"; that DFS "is entitled to levy a civil penalty not to exceed five thousand dollars ($5,000) plus the amount of each claim paid, for each violation"; and that, "[i]n this case, each fraudulent prescription constitutes an independent violation."  The NYDFS Charges thereby revealed to investors for the first time the

full scope and magnitude of a previously unknown, substantial legal liability that Endo itself specifically faced, which was unknown before the full charges were made publicly available.

310.     In addition, the NYDFS Charges alleged that "through their marketing, promotion, manufacture and supply of opioids drugs to patients for whom such drugs were not medically necessary, legitimate, and appropriate," Endo and its Subsidiaries "committed acts of intentional fraud or intentional misrepresentation of material facts with respect to claims for insurance products or services or involving any person offering to provide or providing financial products or services"; that they, "with the intent to defraud, made knowingly false representations about the safety and efficacy of opioid drugs"; that "[t]hese misrepresentations were made with the intent of increasing the demand for opioids into areas of treatment that were not medically necessary, legitimate, and appropriate"; that Endo and its subsidiaries "were aware that the increase in demand would cause fraudulent claims to be made to insurance companies"; and concluded that, as a result, Endo and its subsidiaries "committed intentional fraud and/or made intentional misrepresentations of material facts with respect to a financial product or service and are thus liable to pay a civil penalty of up to five thousand dollars ($5,000) per offense," with "each fraudulent prescription constitut[ing] an independent offense"; thereby also revealing to investors for the first time the full scope and magnitude of a previously unknown, substantial legal liability that Endo itself specifically faced, which was similarly unknown before the full Statement of Charges was made publicly available.

311.     On this news, Endo's Ordinary share price fell $0.66 per share, or 14.63%, to close at $3.85 per share on June 10, 2020.

312.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## VII.     LOSS CAUSATION

313.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs and the Class to suffer substantial losses. During the Class Period, Plaintiffs and the Class purchased Endo common stock at artificially inflated prices and were damaged thereby when the price of Endo common stock declined when the truth was revealed. The price of Endo common stock significantly declined (causing investors to suffer losses) when Defendants' misrepresentations, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the risks that had been fraudulently concealed by the Defendants materialized.

314.     Throughout the Class Period, Defendants issued a series of misleading statements and omissions that misleadingly downplayed the allegations in opioid-related actions against Endo, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. Defendants' misleading statements and omissions further misled Plaintiffs and other investors concerning Endo's involvement in, or knowledge of, the campaign by opioid manufacturers, including Endo, to exaggerate the benefits and downplay the risks of opioids, which has an impact on Endo's business operations and financial results, including the Company's.

315.     Defendants' misleading statements and omissions caused and maintained artificial inflation in the price of Endo's common stock throughout the Class Period until facts about the Company's true condition were revealed to the market. The timing and magnitude of Endo's

common stock price declines, as detailed herein, negate any inference that the losses suffered by Plaintiffs and the Class was caused by changed market conditions or other macroeconomic factors unrelated to Defendants' fraudulent conduct. The market for the Company's common stock promptly digested current information with respect to Endo from all publicly available sources and reflected such information in the price of the Company's common stock.

316.     The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other members of the Class was a direct result of the relevant truth about Defendants' scheme being revealed to the market in a series of partial adverse disclosures and third-party reports in the media. When Defendants' prior misleading statements and omissions were corrected and became apparent, and the risks concealed by them materialized, investors suffered losses as the price of Endo common stock declined because the price inflation was removed. As a result of their purchases of Endo common stock during the Class Period, Plaintiffs and the other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## VIII.   ADDITIONAL SCIENTER ALEGATIONS

317.     As alleged above, Defendants each had scienter as to the false and misleading nature of their statements because they knew or, at a minimum, recklessly disregarded the facts described in Sections IV and V above for the following reasons.

- As admitted in the Directors' Report to assist the Board in "oversee[ing] the management of risks associated with the evolving opioid litigation" Defendant Maletta, as CLO, "provide[d] the Board with a comprehensive report of all material litigation matters affecting Endo on at least a quarterly basis" and separately engage[d] in regular discussions with individual Board members on litigation matters." The opioid litigations were plainly material to Endo because the company disclosed the existence of those cases in every SEC filing during the Class Period, and each SEC filing indicated that the Company was disclosing matters that were material "in the opinion of . . . management." To brief the Board on all material litigation matters and discuss "risks associated with the evolving opioid litigation, Defendant Maletta had to familiarize himself

127

with the allegations and underlying facts at issue in opioid cases filed against Endo.

- As admitted in the Directors' Report, Defendant Campanelli, as CEO, held "regular teleconferences with individual Board members and a teleconference with the full Board on at least a monthly basis" where he discussed "the risks associated with the evolving opioid litigation." To discuss these actions with the Board, Defendant Campanelli had familiarize himself with the allegations and underlying facts at issue in opioid cases filed against Endo.

