1

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF NEW JERSEY

CURTIS LAAKSO,                          :

        Lead Plaintiff,        :

And                                     :

ENOIT ALBIGES, individually and   :      Civil No.
on behalf of all others similarly        20-cv-7536-MCA
situated,                         :

                                       TRANSCRIPT OF
        Named Plaintiff,       :   HEARING ON MOTION

           v.                     :

ENDO INTERNATIONAL PLC, PAUL V.    :
CAMPANELLI, BLAISE COLEMAN,
MARK T. BRADLEY, and MATTHEW J.    :
MALETTA,

                            :
        Defendants.
-----------------------------------x

                           Via Zoom Teleconference
                           August 30, 2021

BEFORE:

      THE HON. MADELINE COX ARLEO, U.S.D.J.

                           Reported by:
                           CHARLES P. McGUIRE, C.C.R.
                           Official Court Reporter

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

CHARLES P. McGUIRE, C.C.R.

2

APPEARANCES:

    POMERANTZ LLP
    600 Third Avenue
    New York, New York 10016
    BY: BRIAN P. CALANDRA, ESQ.
    Attorney for Plaintiffs

    GIBBONS, PC
    One Gateway Center
    Newark, New Jersey 07102
    BY: LAWRENCE S. LUSTBERG, ESQ.
    And
    LATHAM & WATKINS LLP
    BY: JAMES E. BRANDT, ESQ.
        KEVIN M. McDONOUGH, ESQ., and
        JOOYOUNG YEU, ESQ.
    Attorneys for Defendants

CHARLES P. McGUIRE, C.C.R.

(The following takes place via Zoom teleconference)

THE COURT:  Okay.  Good afternoon, everyone.

We are here for oral argument in Laakso v. Endo.

Could I have appearances, please?

MR. CALANDRA:  Good afternoon, Your Honor.

Brian Calandra, Pomerantz LLP, on behalf of the Plaintiffs, Curtis Laakso and Benoit Albiges.

THE COURT:  Okay.

MR. LUSTBERG:  Good afternoon, Your Honor.

Lawrence S. Lustberg, Gibbons, PC, on behalf of Defendants Endo International PLC, et al.

With me are my friends and colleagues, James Brandt and Kevin McDonough and Jooyoung Yeu from Latham & Watkins.  There may be others from the client, but Mr. Brandt will be presenting oral argument, if necessary, to assist the Court today.

THE COURT:  Okay.  Thank you.

I'll state for the record that we are on a Zoom videoconference, and I'm always happy to do things by Zoom if we can, particularly when we're still in the midst of the Covid-19 pandemic.

I want to note for the record that my Court Reporter, Charles McGuire, is on this Zoom call as well.  He'll be taking down this oral argument stenographically.

So, Mr. McGuire, can you see and hear?

4

MR. McGUIRE:  Yes, I can, Your Honor.  Thank you.

THE COURT:  Okay.

I also note that my Deputy Clerk, Amy Andersonn, is also on the call.

And if there are any problems, if anyone's internet goes down or you can't hear, you can contact Amy, and indicate to me in any way you can, and then I'm happy to adjourn it and reschedule it.

So, thank you for accommodating my schedule change.  My internet crashed this morning, so I had no internet, and this saved me a trip into Newark, so thank you.

And so we're here for oral argument on a motion to dismiss this class action complaint, and I'm just going to kind of tell you where I'm headed, and I'll let everyone be heard before I make a final ruling.

But let me put this in a little bit of procedural context.

Plaintiffs commenced this action on June 19th, 2020.  There was an Amended Complaint filed on November 27th of 2020.  Defendants then moved to dismiss the Amended Complaint.

There are two causes of action, violations of 10b-6 of the Securities Exchange Act and 10b-5, promulgated against all the Defendants.

CHARLES P. McGUIRE, C.C.R.

So, I guess in a nutshell, this is really a pretty straightforward securities fraud case. Accordingly, Plaintiffs must satisfy the heightened pleading rules set forth in the PSLRA, and that's pretty well settled law. The PSLRA requires that a complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."

This, again, is pretty settled law from the 3rd Circuit in OFI Asset Management v. Cooper Tire & Rubber, 834 F.3d 481, 490 (3d Cir. 2016).

To state a claim under 10b-6 and 10b-5, Plaintiffs must allege "a material misrepresentation or omission, scienter, a connection with the purchase or sale of a security, reliance, economic loss, and loss causation." Again, settled law from Gold v. Ford, 577 F. App'x 120, 122 (3rd Cir. 2014).

I'd like to focus -- and I'd really like to hear a little bit from Plaintiffs. I'd like to focus on the first element, which is a material misrepresentation.