- As admitted in the Directors' Report, "[w]hen the Company promoted its opioid medications to [healthcare providers], it also monitored a number of secondary surveillance databases (including the NAVIPPRO and RADARS databases) and the FDA Adverse Reporting System for signs of potential abuse and/or misuse of certain branded opioid products." Accordingly, Defendants knew of, used, analyzed, had access to, and/or recklessly ignored the data from these sources showing that Reformulated Opana ER had in fact caused a rise in intravenous abuse of the drug, as well as the health hazards associated with intravenous abuse of the drug.

- Defendant Campanelli abruptly resigned as CEO of Endo in November 2019, only six months after he had entered into a contract to serve as the Company's President and CEO for the next three years. Defendant Campanelli's resignation occurred only *eight weeks* after DFS announced that it was investigating whether the Company had engaged in insurance fraud in connection with its marketing of Endo Opioids, or, in other words, roughly the amount of time for the Board to understand the extent of the Company's exposure to insurance fraud in New York. The suspicious timing of Defendant Campanelli's resignation, when considered holistically with his knowledge of the Company's role in furthering the opioid crisis and the Company's enabling of healthcare professionals to write fraudulent prescriptions for Endo Opioids, which potentially exposed the Company to liability for insurance fraud, supports a strong inference of scienter.

318.   In addition to the above allegations, which on their own create a strong inference of scienter, Individual Defendants were active and culpable participants in the fraud alleged herein, each of the Individual Defendants acted with scienter in that each knew or recklessly disregarded that each of his or her respective public statements alleged in Sections IV and V above was materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of each such statement as a primary violator of Section 10(b) of

the Exchange Act. In addition to the specific facts alleged above, including in Sections I, III, IV, and V, Defendants' scienter is further evidenced by the following facts:

319.    In a deposition taken in the Ohio MDL on March 19, 2019, which was not unsealed until December 2019, Defendant Campanelli admitted that "[i]n September 2016, [he] would have become aware" with "what was going on at Endo," *i.e.*, that he had familiarized himself with Endo's operations. During that same deposition Defendant Campanelli admitted that "[w]e were aware in 2016 when the product [*i.e.*, Endo Opioids] was abused or misused it would lead or could lead to deaths." Defendant Campanelli further testified that by 2016 or 2017, he was aware that Reformulated Opana ER was being abused by intravenous drug users, and that it had been linked to incidences of HIV (as well as Hepatitis and TPP, a dangerous blood disorder).

320.    In other words during his deposition, Defendant Campanelli admitted that he was aware that Endo opioids had contributed to the epidemic and, given the importance of Endo Opioids to the Company's bottom line, his position as COO and/or CEO at Par when auditors concluded that Par lacked a SOM System, and his statement in December 2016, as alleged in paragraph 124, *supra*, that he was undertaking a product-by-product review of Endo Opioids, he knew, reviewed, and/ or had access to, information concerning Endo's misconduct in promoting its opioids, failing to maintain a meaningful SOM system, false promoting of Opana ER and the Company's precarious financial position ***up to eleven months*** before the start of the Class Period. In spite of this knowledge, Defendant Campanelli nevertheless continued to downplay Endo's role in the opioid epidemic and the allegations in opioid-related actions to investors throughout the Class Period.

321.    The September 10, 2019, announcement by Governor Cuomo that DFS was "taking action" against, among others, the opioid manufacturers and distributors "to secure $2 billion for

New York consumers who have shouldered the cost of the ongoing opioid epidemic in the form of higher insurance premiums" put Defendants on notice that DFS was going to investigate Endo's role in the opioid epidemic, in particular its training of sales representatives to market Endo Opioids to healthcare professionals that the Company believed would write the most opioid prescriptions, without regard to whether those prescriptions were fraudulent or the healthcare professionals' experience in treating chronic pain, as well as the Company's failure to implement an effective system to identify prescriptions and orders that were likely designed to obtain opioids under false pretenses. The announcement also confirmed for Defendants that Endo faced billions in liability for insurance fraud since the announcement stated that DFS has "clear statutory authority to impose fines of up to *$5,000 per offense in addition to the amount of the fraudulent claim*." Accordingly, all the Individual Defendants had to do to gain an understanding of the scope of the liability the Company faced was to review records to which they had access to identify representations made to private insurance providers and the number of prescriptions filled by private insurers.

322.    As executive officers of Endo, each of the Individual Defendants was responsible for and had a substantial role in issuing the material misrepresentations and omissions alleged herein. Among other things, each of Defendants Campanelli and Maletta was directly quoted in press releases and/or made public statements during the Company's earnings calls and industry conferences on behalf of Endo.