And this case stems from a litigation that was brought against Endo, and if I could just sum it up in a nutshell, this action is about Defendants' alleged failure

to disclose not just the litigation, because that was disclosed, but the extent of exposure from the litigation and how it impacted their financial bottom line.

And so I place that in a very generalized statement, but this is unique in the sense that we have 70 statements.  A lot of them are, most of them are -- and we'll talk about this -- very general statements.

There is no dispute that the opioid crisis was a bad one and that it wreaked havoc on a lot of companies, including Endo; but this isn't about the opioid crisis, this is about a securities class action, and the law is pretty exacting about what material misrepresentations must be in this context.

And despite there are 70 statements, a lot of them are pre-class-period statements.

There are no confidential witnesses, which is a little bit of a different twist in this case.

And I just don't see in the Amended Complaint the type of material misrepresentations or omissions that would give rise to an actionable -- as actionable statements.

And I can go through them.  I'd really like to have a conversation with the Plaintiffs about this, because I will tell you that I'm inclined to let you plead again, with some guidance from the Court, because what I see in this complaint just isn't enough.

So why don't we talk about some of them.

I could tell you -- you know, I've broken them down a little bit differently than the briefs did.

Statements regarding extent of exposure from the opioid actions, we can talk about those; statements regarding the cause of the opioid actions; statements about liquidity risks and cash reserves; and a lot of statements that I would put under the heading of protected opinion, puffery, and corporate optimism statements.

And then we can talk about scienter.

I'm not going to talk about any of the other elements at this juncture because I think there is a lot of threshold issues that have to be met before we can move forward to loss causation and other things.

But I really want to focus on the material misrepresentations or omissions.  I can go through them.  Why don't we go through them by category, and I'll tell you where I'm headed.

Let's talk first about the representative allegations, statements regarding extent of exposure.

Why don't I hear first from Plaintiffs, and he can tell me what he thinks his best statements are regarding extent of exposure from opioids.

MR. CALANDRA:  Certainly, Your Honor.

So, respectfully, I think by breaking it down into

four categories, your perspective of the case is a little off and a little inconsistent with the guidance from the 3rd Circuit and the case law in general.

There are really two categories of statements, and the first category has to do with the risks attendant to the litigation, and the second category has to do with the liquidity, the finances.

THE COURT:  Okay.  That's fine.  We can look at those two buckets, because, you know, you have so many statements out there, you have 70; you have no witnesses. We can look at -- let's talk about risks attendant to the litigation, and you can talk about it generally, because those are really the two when I started my comments, the risks from the lawsuit, and then how it impacted the financials of the company.

So let's talk about bucket one.

MR. CALANDRA:  Bucket one.

So, first, we have the disclosures that they made consistently throughout the class period about how these litigations are piling up.  And so they're saying, we are going to contest these litigations vigorously; we have nothing -- no knowledge that suggests that a loss is probable, but we will contest these litigations vigorously.

And then they didn't stop there.  They then -- so if you're a reasonable investor and you are looking through

9

these disclosures, your first reaction will be, wow, that's a lot of litigation; I wonder what that means?  And they have a risk factor designed to assuage those fears where they say, yes, we have a lot of litigation, but that's only because Plaintiffs' lawyers have Facebook and they recruit Plaintiffs, and so we get sued all the time and a lot more often.

THE COURT:  Where do they make statements that said the Plaintiffs' lawyers have Facebook and they're frivolous, is that -- or they're not -- they're just piling up, and they're not really risky litigation?  Where do they say that?

MR. CALANDRA:  They say -- in that risk disclosure, the disclosure doesn't affirmatively say that it is frivolous, but it does say that we have a risk of litigation because Plaintiffs' lawyers can attract potential Plaintiffs on Facebook.

And Your Honor isn't required to close your eyes to the meaning of that statement when you compare it to and you look at it with the statement that there are thousands of cases that they are vigorously litigating.  That is a statement that's designed to assure an investor:  Don't be scared off by the numbers of cases, because Plaintiffs' lawyers can recruit potential Plaintiffs easily.

And then you have to read that along with the

10

third disclosure they made, which is, there's a lot of negative publicity about opioids, so right now, there's a lot -- we have a lot of cases, and Plaintiffs' lawyers will do anything they can to sue us, and the Plaintiffs' lawyers are seizing on these media articles and media coverage to bring whatever claims they can. And in that disclosure, they don't even limit it to Plaintiffs' lawyers, they say government lawyers.

And so when you read those three disclosures together, you see that what this is is an attempt to assuage investors.