323.    Each of the Defendants also received and/or had access to detailed information concerning the business operations and financial condition of the Company, including information regarding the misconduct by Endo sales representatives, which meant that Endo was likely in violation of Section 403 of the New York Insurance Law and thus had engaged in insurance fraud

in the state of New York; the attributes and abuse associated with Reformulated Opana ER that contradicted Endo's public statements about the safety and efficacy of the drug; and the allegations of misconduct by Endo, its executives, and its employees in connection with convincing patients, healthcare providers, and insurers contained in the over *3,000* actions filed against Endo.

324. Public statements made by the Defendants during the Class Period also give rise to a strong inference that each had detailed knowledge of or access to the material facts and information that they misrepresented or concealed. The vast majority of the Defendants' misrepresentations pertain to allegations in the over *3,000 cases* brought against Endo concerning the Company, its executive and its employees' roles in engaging in a campaign to exaggerate the safety and downplay the risks of Endo Opioids to patients, healthcare professionals and insurers, and the Individual Defendants made statements and answered questions regarding these actions, and opioid litigation involving Endo in general, during earnings calls and investor conferences during the Class Period. In that regard, each of the Defendants is presumed to have knowledge of and/or access to the information about which he or she made public statements, and each Defendant controlled the contents of his or her statements made on behalf of the Company during the Class Period.

325. In addition, as Endo's CEO, CFO, and General Counsel, Defendants Campanelli, Coleman, Bradley, and Maletta were each provided with, or had access to, copies of the SEC filings alleged herein to be false or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or to cause them to be corrected. As CEO, CFO Defendants Campanelli, Coleman and Bradley each signed certifications pursuant to the SOX and Exchange Act Rule 13a-14(a) in connection with Endo's Forms 10-Q and Forms 10-K filed with the SEC during the Class Period. As signatories of both: (i) the SOX certification representing that

"the information contained in th[e] [SEC filings] fairly presents, in all material respects, the financial condition and results of operations of Endo"; and (ii) the Rule 13a-14(a) certification representing that the Company's SEC filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading," Defendants Campanelli, Coleman, and Bradley each had a duty to monitor any conduct or information that threatened to undermine the veracity of the representations made in these filings, including all material facts concerning opioid litigation involving Endo and Endo's business.

326.   Defendant Campanelli also received a $5 million special bonus from the Board midway through the Class Period, in 2018. Defendant Campanelli's bonus was so large that it attracted the attention of industry press. For example, the industry web site FiercePharma.com published an article on May 3, 2019, entitled, "Endo CEO Campanelli nabs almost $20M in 2018 pay, thanks to special 2017 bonus." The article noted that while Endo's share price "hasn't recovered at all from a sharp decline" that analysts attributed in part to "concerns around the potential opioid liability." Defendant Campanelli's outsized "special bonus" supports a strong inference of his scienter because would not have been awarded that bonus had he fully disclosed the scope of the Company's involvement in the opioid epidemic and disclosed that the Company faced potentially billions in liability to New York for insurance fraud.

327.   Given the amount of liability that the Endo potentially faced in connection with the actions brought against the Company arising out of its role in the opioid epidemic, and, as disclosed in the Company's SEC filings toward the end of the Class Period, the opioid litigation against Endo had the potential to bankrupt the company. Accordingly, the allegations, underlying facts, and legal issues asserted in those actions were core matters of central importance to the Company. In addition, the potential for liability arising from claims for engaging in insurance fraud in New

York was a core matter of central importance to the Company because, under Sections 404 and 408(a)(1)(A) of the New York Financial Services Law, the state could levy civil penalties on Endo of up to $5,000 per offense, since millions of fraudulent prescriptions for Endo Opioids covered by Section 403 of the New York Insurance Law had been written by healthcare providers, the Company's potential liability for insurance fraud likely threatened the Company's existence as well.

## IX.    PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

328.    The market for Endo's common stock was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or omissions made by Defendants and alleged herein, Endo's common stock traded at artificially inflated prices during the Class Period. On October 16, 2018, the Company's stock closed at a Class Period high of $18.30 per share. Plaintiffs and the other members of the Class purchased or otherwise acquired the Company's common stock relying upon the integrity of the market price of Endo's common stock and market information relating to Endo, and have been damaged thereby.

329.    During the Class Period, the artificial inflation of Endo's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing the damages sustained by Plaintiffs and the other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements or omissions about Endo's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Endo and its business, operations, and prospects, thus causing the price of the Company's common stock to be artificially inflated at all relevant times, and when the truth was disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and the other members of the Class purchasing the

Company's common stock at such artificially inflated prices, and each of them has been damaged as a result.