This case really is a war on two fronts, or Endo's reaction to the opioid epidemic is a war on two fronts. Front one is the 450,000 people who died because of the campaign that they participated in. The second front is the investors, who they tried to reassure about the nature of this litigation.

And so then you have those sets of statements, that there are lots of actions that they're litigating vigorously that are brought by Plaintiffs' lawyers, who are easily able to pick up clients, and that they're really just reacting to media press.

Now, that alone, perhaps, is not enough, but then you have added to that the statements they made in the press vigorously denying the merits. If they had just stopped

11

there, without going to their vigorous denials, perhaps Your Honor's instinct with regard to this case I think would -- you know, would be pretty well backed.

But when you have periodically and consistently these forceful denials, and that's where, if I could, I'd like to get into our case law a little bit, because, if you look at Geldwin (ph) and American Dental and Altria, you have these kinds of forceful denials that tip the scales.

In Defendants' cases, like Galena, UBS and Citigroup, they were just straight flat disclosures.

THE COURT:  Is there a difference between saying, we did nothing wrong, these are frivolous, and saying, they're piling up, there's a lot of them, we're going to defend them?

MR. CALANDRA:  Yes, there is a difference, and the point in this case is that that difference arises out of their risk factors, which, even though they don't explicitly attribute, they don't say, these litigations are caused by venal lawyers, they say, look at all these litigations, and, we get sued a lot by venal lawyers.

Your Honor under 3rd Circuit well-established case law should read these disclosures together.  That's one element, the way these risk factors fit in with the vigorous disclosure.

But the other factor are these denials, and that

CHARLES P. McGUIRE, C.C.R.

12

is completely what separates this case.  Defendants have every right to not -- to simply disclose that they are under litigation.  They don't have a right to weigh in on the merits of that litigation when they have facts --

THE COURT:  Tell me the precise statements where they weighed in on the merits of the litigation.

That, I agree with you:  If they said, these are frivolous lawsuits, they fail on the merits, they're frivolous, that is weighing in on the merits.

Where do they weigh in on the merits here?

MR. CALANDRA:  On November 17th -- I'm sorry, November 6th, 2017, paragraph 175, Defendant Maletta says, these are patently offensive.  The Kentucky allegations.

Now, Defendants, because this is a terrible --

THE COURT:  What precisely was he referring to, these are patently offensive?

MR. CALANDRA:  Defendant -- the article, the way the article reads is, Kentucky is bringing --

THE COURT:  Read me the whole context of what he said.

MR. CALANDRA:  Absolutely, Your Honor.

Would you prefer I pull up the actual -- the article itself, which was --

THE COURT:  Well, I would hope that whatever you put in your complaint is the same as what was quoted in the

CHARLES P. McGUIRE, C.C.R.

13

article, or else it would not be accurate.

MR. CALANDRA:  No, that's -- that's right.

THE COURT:  It shouldn't matter; right?

MR. CALANDRA:  It is accurate, but the entire context of the article is not in the complaint.  We just quote it.

THE COURT:  Tell me what's in the complaint.

MR. CALANDRA:  The complaint reads, "On November -- " -- this is paragraph 175:  "On November 6, 2017, the State of Kentucky filed a lawsuit accusing Endo of using deceptive marketing to sell Opana ER.  On that same day, Reuters published an article describing the lawsuit and its allegations.  The article quoted Defendant Maletta as responding that the allegations that Endo was trying to profit at the expense of people's health were, quote, 'patently offensive,' unquote, and that Endo intend[s] to vigorously defend the company against the claims set forth in [the Kentucky] lawsuit."

Now, Your Honor, I have a feeling, I'm intuiting that you may say he's responding to the summary of the allegations.  But if I were to say to you, you stole from me, and you were to respond, that's patently offensive, that -- I would not be expected to infer that, in fact, you did steal from me.  Saying this is patently offensive is a statement denying these allegations.

14

THE COURT:  Well, that's one construction.  That's a reach, honestly.  That's a reach.  You know it's a reach.

MR. CALANDRA:  I disagree, Your Honor.

THE COURT:  Well, it is -- I don't want to fight with you today on this argument, but I asked you what the statements were where they vigorously denied on the merits, and we don't see eye to eye on this point.  It's not a vigorous denial on the merits.  Trying to profit at people's health, he patently denied that, and he said, we will vigorously defend the lawsuit.  That's a little bit different than saying the lawsuits are meritless, the lawsuits are frivolous.