330.    At all relevant times, the market for Endo's common stock was an efficient market for the following reasons, among others:

- Endo common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market, under the ticker symbol "ENDP";

- as a registered and regulated issuer of securities, Endo filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information;

- Endo regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

- Endo was followed by numerous securities analysts employed by major brokerage firms, including Morgan Stanley, Piper Jaffray, RBC Capital Markets, William Blair, Susquehanna Financial Group, and others, who wrote reports that were distributed to those brokerage firms' sales force and certain of their customers, and that were publicly available and entered the public marketplace.

331.    As a result of the foregoing, the market for Endo's common stock promptly digested current information regarding Endo from all publicly available sources and reflected such information in Endo's public stock price. Under these circumstances, all purchasers of Endo's common stock during the Class Period suffered similar injury through their purchase of Endo's common stock at artificially inflated prices and a presumption of reliance applies.

332.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants material omissions. Because this action involves Defendants' failure to disclose material adverse information identified above, positive

proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Specifically, Defendants misled Plaintiffs and other investors regarding the risk that Endo would be implicated in regulatory investigations or actions related unlawful anticompetitive conduct; and, the extent to which Endo's business operations and financial results were and would be impacted by anticompetitive market conduct in the generic drug industry. Given the importance of these facts, that requirement is satisfied.

## X.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

333.   The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

334.   Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, the Individual Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Endo who knew that the statement was materially false or misleading when made. Accordingly, any arguably forward-looking statements cannot be protected under the PSLRA safe harbor.

## XI.   PLAINTIFFS' CLASS ACTION ALLEGATIONS

335.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Endo securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

336.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Endo securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Endo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

337.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

338.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

339.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

- whether the statements and omissions made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations and management of Endo;

- whether the Individual Defendants caused Endo to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Endo securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

340.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

341.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Endo securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Endo securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

342.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

343.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XII.    <u>COUNT I</u>

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

344.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

345.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

346.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Endo securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Endo securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

347. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Endo securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Endo's finances and business prospects.

348. By virtue of their positions at Endo, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew

or recklessly disregarded that material facts were being misrepresented or omitted as described above.

349.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Endo, the Individual Defendants had knowledge of the details of Endo's internal affairs.

350.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Endo. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Endo's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Endo securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Endo's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Endo securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

351.    During the Class Period, Endo securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Endo securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs

and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Endo securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Endo securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

352.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

353.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## XIII.   <u>COUNT II</u>

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

354.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

355.    During the Class Period, the Individual Defendants participated in the operation and management of Endo, and conducted and participated, directly and indirectly, in the conduct of Endo's business affairs. Because of their senior positions, they knew the adverse non-public information about Endo's misstatement of income and expenses and false financial statements.

356.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Endo's

financial condition and results of operations, and to correct promptly any public statements issued by Endo which had become materially false or misleading.

357.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Endo disseminated in the marketplace during the Class Period concerning Endo's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Endo to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Endo within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Endo securities.

358.    Each of the Individual Defendants, therefore, acted as a controlling person of Endo. By reason of their senior management positions and/or being directors of Endo, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Endo to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Endo and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

359.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Endo.

## XIV.    <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## XV.    DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:  November 27, 2020                     Respectfully submitted,

                                              POMERANTZ LLP

                                              */s/ Brian Calandra*
                                              Gustavo F. Bruckner
                                              Jeremy A. Lieberman
                                              (admitted *pro hac vice*)
                                              J. Alexander Hood II
                                              (admitted *pro hac vice*)
                                              Brian Calandra
                                              600 Third Avenue, 20th Floor
                                              New York, New York 10016
                                              Telephone: (212) 661-1100
                                              Facsimile: (917) 463-1044
                                              gfbruckner@pomlaw.com
                                              jalieberman@pomlaw.com
                                              ahood@pomlaw.com
                                              bcalandra@pomlaw.com

                                              POMERANTZ LLP
                                              Patrick V. Dahlstrom
                                              (*pro hac vice* application forthcoming)
                                              10 South La Salle Street, Suite 3505
                                              Chicago, Illinois 60603
                                              Telephone: (312) 377-1181
                                              Facsimile: (312) 377-1184
                                              pdahlstrom@pomlaw.com

                                              BRONSTEIN, GEWIRTZ & GROSSMAN,
                                              LLC
                                              Peretz Bronstein
                                              (*pro hac vice* application forthcoming)

60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 27, 2020, I electronically filed the foregoing ***Amended***

***Class Action Complaint for Violations of the Federal Securities Laws*** with the Clerk of Court

using the CM/ECF system, which will send notification of such to all CM/ECF participants.

POMERANTZ LLP


*/s/ Brian Calandra*
Brian Calandra
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
bcalandra@pomlaw.com