MR. CALANDRA:  I would only add, Your Honor, that, of course you were supposed to inspect these strictly, but at the same time, you're not -- you have to look at the -- or I would urge you to look at the statements for what they are.  This was not intended to be, We don't know if we did anything wrong.  This was intended to tell investors that these lawsuits were meritless, when, in fact, they had evidence in their hands that they knew, for example, that they could liquify Opana ER and had been marketing Opana ER as resistant to injection.  I mean, to describe something as patently offensive when they were data mining to try to identify --

THE COURT:  I have to stop you, Mr. Calandra,

CHARLES P. McGUIRE, C.C.R.

because I just asked you to read the statement.  I'm taking the statement at face value.  I'm not going to read into and intuit something that an individual knew from five or 10 years earlier and read into it.  I'm going to read a statement and I'm going to read it for its plain meaning, and the statement that you read to me said he responded to trying to -- that the company was trying to profit at people's health.  That's what he said in response, using the words "patently offensive," and then he said, we're going to vigorously deny these lawsuits.  That's what paragraph 175 says.

So we keep going down rabbit holes.  I don't want to go down rabbit holes.  I want specific statements, and I want to evaluate the statements.  That's different than vigorously denying it on the merits, saying it's patently frivolous.  Patently offensive in response to trying to profit at people's health is definitely just saying it's patently frivolous, and that is a distinction that's clear in the case law.

So, let's go on to more statements that you can point to.  You have the patently frivolous statement from '17.

What is the class period?

MR. CALANDRA:  The class period is from August of 2017, or July of 2017 to June of 2020.

CHARLES P. McGUIRE, C.C.R.

16

THE COURT:  Okay.  So, move on.  Tell me another statement.

MR. CALANDRA:  And I only for the record, Your Honor, and not to belabor it, but I'm not sure I agree that you are only supposed to look at the statement and not the context in which the statement is given.  Just preserving that for -- should I --

THE COURT:  Listen, Mr. Calandra, let's be clear.  To be clear, I'm going to give you an opportunity to replead.  And so the record is meaningless today because I'm giving you guidance so that you can replead, because I'm not satisfied that you have pled appropriately, and I'll talk about that in a minute.

So, after you replead and I evaluate it again, I assure you that if when I make my final decision and I decide whether or not there's going to be -- when it's a final, without prejudice, if there is -- if it goes forward, it goes forward; if it doesn't go forward, there will be a written opinion.  But I'm using this to be helpful to you so you know what I find troubling in the pleading to date.  Okay?

MR. CALANDRA:  I appreciate that, Your Honor, and I certainly don't want to dig myself into a hole I can't get out of, so I will move on to the next statement.

THE COURT:  Good.

CHARLES P. McGUIRE, C.C.R.

MR. CALANDRA:  Paragraph 217.

THE COURT:  Okay.

MR. CALANDRA:  That is a quote from a Philadelphia Inquirer article that was entitled "Managing the Risks of Opioids:  Endo Outlines How It Takes Accountability in Selling Addictive Drugs."

Again, this is Defendant Maletta, who says, quote, "Our view is that we've done everything properly," then followed by -- or end quote, then followed by, quote, "We deny the allegations in the complaints and we're proud to talk about our business practices.  Hopefully, other companies will follow suit," end quote.

And based on what you said earlier, I am imagining you view this more as an opinion, and I would say that they had undisclosed facts that went directly to that opinion, that contradicted that opinion, and the idea that we are proud to talk about our business practices then puts in play what those business practices were, and they had not disclosed what those business practices were.  Instead, they used that alongside of what I've said earlier about the vigorous contesting and risk factors.

THE COURT:  Okay.

Anyone want to respond to that, to the Philadelphia Inquirer article?

MR. BRANDT:  Sure, Your Honor, I'd be happy to.

CHARLES P. McGUIRE, C.C.R.

18

I'm just going to try and pull it up for a second.

What that article is talking about -- hang on one second.

What that article is talking about is the constructive conversation.  And it's, by the way, I think Exhibit 22 to Mr. McDonough's affidavit that we put in in the case.

What that article is talking about is the way that the company responded to problems relative to the opioid crisis.  So, for example, it talks about how the company largely eliminated opioids from its portfolio, that they had gotten rid of their entire sales force for opioids, that they voluntarily withdrew their opioid, Opana ER, from the market, et cetera, et cetera, and a conversation, a dialogue that the company was having with an organization that was active in the opioid area, and it was in response to that that Mr. Maletta was saying -- a conversation about that in the article that Mr. Maletta was saying, "Our view is that we've done everything properly.  We deny the allegations in the complaints," which, of course, they deny in the actual litigations, and "we're proud to talk about our business practices," which are the things that the article was talking about.

So, you know, Brian, Mr. Calandra, rather, is conflating Mr. Maletta's comment in the article with a group

CHARLES P. McGUIRE, C.C.R.

of allegations made in opioid litigations that are not what his comments were about in the article.

And anyway, that's where the article is, and you can take a look at it and see what I'm talking about.

THE COURT:  Thank you.

Mr. Calandra, anything else?

MR. CALANDRA:  What Mr. Brandt is doing is disputing the misleading nature of the statement, and that is not a subject matter for a motion to dismiss.  The misleading nature of the statement is usually reserved for the Trier of Fact.

THE COURT:  Okay.  Give me the next statement.

MR. CALANDRA:  Then, Your Honor, we have two statements, one in August 2017, and -- well, the first one, in August 2017 -- actually, I will leave that one aside for the moment.

In January 2018 -- and here, I am going to paragraph 178 of the complaint.  In January 2018 -- and actually, I apologize, I'm going to paragraph 177, --

THE COURT:  Okay.

MR. CALANDRA:  -- and it concerns the press release that Endo issued in response to announcing that the U.S. Attorney's Office for the Southern District of Florida was seeking documents.

And then -- so we have the disclosure of the

CHARLES P. McGUIRE, C.C.R.

20

subpoena, but then in paragraph 178, it goes on and states: "In all circumstances, it is Endo's policy to comply with applicable laws, rules, regulations and industry guidance governing the sale and marketing of pharmaceutical products."

Now, this is an example of exactly what was at issue in Geldwin and Altria. Defendants, if they had just simply disclosed the existence of the subpoena as the Defendants did in Galena, UBS, Citigroup and other cases, they would have been fine, but they went on to editorialize about their policies and how they comply with all applicable laws, and by doing so, that moves the case out of the realm that Defendants cite and into the realm of the cases that we cite, like Geldwin, where this kind of statement was found to be an attribution of the company -- was found to be something more than simply just disclosing the existence of the litigation, and that was found to be misleading.

THE COURT: Okay. Anything you want to talk about in terms of the second area, liquidity risks and cash reserves?

MR. CALANDRA: Your Honor, beyond what we said in our briefs, I don't have much to add, other than there isn't a categorical ban on pleading -- there isn't a categorical ban on pleading misrepresentations about their finances, and although it's not part of the record, it probably will be if

CHARLES P. McGUIRE, C.C.R.

21

Your Honor -- if I hopefully haven't talked Your Honor out of giving me the opportunity to amend.  They've hired a bankruptcy consultant, and so certainly those liquidity issues are coming up front and center and will likely be a matter of record by the end of the year.

But I don't really have anything to add beyond what I said in our brief.

THE COURT:  Okay.  So, let me just, you know, touch on some of the points.

And I'm not satisfied that you state a claim based on what I see before me now, and I just want to give you some guidance on why I have come to that conclusion.

And we can talk about the two buckets, the failure to disclose, the extent of exposure from the litigation.

There's a lot of statements in this complaint, but I'm going to try to give you a little bit of guidance and let you know what the basis of my ruling is.

So, there were some statements from the 10-K back in February of 2018 regarding the opioid-related matters, signed by Campanelli and Coleman, just stating that "multiple U.S. states, counties, other governmental persons or entities and private plaintiffs have filed suits..."

The 10-K disclosed a number of cases that had been filed by various entities and unequivocally stated that "We will continue to vigorously defend the foregoing matters and

CHARLES P. McGUIRE, C.C.R.

22

explore other options as appropriate in our best interests." That's the complaint at 220-221, noting "We are unable to predict the outcome of these matters or to estimate the possible range of losses..." That's, again, in the 10-K.

The Amended Complaint alleges that these statements "misleadingly downplay the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct..." And that's, again, Amended Complaint at 222.

So the law is pretty clear, at least in the Galena case, to start, found at 2019 Westlaw 5957859, and that case states that a company "need not make a complete mea culpa when disclosing the investigation and its potential legal implications."

As in Galena, Plaintiffs here "do not claim that Defendants made a misrepresentation or actionable omission concerning the nature of the investigation itself nor as to the potential legal liability faced by [the Company], but rather claim that the disclosures were misleading because they concealed the true extent of the company's legal exposure."

The Galena court ruled that that "theory is not

CHARLES P. McGUIRE, C.C.R.

23

supported by precedent."  The "law required [the Company] to disclose the [opioid actions] and their potential legal ramifications, which [the Company] appears to have done."

So let's talk about some of the other representations.

We talked earlier about the downplaying the scope of the alleged misconduct, attributed to "negative publicity," "public concern," "potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than Defendants' own misconduct."

The cause of the opioid actions, that's something that we touched on, that counsel touched on earlier.  That's at 270-275.

First, there's no explanation for how these disclosures were, in fact, false or misleading, and that the plain language of those statements does not suggest that the opioid actions were solely as a result of media coverage and other companies' conduct.

We talked a little bit about a lot of statements, regarding statements made by representative allegations, which I would say fall in the category of opinion, puffery, corporate optimism, and what counsel touched on a minute ago, the press release -- the grand jury subpoena from the Southern District of Florida and the Philadelphia Inquirer article.  We talked about both of them, the January 2018

CHARLES P. McGUIRE, C.C.R.

press release, the subpoena and the press release, as counsel just went beyond just stating what was in the subpoena -- that they were subpoenaed, but, quote, "[i]n all circumstances, it is Endo's policy to comply with applicable laws, regulations, and industry guidance governing the sales and marketing of pharmaceutical products."

And again, in the Philadelphia Inquirer article that we spoke about, Maletta, the company's chief legal counsel, said, quote, "Our view is that we've done everything properly...We deny the allegations in the complaints and we're proud to talk about our business practices. Hopefully, other companies will follow suit."

The 3rd Circuit has stated that "[o]pinions are only actionable under the securities law if they are not honestly believed and lack a reasonable basis." City of Edinburgh Council v. Pfizer, Inc., 754 F.3d 159, 170 (3d Cir. 2014).

Furthermore, "the Supreme Court explained that an opinion may be an actionable misrepresentation or misleading omission if (1) the statement expresses an opinion not actually held by the speaker (subjectively false) and contains an embedded assertion of incorrect facts (objectively false), or, (2), the speaker omits facts concerning the basis for the opinion and 'those facts conflict with what a reasonable investor would take from the

25

statement itself.'"  Hall v. Johnson & Johnson, No. 18-1833, 2019 Westlaw 7207491, at 18 (D.N.J. Dec. 27, 2019).

Here, Defendants' statements denying the allegations in the complaints and its "view" that they have "done everything properly" are non-actionable opinion statements because the Amended Complaint does not adequately allege that the statements were not honestly believed, lack reasonable basis, or any omitted facts that render them misleading.

Again, this issue was addressed in Hall v. Johnson & Johnson in which the Court said "Defendants' statements regarding the viability of the lawsuits against J&J clearly constitute opinions regarding the success of the litigation, rather than statements of fact...Plaintiff's argument on this point is, essentially, that because Defendants knowingly engaged in a fraudulent scheme to conceal the truth about its asbestos products, none of the statements regarding the viability of the lawsuits against the Company could have possibly been in good faith.  That type of circular reasoning is insufficient to satisfy the Supreme Court's decision in Omnicare."

I should state that when I quoted Hall v. Johnson & Johnson a minute ago, it was quoting Omnicare.

In addition, Defendants' statements that "[i]n all circumstances, it is Endo's policy to comply with applicable

26

laws..." is not actionable.  Again, I'm referring to the 3rd Circuit in EP Medsystems v. Echocath, Inc., 235 F.3d 865, 872, where the Court said the "Material representations must be contrasted with statements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism, which constitute no more than puffery and are understood by reasonable investors as such."

I also just want to add for the record for guidance to Plaintiffs' counsel when they file their amended pleading is some comment about the statements regarding liquidity and cash reserves.

There were statements contained in the Amended Complaint at 277 to 278 that S.E.C. disclosures "contained generic, boilerplate representations regarding Endo's supposed view of its liquidity risks" that were "not tailored to Endo's actual known risks," referring to Endo's 10-Q quarterly report at 206 and 214, and that these statements were false because the company faced potentially billions in liability.

They also allege that in July of '19, the Company filed an 8-K which disclosed that the Company had "maxed out" a credit facility after borrowing $300 million.  The 8-K stated that the company "expects to use the proceeds from the borrowing under the Revolving Credit Facility for

CHARLES P. McGUIRE, C.C.R.

purposes consistent with the Company's previously stated capital allocation priorities, including for general corporate purposes" and to "provide additional flexibility and strategic optionality."  That's at 134.  Plaintiffs assert that notwithstanding these representations, "Defendants had plainly maxed out the credit facility to pay for any opioid-related settlements."

The Company's statements regarding its expected ability to meet its liquidity requirements are forward-looking statements that are not actionable.

The 3rd Circuit has stated that "the word 'expected'" is "a term that identifies the statement as forward-looking."  OFI Asset Mgmt. v. Cooper Tire & Rubber, 844 F.3d 481, 501 (3rd Circuit 2016).

The PSLRA contains a "'safe harbor' that immunizes...'forward-looking' statements from 10(b) liability" if the "statement is identified as [such], and is accompanied by meaningful cautionary" language.

Here, the Amended Complaint does not explain with particularity how Defendants had knowledge that the statement is false or misleading.

The statement is accompanied by meaningful cautionary language regarding possible "unexpected expenses," which specifically included "expenses related to our ongoing and future legal proceedings and governmental

28

investigations and other contingent liability."  That's at 214 in the Amended Complaint.

The 10-Q further states that the Company "may need to obtain additional funding to repay our outstanding indebtedness, for our future operational needs or for future transactions."  That's at 34.24, electronic filing at 7.

The Amended Complaint does not adequately state how the Company's July 2019 8-K contained a false or misleading statement.

Coleman's statement during a call that "[W]e know what our strategy is.  We feel good about our flexibility that we have to deal with that," is not a particularized allegation that Coleman was referencing the borrowing seven months earlier with this statement.

I want to talk a little bit about scienter.

I'm not satisfied that scienter is appropriately pled here, either, and I'd like to give you a chance to replead that, if possible.

So why don't I hear from Mr. Calandra about scienter.

MR. CALANDRA:  Certainly, Your Honor.

When you look at cases like Advance Auto Parts and Swanson and Epstein v. World Acceptance, the allegations in the complaint of the directors themselves saying when they met with or how often they met with Defendant Maletta and

CHARLES P. McGUIRE, C.C.R.

29

Defendant Campanelli and what they discussed and assuring investors, and this disclosure from the board was made very much for investors, that kind of disclosure has been -- it's -- if I can catch my breath, it discloses the number of meetings, what was discussed at the meetings, and the subject matter of the meetings and the attendees.  That is sufficient under these cases to allege that the directors in making that statement and Defendants Maletta and Campanelli in preparing themselves had knowledge of the contrary facts that we allege in our complaint.

All of those contrary facts, by the way, come from sworn deposition testimony, documents produced in the discovery, not mere just recitations of facts from other complaints.

So, by affirmatively coming out and assuring investors that the individual Defendants are having these meetings with the directors, that alone has been held to be sufficient to allege scienter.

And it's important to remember, Your Honor, that, although we are subject to a very high burden in these cases of pleading with particularity, that burden is softened somewhat by evidence that is uniquely within Defendants' possession, and Defendants have come out and affirmatively explained and chosen to explain when they were meeting and what they were talking about, and our submission would be

30

that it is too much to ask for us to know what the minutes of these meetings are when they haven't been made public.

THE COURT:  So your argument is it was based on the meetings of the board and the directors?

MR. CALANDRA:  Which are specifically to discuss these litigations.  That's one element.

In addition, we know that the Defendants were monitoring the reporting systems for adverse events.  In that same board disclosure, they acknowledged that they had been monitoring them.

And then finally, we have --

THE COURT:  Can I ask you a question?  Can I stop you?

Isn't saying, I don't have any real evidence of scienter, they didn't dump their stock, I have no statements, I have no witnesses, but if they're meeting, I'm assuming that they knew what was going on, isn't that really rank speculation?

MR. CALANDRA:  It is not --

THE COURT:  They met with the board, and that would be in every case, because, in every single case, the leadership meets with the board regularly.

MR. CALANDRA:  But, Your Honor, that's not what we allege.  We allege that the directors themselves said, we meet specifically with Campanelli and Maletta to talk about

CHARLES P. McGUIRE, C.C.R.

31

the allegations in these opioid cases.

THE COURT:  Well, let me stop you for a minute.

Of course they do.  They have all this ongoing litigation.  Who wouldn't?  I mean, the fact that they're meeting with them about litigation -- they're in litigation.  They disclosed there was litigation.  It would be reckless not to talk about ongoing litigation that they've already disclosed, right?  If they said, we never talked about the litigation, you'd say it was malfeasance.  They talked about litigation.

But beyond that, the fact that they talked about litigation, isn't that just speculating that they had some kind of scienter in light of all the other conduct - that they didn't sell their stock, there's no other confidential informant saying what they might have said about what was going on:  We know that this company is going under any day now, but we're just trying to keep it afloat; let's dump our stock.

There's none of that here.  It's just that they met and they talked about the litigation.  That was in the minutes.

MR. CALANDRA:  As Your Honor has found previously in the Roofers v. Papa case, you don't need sales of shares to prove scienter.

THE COURT:  Oh, I know that.  I know that you

CHARLES P. McGUIRE, C.C.R.

32

don't need it.  But you don't even have it here.

MR. CALANDRA:  Right, because, at the very least, Defendants were smart enough not to dump their stock when they were making these statements.

But, Your Honor, what makes this case different is that the gravity of these actions -- as you know, this is an existential event for the company, and I think you said it exactly right when you said it would be reckless not to discuss the details of what this company knew and what its --

THE COURT:  How can you say that?  It would be reckless not to discuss pending lawsuits.  They disclosed that:  We have lawsuits; we're defending them.  I mean, of course that's going to be a topic.  That's all I said.

I mean, you want me to make -- you have to plead "facts giving rise to a strong inference that the defendant acted with the required state of mind.  A strong inference exists "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, Inc. v. Makor Issues and Rts., Ltd., 551 U.S. 308, 324 (2007).  The 3rd Circuit permits a plaintiff to satisfy the scienter requirements by alleging strong circumstantial evidence of either conscious or reckless behavior. Institutional Invs. Grp. v. Avaya, Inc., 564 F.3d 242, 267

33

(3d Cir. 2009).

What you have is that they discussed at board meetings litigation.

MR. CALANDRA:  But no, that's not what we have, Your Honor.

THE COURT:  What do you have?

MR. CALANDRA:  We have -- they were specifically carving out extensive amounts of time -- the board said that they were doing this and said who they were doing it with, to specifically talk about the opioid litigation.

THE COURT:  Fine.  Of course they were.  Of course they were.  Why wouldn't they be?  They have all these lawsuits that they just disclosed to all their investors. They should be talking about them.

MR. CALANDRA:  That's right.  So then --

THE COURT:  So where is the scienter of -- where am I supposed to draw -- where do I draw an inference from that that they act recklessly -- conscious and reckless behavior?

MR. CALANDRA:  Because what else are they talking about in that meeting other than the fact that --

THE COURT:  I don't know.  I wasn't there.  Were you?

MR. CALANDRA:  I wasn't, either, and I'm not required to be, Your Honor.

CHARLES P. McGUIRE, C.C.R.

34

THE COURT: I know you're not. But, counsel, you can't just say, they met and they discussed X; therefore, what they discussed, X, is what they disclosed, that there are lawsuits. There has to be more than that. It's a heightened burden. You can't just say they met and they carved out extra time and they talked about the pendency of lawsuits, which they had disclosed, so now you have to prove scienter, reckless or conscious behavior.

So there's nothing else. There's nothing else that you have, other than -- that inference is not as compelling as any opposing inference. It's just not. You need something else.

MR. CALANDRA: Your Honor.

THE COURT: I'm not going to fight with you.

MR. CALANDRA: No, no.

THE COURT: I'm telling what you my ruling is. It's not enough.

MR. CALANDRA: Right. I understand, and just for a point of clarification, is it your ruling that for us to overcome this burden, we need to allege what happened during those meetings?

THE COURT: No. I didn't say that.

MR. CALANDRA: Okay.

THE COURT: I just said that that piece of evidence, that fact as pled is not enough for scienter.

CHARLES P. McGUIRE, C.C.R.

35

MR. CALANDRA:  Okay.

THE COURT:  That's all I'm saying.  And I'm giving you an opportunity to go back to the drawing board and see where your investigation takes you and what you may have missed and what you can replead out of an abundance of caution to give you an opportunity to see where I'm headed.

MR. CALANDRA:  I understand, Your Honor.

THE COURT:  What I'm saying is, I'm not satisfied that that's enough.

MR. CALANDRA:  I understand.

THE COURT:  All right?

MR. CALANDRA:  I appreciate that, Your Honor.

THE COURT:  Anything further for anyone?

(No response)

THE COURT:  Okay.  So, I think you see where I'm headed.

I appreciate the arguments and the fine briefing from both sides.

I'm going to give you -- Mr. Calandra, how much time do you need to file an Amended Complaint:  Thirty, 45 days, 60 days?  Whatever you need, you can have.

MR. CALANDRA:  That is very generous.  I would appreciate 60 days, Your Honor.

THE COURT:  Sure.  If you need more time, just check with Amy.

CHARLES P. McGUIRE, C.C.R.

MR. CALANDRA:  Okay.

THE COURT:  And we can give you more time for that.  So that would be roughly by November 1, and then you can agree on another briefing schedule following that.  All right?

MR. CALANDRA:  Thank you, Your Honor.

THE COURT:  And thank you, everyone.

(Off the record discussion)

THE COURT:  All right, guys.  Be well.  I'll talk to you soon.

MR. CALANDRA:  Thank you, Your Honor.

MR. LUSTBERG:  Thank you, Your Honor.

(Matter concluded)

Pursuant to Section 753, Title 28, United States Code, the foregoing transcript is certified to be an accurate record as taken stenographically in the above entitled proceedings.

s/CHARLES P. McGUIRE, C.C.R.

CHARLES P. McGUIRE, C.C.R.