POMERANTZ LLP
Gustavo F. Bruckner
Jeremy A. Lieberman (admitted *pro hac vice*)
Brian Calandra
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
gfbruckner@pomlaw.com
jalieberman@pomlaw.com
bcalandra@pomlaw.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CURTIS LAASKO<br><br>      Lead Plaintiff<br><br>and<br><br>BENOIT ALBIGES, Individually and On Behalf of All Others Similarly Situated,<br><br>      Named Plaintiff,<br><br>    v.<br><br>ENDO INTERNATIONAL PLC, PAUL V. CAMPANELLI, BLAISE COLEMAN, MARK T. BRADLEY, and MATTHEW J. MALETTA,<br><br>      Defendants. | Civil Action No.: 20-07536 (MCA)(MAH)<br><br><u>Second Amended Class Action Complaint for Violations of the Federal Securities Laws</u><br><br><u>JURY TRIAL DEMANDED</u> |

**TABLE OF CONTENTS**

**PAGES**

I.    NATURE OF THE ACTION ................................................................. 1

II.   JURISDICTION AND VENUE ........................................................... 12

III.  PARTIES ............................................................................................ 13

IV.   SUBSTANTIVE ALLEGATIONS .................................................... 16

    A.    Background .................................................................................. 16

    B.    The Opioid Epidemic .................................................................. 17

    C.    Endo's Marketing Exaggerated the Benefits of Opioids and Downplayed Their Risks .................................................................................. 19

        i.    Endo's Use of Sales Representatives ........................................ 20

        ii.   Endo's "Use of Front Groups" ................................................ 23

        iii.  Endo's Use of Key Opinion Leaders ....................................... 27

        iv.   Endo's Educational and Marketing Materials .......................... 29

    D.    Endo Trained Its Sales Representatives to Focus On Healthcare Providers Most Likely to Write the Most Opioid Prescriptions .................................... 30

    E.    Endo Lacked an Effective System for Identifying Fraudulent Prescriptions ....... 35

    F.    Endo Falsely Promoted Opana ER Knowing That It Had an Increased Risk of Abuse .................................................................................. 42

        i.    Endo Falsely Promoted Opana ER to Private Insurance Companies ....... 47

    G.    Endo Ceases Marketing Endo Opioids and Withdraws Opana ER ..................... 50

    H.    Endo's Precarious Financial Condition Meant That The Company Did Not Have Liquidity Sufficient to Satisfy Judgments in Opioid-Related Actions ................ 51

    I.    Endo Defended Itself in the Opioid-Related Actions Through A Campaign to Obstruct the Litigation and Conceal its Wrongdoing that Furthered the Opioid Crisis .................................................................................. 54

        i.    The Staubus Action ................................................................... 55

        ii.   The New York State Actions ..................................................... 69

iii.    The Chicago Actions.................................................................................. 87

J.    Defendants Minimized Endo's Misconduct, Downplayed the Scope of the Company's Liability As a Result of its Role in the Opioid Crisis, and Concealed the Company's Campaign to Obstruct the Opioid-Related Actions .................... 94

V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD ............................................................................................................... 101

A.    2017 Misstatements ..................................................................... 101

B.    2018 Misstatements ..................................................................... 113

C.    2019 Misstatements ..................................................................... 133

D.    2020 Misstatements ..................................................................... 155

E.    2021 Misstatements ..................................................................... 175

VI.    THE TRUTH SLOWLY EMERGES ............................................................... 191

VII.  LOSS CAUSATION.......................................................................................... 203

VIII. ADDITIONAL SCIENTER ALEGATIONS ................................................... 204

IX.    PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ............ 212

X.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ...................... 214

XI.    PLAINTIFFS' CLASS ACTION ALLEGATIONS.......................................... 214

COUNT I (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants) ............................................................. 217

COUNT II (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants) .................................................................................................................... 220

XII.  PRAYER FOR RELIEF ................................................................................... 221

XIII. DEMAND FOR TRIAL BY JURY ................................................................. 222

Lead Plaintiff Curtis Laasko and Named Plaintiff Benoit Albiges (together, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' Second Amended Complaint[1] against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, (i) a review of the Defendants' public documents, (ii) conference calls and announcements made by Defendants, Endo International plc's public filings with the United States ("U.S.") Securities and Exchange Commission ("SEC"), (iii) wire and press releases published by and regarding the Company, (iv) securities analyst reports and advisories regarding the Company, (v) interviews with confidential witnesses, (vi) publicly available trading information regarding Endo common stock, (vii) articles on Endo in the general press, and (viii) and information readily obtainable on the Internet.

## I.        NATURE OF THE ACTION

1.        This is a federal securities class action on behalf of a class (the "Class") of persons and entities that purchased or otherwise acquired Endo common stock between August 8, 2017, and August 10, 2021, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

---

[1] The Court granted Plaintiffs leave to file this Second Amended Complaint. ECF No. 44. The Second Amended Complaint provides new information and allegations supporting the falsity of Defendants' misstatements and a strong inference of Defendants' scienter. Plaintiffs reallege the allegations from their First Amended Complaint (ECF No. 30) both to provide context for the new allegations and to preserve their appellate rights. For ease of comparison, a redlined document showing the additions and subtractions in the Second Amended Complaint is attached hereto as Exhibit A.

2.      Endo International plc ("Endo" or the "Company") is a pharmaceutical company that, for tax purposes, is incorporated in Ireland and whose U.S. headquarters is in Malvern, Pennsylvania. The Company operates through several subsidiaries, including Endo Health Solutions Inc. ("EHS"), Endo Pharmaceuticals, Inc. ("EPI"), Par Pharmaceutical Companies, Inc. ("PPCI") and Par Pharmaceutical, Inc. ("PPI," and together with PPCI, "Par"). Endo and its subsidiaries manufacture, market, and/or sell generic and branded pharmaceuticals in the U.S. and internationally. These pharmaceuticals include both generic and branded opioids.

3.      In the mid-to-late 1990s, opioid manufacturers, marketers, and distributors, including Endo, developed and began to market powerful synthetic opioids. Rather than characterize opioids for what they were—dangerous, highly addictive substances with limited medical use—these companies engaged in a campaign to convince patients, healthcare providers, insurance companies, and others that opioids were safe and effective treatments for chronic pain.

4.      These companies were shockingly callous in their willingness to push opioids. For example, in September 2019, the Washington Post published the following January 2009 email exchange between a national account manager for opioid manufacturer Mallinckrodt Pharmaceuticals and a vice president for opioid distributor KeySource Medical, Inc. When the Mallinckrodt account manager emailed the vice president that 1,200 bottles of opioids had been shipped, the vice president responded "***It's like people are addicted to these things or something. Oh, wait, people are***," and the account manager replied: "***Just like Doritos keep eating, we'll make more***."

5.      Endo and its peer opioid manufacturers and distributors' wildly successful campaign came at a horrific cost to public health. From 1999 to 2018 nearly ***450,000*** people in the U.S. died from overdoses involving an opioid, including prescription and illicit opioids. The cost

to the U.S. economy of this opioid epidemic has been estimated to be in the hundreds of billions of dollars. These deaths are directly attributable to the opioid manufacturers and distributors' campaign to portray of opioids as safe and effective.

6.     As a result of Endo's participation in this campaign, over *2,500 lawsuits* have been filed against the Company during the Class Period seeking to hold it accountable for its contributions to the opioid epidemic. These lawsuits allege that the Company's use of deceptive, unsubstantiated and scientifically baseless claims to market its opioids violated laws against public nuisances, consumer protection, unfair trade practices, racketeering, and, most recently, insurance fraud ("opioid-related actions").

7.     As these cases were being filed, Defendants knew that Endo and/or its subsidiaries had (i) engaged in deceptive advertising in promoting Endo Opioids; (ii) trained the Company's sales representatives specifically to target healthcare professionals most likely to prescribe the most opioids regardless of whether those prescriptions were legitimate; (iii) failed to implement a meaningful or effective system to identify and report opioid orders that had the hallmarks the government associated with "drug diversion"[2]; (iv) promoted one of Endo's most profitable opioids, Opana ER, as safe and resistant to tampering when the Company knew it was *impossible* to prevent abusers from liquifying and injecting the drug; and (v) insufficient liquidity to resolve the billions in liability that the Company potentially faced. Nevertheless, Defendants misleadingly downplayed the allegations in opioid-related actions and told investors that the cases were merely the result of "negative publicity" and opportunistic attorneys who were bringing suits by manipulating the legal system.

---

[2] "Drug diversion" or "diversion" refers to attempts to obtain or use prescription medicines illegally.

8.      Defendants also knew that Endo was exposed to liability for insurance fraud in New York because the Company had allowed millions of fraudulent prescriptions to be written by healthcare providers for Endo's opioids that were reimbursed by unsuspecting insurers. In fact, Endo had directly promoted Opana ER to insurers as safer and less susceptible to abuse, and thus, by implication, worked to convince those insurers to reimburse Opana ER prescriptions more readily because those prescriptions were likely legitimate and not likely to be for abusers. Although Defendants knew about Endo's misconduct, Defendants ***never*** apprised investors of the Company's exposure to claims for insurance fraud.

9.      In addition, throughout the Class Period, Defendants assured investors that they would vigorously contest the merits of the opioid-related actions, allegations of wrongdoing by Endo were "patently offensive," and they were "proud to discuss their business practices." As litigation of the opioid-related actions began in earnest, however, rather than vigorously contest the merits of the opioid-related actions, Defendants embarked on a widespread and pervasive campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that ***demonstrated that the allegations of wrongdoing were true***, not "patently offensive," and otherwise prevent litigation of the merits of the opioid-related actions.

10.      Over the course of the Class Period, investors learned the truth about the scope Endo's role in the opioid crisis, its precarious financial situation, the full extent of the liability it faced, and its campaign to obstruct the opioid-related actions and conceal evidence documenting their business practices that demonstrated Endo's wrongdoing. In addition, material risks created by the Company's knowing campaign to obstruct the opioid-related actions and conceal evidence documenting their business practices materialized in the form of, among other things, a default judgment and multiple motions for sanctions that led directly to disproportionately large

settlements of only two of the thousands of opioid-related actions. On the revelations of these undisclosed facts and the materialization of these risks, Company's stock plummeted, causing significant damage to investors.

11.    Opioids manufactured and sold by Endo included generic oxycodone, oxymorphone, hydromorphone, and hydrocodone, as well as the "branded" opioids Opana; Opana ER; Belbuca; Percodan; Percocet; and Zydone. Endo reaped hundreds of millions of dollars in revenues selling these and other opioids. For example, opioid sales were responsible for roughly $403 million of Endo's overall revenues in 2012, $657 million in 2014, and $486 million in 2016. Opana ER alone garnered the Company revenue of $1.15 billion from 2010 to 2013 and accounted for 10% of Endo's total revenue in 2012.

12.    Throughout the 2000s and early-to-mid-2010s Endo knowingly furthered false narratives to legitimize dangerously powerful opioid products as an appropriate treatment for pain. In particular, Endo downplayed the risks of opioids and increased acceptance of opioids as medically legitimate, necessary, and appropriate by patients and medical professionals. For example, complaints in opioid-related actions filed in Kentucky, Michigan, Tennessee, Ohio, and elsewhere have revealed that Endo had trained its sales representatives to "distinguish addiction from 'pseudoaddiction,' a purported condition in which patients exhibit drug-seeking behavior that resembles but is not the same as addiction." These lawsuits also revealed that Endo misleadingly promoted opioids through "Key Opinions Leaders" ("KOLs") and "Front Groups" that disseminated educational materials containing unsubstantiated and misleading claims promoting opioids.

13.    In addition, actions filed in Michigan, Ohio and Tennessee during the Class Period revealed that the Company had specifically instructed its sales representatives to market Endo

Opioids to healthcare providers who wrote the most opioid prescriptions, without regard to whether those providers were writing prescriptions for opioid abusers or were not experienced in using opioids to treat chronic pain. This sales strategy resulted in massive amounts of prescriptions being written for opioid abusers and under other false pretenses. These complaints identify specific doctors who later pled guilty to writing fraudulent prescriptions. Endo's sales strategy not only dramatically worsened the opioid epidemic by increasing prescriptions written for Endo Opioids, but it also substantially increased the likelihood that private insurers would reimburse prescriptions written under false pretenses, which exposed Endo to insurance fraud claims.

14.     Similarly, during the Class Period it was revealed that Endo and/or its subsidiaries had failed to implement an effective system for identifying opioid orders indicative of diversion, *i.e.*, of being obtained under false pretenses, in violation of the U.S. Controlled Substances Act ("CSA"). *See* 21 C.F.R. §1301.74. In fact, as alleged below, Endo subsidiary Par did not have ***any*** system for identifying opioid orders bearing the hallmarks of diversion ***at the same time*** that Par was flooding the prescription opioid market with nearly ***12 billion*** opioid pills, or ***15.7%*** of the opioid pills sold in the United States.

15.     In late 2016, Endo began reducing its footprint in the opioid market. On December 13, 2016, Endo announced that it had given up the rights to its branded opioid Belbuca, had laid off the entire 375-person sales staff for Endo Opioids, and would no longer engage in "field sales promotion" those products. In other words, while Endo would continue to manufacture Endo Opioids, including Opana ER, it would no longer promote those opioids to healthcare providers. Six months later, on June 8, 2017, in response to shocking reports of abuse, the FDA requested that Endo remove Opana ER from the market, and the Company complied in July 2017.

16.     As Endo was reducing its opioid footprint, states, counties, municipalities, individuals, and others filed **thousands** of lawsuits against the Company to hold it accountable for the devastation that the opioid epidemic had wrought. As a result of removing Opana ER and abandoning opioid marketing, however, Endo's revenues had declined sharply. For example, while the Company reported $4.01 billion in revenues in 2016, just before the start of the Class Period, it only reported $2.91 billion in revenues in 2019, a decline of 27.4%. To make matters worse, in the years prior to the Class Period, Endo had borrowed extensively to fund corporate acquisitions, and its debt almost doubled from $4.1 billion in 2014 to over $8 billion in 2015. The Company's debt remained above $8 billion throughout the Class Period. These pressures meant that, throughout the Class Period, unbeknownst to investors, Endo's financial position was precarious and the Company did not have the liquidity and/or capital to withstand the liability it was potentially facing in opioid-related actions.

17.     Rather than disclose the truth—that Endo had engaged in a litany of deceptive marketing practices and that the Company potentially faced billions in liability, including for insurance fraud, that could cause serious financial strain on Endo, which the Company did not have the capital to absorb—Defendants downplayed the allegations to investors.

18.     For example, at the start of the Class Period, on August 8, 2017, Endo disclosed in its quarterly report on Form 10-Q for the second quarter of 2017 ("2017 10-Q") that at least 13 different actions had been filed by state and local governments against Endo in connection with the Company's sales and marketing practices for opioids. The 2017 10-Q gave no hint of the Company's misdeeds in marketing and selling Endo Opioids or the tsunami of liability facing the Company and downplayed the allegations in the actions by stating unequivocally that "*[w]e intend to contest the lawsuits identified above vigorously*."

19.    This pattern of downplaying opioid-related actions against Endo, refusing to acknowledge Endo's misconduct, and downplaying the extent of liability facing the Company for its sales and marketing of Endo Opioids continued throughout the Class Period. For example, on November 6, 2017, after the state of Kentucky announced that it had filed a lawsuit to "seek to hold Endo responsible for illegally building a market for the long-term use of opioids in the state as part of an effort to boost corporate profits," Defendant Maletta responded to *Reuters*, which was covering the lawsuit, that the accusations were "***patently offensive***." Similarly, in December 2018, by which point over ***1,500*** cases had been filed by states, counties, municipalities, hospitals and individuals, Defendant Maletta told *The Philadelphia Inquirer*, which was covering opioid litigation involving Endo, that ***"[o]ur view is that we've done everything properly***," and "[w]e deny the allegations in the complaints and we're proud to talk about our business practices."

20.    Even when the Company did begin to advise investors, mid-way through the Class Period, that opioid-related actions could affect the Company's revenues, it attributed that litigation to negative publicity and overzealous media, not Endo's own misconduct. Endo's annual report on Form 10-K for the year 2017, which was filed on February 27, 2018, for example, included a "Risk Factor" advising investors that, "***unfavorable media coverage*** of opioid pharmaceuticals could negatively affect our business, financial condition and results of operations. In recent years, opioid drug abuse has received ***a high degree of media coverage*** . . . . ***such negative publicity*** could have an adverse effect on the potential size of the market for our drug candidates." These and other statements by Defendants to investors misleadingly downplayed the extent of the Company's misconduct in marketing and selling opioids and utterly failed to apprise investors that the Company had engaged in insurance fraud in New York.

21.     While Defendants were making these and other false and misleading statements to investors, Defendants were concurrently engaging in a secret campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, not "patently offensive," and otherwise prevent litigation of the merits of the opioid-related actions. Specifically, Endo, among other things, made false or misleading representations or omissions to plaintiffs and courts concerning the scope of the Company's searches for evidence, falsely represented that documents had been produced, knowingly withheld documents despite Court orders to produce them, and knowingly withheld documents that expressly contradicted sworn testimony by Endo's own witnesses. Endo even sought to gain a litigation advantage from their false representations, including by inducing plaintiffs to withdraw a motion to compel, moving for summary judgment based on a "lack of evidence" that was the result of Defendants' withholding of documents, producing contradictory documents after false testimony had been provided to a jury, and "slipping" documents into production databases in the hopes that plaintiffs in the opioid-related action New York would not notice them.

22.     The truth about the Company's misconduct and the meritorious nature of the actions slowly leaked into the market throughout the Class Period, in connection with the over *2,500* cases detailing the Company's misconduct filed against Endo during that time. For example, on June 10, 2020, New York Governor Andrew Cuomo announced that the DFS had filed administrative charges against Endo in connection with the Company's role in the opioid crisis, alleging that Endo had fraudulently misrepresented the safety and efficacy of its opioid drugs, minimized the risk of addiction and other ill effects, and, among other things committed insurance fraud (the "NYDFS Charges"). In addition, the NYDFS charges revealed to investors, for the first

time, that Endo had actually fraudulently marketed Reformulated Opana ER to insurance companies as safer and less susceptible to abuse in the hopes that insurance companies would be more likely to accept and reimburse prescriptions for Reformulated Opana ER, no questions asked. On this news, Endo's Ordinary share price fell $0.66 per share, or 14.63%, to close at $3.85 per share on June 10, 2020.

23.     The truth about Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices, and otherwise prevent litigation of the merits of the opioid-related actions emerged in the spring and summer of 2021. First, early in the morning of April 7, Endo announced that a Tennessee State Court had granted a default judgment against Endo on the issue of liability to victims of the opioid epidemic in that state. On this news, the Company's share price opened down $0.19, or 2.6%. Over the course of trading that day, the market digested the Tennessee Court's holding that "***Endo and its counsel at Arnold & Porter willfully withheld responsive records***," and that there was "***a coordinated strategy between Endo and its counsel to delay these proceedings, deprive plaintiffs of information that would support their case, and interfere with the administration of justice***." Endo's share price plummeted $0.44, or 6.1%, on unusually high trading volume.

24.     Then, on August 6, 2021, the market learned that Endo's campaign to obstruct the opioid-related litigation was not limited to the action in Tennessee. That day, a state court in Suffolk County, New York, held an over four-hour long hearing concerning Endo's misconduct in actions brought by New York counties and the state of New York, which included withholding documents, misrepresenting searches for relevant documents, and shamelessly capitalizing on that misconduct at trial. On this news, Endo's share price fell from $4.69 to $4.31, or 8.1%.

25.     On August 11, 2021, the undisclosed risk caused by Endo's misconduct materialized when the Suffolk Court stated that it was contemplating a "head shot" against Endo, *i.e.*, granting the plaintiffs in the New York state actions default judgment akin to the judgment in the Tennessee state case. Specifically, New York state court scheduled a hearing for August 25, 2021, and stated, "I put together a menu of seven remedies, one through seven. I'm not going to publish them . . . . They go from nothing to essentially a head shot." Endo's share price had closed at $4.35 on August 10, 2021, the day before the Suffolk Court announced that it was considering granting the NYS Plaintiffs a default judgment. After the court's statements, the Company's share price sank to $3.88 on August 11, 2021, or a decline of 10.8%. Eventually, a "referee" appointed by the Suffolk Court determined that Endo and its counsel likely engaged in misconduct *intentionally*, finding that Endo's attorneys "slipped those voluminous documents into the MDL, while failing to give this Court notice of their existence*, perhaps in the hope that the plaintiffs' counsel was preoccupied with the ongoing trial to notice them*," and that while Endo's counsel have submitted "explanations for the delays in submitting the ordered discovery in a timely manner due to misfiling in the various data retrieval systems employed by them directly or through a contractor *such explanations are insufficient and inconsistent with the facts concerning the timing and substance of those disclosures*."

26.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that the Company had (i) engaged in deceptive advertising in promoting its opioids; (ii) trained its sales representatives specifically to target healthcare professionals most likely to prescribe the most opioids without regardless of whether those prescriptions were legitimate; (iii) failed to implement

a meaningful or effective system to identify and report opioid orders that had the hallmarks the government associated with drug diversion; (iv) promoted one of its most profitable opioids, Opana ER, as safe and resistant to tampering when the Company knew it was ***impossible*** to prevent abusers from liquifying and injecting the drugs; (v) insufficient liquidity to address liabilities arising from opioid-related actions; (vi) engaged in a coordinated campaign to obstruct the opioid-related actions and prevent litigation of those actions on their merits, and (vii) that, as a result, the Company's public statements were materially false and misleading at all relevant times.

27.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II.    <u>JURISDICTION AND VENUE</u>

28.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

29.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

30.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Pursuant to Endo's most recent annual report on Form 10-K, as of February 18, 2020, there were 226,833,617 Ordinary shares of the Company's stock outstanding. The Company's Ordinary shares trade on the Nasdaq Global Select Market ("NASDAQ"). Accordingly, there are presumably hundreds, if not thousands, of investors in Endo's Ordinary shares located within the U.S., some of whom undoubtedly reside in New Jersey. Additionally, Endo maintains facilities within this Judicial District at 7 Clarke Drive, Cranbury, New Jersey, 08512.

31.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.      PARTIES

32.     Lead Plaintiff Curtis Laasko acquired Endo common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

33.     Named Plaintiff Benoit Albiges acquired Endo common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

34.     Defendant Endo develops, manufactures, markets, and distributes pharmaceutical products and generic drugs primarily in the U.S. and Canada. Endo was founded in 1997 when it acquired certain pharmaceutical products, related rights, and assets from The DuPont Merck Pharmaceutical Company. To avoid paying U.S. taxes, the Company reincorporated in Ireland in 2014, and is technically headquartered in Dublin, Ireland. Its U.S. headquarters are located at 1400 Atwater Drive, Malvern, Pennsylvania. Endo also maintains a facility in Cranbury, New Jersey. Endo's stock trades on the NASDAQ Global Select Market ("NASDAQ") in the U.S. under the ticker symbol "ENDP."

35.     In its most recent Form 10-K filed with the SEC, Endo stated that its sales and marketing activities are primarily based in the U.S., and that its U.S. business segments accounted for more than 96% of the company's $2.9 billion in total net revenue during the year ended December 31, 2019. Endo regularly conducts business in this district.

36.    Defendant Paul V. Campanelli ("Campanelli") joined Endo in 2015 as head of its U.S. Generics business when Endo acquired Par. Campanelli served as President of the Par Pharmaceuticals segment of Endo from September 25, 2015 until September 23, 2016, when he was named Endo's President, Chief Executive Officer ("CEO") and a member of Endo's Board of Directors ("Board"). Defendant Campanelli served in that role until March 2020. He currently serves as Endo's Chairman of the Board. Prior to joining Endo, Defendant Campanelli joined Par in November 2001, was Par's Chief Operating Officer from January 2010 to September 2012, and was Par's CEO from September 2012 to September 2015.

37.    When Defendant Campanelli was named President and CEO of Endo, and to the Board, on September 23, 2016, he also entered into an employment agreement with Endo ("2016 Campanelli Agreement"). Under that agreement, Defendant Campanelli could be terminated if, among other things, he "makes, or is found to have made, a false certification relating to the Company's financial statements that [he] knows is false" or "engage[d] . . . in misconduct that has caused, or in the good faith judgment of the Board may cause if not discontinued, material harm (financial or otherwise) to the Company or any of its affiliates." On April 24, 2019, *i.e.*, before the 2016 Campanelli Agreement expired, Campanelli entered into a second employment agreement ("2019 Campanelli Agreement"), under which he would be Endo's President and CEO and a member of the Board until September 23, 2022. The terms of the 2019 Campanelli Agreement were substantively similar to the terms of the 2016 Campanelli Agreement. On November 4, only six months after the 2019 Campanelli Agreement, and, as described below, only eight weeks after the state of New York announced that it was investigating Endo for insurance fraud, Endo abruptly announced that Defendant Campanelli was resigning as the Company's President and CEO.

38.    Defendant Blaise Coleman ("Coleman") served as Endo's Executive Vice President ("EVP") and Chief Financial Officer ("CFO") from December 19, 2016 to March 6, 2020, when he replaced Defendant Campanelli as Endo's President and CEO and a member of Endo's Board. Coleman has been Endo's CEO and a Director of the Company from March 6, 2020 to present.

39.    Defendant Mark T. Bradley ("Bradley") has served as Endo's EVP and CFO since March 2020.

40.    Defendant Matthew J. Maletta ("Maletta") has served as Endo's EVP and Chief Legal Officer since May 2015.

41.    Defendants Campanelli, Coleman, Bradley and Maletta are sometimes referred to herein as the "Individual Defendants."

42.    The Individual Defendants possessed the power and authority to control the contents of Endo's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Endo's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Endo, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

43.    Endo and the Individual Defendants are collectively referred to herein as "Defendants."

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background

44.    Endo was founded as the Intravenous Products of America, Inc. in 1920 and changed its name to Endo Products in 1935. In 1970, E.I. du Pont de Nemours and Company ("DuPont") acquired Endo. In 1994, Endo was established as a separate entity within a joint venture between DuPont and Merck & Company ("Merck") and re-named Endo Laboratories L.L.C. Endo Laboratories, L.L.C. was DuPont Merck's generic division. In 1997, a private equity investment firm purchased all of Endo Laboratories L.L.C.'s generic products, along with twelve branded products, including Percocet and Percodan, and renamed the company Endo Pharmaceuticals, Inc. In 2000, Endo Pharmaceuticals, Inc. acquired Algos Pharmaceutical Corporation and became a publicly traded company with the following business segments: U.S. Branded Pharmaceuticals; U.S. Generic Pharmaceutical; and International Pharmaceuticals. On February 28, 2014, the Company reincorporated in Ireland under the name Endo International plc, but retained its U.S. headquarters in Malvern, Pennsylvania. Endo employs more than 4,600 people worldwide.

45.    Endo, including its subsidiaries, are or have been in the business of manufacturing, selling, promoting, and/or distributing both brand name and generic opioids throughout the United States. Today, Endo continues to manufacture and sell generic and branded pharmaceuticals, including opioids, in the U.S. and internationally, although it ceased marketing opioids in December 2016. The Company sells its branded pharmaceuticals and generics to specialty physicians, retailers, clinics, government agencies, doctors, retail and specialty pharmacies, and specialty distributors.

46.    Endo operates through several subsidiaries that are or have been engaged in the opioid market, including EHS, a Delaware corporation with its principal place of business in

Malvern, Pennsylvania, which is a wholly owned subsidiary of Endo; EPI, a Delaware corporation with its principal place of business in Malvern, Pennsylvania, which is a wholly owned subsidiary of EHS; PPCI, a Delaware corporation with its principal place of business located in Chestnut Ridge, New York; and PPI, a Delaware corporation with its principal place of business located in Chestnut Ridge, New York. PPI is a wholly owned subsidiary of PPCI. Endo acquired PPCI and PPI ("Par") in September 2015.

### B. The Opioid Epidemic

47.    Opioids are a class of narcotic painkilling drugs that are either derived from opium or have effects similar to opium. "Opiates" are generally opium-derived drugs such as morphine, codeine, and heroin. Conversely, "opioids" are different from opiates and are newer, mostly synthetic drugs like oxycodone, hydrocodone, and fentanyl.

48.    In the mid-to-late 1990s, opioid manufacturers and distributors, including Endo, developed and began to market powerful synthetic opioids. To promote these products, Endo and other opioid manufacturers and distributors, including Purdue Pharma Inc. ("Purdue"), Johnson & Johnson ("J&J"), Mallinckrodt plc ("Mallinckrodt"), Teva Pharmaceutical Industries, Limited ("Teva") and Allergan plc ("Allegan"), and other manufacturers and distributors embarked upon a marketing and promotional campaign to intentionally create a misperception of the danger and addictive quality of opioids. These opioid manufacturers and distributors sought to convince physicians and other healthcare professionals that opioids were safe and effective treatments for chronic pain.

49.    This campaign by Endo and other companies in the opioid industry to push healthcare providers to prescribe opioids was a stunning success. According to one study, prescriptions for pain increased by *73%* between 2000 and 2010, even though over that period the number of visits to physicians for pain-related issues did not increase and prescriptions for non-

opioid pain medications decreased. Although Opioid prescriptions peaked in approximately 2012, when more than 280 million prescriptions were issued (roughly a one-month supply for every American adult), opioid prescription levels have remained astonishingly high. In this Judicial District, which covers the State of New Jersey, for example, there were a total of approximately 34,620,760 opioid prescriptions dispensed between 2013 and 2019. In fact, there were 1,486,295 opioid prescriptions dispensed in the New Jersey between January 1, 2020, and May 31, 2020 *alone*.

50.     The success of Endo and its peer companies at convincing physicians to prescribe opioids came at a terrible cost to public health. Nearly ***450,000*** people in the United States died from overdoses involving any opioid, including prescription and illicit opioids, from 1999-2018. For example, in 2014, 47,000 Americans died drug overdose deaths attributable to prescription opioids or heroin (which is often used as a cheaper substitute for opioids by addicts who can no longer afford prescriptions). The following year, in 2015, more than 52,000 Americans died of drug overdoses. In 2016, the nearly 64,000 drug overdose deaths outnumbered every other cause of accidental fatalities. In 2018, there were 67,367 drug overdose deaths in the United States, 46,802 (or 69.5%) of which directly involved opioids.[3]

51.     While the cost to the U.S. economy of these overdoses is estimated to be in the hundreds of billions of dollars, overdoses have also resulted in an astonishing increase in healthcare expenditures. The opioid crisis has resulted in an estimated ***$11.3 billion*** annually in additional spending in the U.S. healthcare system—or approximately 1% of all expenditures.

_____

[3] New Jersey saw a wave of overdoses during this time as well. Between 2013 and 2019 there were 15,324 suspected overdose deaths in the state. Indeed, the horrific death toll continues to this day: there were over 1,339 suspected overdose deaths in New Jersey from January 1, 2020, to May 31, 2020.

These costs are also borne by insurance companies, patients who have seen their premiums increase to cover these expenses, and government programs like Medicare and Medicaid. For example, in 2015, the Centers for Disease Control and Prevention ("CDC") estimated that healthcare costs directly related to opioid abuse totaled ***$28 billion in that year alone***. The average costs for private payors in 2015 for a patient with an opioid abuse or dependence diagnosis was almost ***$16,000 higher*** than the average per-patient cost based on all patients' claims.

### C.    Endo's Marketing Exaggerated the Benefits of Opioids and Downplayed Their Risks

52.    Endo and its subsidiaries have been substantial manufacturers, marketers and sellers of opioids in the United States. Indeed, the Company's history with opioids, and opioid abuse, dates back to 1959, when the Company launched the painkiller Numorphan (oxymorphone). Within a decade, problems with abuse had been reported, and Endo stopped marketing a tablet version of Numorphan in 1971 and officially withdrew the drug from the market in 1982.

53.    Endo's opioids included generic oxycodone, oxymorphone, hydromorphone, and hydrocodone, as well as the "branded" opioids Opana (oxymorphone hydrochloride); Opana ER (extended release Opana); Belbuca (buprenorphine); Percodan (oxycodone and aspirin); Percocet (oxycodone and acetaminophen); and Zydone (hydrocodone and acetaminophen) ("Endo Opioids"). Endo Opioids are devastatingly strong. Opana ER, for example, has been estimated to be between three and ten times more potent than morphine.

54.    Endo reaped billions in revenues from these opioids. Sales of Endo Opioids comprised roughly $403 million of Endo's overall revenues in 2012, more than 10% of Endo's total revenue that year alone. Endo's opioid revenue was $657 million in 2014, and $486 million of Endo's $4 billion in sales in 2016. Endo's best-selling opioid was Opana ER, which produced ***$1.15 billion*** from 2010 to 2013, and $198 million in 2014. In late 2018, Defendant Maletta

acknowledged to a reporter for The Philadelphia Inquirer that that Opana ER generated "well over $100 million a year for us [Endo]." The Philadelphia Inquirer reported that, from its launch in 2006 until 2017, when Defendants voluntarily withdrew the drug from the market at the request of the FDA after reports of abuse, Opana and Opana ER generated more than *$2 billion* in sales for Endo.

55.    Endo reaped these outsized profits, and ushered in the opioid epidemic, by conspiring with its peer opioid manufacturers to drive physicians to overprescribe opioids under false pretenses. To that end, Endo, among other things, disseminated patient education and advertising materials that falsely denied or downplayed the risks of opioids and overstated the benefits of their long-term use in treating chronic pain. Endo used its sales representatives, physicians perceived to be "key opinion leaders" ("KOLs") and ostensibly neutral professional societies and patient advocacy groups ("Front Groups") to disseminate these messages.

56.    Throughout the 2000s and early-to-mid-2010s Endo knowingly furthered false narratives to legitimize dangerously powerful opioid products as appropriate for a broad spectrum of pain. As a result, demand for opioids soared to unprecedented levels as did the crisis of addiction and abuse that resulted from overprescribing.

i.      *Endo's Use of Sales Representatives*

57.    Endo's sales representatives spread misinformation to healthcare providers about the safety and efficacy of Endo Opioids through the use of "detailing." Detailing refers to one-on-one visits by pharmaceutical sales representatives with healthcare providers. During a detailing visit, the sales representative purportedly educates the healthcare provider about the pharmaceutical company's products in the hopes that the healthcare provider will prescribe the company's products more often. According to documents that were unsealed in 2019 in connection with cases brought against Endo and other opioid manufacturers that were consolidated into a

multi-district litigation in Ohio,[4] Endo's marketing materials pointedly observed, in connection with its opioids and other pain medication, that "[s]ales force detailing is *the most impactful tactic*, detailing accounts for ~35-65% of all sales & marketing impact."

58.     It is thus unsurprising that Endo spent millions sending its sales representatives on detailing visits. For example, Endo spent over ***$10 million*** detailing branded Endo Opioids in 2014 alone. In addition, from 2009 to 2013, Endo sales representatives made over ***164,000 visits*** to healthcare providers in New York state to promote Opana and Opana ER. According to the NYDFS Charges, Endo not only allegedly paid bonuses to sales representatives based on prescriptions written by healthcare providers, it also "made extensive payments to [the healthcare providers] in the form of speakers' fees, lunches, and dinners."

59.     Numerous actions filed against Endo, including an action filed by the State of Kentucky in November 2017, described how Endo trained its sales reps to "distinguish addiction from 'pseudoaddiction.'" "Pseudoaddiction," Endo (and other pharmaceutical companies) claimed, was a condition in which "patients exhibit drug-seeking behavior that resembles but is not the same as addiction." Endo and its sales representatives suggested to healthcare providers that pseudoaddiction could be treated by simply writing more prescriptions for stronger opioids. According to these actions, "Endo's Vice President for Pharmacovigilance and Risk Management testified to . . . that he was not aware of any research validating the 'pseudoaddiction' concept."

60.     Endo's improper use of its sales force is also evident from the sales materials that the Company provided to its sales representatives. For example, an Endo 2013 training guide instructed sales representatives that "[p]seudoaddiction is a pattern of drug-seeking behavior among pain patients with unrelieved pain. Differentiating between addiction and pseudoaddiction

---

[4] *In Re: National Prescription Opiate Litigation*, No. 17-md-02804 (N.D. Ohio) ("Ohio MDL").

can be challenging and may often take multiple patients encounters. One key difference from addiction is that in pseudoaddiction, the patient's drug seeking behavior stops once his or her pain has been effectively treated." Sales representatives then passed this message on to healthcare professionals during detailing visits.

61.     While promoting Endo Opioids using the misleading tactics described above, Endo sales representatives had a purported obligation to identify and internally report healthcare providers who showed signs of potential diversion of opioids. Sales representatives could formally report potential opioid diversion by filling out a "Report of Suspected Diversion" form that described what the representative had observed, or informally report potential opioid diversion by emailing the observations to company officials.

62.     Following a formal or information diversion report, an Endo District Manager could decline to take action, forward the report to Endo's Compliance Department, or place the prescriber on an informal exclusion list. The Compliance Department then could either decline to take action or place the prescriber on Endo's "Global Exclusion List," which barred sales representatives from detailing the prescriber. Endo's exclusion lists were fluid, with some prescribers being taken off the lists (allowing detailing to resume) at various points in time. Endo also could exclude certain healthcare providers while continuing to detail others or, where Endo had previously excluded multiple prescribers, allowing detailing to resume as to some of those prescribers.

63.     To ensure that sales representatives delivered the desired messages to prescribers, Endo directed and monitored its sales representatives through detailed action plans, trainings, tests, scripts, role-plays, supervisor tag-alongs, and review of representatives' "call notes" from each visit. Call notes are detailed internal records of which Endo sales representative visited which

healthcare practitioner on which day to sell Endo products, including Endo Opioids. Call notes are thus contemporaneous records of sales representatives' interactions that are prepared for the representatives' supervisors, used to remind representatives of prior communications with healthcare providers, and to prompt follow up contacts.

64.     According to documents produced in opioid-related actions, Endo's call notes system included a "Message" field that allowed sales representatives to draft a description of the representatives' impressions during a visit as well as what occurred during the visit. For example, one set of call notes for a physician, Dr. Nessim Roumi of Brooklyn, New York, who was ultimately revealed to have been operating a "pill mill," stated that a sales representative observed "[a] lot of drug abusers here and crack-heads. Scary place." The notes further revealed that despite these observations, the representative nevertheless detailed Dr. Roumi six times in the ensuing months and even encouraged Dr. Roumi to prescribe Endo's lower dose opioid Percocet as a "Gateway" to higher dose opioids. Endo's "Message" field also allowed sales representatives to select standardized messages from dropdown menus that included at least 20 stock messages for Opana/Opana ER alone. Endo's call notes system also included fields entitled to "Materials," "Reaction," and "Next Call."

> ii.      *Endo's "Use of Front Groups"*

65.     Endo also extensively used opioid advocacy groups, or "Front Groups," to disseminate materials containing unsubstantiated and misleading claims about opioids. On December 9, 2019, *The Washington Post* published an expose entitled, "Inside the Industry's Marketing Machine" (the "Marketing Article"). The article was based on "recently unsealed corporate documents and plaintiffs attorneys suing two dozen drug companies in a landmark federal case in Cleveland," *i.e.*, the Ohio MDL.

66.     The Marketing Article identified Alliance for Patient Access as a potential Front Group. The Marketing Article stated that in June 2017, the alliance's list of "associate members and financial supporters includ[ed] Johnson & Johnson, Endo, Mallinckrodt, Purdue Pharma and Teva, all opioid manufacturers." The article pointed noted that in the alliance's "marketing plans [which] are now part of the court file, the companies referred to the doctors and other pain experts who promoted opioids for pain as 'Key Opinion Leaders.'" As alleged in Section IV.C.iii below, Endo's use of KOLs was instrumental in its efforts to use unsubstantiated and biased evidence to convince patients and healthcare providers that opioids were a safe and effective way to treat pain. The Marketing Article had been published before Endo's share price had closed the prior trading day at $4.84 per share. In response to The Washington Post article, opened trading down $0.08 per share—or 1.7%—and closed the day at $4.59 per share, down $0.25, or a total of 5.2%.

67.     In addition, other cases filed against Endo and opioid manufacturers and distributors arising out of their contributions to the opioid epidemic confirm Endo's use of Front Groups to promote opioids. These cases alleged, for example, that between 2007 to 2012, Endo provided nearly $6 million to the American Pain Foundation ("APF"), a Front Group that promoted opioid use through its National Initiative on Pain Control ("NIPC") and the NIPC's website www.PainKnowledge.com. Visitors to PainKnowledge.com were falsely informed, among other things, that "[p]eople who take opioids as prescribed usually do not become addicted." Endo funded NIPC projects, developed content for the initiative, and distributed NIPC materials.

68.     Endo also sponsored an NIPC continuing medical education ("CME") program in 2009 entitled "Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia." According to an action filed by the State of Kentucky in November 2017, the CME promoted pseudoaddiction by teaching that aberrant or usual behavior by a patient using opioids was the

result of untreated pain. Endo was also the sole sponsor, through NIPC, of a series of CMEs entitled "Persistent Pain in the Older Patient." The CME's webcast claimed—without any scientific support—that opioid "therapy" has been "shown to reduce pain and improve depressive symptoms and cognitive functioning."

69.     APF also issued education guides for patients, reporters, and policymakers that touted the benefits of opioids and minimized their risks. APF also launched a campaign using radio, television and internet to educate patients about their "right" to pain treatment, *i.e.*, opioids. Endo helped fund the distribution of *Exit Wounds*, a 2009 publication that purports to be the personal narrative of a military veteran. The veteran informs readers that opioids are "underused" and the "gold standard of pain medications," but neglects to mention addiction, overdose, or injury, or the side effects of opioids, including decreased testosterone, nausea, sleep apnea, immune system changes, and birth defects.

70.     APF also developed The Pain Care Forum ("PCF"), which purportedly offered "a setting where multiple organizations can share information" and "promote and support taking collaborative action regarding federal pain policy issues." PCF is mostly made up of representatives from Endo and other opioid manufacturers and distributors; Front Groups; pro-opioid professional organizations; and healthcare professionals that support prescribing opioids.

71.     Endo also provided extensive grants to the Federation of State Medical Boards ("FSMB"), a trade organization representing state medical boards across the U.S. In 1998, the FSMB developed what it purported were "Model Guidelines for the Use of Controlled Substances for the Treatment of Pain" ("FSMB Guidelines"). The FSMB Guidelines, which FSMB admitted were produced "in collaboration with pharmaceutical companies," stated that opioids were "essential" for treatment of chronic pain and did not disclose the risk of overdose. The guidelines

also represented that "inadequate understandings" of addiction can lead to "inadequate pain control." From 2001 to 2012 the FSMB received at least $820,000 in payments from pharmaceutical manufacturers, including at least $370,000 in payments from Endo.

72.    The claims were repeated in the 2007 book *Responsible Opioid Prescribing*, which was adapted from the FSMB Guidelines. Endo gave at least $40,000 specifically to finance publication of *Responsible Opioid Prescribing*. The book stated that, among other things, patients who "request[ed] drugs by name," engaged in "demanding or manipulative behavior," saw more than one doctor to obtain opioids, and hoarded opioids were merely exhibiting pseudoaddiction, not addiction. The book also stated that the appropriate treatment was to prescribe *higher doses of opioids*. The book also made the false claim that relief of pain by opioids in and of itself improved patients' function. In all, 163,131 copies of were distributed to state medical boards (and through the boards, to practicing doctors). The 2012 edition of *Responsible Opioid Prescribing*, which remains available for sale online, continued to claim that pseudoaddiction is real.

73.    Endo also used a Front Group named The Academy of Integrative Pain Management ("AIPM") to spread misinformation about the safety and efficacy of opioids. Endo, together with other opioid manufacturers, funded a purported medical education guide, *Opioid Prescribing: Clinical Tools and Risk Management Strategies* ("*Opioid Prescribing*") which was authored by three members of the board of directors of AIPM. The guide claimed that "fear of addiction and abuse prevents physicians from properly prescribing opioids, particularly for those with a substance abuse history who could benefit from opioids." It also instructed healthcare providers to give patients exhibiting pseudoaddiction higher or more frequent dosages of opioids because "[w]hen pain is treated appropriately, aggressive drug-seeking behavior ceases." In

addition, *Opioid Prescribing* also reiterated that "behaviors that suggest abuse," may not be signs of addiction, but rather "pain that is untreated."

74.     Finally, the American Geriatrics Society ("AGS"), a nonprofit purporting to serve healthcare professionals for the elderly, disseminated guidelines regarding the use of opioids for chronic pain. These guidelines included the 2002 publication *The Management of Persistent Pain in Older Persons* and the 2009 publication *Pharmacological Management of Persistent Pain in Older Persons*. The latter publication recommended that "All patients with moderate to severe pain . . . should be considered for opioid therapy" and "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse." AGS had contracted with Endo and other opioid manufacturers to distribute *Pharmacological Management of Persistent Pain in Older Persons* and sponsor CMEs based on them. In 2009 AGS also issued new guidelines that recommended prescribing opioids for all patients with moderate-to-severe pain and that over-the-counter pain relievers like ibuprofen or naproxen only should be used rarely. The chairman of the task force that wrote the guidelines was Bruce Ferrell, MD, a UCLA geriatrics specialist. While Ferrell claimed that he had "no significant relationships with commercial interests," he had delivered messages supporting use of the painkillers in venues funded by the firms. In 2007, Ferrell wrote favorably about opioids as part of a continuing medical education course on treating pain in the elderly that was funded by Endo Pharmaceuticals, an opioid maker. In 2010, a year after the guidelines came out, Ferrell was listed as a paid speaker for Endo Pharmaceuticals.

       *iii.*       <u>*Endo's Use of Key Opinion Leaders*</u>

75.     Endo also misleadingly promoted its opioids through KOLs. KOLs were physicians who supported aggressively using opioids to treat chronic pain that Endo recruited to tout using opioids to treat chronic pain at conferences, educational sessions for healthcare providers and other marketing events. KOLs touted opioids at the direction of Endo (and other opioid manufacturers)

even though the KOLs knew that there was not sufficient evidence to support prescribing and using opioids so aggressively.

76.     Endo knew that KOLs were very effective. Endo's Former Senior Director of Oral Pain Solutions Group, Demir Bingol, testified in a deposition in an opioid-related action in the Ohio MDL that KOLs "help legitimize" the message that opioids can be more widely prescribed. During his deposition he agreed that "Endo could drive business with speakers programs."

77.     One prominent KOL used by Endo was Dr. Russell Portenoy, a former Chairman of the Department of Pain Medicine Palliative Care at Beth Israel Medical Center in New York. Among other things, Dr. Portenoy spread misrepresentations about opioids during frequent media appearances. For example, during an appearance on Good Morning America in 2010, he claimed: "Addiction, when treating pain, is distinctly uncommon. If a person does not have a history, a personal history, of substance abuse, and does not have a history in the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that that person is not going to become addicted." Dr. Portenoy later admitted during an interview that these and many other statements were false. Dr. Portenoy acknowledged that had admitted that he "gave innumerable lectures in the late 1980s and '90s about addiction that weren't true," and which falsely claimed that fewer than 1% of patients would become addicted to opioids. Specifically, Dr. Portenoy said, "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation? . . . I guess I did." Dr. Portenoy has also since conceded that "[d]ata about the effectiveness of opioids does not exist."

78.     According to multiple lawsuits, including an action filed by the state of Kentucky in November 2017, Endo also distributed a pamphlet edited by a KOL entitled "Understanding Your Pain: Taking Oral Opioid Analgesics," which Endo initially published in 2004. The pamphlet

contained a question and answer section, in which a "question" stated, "If I take the opioid now, will it work later when I really need it?" The corresponding "answer" advised, "The dose can be increased . . . You won't 'run out' of pain relief." In this way, Endo used KOLs to further the message that opioids should be used constantly and in ever-increasing doses.

79.    Endo also had KOLs draft a paper entitled "*A Clinical Guide to Opioid Analgesia*." The paper stated that "[p]seudoaddiction refers to the development of abuse like behaviors that are driven by desperation surrounding unrelieved pain and are eliminated by measures that relieve the pain, such as increase in medication dose." In other words, Endo's KOLs lent the imprimatur of their "expertise" to further the message that if a patient appeared to be addicted to a drug, including, the solution was to simply feed the patient's addiction, *i.e.*, prescribe the patient more opioids.

80.    Endo, and other opioid manufacturers and advocacy groups, even sought to overturn the criminal conviction of a doctor who had been found guilty of illegally prescribing opioids. In an amicus brief, Endo (and the other entities signing on to the brief), argued to the United States Fourth Circuit Court of Appeals that "patients rarely become addicted to prescribed opioids," citing research by Dr. Portenoy. The amicus brief also argued that "there is no 'ceiling dose," for opioids, *i.e.*, patients simply could not be prescribed too many opioids.

iv.    *Endo's Educational and Marketing Materials*

81.    Endo also created and distributed its own publications as part of its campaign to misrepresent the risks of opioids to patients, healthcare professionals, insurers and others. For example, The Marketing Article revealed that in 2012, Endo had stated on its website for Opana and Opana ER that "most healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted."

82.    The article further disclosed that PainKnowledge.com, a website funded in part by Endo, informed visitors, "'Did you know? Most chronic pain patients do not become addicted to

29

the opioid medications that are prescribed for them.'" The article also described how Endo had created a patient education pamphlet entitled "Understanding Your Pain: Taking Oral Opioid Analgesics," which told patients that "taking opioids as prescribed for pain relief is not addiction."

83.    Actions brought against Endo for its misconduct in connection with marketing opioids also revealed that Endo had distributed a pamphlet with the Endo logo entitled "Living with Someone with Chronic Pain." The pamphlet inaccurately informed readers that "[m]ost health care providers who treat people with pain agree that most people do not develop an addiction problem." The actions further described how Endo paid for a 2007 supplement in the Journal of Family entitled "Pain Management Dilemmas in Primary Care: Use of Opioids," which claimed that individuals at risk of opioid addiction could be either screened out by healthcare providers and/or safely prescribed opioids using a "maximally structured approach" involving pill counts. The actions also described how Endo distributed a book entitled *Avoiding Opioid Abuse While Managing Pain*, which sought to convince healthcare providers that, when a patient exhibited signs of drug-seeking behavior, *increasing* the patient's opioid dosage "in most cases . . . should be the clinician's first response."

**D.    Endo Trained Its Sales Representatives to Focus On Healthcare Providers Most Likely to Write the Most Opioid Prescriptions**

84.    In addition to generally using marketing materials containing unsubstantiated and biased claims to convince patients and healthcare providers that opioids were a safe and effective way to treat pain, Endo also specifically trained its sales representatives to market Endo Opioids to healthcare providers most likely to write the most opioid prescriptions, regardless of whether those prescriptions were legitimate or whether the healthcare providers had experience in treating pain. This sales strategy resulted in massive amounts of prescriptions being written for opioid abusers and under other false pretenses. Indeed, complaints filed by states, counties,

municipalities, and other entities against Endo during the Class Period identified specific doctors who later pled guilty to writing such fraudulent prescriptions. Endo's sales strategy not only dramatically worsened the opioid epidemic by increasing prescriptions written for Endo Opioids, but it also substantially increased the likelihood that private insurers would reimburse prescriptions written under false pretenses, which exposed Endo to insurance fraud claims in New York and elsewhere.

85.     For example, in an action filed in October 2017 by the Michigan counties of Oakland and Wayne,[5] revealed that in 2015 and 2016, "sales representatives in Detroit received from Endo a list of doctors to target—referred to internally as 'the universe.'" Endo trained its sales representatives to "put their heads down and ignore problematic remarks from doctors and their staff regarding their prescription practices." In fact, "at no time were sales representatives provided a do not call list of problematic prescribers." The Wayne Complaint further alleged that the list of doctors included not only "pain clinics and anesthesiologists," who might have experience treating chronic pain, but also general and family practitioners, who were less experienced and thus more likely to credit and/or be influenced by unsubstantiated claims put forth by Endo's sales representatives. The Wayne Complaint further alleged that "some of the doctors on the list were clearly engaged in problematic prescribing of opioids, including a Detroit internal medicine doctor who wrote so many opioid prescriptions that he was eventually shut down."

86.     The allegations in the Wayne Complaint were corroborated by allegations in a complaint filed by the state of Tennessee under seal in May 2019 against certain Endo

---

[5] *County of Wayne, et al., v. Purdue Pharmaceuticals, et al.*, No. 2:17-cv-13334-JCO-EAS (E.D. Mich.), ECF No. 1 ("Wayne Complaint").

subsidiaries.[6] The Tennessee Complaint revealed that Endo also "routinely gave health care providers letter grades for their prescribing habits as a quick way for its sales representatives to identify who to prioritize for sales calls." According to the Tennessee Complaint, which was based on documents that state officials had obtained directly from Endo, Endo gave prescribers "A" letter grades "for their unrestrained prescribing habits and encouraged [Endo] sales representatives to prioritize and make more frequent sales calls to them." The Tennessee Complaint further alleged that "Endo's sales teams outpaced even Purdue with tactics that included marketing directly to doctors and patients alike, targeting addicts and winking at pill mills that prescribed more drugs than people per square mile." The complaint also specifically identified multiple healthcare providers who had "disciplinary actions taken against their medical licenses or pleaded guilty to crimes related to their prescribing of controlled substances."

87.    For example, the Tennessee Complaint identified Dr. Yuchun Han of Chattanooga, Tennessee as Grade "A" prescriber of Endo Opioids and alleged that Endo sales representatives visited him 31 times in 2008 alone. In 2014, Han, a neurologist, was reprimanded for leaving the country and leaving pre-signed blank prescription forms with his staff. Similarly, Dr. Samson Orusa, of Clarksville, Tennessee was another Endo Grade "A" prescriber who was later indicted by the federal government indicted for 22 counts of unlawful distribution of a controlled substance outside the boundaries of professional medical practice; 13 counts of health-care fraud; and nine counts of money laundering. The state's complaints alleged that Dr. Orusa wrote prescriptions for 50-60 patients a day.

---

[6] Complaint, *Tennessee, et al. v. Endo Health Solutions Inc., et al.*, No. 1-174-19 (Tenn. Cir. Ct. Knox Cnty.) ("Tennessee Complaint")

88.    The Tennessee Complaint was unsealed on Friday, June 7, 2019, and, on this news, Endo's share price declined that day from its opening price of $5.11 per share to close at $4.89, or 4.3%. Over the next two trading days, Endo's share price fell still further to $4.49 per share, or a total decline of 12.1%.

89.    Endo also knew that the more often their sales representatives visited a healthcare provider, the more likely that healthcare provider was to prescribe Endo Opioids. According to the Tennessee Complaint, Endo's chief marketing executive for Opana ER stated that "OPANA ER is in a **_promotionally sensitive_** market"—*i.e.*, a market where more sales calls meant more prescriptions. According to documents obtained by Tennessee officials, Endo's return on investment for each sales call was "projected as high as a 4:1 revenue to-cost ratio."

90.    Endo also had its sales staff focus on health care providers who already prescribed large amounts of Endo Opioids and pushed those prescribers to write still more prescriptions. For example, according to the Tennessee Complaint, a document titled "2009 Opana Brand Strategic Plan," revealed that Endo wanted to "**_increase the writing intensity_** of current OPANA ER prescribers and **_increase the product trial with mid-deciles prescribers_** via comprehensive and focused detailing and excellence in overall promotional execution." In layman's terms, this meant that Endo was identifying the healthcare providers who write the most Opana ER prescriptions, (*i.e.*, "decile 10 prescribers") and then having its sales representatives visit the healthcare providers who wrote the most Opana ER (*i.e.*, Endo Opioid) prescriptions precisely because those healthcare providers were more likely to write still more prescriptions. The Tennessee Complaint confirmed this by citing an internal Endo document, that showed that "the Company's return on investment for sales calls for the decile 10 prescribers was significantly higher than those who wrote fewer Opana ER prescriptions." An internal Endo marketing document cited in the Tennessee Complaint

also confirmed that Endo's strategy for its sales representatives was working. The document stated, among other things, the "[t]hose [healthcare providers] who have tried [Opana ER] were largely persuaded to do so by a rep, successful referrals" and "[m]ain messages are resonating." In addition, the Tennessee Complaint cited documents demonstrating that Endo emphasized marketing to physician assistants and nurse practitioners "who generally have less pain management expertise." In documents cited by the Tennessee Complaint Endo stated that nurse practitioners and physician assistants were a "key driver of [sales] performance." Endo's documents "pressed its sales force to consistently 'focus on NPs and PAs.'" Endo was targeting these less experienced healthcare professionals because the Company had "data showing they were '3x times more responsive than MDs to details' and that '96% of prescriptions are written without physician consult (60% are for therapy initiation).'"

91.    Endo's strategy of indiscriminately marketing to healthcare providers, regardless of whether those doctors were prescribing opioids legitimately was further corroborated by documents and testimony in the Ohio MDL. For example, Endo sales representatives ignored warning signs that an Akron, Ohio, doctor, Adolph Harper, was writing fraudulent prescriptions for Endo Opioids. According to a sworn declaration filed by one of Dr. Harper's receptionists, Ramona Harrison, an Endo sales representative made weekly visits to "Dr. Harper during regular office hours and would have witnessed the waiting room packed with individuals who appeared to be drug addicts. He would have seen some patients who appeared to be high or who were sleeping." Dr. Harper was called on 110 times by Endo sales representatives promoting Opana ER from 2008 to 2012, was later indicted for running a "pill mill," and is currently incarcerated.

92.    Similarly, documents unsealed in the Ohio MDL also show that Endo sales representatives visited a healthcare provider, Dr. Guang Yang, 180 times from late 2008 to 2016

to encourage him to write prescriptions for Opana and Opana ER. At the time, Dr. Yang was the second-highest opioid prescriber in the country.

93.    These allegations were further corroborated by an expert report filed by the plaintiffs in the Ohio MDL. The expert report, which was created by former FDA commissioner David A. Kessler, stated that "Endo 'incentivized' its sales reps to meet the goal of 'pushing higher doses,'" and specifically referenced the Endo opioid "Percocet, which contains oxycodone." According to Kessler, such rewards "'increased steeply' along with sales. Endo held a 'Grand Prix Contest' in which the top prize was a BMW for use as a company car."

### E.    Endo Lacked an Effective System for Identifying Fraudulent Prescriptions

94.    In addition, news reports and complaints filed against Endo during the Class Period reveal that from approximately 2000–2016, Endo and/or its subsidiaries were in violation of their duties, under the United States Controlled Substances Act ("CSA") to maintain effective controls against diversion of Endo Opioids. The CSA requires "registrants" to design, implement, and operate a suspicious ordering monitoring system that can identify suspicious orders and report suspicious orders to the DEA ("SOM System"). Endo's failure to implement an effective SOM System not only dramatically worsened the opioid epidemic by allowing enormous amounts of fraudulent prescriptions to be written for Endo Opioids, but it also substantially increased the likelihood that private insurers would reimburse prescriptions written under false pretenses, which exposed Endo to insurance fraud claims in New York and elsewhere.

95.    Under the CSA, all "registrants" must design and operate a system to disclose suspicious orders of controlled substances and notify the DEA of any suspicious orders. "Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. §1301.74(b). Under the CSA, a registrant is "as any person who is registered with the DEA under 21 U.S.C. §823." 21 C.F.R. §1300.02(b).

Section 823, in turn, requires manufacturers of Schedule II controlled substances to register with the DEA.

96.     According to documents and testimony obtained in connection with the Ohio MDL, at least two Endo subsidiaries, Par and Qualitest Pharmaceuticals ("Qualitest"), a generic pharmaceuticals manufacturer acquired by Endo in 2010, were "registrants" under the CSA. In addition, the documents revealed that Endo, although not technically a registrant under the CSA, nevertheless had a duty to maintain effective controls against diversion and had represented to the government, including the DEA, that it would "monitor orders and distribution for signs of diversion, including suspicious orders."

97.     In spite of these obligations, it was revealed during the Class Period that Par, Qualitest and/or Endo had failed to create or operate a meaningful system in connection with their manufacturing, marketing, and/or distribution of opioids to disclose suspicious orders of controlled substances and failed to notify the DEA of suspicious orders.

98.     For example, on July 27, 2019, The Washington Post published an expose on opioid marketing entitled, "Little-Known Makers of Generic Drugs Played Central Role in Opioid Crisis, Records Show" ("Monitoring Article"). The Monitoring Article revealed that auditors from the management consulting firm BuzzeoPDMA had warned Par as early as May 2010—when Defendant Campanelli was Par's Chief Operating Officer—that the company was "not meeting federal requirements for deleting suspicious orders." The article reported that the auditors concluded that "[t]here is no Suspicious Ordering Monitoring System in place," at Par, and told the Par that "[a] program must be instituted based on customers' sales volumes, seasonal fluctuations, etc., with a firm statistical analysis as the basis for such a program."

99.    The Monitoring Article further reported that, "Par did not act on that advice for years, records show. Instead, employees inside Par's sales department were responsible for monitoring orders, according to company documents and an executive at Par's current parent company, Endo Pharmaceuticals." The Monitoring Article further stated that "[a]s late as 2015, though, the outside auditors still had concerns about Par's oversight of opioid sales. The auditor noted that federal regulators might take issue with the company's method for vetting orders."

100.    In addition to the Monitoring Article, separate reporting from The Washington Post on July 16, 2019 ("Manufacturing Article") revealed that at approximately the time that its auditors had concluded that Par did not have a system in place to monitor suspicious orders, Par was the third largest manufacturer of prescription opioids. According to the Manufacturing Article, from 2006 to 2012, Par manufactured *11,996,780,781* opioid pills, or nearly *15.7%* of the opioid pills sold in the United States. In short, Par was flooding the United States with opioids without a meaningful SOM System in place, which not only dramatically worsened the opioid epidemic by allowing enormous amounts of fraudulent prescriptions to be written for Endo Opioids, but it also substantially increased the likelihood that private insurers would reimburse prescriptions written under false pretenses, which exposed Endo to insurance fraud claims in New York and elsewhere.

101.    The allegations in the Monitoring Article are corroborated by documents and testimony unsealed in December 2019 in the Ohio MDL. These documents and testimony revealed that Par, Qualitest and Endo lacked any meaningful SOM System during much of the time Endo was flooding the market with opioids.

102.    For example, the plaintiffs in the Ohio MDL elicited testimony from Endo's Senior Vice President of Global Supply Chain, Stephen Macrides, during a March 2019 deposition pursuant to Federal Rule of Civil Procedure 30(b)(6), that Par's first "standard operating

procedure" ("SOP") for an SOM system was not implemented until April 2012 ("2012 SOP"), and, even then, the 2012 SOP was woefully insufficient and did not "define what a 'suspicious order' was or explain when and how to report suspicious orders to the DEA." Documents produced in the Ohio MDL also confirmed that auditors of Par's SOM process in 2015 had found that "Par's current SOM system as it currently operates may be difficult to explain and defend during a DEA review." Specifically, the audit noted that while under Par's SOM "'Sales Operations' is responsible for ensuring that Par Pharm is 'in line' with DEA requirements. . . . If customers order more than would be expected, a sales person would interview the customer to determine whether there is a legitimate reason for the order," the auditor recommended that the "SOM decisions should be managed by regulatory officials rather than sales officials or customer service account representatives" and that "[a]ny employees that receive incentives for controlled substance orders should not be involved in evaluating either accounts or orders"), rather than regulatory employees, which was "viewed as a conflict of interest by the DEA."

103.    According to additional information unsealed as part of the Ohio MDL, after Endo acquired Par, Qualitest's DEA compliance unit took responsibly for Par's SOMs, but Par conducted no customer due diligence "other than confirming the customer held a DEA license," and there was no reliable review for unusual size, pattern, or frequency. Specifically, an April 2015 audit report indicated that "[Par's] SOP does not contain instructions for reporting suspicious orders. Instead there is a section, which is 'bolded' which states that 'Criminal Activities' will be reported to federal and state agencies." Par's outside auditor then warned Par that this "should be corrected as soon as possible, since it misses the point of the regulations[,]" which is that "[s]uspicious orders should be reported as soon as they are identified." According to documents unsealed in the Ohio MDL, "Par did not identify or report any suspicious orders from 2010 through

2012," and while "[b]etween 2013 and 2017, a multitude of orders were flagged by its SOM system," "they were all cleared to ship," and there is "no indication Par reported any suspicious orders to the DEA prior to 2015."

104.     Nor did Qualitest maintain an effective SOM System. For example, according to documents in the Ohio MDL, during an August 2008 audit, the auditor, a former DEA official, stated that "[t]he Qualitest system for reporting suspicious orders to DEA needs to be improved to comply with 21 CFR 1301.74." In addition, the audit found that Qualitest's employees were "not aware that in addition to notifying DEA of sales that were above established thresholds and suspicious, they are expected to report to DEA suspicious orders, even if the sale was declined by Qualitest." Documents unsealed in the Ohio MDL also showed that, in 2012, there were at least two occasions in which "controlled product [*i.e.*, opioids, was] released that should not have been." Qualitest's SOM program continued to have deficiencies well into 2013, including that it "only applie[d] to the retail side of the business[,]" despite Qualitest's knowledge that the "DEA requires it to apply to all customers." In addition, "Orders were flagged only on the basis of 'historical purchases by an individual customer (thresholds),' and not by size, pattern, or frequency as required by CSA regulations." Additional documents in the Ohio MDL showed that a 2009 Qualitest SOM audit review found that Qualitest's employees modifying large orders to ensure that they cleared Qualitest's SOM thresholds: "[t]he review of Order Release Requests showed that many requests were made for quantities of drugs that were several times greater than the current limit set in the order monitoring system. In most of those instances, the size of the order was cut down and the order was approved to be released, with some increase to the limit in the Order Monitoring System." In addition, "[a]lthough the original order requested a quantity of controlled substances that was larger than [Qualitest] was willing to ship to the customer, no report

of a suspicious order was sent to the DEA as required by 21 CFR 1301.74(b)." The documents in the Ohio MDL showed that Qualitest lacked sufficient SOM-related SOPs until late 2013, "[n]o mandatory, routine DEA training exist[ed] for employees handling controlled substances" and "[k]nowledge of DEA regulations [wa]s not incorporated in employee's job descriptions or performance reviews," which was alarming considering that approximately 70% of Qualitest's business was controlled substances. In fact, at a March 2013 meeting with Qualitest, the DEA Staff Coordinator stated that "Qualitests' [sic] current [SOM] system as explained to him and as seen on their ARCOS data is inadequate to say the least[.]" The staff coordinator's conclusion was shared by external consultants who had reviewed Qualitest's SOM program in January 2013, and "concluded that [Qualitest's] 'current SOM program, systems and procedures do not meet the regulatory requirements[.]'"

105.    Not only did Par and Qualitest fail to maintain an effective SOM System during much of the time the entities flooded the market with opioids, but Endo failed to maintain such a system as well. According to documents and testimony in the Ohio MDL, the SOM System Endo purported to offer "was ineffective controls against diversion because it employed a rigid 'excessive orders' system operated by sales and customer service personnel, never looked to available data on its customers' customers, and failed to conduct any meaningful due diligence of its customers." Incredibly, Endo's purported SOM System "***never determined any order to be suspicious, nor did it report any orders flagged by its SOM program to the DEA***."

106.    The documents and testimony in the Ohio MDL stated that, until at least mid-2014, "Endo's internal order review system was admittedly a 'limited' system using a rudimentary algorithm that was designed only to identify 'excessive' orders from a commercial perspective, rather than suspicious orders based on unusual volume, frequency, or pattern." The system looked

at Endo's wholesale "customers' 3 month and 12 month history and if any order [wa]s above the 3 or 12-month it [went] on hold until it [wa]s reviewed by Customer Service." Endo used this limited system because it believed that UPS, *i.e.*, the United Parcel Service, which processed and shipped orders for Endo, had its own SOM System." But the unsealed documents and testimony in the action indicated that, according to a 2013 audited conducted by Endo and Qualitest of UPS's SOM system, "UPS had not reported any Endo/Qualitest product orders as 'suspicious orders' to any agency, did not visit customers, lacked the functionality to visit or know customers' customers, and did not utilize chargeback data, trending analyses, or modify its program based on current diversion trends." The plaintiffs in the Ohio MDL also claimed, citing documents and testimony, that "at one point, Endo asked UPS whether it could carry out the due diligence on Endo's behalf, but UPS made it clear it could not carry out Endo's 'know your customer' duties."

107.    The documents and testimony in the Ohio action also indicate that while Endo began to adjust its algorithm for identifying suspicious orders in May 2014, Endo never utilized "chargeback data or IMS/IQVIA data,[7] to which it had access, as part of its internal order review process for its branded opioids," nor did it conduct "due diligence site visits of its customers, despite recognizing the importance of such visits."

108.    Although Endo's review system was purportedly handled by employees in its customer service department, Endo's Director of Distribution and Customer Service, Lisa Walker,

---

[7] IQVIA (formerly IMS Health Holdings, Inc.) is a data vendor that collects data to measure the volume of pharmaceuticals sold by manufacturers and wholesalers to pharmacies, hospitals and other settings. According to an action filed in March 2019 by the State of New York against Endo and other drug manufacturers, Endo used data from IQVIA containing details regarding the drugs prescribed by HCPs and the pharmacies that dispensed those drugs, to track the prescribing practices of individual HCPs in order to select them for detailing. *New York v. Purdue Pharma L.P., et al.*, No. 400016/2018 (N.Y. Sup. Ct. Suffolk Cty.). The action alleges that Endo, and other co-defendants, "could have—but did not—use this data to identify inappropriate prescribing and potential diversion."

testified in a deposition in December 2018, which was not unsealed until December 2019, that in the twenty years she had worked for Endo, she could not recall *a single order being determined to be "suspicious"* by her, her team, or UPS. In addition, a witness identified to testify on behalf of Endo during a deposition pursuant to Federal Rule of Civil Procedure 30(b)(6), stated that "We did not have any orders that we deemed suspicious during th[e] time period [from 1999 to 2019]." Moreover, Walker testified that neither Endo nor UPS ever reported a suspicious order for Endo's products to the DEA.

**F.    Endo Falsely Promoted Opana ER Knowing That It Had an Increased Risk of Abuse**

109.    Endo also made egregiously misrepresented the safety and susceptibility to abuse of its biggest selling opioid, Opana, which also led directly to overprescription, abuse, and, by extension, insurance fraud. Opana, and especially its extended release formula, Opana ER, had quickly become among Endo's highest grossing products after the FDA approved them in 2006. By 2010, Opana ER was Endo's second largest revenue generator, with nearly $240 million in sales. Opana ER sales surged in ensuing years, with over $384 million in sales in 2011 and nearly $300 million in 2012. In all, from 2006 to 2017, Opana and Opana ER generated more than *$2 billion* in sales for Endo.

110.    To combat competition from generics, and to address concerns that patients were abusing Opana ER by chewing or crushing and snorting the drug, Endo developed a new formulation of Opana ER, which the FDA approved on December 9, 2011 ("Reformulated Opana ER"). Endo began selling Reformulated Opana ER in February 2012.

111.    Endo touted Reformulated Opana ER as safer than original Opana ER and its generic alternatives, in part because Opana ER had a hard coating that purportedly made it "crush resistant" and thus more difficult to grind up. Endo referred to this hard coating as "INTAC

Technology." Endo and its executives, however, knew that Reformulated Opana ER was actually *more* dangerous than original Opana ER and its associated generics because it was not only *not* crush resistant, but also because opioid addicts could liquify the new painkiller and inject it intravenously, and **there was no way to stop this from occurring**.

112.     Endo had attempted to support its claims about the efficacy and safety of Reformulated Opana ER by relying on, among other things, studies conducted in 2009 and 2010, including bioequivalence studies comparing Reformulated Opana ER to original Opana ER, a clinical pharmacokinetic study called "Study 108," human abuse potential studies called "Study 109," two bench top attractiveness studies called "Study 901" and "Study 902," and in vitro manipulation and chemical extraction studies, that were designed to assess whether the drug was tamper-resistant.

113.     Study 108's results showed that it was possible to grind, cut, chew or otherwise tamper with Reformulated Opana ER, which allowed a user to feel the full load of the drug's *12 hours'* worth of opioids immediately. Study 109 showed that Reformulated Opana ER tablets could be chewed, which also affected the drug's controlled release mechanism and produced a "high." Since these studies were conducted in 2009 and 2010, Endo knew by 2011, or shortly after Reformulated Opana ER was approved by the FDA, that Reformulated Opana ER was no safer than the original formulation of Opana. Endo and its executives did not disclose these results.

114.     Studies 901 and 902 were conducted between December 2009 and February 2010 to test Endo's claims that Reformulated Opana ER was tamper-resistant. FDA reviewers concluded that, based on the results of Studies 901 and 902, "concerns have been raised regarding the [redacted] tamper-resistant features of this product's formulation" because the product can still be cut or chewed. The FDA reviewers also noted that "after chewing [redacted] the product acts like

an immediate-release oxymorphone pill and this places certain patient populations, particularly the elderly and/or cognitively impaired, at high risk of overdose." In light of their findings, FDA reviewers were "concerned that any reference to the product's incremental improvement in tamper resistance could be misleading" and recommended that: (i) Reformulated Opana ER's "product label not include language asserting that [it] provides resistance to crushing," as well as other things that were, and remain, redacted from public view; and (ii) Endo conduct a study to determine if ground Reformulated Opana ER could be administered intranasally.

115.    Not only did Endo know that Reformulated Opana ER could be crushed, it also knew that it easily could be liquified and injected. The Tennessee Complaint, which was unsealed in June 2019, revealed that in 2012, only months after Endo had begun selling Reformulated Opana ER, Endo's Vice President of Pharmacovigilance and Risk Management & Senior Clinical Advisor, in response to internal questions, admitted that it was ***impossible*** to prevent intravenous use of Opana ER:

> "the tablets are placed in water and the drug dissolves into the water. This is then drawn up and injected. This method of abuse existed with the old tablets and was predicted by the nonclinical studies to be a potential route of abuse with these tablets. Because oxymorphone is water soluble, ***there is no way to prevent this***."

116.    Evidence appeared almost immediately indicating that the Reformulated Opana ER was not tamper-resistant and was subject to widespread abuse. For example, in July 2012, USA Today reported that Reformulated Opana ER had become "the drug of choice" for Opioid addicts, and that in Nassau County alone hundreds of people each month were seeking treatment for addiction to Opana ER.

117.    The FDA then warned Endo in a May 10, 2013 letter from Janet Woodcock, M.D., the Director of the FDA's Center for Drug Evaluation and Research, to Robert Balio, Endo's Vice President, Regulatory Affairs. Dr. Woodcock's letter stated that Opana ER tablets' "extended-

release features can be compromised, causing the medication to 'dose dump,' [*i.e.*, release the full amount of the drug stored in the tablet] when subject to . . . forms of manipulation such as cutting, grinding, or chewing, followed by swallowing."

118.    In 2015, the Indiana Department of Public Health determined that an HIV outbreak in southeastern Indiana was linked to injection of Reformulated Opana ER, the first documented HIV outbreak in the United States associated with injection of a prescription painkiller. The CDC also issued CDC issued a public health alert on April 24, 2015 announcing its investigation into a cluster of HIV-infections reported in Indiana associated with individuals who abused Reformulated Opana ER intravenously. The alert stated that:

> From November 2014 to January 2015, ISDH [Indiana State Department of Health] identified 11 new HIV infections in a rural southeastern county where fewer than 5 infections have been identified annually in the past. As of April 21, 2015, an on-going investigation by ISDH with assistance from CDC has identified 135 persons with newly diagnosed HIV infections in a community of 4,200 people; 84% were also HCV infected. Among 112 persons interviewed thus far, 108 (96%) injected drugs; all reported dissolving and injecting tablets of the prescription-type opioid oxymorphone (OPANA® ER) using shared drug preparation and injection equipment.

119.    Endo and its executives also had access to information that refuted their claims about Reformulated Opana ER. The National Addictions Vigilance Intervention and Prevention Program ("NAVIPPRO"), a national program that Endo helped found in 2005 as the first industry sponsor, performs surveillance of substance abuse. NAVIPPRO data, which was available to Endo and its executives, and which Endo used and analyzed, showed that there was a decline in snorting of Reformulated Opana ER after it became available as well as an enormous increase in intravenous abuse beginning in 2013. In particular, this data showed that, as compared to original Opana ER, rates of abuse by intravenous injection for Reformulated Opana ER were nearly ***five times higher*** than rates of abuse by snorting the drug.

120.    The NAVIPPRO data was corroborated by data from the Researched Abuse Diversion and Addiction-Related Surveillance System ("RADARS"). RADARS provides surveillance data to meet the needs of pharmaceutical companies, policy makers, regulatory agencies, medical/public health officials, and the public in addressing the concerns of prescription drug abuse. RADARS data also showed a marked increase in Reformulated Opana ER abuse via injection following the introduction of the reformulated product. Endo and its executives had access to the RADARS Reformulated Opana ER data and used and analyzed that data.

121.    In addition, data reported to the FDA's Adverse Event Report System ("FAERS") database also demonstrated a significant rise in the rate of abuse after the introduction of Reformulated Opana ER to the market. FAERS data also revealed fifty-nine cases of thrombotic microangiopathy, or "TMA," associated with Reformulated Opana ER use between December 2011 and June 2016. TMA is a serious condition caused by intravenous drug users that was unique to intravenous abuse of Reformulated Opana ER.

122.    Finally, during a deposition taken March 19, 2019 in the Ohio MDL, Defendant Campanelli admitted that he was "unaware" of "*any scientific data* for Opana ER or [Reformulated] Opana ER . . . that had low abuse potential."

123.    Even though Endo had actual knowledge that Reformulated Opana ER was not safer than original Opana ER or generics and could easily be manipulated for intravenous injection, the Company nevertheless promoted Opana ER to healthcare providers—many of whom were strategically selected because they were not as experienced in treating chronic pain—as safer and less susceptible to abuse. Endo had long known that healthcare providers would respond to this type of false promotion. A 2007 internal Endo presentation, which had been emailed by Endo employee Larry Romaine to the "Opana 4 brand IQ team," and which was unsealed as part of the

Ohio MDL, for example, stated that "Potential sales of Opana ER depend directly on prescribers' comfort level with the risk of abuse and diversion."

124.    Armed with this insight, Endo instructed its sales representatives to market Reformulated Opana ER as safer and less susceptible to abuse. For example, the Tennessee Complaint revealed that Endo's strategy the from the moment reformulated Opana ER hit the market was to position the drug as being less susceptible to abuse that competing extended release opioids, even though the Company knew that the drug could be crushed and that it was impossible to prevent abusers from liquifying the drug and injecting it intravenously. For example, the Tennessee Complaint cited a "2011 Endo document titled 'Opana™ ER Playbook' [which] described the franchise vision for Opana ER to 'become the branded oral-solid [Long-Acting Opioid] of choice based on the most *complete array of tamper-resistant properties and attributes* combined with the heritage of oxymorphone."

125.    The Tennessee Complaint further revealed that, starting in September 2015, Endo sales representatives also distributed a "sell sheet" identified internally as "OP-02294b(1)" to health care providers. "OP-02294b(1)" that used the term "Opana ER with INTAC," which alone misleading suggested that Reformulated Opana ER contained proprietary technology that made it safer and more difficult to tamper with. The sheet then "conveyed the claim that the Opana ER tablet stayed intact and was difficult to abuse by injection when this was not the case." According to the Tennessee Complaint, "Endo's sales representatives used this sell sheet during interactions with providers until at least March 24, 2017."

i.    *Endo Falsely Promoted Opana ER to Private Insurance Companies*

126.    Endo not only directed its false and misleading marketing of Reformulated Opana ER at healthcare providers, it also used this false and misleading claims to promoted the opioid to

commercial insurers. These promotions opened a devastating new avenue of liability for the Company, insurance fraud.

127.    Under Section 403 of the New York Insurance Law, the New York Department of Financial Services ("DFS") can levy civil penalties upon any person who has committed a fraudulent insurance act, as defined in Section 176.05 of the New York Penal Law, up to $5,000 and the amount of the claim—per fraudulent claim.

128.    Under New York Penal Law Section 176.05, a fraudulent insurance act is an act "committed by any person who, knowingly and with intent to defraud presents [or] causes to be presented . . . to or by an insurer . . . or any agent thereof: . . . a claim for payment, services or other benefit pursuant to [a health insurance] policy, contract or plan that he or she knows to: (a) contain materially false information concerning any material fact thereto; or (b) conceal, for the purpose of misleading, information concerning any fact material thereto. Finally, under Sections 404 and 408(a)(1)(A) of the New York Financial Services Law, the Superintendent has the authority to levy civil penalties upon any person who has committed any intentional fraud or intentional misrepresentation of a material fact with respect to a financial product or service or involving any person offering to provide or providing financial products or services, up to $5,000 per offense. "Financial product or service" includes, among other things, any financial product or service provided by person regulated by the Superintendent under the New York Insurance Law. This includes commercial health insurance plans.

129.    According to charges filed by the DFS, when Endo was marketing Reformulated Opana ER in 2012, it "engaged in direct and concerted efforts to woo insurance companies to favor Reformulated Opana over other opioids." The DFS alleged that these efforts directly misled insurers "about Opana's crush-resistance properties and falsely present[ed] Reformulated Opana

ER as a panacea to the opioid crisis." The NYDFS Charges stated that Endo's Health Outcomes and Pharmacoeconomics team had given a presentation to numerous insurers entitled "Prescription Opioid Abuse: Impact and Interventions for Health Plans and Systems." According to the charges, Endo admitted to the existence of an opioid epidemic in the United States when setting up the meetings, but misleadingly tried to "leverage the opioid crisis into a selling point for Reformulated Opana [ER] by [telling insurers] that: 'As we all know, opioid prescription abuse has become somewhat of an epidemic within the United States. At Endo, we are doing our part to try to limit abuse of our long acting opioid where possible. In 2012, we launched Opana ER with INTAC technology which is designed to be crush resistant.'"

130.    According to the DFS, the insurer presentation included slides "depicting in granular detail the gravity of the opioid crisis in America." For example:

> In Slide 11 of the presentation, Endo presented a graph showing the sharply rising trend of "opioid analgesics contributing to drug poisoning" between the years 1999-2008. In slide 15, Endo calculated the "Annual societal costs of opioid abuse, dependence, and misuse in the United States" at $55.7 billion. Endo concluded the presentation by touting the benefits of abuse-deterrent and abuse resistant opioid formulation directly to insurers.

131.    These representations to insurers were especially startling because they created serious liability for Endo. Endo knew that the costs for a sizeable number of prescriptions related to abuse of Endo Opioids were almost certainly reimbursed by private insurance companies, including insurance providers in New York. Under Section 403 of New York insurance law, the Superintendent of the DFS had the authority to levy civil penalties of to $5,000 and the amount of the associated insurance claim, upon any person who participated in insurance fraud. Endo also knew that it had intentionally marketed Reformatted Opana ER as safer and less susceptible to abuse in the hopes that the companies would view Reformatted Opana ER prescriptions as legitimate and thus be more likely  to reimburse those prescriptions, no questions asked. Since

Endo's marketing practices and sales representatives had enabled doctors to write and be reimbursed from insurance companies for enormous numbers of fraudulent opioid prescriptions, the Company would face potentially billions in liability under New York's insurance law.

132.    Although Endo ultimately settled claims brought by New York State Office of the Attorney General in 2016 that the Company had improperly marketed Reformulated Opana ER as "crush resistant," when the Company's studies indicated that the pill could be crushed and ground and had improperly instructed its sales representatives to diminish and distort risks associated with Opana ER, Endo neither admitted nor denied those allegations. It was thus not until the Tennessee Complaint was unsealed and allegations, documents and testimony from other cases filed during the Class Period became public that investors understood that the Company had marketed Opana ER to healthcare professionals as safer and less susceptible to abuse when the Company had actual knowledge that it was ***impossible*** to prevent intravenous abuse of Opana ER. In addition, investors never knew that the Company had made these false representations to insurance providers until June 2020, when the DFS unveiled the NYDFS Charges.

### G.    Endo Ceases Marketing Endo Opioids and Withdraws Opana ER

133.    In late 2016, Endo began to reduce its footprint in the opioid market. On December 8, 2016, for example, the Company announced that it had entered into an agreement to return the rights to its opioid Belbuca to BioDelivery Sciences International, Inc. (BDSI). In the press release ("December 2016 Release"), Defendant Campanelli commented that Belbuca "no longer aligns with Endo's U.S. Branded segment strategy and our focus on core assets." The release also announced that Endo was terminating all 375 members of its sales force for its branded opioids, which included Reformulated Opana ER. In other words, while Endo would continue to ***manufacture*** Endo Opioids, including Opana ER, it would no longer ***promote*** those opioids to healthcare providers.

134.    Notably, the December 2016 Release quoted Defendant Campanelli as advising that "We are continuing our product-by-product portfolio assessment and the development of our full corporate strategy, which we plan to discuss in greater detail when we provide our fourth quarter and full year 2016 results in February 2017." In other words, Defendant Campanelli disclosed that Endo, and he personally, were reviewing each Endo Opioid, the Company's efforts to promote those opioids.

135.    Four months later, in March 2017, the FDA heard devastating testimony at an advisory committee meeting about the addictive properties of Reformulated Opana ER and the drug's susceptibility for abuse. In the wake of the meeting, on June 8, 2017, the FDA requested that Endo remove Reformulated Opana ER from the market, and the Company complied one month later. It was the first time the FDA had taken steps to stop sales of a currently marketed opioid because of the consequences of abuse.

### H.    Endo's Precarious Financial Condition Meant That The Company Did Not Have Liquidity Sufficient to Satisfy Judgments in Opioid-Related Actions

136.    As Endo ceased marketing Endo Opioids and withdrew Reformulated Opana ER, states, counties, municipalities and individuals filed ***thousands*** of lawsuits against the Company to hold it accountable for the devastation that the opioid epidemic had wrought. Unbeknownst to investors, however, the scope of Endo's wrongdoing, the Company's increased debt from pre-class period acquisitions, and the Company's reduced revenues as a result of its reduced footprint in the opioid market created a significant risk that the Company would not have sufficient capital or liquidity to address liabilities arising from opioid-related actions.

137.    In its annual report on Form 10-K for 2014, the Company reported approximately $4.1 billion in long-term debt. That debt doubled in 2015, however, to approximately ***$8.3 billion*** in connection with, among other things, the Company's 2015 acquisition of Par for $8 billion.

138.    This increase in debt meant that the Company needed to adjust its debt load to continue operating. Just before the start of the Class Period, as part of these efforts, on April 27, 2017, the Company and certain of its subsidiaries entered into a new credit agreement (the 2017 Credit Agreement) that included (i) a five-year $1 billion revolving credit facility and a $3.4 billion term loan. According to the Company's quarterly report on Form 10-Q for the second quarter of 2017 ("2017 10-Q").

> "The 2017 Credit Agreement contains affirmative and negative covenants that the Company believes to be usual and customary for a senior secured credit facility of this type. The negative covenants include, among other things, limitations on asset sales, mergers and acquisitions, indebtedness, liens, dividends, investments and transactions with the Company's affiliates."

139.    During the Class Period, Endo's financial position deteriorated as its revenues decreased, its outstanding debt stayed constant, and it drew down on the 2017 Credit Agreement.

140.    For example, in February 2018, Endo filed its 2017 10-K, which reported the Company's financial results for 2017, which included the start of the Class Period. The 2017 10-K reported that the Company's revenues had declined from approximately $4.01 billion in 2016 to approximately $3.47 billion in 2017, or 13.5%. The 2017 10-K further reported that the Company's debt had ticked up from $8.14 billion in 2016 to $8.24 billion in 2017.

141.    The Company's financial picture worsened the following year. In February 2019, Endo filed its 2018 10-K, which reported the Company's financial results for 2018. The 2018 10—K reported that the Company's revenues had plummeted even further from $3.47 billion in 2017 to $2.94 billion in 2018, or 15.3%. In addition, the company's net cash flows from operating activities had plummeted from $554 million in 2017 to $267.2 million in 2018, or *by nearly 52%*. The Company's shocking declines in revenue and cash flows had no effect on the Company's debt, however, which remained flat at $8.2 billion.

142.    The Company's financial picture did not improve in 2019. In February 2020, near the end of the Class Period, the Company filed its 2019 10-K, which reported the Company's 2019 financial results. The 2019 10-K reported that the Company's revenues had ticked downward from $2.95 billion to $2.91 billion, or 1.4%, or a total of 27.4% from 2017. In addition, while the Company's debt ticked upward from $8.2 billion in 2018 to $8.36 billion in 2019, the Company's net cash flows from operating activities had plummeted from $267.2 million in 2018 to $98.1 million in 2019, a staggering decline of 63%, and a total decline of 82% since 2017.

143.    To make matters still worse, in 2019, Endo "maxed out" the 2017 Credit Facility. Late in the day on June 28, 2019, a Friday, Endo filed an 8-K (the "July 2019 8-K"), which was signed by Defendant Maletta. The 8-K announced that Endo had drawn—*i.e.*, borrowed—$300 million from the 2017 Credit Facility through its subsidiary Endo Luxembourg Finance Company I S.à r.l. Defendant Campanelli, as Endo's CEO, and Defendant Coleman, as Endo's CFO, made the decision to draw on the facility.

144.    The 8-K further disclosed that Endo's draw had effectively "maxed out" the credit facility because covenants in the Company's credit agreements contained "certain conditions that limit the Company's ability to incur additional secured indebtedness" beyond what Endo had just drawn on the revolver. While Defendants coyly disclosed that the Company "expects to use the proceeds from the borrowing under the Revolving Credit Facility for purposes consistent with the Company's previously stated capital allocation priorities, including for general corporate purposes" and to "provide additional flexibility and strategic optionality," Defendants had plainly maxed out the credit facility to pay for any opioid-related settlements.

145.    The investment press quickly questioned the Company's timing and reasons for drawing on the credit facility. On July 1, 2019, *i.e.*, the following Monday, Bloomberg Senior

Credit Analyst Mike Holland told investors that "[a]nnouncing a max revolver drawing late on a summer Friday without any explanation generally doesn't bode well for a company's stock and bond prices Monday morning." And on July 15, 2019 Barron's Online published an article noting pointedly that "the company did not respond to our query if the loan was taken to pay for an opioid settlement."

146.    In short, throughout the Class Period, the Company was bringing in less money, while reaching the borrowing limit for the 2017 Credit Facility, not paying down its debt and watching its cash flows from operating activities bottom out. In addition, the Company did not disclose that it had reserved *any* funds to pay for opioid related settlements. At the same time, Endo remained exposed to *billions* in liability in connection with the over *2,500* opioid-related actions pending against it. In fact, while the Company settled only claims brought by a small subset of the Plaintiffs in the Ohio MDL (the "Track 1 cases") and claims brought by the state of Oklahoma, the settlements contained escalator clauses requiring Endo to increase its payouts should any of the other over *2,500* cases involve larger settlements. In short, unbeknownst to investors, Endo's precarious financial condition made the imposition of any sizeable judgment against it an extinction-level event for the Company since its declining revenues and increased leverage meant that the Company lacked sufficient capital to address liabilities arising from opioid-related actions.

## I.    Endo Defended Itself in the Opioid-Related Actions Through A Campaign to Obstruct the Litigation and Conceal its Wrongdoing that Furthered the Opioid Crisis

147.    As litigation of *thousands* of opioid-related actions against the Company began in earnest at the beginning of the Class Period, Defendants assured investors they would vigorously contest the merits of the opioid-related actions, allegations of wrongdoing by Endo were "patently offensive," and they were "proud to discuss their business practices." Unbeknownst to investors,

however, Defendants had embarked on a widespread and pervasive campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, not "patently offensive," and otherwise prevent litigation of the merits of the opioid-related actions.

148.    Defendants' campaign to obstruct the opioid-related actions, conceal evidence, and prevent litigation of the merits of those actions, which seek to hold Endo accountable for the devastation that its opioids have wrought, is exemplified by the Company's conduct in opioid-related cases in Tennessee, New York, and Chicago. As set forth in detail below, the Company's campaign included, among other things, failing to adequately search for relevant documents, making false or misleading representations or omissions to plaintiffs and courts concerning the Company's searches for evidence, falsely representing that documents had been produced, knowingly withholding documents in the face of Court orders, and knowingly withholding documents expressly contradicting sworn testimony by Endo's own witnesses. In addition, Endo used their misconduct to attempt to gain a litigation advantage, including by inducing plaintiffs to withdraw a motion to compel, moving for summary judgment based on a "lack of evidence" that Defendants had withheld, waiting to produce documents until false testimony had been provided to a jury, and "slipping" documents into production databases in the hopes that plaintiffs would not notice them.

                    i.        *The Staubus Action*

149.    In June 2017, Tennessee Second Judicial District Attorney General Barry Staubus and other local government officials filed an action against Endo, its subsidiaries, other opioid manufacturers, and healthcare practitioners in the Tennessee Circuit Court for Sullivan County

(the "Staubus Action").[8] The plaintiffs ("Staubus Plaintiffs") also included "Baby Doe," an infant born with neonatal abstinence syndrome in 2015 who went through withdrawal after his birth. In fact, it was reported that "the neonatal abstinence syndrome rate in [Tennessee] in 2017 was 16.4 cases per 1,000 hospital births," nearly *triple* the "national rate of 6 cases per 1,000 births, according to the National Institute on Drug Abuse." This likely stemmed from the fact that Endo sold nearly a million more pills of Opana in Knoxville, Tennessee, that in New York City, Los Angeles, and Chicago *combined*.

150.    The complaint in the Staubus Action alleged that Endo's promotion, sales, and distribution of Opana in Tennessee violated the state's Drug Dealer Liability Act because the Company had engaged in activities facilitating over-prescription and diversion of controlled substances, *e.g.*, Opana. The Staubus Plaintiffs served discovery requests with the complaint in June 2017, which included, among other things, requests for files concerning healthcare practitioners who prescribed Endo Opioids.

151.    After the Staubus Plaintiffs moved to compel Endo to produce documents in response to their document requests, on September 28, 2018, the Sullivan County Circuit Court presiding over the case (the "Staubus Court") ordered Endo to produce, within 90 days, among other things, records for all of the Company's prescription opioids concerning (1) "Endo's knowledge of suspect practices concerning the drugs, including but not limited to high-volume prescribers who were likely engaged in diversion or over-prescribing, (2) "Endo's policies, practices and procedures for addressing potential abuse and diversion of its drugs," and (3) "the

---

[8] The Staubus Action is captioned *Barry Staubus vs Purdue Pharma, L.P. (et al.)*, 82CC3-2017-CK-41916 (Tenn. Cir. Ct.).

volume of Endo Opioids streaming into the relevant geographic area and the illegal drug market" ("Discovery Order").

152.    Endo's knowing and willful violations of the Discovery Order, violation of other orders, and false statements to the Staubus Plaintiffs' counsel and the Staubus Court ultimately led to the Staubus Court in April 2021 granting the Staubus Plaintiffs a default judgment against Endo (the "Default Judgment"). The Default Judgment held that Endo was liable to the Staubus Plaintiffs and ordered a trial on the amount of damages for which Endo was liable. As alleged below, the Default Judgment identified at least *twelve false statements* by Endo's attorneys to the Staubus Court or the Staubus Plaintiffs and expressly held that there had been a "coordinated strategy between Endo and its counsel to . . . interfere with the administration of justice." The Default Judgment further held that the Staubus Plaintiffs had proffered evidence support their claims for up to *$2.4 billion* in damages.

153.    The Staubus Court first held that "Endo ***knowingly*** did not fully comply with" the September 18, 2018 Discovery Order. Specifically, the Staubus Court found that "Endo did not search the files of *any* of its 86 Tennessee sales representatives, any of 18 District Sales Managers with responsibility for Tennessee, or the files of its non-executive level compliance officials." It further found that Endo did not produce formal "Reports of Suspected Diversion" that Endo sales representatives filled out concerning Tennessee prescribers, nor did it produce "various iterations of [Endo's] Global Exclusion List or the District Manager Exclusion List." Instead, the Court expressly found that "Endo simply searched the files of custodians that it had identified in the [Ohio] Multi-District Litigation proceeding that did not involve Tennessee-specific discovery," and "[d]uring the discovery period, [Endo] never told Plaintiffs or the Court that it had self-limited its response to the September 28, 2018 Order to Compel this way."

154.    Instead of complying with the Discovery Order, the Staubus Court held that "Endo engaged in obfuscation and delay," including "refus[ing] to specify which records, if any, were responsive to the [Discovery Order] and whether Endo's Court-ordered production was complete." For example, the court held, after producing some documents in the 90 days after the Discovery Order, Endo refused to specify which documents were responsive to the order or to confirm that its production was complete. Indeed, Endo's counsel, Joshua Davis of Arnold & Porter Kaye Scholer LLP ("APKS") stated that Endo had "complied" with the order, referred the Staubus Plaintiffs generally to the entire production, and emphatically stated that Endo had "neither the obligation nor inclination to certify" that its production was complete. The Staubus Court expressly found that although APKS has represented that Endo had "complied" with the Discovery Order, "**This wasn't true**" (emphasis in original).

155.    The Staubus Plaintiffs served another set of requests for production in March 2019, which also sought Endo's files concerning suspicious prescribing practices by Tennessee HCPs and pharmacies, including compliance-related files. Endo served objections and responses on the Staubus Plaintiffs that stated it would produce "an unspecified subset of records located after conducting a 'reasonable search.'" The Staubus Court found in the Default Judgment, however, that Endo *again* did not  produce its Reports of Suspected Diversion or provide complete copies or versions of its Global Exclusion List and District Manager Exclusion List; search files of Endo's Tennessee sales representatives, district managers, or non-executive compliance officials; or tell the Staubus Plaintiffs how Endo was limiting the productions.

156.    According to the Staubus Court, the Staubus Plaintiffs repeatedly asked Endo to clarify what it was producing and withholding, but Endo failed to provide any clarification. The Staubus Court found that, when the Staubus Plaintiffs asked Endo's counsel directly whether Endo

58

had produced specific records responsive to their production requests, Endo had responded, on June 14, 2019, "by stating that certain responsive records that Plaintiffs requested were 'already in Plaintiffs' hands.'" The Staubus Court held "**That was not true**" (emphasis in original).

157.    In January 2020, the Staubus Plaintiffs asked Endo to identify responsive documents and production dates for files related to healthcare practitioners who prescribed Endo Opioids and for the Company's registration with the state of Tennessee to manufacture and distribute prescription drugs in the state. Although the Staubus Plaintiffs had been repeatedly requesting these files, Endo's counsel replied that the "Endo supplemented its responses as agreed . . . between October 22 and 25," 2019. The Staubus Court expressly held that "**This was not true. Endo had not actually produced the referenced records, nor did it provide more detail as promised**" (emphasis in original).

158.    On January 9, 2020, the Staubus Plaintiffs again moved for an order to compel Endo to produce documents, and Endo responded that "it had already made a 'reasonable search' for responsive records," "accused Plaintiffs of making 'a transparent attempt to manufacture a non-existent dispute concerning Endo' discovery compliance,'" and represented to the Staubus Court that Endo had been "transparent with Plaintiffs for months about the objections on which it was standing." The Staubus Court expressly held that "**This was not true**" (emphasis in original).

159.    With regard to the Staubus Plaintiffs' January 2020 motion to compel, the Staubus Court further found that "Endo in fact was withholding responsive records (such as Reports of Suspected Diversion, sales communications about Tennessee prescribers, and other critical records), had not conducted a 'reasonable search,' and had not been transparent about the fact that it was withholding those records," and that *the Staubus Plaintiffs had withdrawn their motion to compel based on Endo's false representations*.

160.    On December 13, 2019, the Staubus Plaintiffs noticed the Tennessee state equivalent of a Federal Rule of Civil Procedure 30(b)(6) for a deposition of an Endo representative (the "Rule 30.02(6) Deposition"). The notice set deposition dates of January 21 and 22, 2020. According to the Staubus Court, although Endo did not raise any objections to the notice at a status conference with the Court on December 19, 2019, on January 15, 2020, Endo served 34 pages of objections to the notice, including objecting to the words, "person," "opioids," "efforts," "communicate," "diversion," "district attorneys," "due diligence," "Opana ER," and "pharmacy." At a status conference with the Court the following day, Endo again did not indicate that there were any issues with the Rule 30.02(6) Deposition proceeding, but within hours of the conference, Endo unilaterally refused to present a witness for the deposition.

161.    In response to Endo's refusal to present a witness for the Rule 30.02(6) Deposition, the Staubus Plaintiffs moved for expedited relief, which the Staubus Court granted, ordering Endo to present a deponent before February 14, 2020, which was the cutoff for fact discovery, and to identify Bates ranges of documents responsive to a topic in the Staubus Plaintiffs' deposition notice.

162.    The Staubus Plaintiffs and Defendants scheduled the Rule 30.02(6) Deposition for February 4 and 5, 2020, but—despite repeated follow-ups by the Staubus Plaintiffs—Endo did not provide *any* Bates ranges. Instead, on February 4, 90 minutes before the deposition, Endo identified 13 responsive documents and presented Plaintiffs with previously unproduced compliance files for three opioid prescribers in Tennessee as well as a purported "Global Exclusion List."

163.    The Staubus Court held that Endo had not produced *seven of the thirteen documents it identified at the deposition*. Even though Endo had not produced more than half the documents

it had identified less than two hours before the deposition, Endo's counsel falsely stated on the record at the deposition that:

> "You just didn't find out about these documents this morning. These documents were produced to you months ago. You've known about them. If you haven't done the preparation necessary to bring the appropriate documents to ask this witness questions, that's not my fault and that's not his fault. . . . And you've known about these documents that are referenced right here for, I assume, many months, if you'd bothered to look at them."

The Staubus Court expressly held that "**Endo had not in fact produced these records**" (emphasis in original).

164.    When the Staubus Plaintiffs emailed Endo's counsel on the evening of February 4, 2020, to affirm that they had not received seven of the 13 files identified by Endo, according to the Staubus Court, Endo's counsel falsely accused Plaintiffs of "attempt[ing] to manufacture an issue where none exists." The next day, however, Endo's counsel admitted on the record that Endo had not produced those documents.

165.    Also on the evening of February 4, 2020, the Staubus Plaintiffs asked Endo if it had produced all responsive prescriber-related files. Endo responded, "You now have *all* the documents regarding TN prescribers responsive to plaintiffs' requests that Endo has been able to identify following a reasonable search." The Staubus Court expressly held that "**it is now clear that this representation was not true either**" (emphasis in original).

166.    With discovery in the Staubus Action set to end on February 14, 2020, the Staubus Court ordered the parties to certify whether they had "produced all responsive records" and for each party "to identify whether it was withholding any documents based on an objection." On February 14, 2020, Endo certified its compliance with that order, "stating that it had made a 'reasonable search' for records but not identifying any specific categories of documents that it had withheld." The Staubus Court expressly held that "**this was not true**" (emphasis in original).

61

167.    On February 20, 2020, the Staubus Court sanctioned Endo for its conduct concerning the Rule 30.02(6) Deposition, ordered a witness to reappear for three hours of testimony, and awarded the Staubus Plaintiffs their fees for the deposition.

168.    The Staubus Plaintiffs' March 2019 requests for production also had specifically sought documents "concerning registration certificates, licenses, applications, renewals, and other documents provided by Endo and its affiliates to the State of Tennessee" (the "Registration Request"). The Staubus Plaintiffs sought these documents because Endo's legal status in Tennessee was a key factor in the Company's liability under the Drug Dealer Liability Act. In addition, Endo had indicated that the Company would use its status under the act as a core defense to the Staubus Plaintiffs' claims. In April 2019, Endo objected to the request and stated that it would produce documents subject to those objections. Endo, however, did not produce any documents. Instead, on June 14, 2019, in response to a follow-up from the Staubus Plaintiffs, Endo sent the plaintiffs a letter stating that "much" of the information responsive to multiple requests had already been produced and stated that it would produce more records. Endo's letter was ambiguous and did not state whether Endo had produced any records responsive to the Registration Request. On October 5, 2019, Staubus Plaintiffs again followed up on the Registration Request, and Endo responded only that it had "provided responsive information to the vast majority of requests."

169.    On January 6, 2020, the Staubus Plaintiffs requested that Endo identify responsive Bates ranges and dates of production for the Registration Request, and whether the production was complete, and Endo responded on January 8, 2020 by stating that it had "supplemented its responses as agreed" between "October 22 and October 25." Since the productions between October 22 and 25 did not include any documents responsive to the Registration Request, the

Staubus Plaintiffs filed a motion to compel. Just before the hearing on the motion, on January 16, 2020, Endo's counsel relayed via an email to the Staubus Plaintiffs that Endo had not withheld any responsive documents based on its objections and had produced all records that were responsive to the Registration Request. Based on Endo's represented that it had produced all responsive records encompassed by the motion to compel, the Staubus Plaintiffs withdrew their motion.

170.    According to the Staubus Court, although Endo's counsel represented on June 14, 2019, January 8, 2020, January 16, 2020, and February 14, 2020 (via its court-ordered certification) that the Company had produced documents responsive to the Registration Request, Endo had not produced *any* responsive registration files at those times. Indeed, the Staubus Court expressly held, "**That was not true**" (emphasis in original).

171.    The Staubus Plaintiffs filed yet another motion to compel concerning the Registration Request on March 20, 2020. On March 25, 2020, the day before a hearing on the motion, Endo produced two responsive documents to the Staubus Plaintiffs and told the Staubus Court that it had "simply overlooked a 'small number' of responsive records." The Staubus Court held that "**That turned out not to be true**" (emphasis in original).

172.    On March 26, 2020, when it heard the Staubus Plaintiffs' March 20 motion to compel, the Staubus Court ruled that Endo "had given an evasive response to" the Registration Request that "amounted to failure to answer under Rule 37.01(3)" and ordered Endo to produce all documents responsive to the Registration Request in five days. The Staubus Court further warned that non-compliance could result in sanctions including a default judgment and referrals for ethics violations.

173.    With its back to the wall, Endo disclosed to the Staubus Plaintiffs that it had *thousands* of responsive documents that it had not produced. According to the Staubus Court,

between March 31, 2020 and April 6, 2020, Endo produced over 3,000 documents responsive to the Registration Request alone.

174.    While it had been withholding produce documents concerning the Registration Request to the Staubus Plaintiffs, Endo sought to capitalize on the plaintiffs' lack of access to those documents. On April 2, 2020, Endo filed a motion for summary judgment that, among other things, asserted the grounds that it had always been properly registered with the State of Tennessee and never violated the conditions of its registration. In addition, in response to the Staubus Plaintiffs' motion for partial summary judgment, Endo asserted that it was not required to report suspicious orders because its license as a "Manufacturer/Wholesaler/Distributor" did not render it a "wholesaler." The documents Defendants had refused to produce in response to the Registration Request, which addressed the relevant conditions of Endo's registration and obligations pursuant to its license with the State of Tennessee thus contained evidence directly relevant to these motions. Nevertheless, and shockingly, Defendants had argued in their motion for summary judgment that "There is no evidence that Endo . . . lacked any license required by [Tennessee] to manufacture and sell prescription opioids medications during the relevant time period or violated the terms of that license." There was "no evidence" because Endo refused to produce that evidence.

175.    On March 20, 2020, Plaintiffs again inquired as to whether Endo had produced all its responsive files for prescribers of Endo Opioids. On April 6, Endo produced multiple categories of records, including 13 Reports of Suspected Diversion for prescriptions written in Tennessee, and indicated that it would be producing additional records.

176.    On April 9, 2020, the Staubus Plaintiffs moved for sanctions or for an order to show cause asserting that Endo had not produced all the requested prescriber files, Reports of Suspected Diversion, internal communications regarding suspicious prescriptions, and "Global Exclusion

List." The Staubus Plaintiffs further asserted that Endo had not searched Tennessee custodians and only produced subsets of productions from the federal multi-district litigation.

177.    Approximately six hours after the Staubus Plaintiffs filed their April 9 motion, Endo produced over *60,000 documents* totally nearly over 886,000 pages, provided no index for those documents, and stated that it did not know whether Plaintiffs already had these records. Then, over the ensuing two weeks, in the lead-up to the April 24, 2020, hearing on the April 9 motion, Endo produced nearly 10,000 more documents totaling nearly 127,000 additional pages. Despite these late productions, Endo nevertheless accused the Staubus Plaintiffs of "trying to create a false separation between what they consider to be Tennessee-specific searches and what was produced in the MDL" and represented to the Court that Endo had "produced everything it found after a 'reasonable search.'" The Staubus Court held that "**This was not true**" (emphasis in original). Endo also admitted that it had *not* searched Tennessee-based custodians in response to the Staubus Plaintiffs' first requests for production, the Discovery Order, or Plaintiffs' March 2019 requests for production.

178.    On May 4, 2020, the Staubus Court held Endo in contempt of court "for failure to do a reasonable search and to produce responsive documents." The court expressly held that it was "even more concerned with the untrue statements made by Endo Defendants' attorneys [APKS] than their failure to do a reasonable search." The court directed Endo again to produce documents and reserved judgment on remedies.

179.    On May 15, 2020, in response to being held in contempt of court, Endo retained Redgrave LLP ("Redgrave") as "discovery counsel."

180.    On June 30, 2020 Endo purported to complete its productions in response to being held in contempt of court. These productions included 255,000 documents (170,000 of which had

not been previously produced) comprising approximately 1 million pages and included reports of suspected diversion and additional exclusion lists. These documents were incredibly damning. They showed, among other things, that:

- Endo had not added 67 of 170 physicians listed on the Global Exclusion List it had initially produced to the Staubus Plaintiffs until *after it had terminated its opioid sales force* in 2016. For one physician, Endo did not add him to the Global Exclusion List until October 2019, three years after Endo had fired its sales force and *two years into the doctor's prison term for illegal opioid prescriptions*.

- Endo had removed Tennessee prescribers from the exclusion list (*i.e.*, resumed detailing) without providing any explanation of why, as well as documents showing Endo waiting to place prescribers on an exclusion list until years after learning of potential diversion by the prescriber.

- Endo employees knew about opioid diversion in Tennessee and emails existed concerning suspicious sales practices by Endo including purposely targeting high-volume opioid prescribers in Tennessee.

181.    The Staubus Court found that the withheld documents contained information contradicting sworn testimony by Endo witnesses. At the Rule 30.02(6) deposition, for example, the witness testifying on Endo's behalf testified that the wife of a physician who was imprisoned for running a "pill mill" in Knoxville Tennessee was never on Endo's Global Exclusion List. Endo's production of documents after the contempt order, however, demonstrated that this was false because the physician's wife both was placed on the list and was detailed by Endo *after she was placed on the list*.

182.    In addition, Endo's Chief Compliance Officer had testified in a February 2020 deposition that he did not know of any prescribers being removed from the Global Exclusion list, but Endo's belated productions demonstrated that prescribers *were* removed from that list.

183.    Finally, the Staubus Court noted that although Endo had *certified* on February 14, 2020, that its productions were complete and that the Company was not withholding any responsive documents, Endo subsequently produced nearly *400,000 documents*.

184.    On November 10, 2020, the Staubus Court held a hearing on the appropriate sanctions for Endo's contempt of the Court's orders. According to the Default Judgment, at this hearing Endo "repeatedly tried to characterize its discovery misconduct as a simply misunderstanding between Plaintiffs' counsel and defense counsel in the discovery process."

185.    On April 6, 2021, however, the Staubus Court issued the Default Judgment which granted judgment in the Staubus Plaintiffs' favor on liability and reserved a final judgment on damages pending a damages trial. Specifically, the Staubus Court held that, in response to Endo's self-serving characterization of its misconduct as a "misunderstanding":

> [T]he record demonstrates otherwise. It is clear to the Court that ***Endo and its counsel at Arnold & Porter willfully withheld responsive records*** in violation of this Court's September 28, 2018 Order to Compel, in violation of this Court's February 12, 2020 Certification Order, and (more generally) in derogation of Plaintiffs' reasonable documents requests and Endo's discovery obligations.

186.    The Court further held that:

> It is apparent that ***Endo intended to defend itself at trial by touting its anti-diversion measures, while simultaneously depriving Plaintiffs of evidence that would have undercut that defense***. Accordingly, the Court find that Endo willfully withheld this information during the discovery phase to gain a litigation advantage at trial. The Court further finds that Endo and its attorneys' false statements violated the Tennessee Rules of Civil Procedure and the Tennessee Rules of Professional Conduct.

187.    The Court went on to hold that "Endo's willful discovery violations were severely prejudicial to [the Staubus] Plaintiffs. During that time, Plaintiffs conducted numerous depositions of Endo witnesses across the country during the two-year discovery phase, served expert reports, prepared motions for summary judgment and pretrial motions," and otherwise prepared for trial "based on the documents and evidence they had received. It is now clear that they did so without highly relevant records that Endo had willfully withheld, some of which even directly contradict testimony by Endo witnesses."

188.    Further, the Court held that "Plaintiffs should not be forced to choose between going to trial without this highly relevant information — *which Endo and its attorneys intentionally hid from Plaintiffs and the Court* — or delaying the trial for months or even a year." The Court then granted the Staubus Plaintiffs a default judgment because "[t]his case involves a 'clear record of delay or contumacious conduct," and that "the Court finds that *this was part of a coordinated strategy between Endo and its counsel* to delay these proceedings, deprive Plaintiffs of information that would support their case, and interfere with the administration of justice."

189.    After granting the Staubus Plaintiffs a default judgment in their favor as to liability, the Court noted that, going into the damages trial, the Staubus Plaintiffs "have sued for $2,400,000,000 *and have expert testimony which supports that amount*.

190.    Defendants quickly appealed the Default Judgment, but on June 8, 2021, the Tennessee Court of Appeals declined to exercise its discretion to review it and denied Endo's motion to stay the Staubus Action. On July 13, 2021, the Tennessee Supreme Court denied Endo's request for a discretionary review of the Default Judgment, and the Tennessee Court of Appeals rejected Defendants' attempt to seek a review of the Default Judgment as a matter of right.

191.    With their opportunities for immediate appeal of the Default Judgment effectively exhausted and the damages portion of the trial in the Staubus Action set to begin on July 26, 2021, Defendants scrambled to settle the action. On July 22, 2021, Defendants announced an agreement in principle to settle the Staubus Action for $35 million. The agreement was the largest that any prosecution had reached with Endo at that time, more than triple the $10 million settlement paid to two Ohio counties in 2019, and nearly quadruple the $8.8 million paid to the state of Oklahoma in 2020, areas with far higher population levels than the counties of northeast Tennessee involved

in the Staubus suit. The size of the settlement suggested that Endo's conduct had increased the extent of the Company's liability for the opioid crisis.

ii.    <u>*The New York State Actions*</u>

192.    Defendants' campaign to obstruct litigation of the opioid-related actions on the merits also was on display in an action that consolidated actions by several counties in New York state and the State of New York itself (collectively, the "New York State Actions").[9]

193.    In 2008–09, APKS represented Endo in an investigation of a non-opioid Endo product called Lidoderm ("Lidoderm Investigation"). As part of that investigation, APKS reviewed documents, including call notes—contemporaneous records of sales representatives detailing visits with healthcare providers—showing that Endo sales representatives detailed Lidoderm at the same time they detailed opioids like Percocet and Opana ER. APKS and Endo thus knew how and where Endo kept its "call notes," as Endo produced documents concerning detailing visits made by Endo representatives, including call notes, in connection with the Lidoderm Investigation.

194.    In 2013, the New York State Office of the Attorney General ("OAG") launched an investigation into whether the Company had improperly marketed Reformulated Opana ER as "crush resistant," when the Company's studies indicated that the pill could be crushed and ground (the "OAG Opana ER Investigation"). During that investigation, OAG requested, among other things, "For each sales representative who detailed Opana in New York, copies of all submitted monthly reports, progress reports, sales reports, and call notes that refer or relate to Opana" from January 1, 2009, to the date of the subpoena. Endo ultimately settled the OAG's claims arising out of that investigation, including that Endo sales representatives detailed "HCPs who were

---

[9] The New York State Actions are captioned *In re Opioid Litigation*, No. 400000/2017, (N.Y. Sup. Ct. Suffolk Cty.).

subsequently arrested and/or convicted for illegal prescribing of opioids in New York State" and that sales representatives failed to report potentially illegal conduct "even when they saw suspicious behavior."

195.    Endo also was represented by APKS in the OAG Opana ER Investigation, which was focused on how Endo sales representatives detailed opioid prescribers in New York State and how those representatives documented potentially illegal conduct. Endo and APKS reviewed call notes during the OAG Opana ER Investigation and thus knew that call notes were a source of relevant evidence concerning representations Endo's sales representatives made about the safety of Endo Opioids. In addition, although Endo and APKS knew that call notes reviewed and produced in connection with the Lidoderm Investigation contained descriptions of detailing visits involving Opana ER, Endo hid these materials and did not disclose them to the OAG State during the OAG Opana ER Investigation.

196.    In August 2016, the County of Suffolk, New York filed suit in New York Supreme Court (Suffolk County) against multiple defendants, including Endo and certain of its subsidiaries, for alleged violations of state false and deceptive advertising and other statutes, public nuisance, common law fraud and unjust enrichment based on opioid sales and marketing practices. In July 2017, the State of New York Supreme Court Litigation Coordinating Panel granted a motion by certain defendants, including Endo and its subsidiaries, to coordinate nine New York county suits (the "New York State Actions") within the Supreme Court of the State of New York, County of Suffolk (the "Suffolk Court").

197.    In October 2017, Endo searched its data warehouse in response to discovery requests from the plaintiffs in the New York State Actions ("NYS Plaintiffs"). The NYS Plaintiffs' discovery requests sought, among other things records of meetings between Endo sales

representatives and HCPs, *e.g.*, call notes. Although the NYS Plaintiffs sought *all* call data, Endo's production in response to the request omitted Endo's "Message" field, described in paragraph 64 above. Information in the Message field was essential to the New York State Actions because field the message contained text entered by the sales representatives describing the visit, and the NYS Plaintiffs alleged that Endo was specifically targeting healthcare practitioners most likely to write prescriptions even in the presence of evidence that the prescriptions were fraudulent. Facilitating these fraudulent prescriptions was a violation of multiple laws, including New York insurance law.

198.    On September 5, 2018, the Suffolk Court entered a case management order stating that the parties agreed to treat document productions made in the Ohio MDL as if produced in the New York State Actions.

199.    The New York State OAG had filed an opioid-related action in 2018, which was consolidated with the other New York State Actions. On March 28, 2019, the OAG filed an amended complaint that added Endo certain subsidiaries as defendants. OAG's complaint alleged that Endo had deceptively promoted Endo Opioids, including Opana ER, Opana, Percodan, Percocet, generic oxycodone, generic oxymorphone, and generic hydromorphone. The OAG alleged that Endo, as well as other opioid manufacturers:

> [D]eveloped a three-part playbook for their fraudulent scheme: (i) conjure up no fewer than ten separate categories of deceptive statements about the use of opioids; (ii) use those lies in high-frequency 'detailing' sales calls to susceptible HCPs, advertisements, and discount card programs to promote their branded opioid formulations; and (iii) spread those lies throughout the health-care community by using co-opted, paid-off doctors (the KOLs) to secretly sponsor phony CMEs and Front Groups that broadly targeted unwitting HCP's and even the most vulnerable patient populations.

200.    The OAG's claims were based on hundreds of thousands of sales visits Endo's representatives made to healthcare providers in New York and the promotional materials the

company disseminated in New York. The OAG Complaint also specifically referenced call notes, as well as described sales calls made by Endo sales representatives who were illegally prescribing opioids.

201.    On May 7, 2019, OAG served document requests on Endo seeking documents dated from "one year prior to the time period [Endo] began selling or planning to sell [opioids] until present." Specifically, these requests sought:

> All Documents and Communications Concerning Your Marketing and Detailing to New York Customers, including but not limited to Documents showing: a. Identification of New York Customers; b. Identification of New York HCPs for potential Detailing, including but not limited to use of prescribing data for identifying HCPs for Detailing; c. Interactions with New York Customers; d. Your determination(s) about whether or not to Detail specific HCPs; and e. Analyses of return on investment from Detailing HCPs" and "any form of Communication between Your Sales Representatives or other Employees and Health Care Providers.

202.    In response to these requests, Endo stated that, subject to its objections, "Endo will produce non-privileged documents concerning its marketing and promotional visits to prescribers in New York to the extent such documents relate to Opana ER or opioids as a class of medications for the treatment of chronic pain, can be located through a reasonable search and inquiry, and have not been produced to Plaintiff" in the Ohio MDL. In other words, Endo agreed to conduct a reasonable search to find and produce call notes that had not already been produced in the Ohio MDL.

203.    According to a sworn affidavit he filed in the New York State Actions, APKS partner Joshua Davis was leading "the team working on discovery across all federal and state [opioid] cases." Davis had also worked on the Lidoderm Investigation and the OAG Opana ER Investigation.

204.    On July 26, 2019, Davis wrote a letter to the NYS Plaintiffs disclosing that Endo was searching, among other things, "Customer relationship management (CRM) systems providing information about healthcare providers detailed by sales representatives as logged by sales representatives and materials logged as left behind with a healthcare provider, from 2008 to 2017." Davis did not disclose that Endo had sales call information spanning from 2008 to 2016 stored in a commercial data warehouse.

205.    In fact, neither APKS nor Endo disclosed in the New York Actions, whether in discovery responses, litigation of discovery disputes, or during the jury trial that commenced in June 2021, that Endo owned and operated a commercial data warehouse containing the records of Endo employees' communications and activities with New York prescribers generated by at least four different Endo CRM systems. In addition, Endo never gave the NYS Plaintiffs any reason to believe that the searches APKS and Endo were promising would omit these well-known repositories. According to Endo's "discovery counsel," Redgrave, Endo's CRM has been at all times accessible to the company's Commercial IT department and contains data retained "indefinitely."

206.    Endo began producing documents to the NYS Plaintiffs, including OAG, in the New York State Actions in September 2019. Although discovery closed in the actions on March 9, 2020, Endo continued to produce documents through May 2020.

207.    Although Endo continued to identify documents responsive and highly relevant to the New York State Actions, they did not identify those documents to the OAG or NYS Plaintiffs, *even after trial in the NYS actions had commenced*.

208.    For example, by mid-May 2021, Endo had identified highly relevant call notes from a commercial data warehouse. According to the principal of a third-party vendor that Endo

apparently engaged to review its systems—Brandon Leatha of Leatha Consulting LLC—the commercial data warehouse is a source of four databases of sales representatives' call information spanning from 2008 to 2016. Endo did not communicate that it had identified call notes or Mr. Leatha's statement to the NYS Plaintiffs, however. Instead, Endo disclosed them to the plaintiffs in a federal opioid-related action captioned *City of Chicago v. Purdue Pharma*, No. 14-cv-04361 (N.D. Ill.) (the "Chicago Action").

209.    Similarly, on June 15, 2021, Endo further advised the plaintiffs in the Chicago Action that they had identified "opioid product Call Data from 2002 to 2007" (*i.e.*, call notes) in productions made to the government in 2008 and 2009 in the Lidoderm Investigation. Endo produced that data on June 21, 2021, to the plaintiffs in the Chicago Action, but said nothing about the data to OAG.

210.    These call notes detailed what Endo sales representatives said to HCPs in New York and contained sales representatives' observations during detailing visits. One set of call notes, for example, showed entries concerning Dr. Nessim Roumi, an HCP in Brooklyn, New York. The call notes showed that a sales representative observed "[a] lot of drug abusers here and crack-heads. Scary place." In addition, the call notes and other documents withheld by Endo showed that Endo did not respond to its employees' report of this situation by contacting the New York Bureau of Narcotics Enforcement and passing the employee's report. Nor did Endo stop detailing Dr. Roumi. Instead, the call notes revealed that Endo had its sales representative detail Dr. Roumi five more times in just the next eight months. And after at least one of those visits, the sales representative reported that he had pushed Dr. Roumi to prescribe Percocet to patients "as [a] Gateway" to higher-potency opioids.

211.    On June 23, 2021, Endo also disclosed to the Chicago plaintiffs that they had identified additional fields of information ("message description" and "message name") for call notes for the period 2008 through 2015 and would be making a supplemental production. Endo did not notify the NYS Plaintiffs of these productions.

212.    Jury selection had begun in the New York State Actions on June 8, 2021. Trial began on June 28, 2021. Endo's campaign to obstruct litigation of the merits of those claims had worked. Endo had failed to search areas where it knew relevant documents were stored, knowingly withheld inculpatory documents, and falsely represented to the NYS Plaintiffs that its productions were complete.

213.    Endo's campaign to obstruct the New York State Actions began to fall apart toward the end of July, nearly a month after trial began. On July 27, 2021, the NYS Plaintiffs notified the Suffolk Court that the NYS Plaintiffs had discovered "grossly inculpatory" materials hidden in rolling productions Endo had been making in proceedings in other jurisdictions. Endo's counsel, APKS Partner Andrew Solow, admitted to the Suffolk Court that the documents were produced in the MDL and not in the New York State Actions.

214.    The following day, on July 28, 2021, the Suffolk Court asked Endo's counsel why the call notes had not been produced before trial, during discovery. Endo's counsel, APKS partner Solow, represented to the Court that, at the time of discovery in the New York State Actions, documents were downloaded from the "only call note database that was operational within the company." The commercial data warehouse where these call notes are ostensibly from, however, has been in existence since 2014 and contained data from as early as 2008. In addition, Endo's commercial data warehouse had been maintained by Endo's Commercial IT group since 2014, and

therefore was readily available to Endo throughout the course of discovery in the New York State Actions, which began in July 2017.

215.     Endo plainly had been concealing the call notes in the commercial data warehouse. OAG had asked for these very call notes *in 2013* as part of the OAG Opana ER Investigation. The same attorneys at APKS had represented Endo in the Lidoderm Investigation in 2008–09, the OAG Opana ER Investigation, and the New York State Actions. Yet Endo failed to produce call notes in the OAG Opana ER Investigation and the New York State Actions even though those call notes had been reviewed in the Lidoderm Investigation and/or been stored in the commercial data warehouse since 2014.

216.     Endo withheld both the pre-2008 call notes purportedly stored in records of the Lidoderm Investigation as well as the call notes from 2008 to 2016 in the commercial data warehouse so that they could argue at trial in the New York State Actions that the absence of evidence was "evidence of absence." In fact, during the trial in the New York State Actions, Endo's counsel hammered the NYS Plaintiffs' witnesses with questions designed to emphasize that the plaintiffs had not produced evidence of exactly what Endo sales representatives said to healthcare practitioners who prescribed opioids.

217.     For example, on July 12, Endo's counsel asked Plaintiffs' expert, Dr. Anna Lembke, "would you agree that it's important to see what information was sent to the doctor before you can determine if the communication to her was misleading?" and "what you have done in this trial, you made no effort to try to connect any defendants' marketing to any specific doctors in the State of New York, County of Nassau or County of Suffolk, correct?" The next day, on July 13, 2021, Endo's counsel said, "You'd agree that you are not aware of any evidence that Endo sales representatives disseminated messaging related to pseudoaddiction?" Later, on July 13, Endo

counsel said, "You did not identify in your report any doctors whom you believed saw a particular Defendant marketing material and actually relied upon it in making a decision, correct?" and "those doctors are not prescribing opioids based on anything the Defendants said, correct?"

218.     Affidavits submitted by Endo's counsel in the New York State Actions and other cases in the MDL admitted that Endo knew of the pre-2007 call notes by early June 2021, before trial in the New York State Actions and had access to the commercial data warehouse containing relevant call notes since *2014*. Endo engaged in this questioning during the trial in the New York State Action knowing that it was withholding call notes, and thus the reason that the NYS Plaintiffs' witness could not identify specific evidence or documentation of what Endo sales representatives had said to healthcare practitioners was because Endo had withheld that evidence.

219.     On August 3, 2021, the Suffolk Court issued an Order to Show Cause and Interim Trial Orders directing the parties to appear for a hearing on August 6, 2021 and ordering "Endo and all other parties in this action represented by APKS shall deliver to Plaintiffs a list identifying the bates number and the dates, persons, entities and repositories establishing the chain of custody of each responsive document produced by Endo or any such other party after the close of discovery in this action no later than 5:00 p.m. on [Wednesday], August [4], 2021."

220.     Also on August 3, 2021, OAG discovered documents that Endo had added to the Ohio MDL, on July 19, 2021, without giving notice to the NYS Plaintiffs. One document was a May 26, 2009 email copying Endo's Northeast Regional Sales Director J.P. Brassil announced the "2007 Opana March Madness Tournament" another sales competition Endo used to incentivize increasing opioid prescriptions regardless of the existence of any underlying medical condition.

221.     Another document was an August 6, 2007 email from Leslie Heindl, Endo's Boston District Manager, copying Brassil that encouraged sales team members to push back against

doctors who are "nervous" about prescribing Opana ER after a "failure." The email was entitled "Opana ER & Lidoderm 'Best Practices,'" and stated that in no uncertain terms that Endo's sales staff should push healthcare practitioners to prescribe as large doses of Endo opioids as possible and use older Endo Opioids specifically as a "gateway" to getting patients hooked on large amounts of Opana ER. Heindl's email stated, "[m]any doctors who have not had success with Opana ER *have started way too low*. Our best results are coming from doctors who *convert patients on Percocet or Vicodin to Opana* and then make the switch to Opana ER. It is within labeling guidelines for someone to be on Opana 10mg 4 times a day." Heindl's email went on to state that "[w]e seem to get nervous when a doctor relates a 'failure.' . . . . *Don't let them shy away and get away with that*" and "[u]nder treatment of pain is just as big a problem as over treatment. *Why do they think so many people call early for their refills*." The email further stated that "*Your success at Endo will be defined by how well you can sell Opana ER*. We're 14 months since launch, 8 months into the year and 1 month into Semester IIyet our results are still anemic. *We need scripts and we need them now*."

222.    Finally, the Heindl's email demanded that Endo's sales representatives do everything short of physical force to get healthcare practitioners to prescribe Opana ER, stating "*Don't leave an office until you have some kind of commitment* or you fully understand what is preventing your physicians from prescribing Opana ER right now. Week in and week out they say they're waiting for the "right" patient. *The right patient has not made it in the door for 14 months? Enough of that. Challenge them*. What are you going to get, fewer scripts than you are getting now?"

223.    Early calls for refills of opioid prescriptions is a classic sign of opioid abuse.[10] Heindl's email instructed Endo's sales staff to exploit this addictive behavior by using it to drive increased opioid prescriptions. Heindl's email thus demonstrates how Endo saw profit potential from addictive behavior in patients—the exact conduct that Endo and Defendant Maleta later scoffed was "patently offensive." It also demonstrated how Endo wanted healthcare practitioners to ignore "failures" and prescribe Opana ER whether or not the medication was effective. This document was devastating evidence of exactly the misconduct for which Endo was on trial, but Endo withheld it as long as possible before belatedly producing it in a way strategically designed to prevent the NYS Plaintiffs from using it at trial.

224.    The following day, on August 4, 2021, OAG discovered another document that Endo had produced in the Ohio MDL, on July 19, 2021, without giving notice to the NYS Plaintiffs. The document was an April 3, 2008 presentation by Endo district manager Wayne Morris, detailing "top Opana ER targets" employees should "focus on."

225.    At a hearing during the trial in the New York State Actions on August 6, 2021, the Suffolk Court observed that Endo's explanation for why it never searched files from the Lidoderm Investigation for pre-2008 call notes simply was not credible. Specifically, the court stated that:

> It's apparent that both Endo and Arnold & Porter had the pre-2008 call notes . . . . It further indicates—these are my words, not

---

[10] National Institutes of Health, *How Can Prescription Drug Misuse Be Prevented?*, https://www.drugabuse.gov/publications/research-reports/misuse-prescription-drugs/how-can-prescription-drug-misuse-be-prevented, ("Doctors should also take note of rapid increases in the amount of medication needed or frequent, unscheduled refill requests"); Pharmacy Times, 13 Responses to Repeated Requests for Early Narcotic Refills, Aug. 3, 2015, https://www.pharmacytimes.com/view/13-responses-to-repeated-requests-for-early-narcotic-refills ("Repeated requests for early refills may be a sign that a medication is being misused or diverted"); Commonwealth of Massachusetts Board Of Registration In Medicine, Prescribing Practices Policy And Guidelines, Policy 15-05, Oct. 8, 2015, https://www.mass.gov/files/documents/2016/10/wz/policy-15-05.pdf ("Physicians should be aware of the following criteria for problematic opioid use . . . . [t]he patient has a pattern of early refills").

[theirs]—no one thought to look there because they, and I stress the word "they," did not realize that the salesperson would have incidentally discussed opioids, in addition to Lidoderm, during a certain number of sales calls. *I suspect if a salesman has a product line, whether it's shoes, shirts, anything with a potential customer, oftentimes – and oftentimes, not oftentimes, I suspect all the time, the salesman were to sell other products*. I use the word "they," when I noted that last portion, because you indicate that they did not realize. Arnold & Porter is one party, but Endo is another. *And Endo would have been in a unique position to know that during the course of time their salespeople, when they made their call, whether on Lidoderm or anything else, detailed other products, including opioids*.

226. When pressed about Endo's failure to search these files for opioid-related call notes, Endo's discovery counsel, Redgrave conceded "your Honor, yes, a salesperson probably details more than one thing," but insisted that Endo was not "trying to hide documents, they weren't trying to, hey, let's never tell them about Lidoderm. They didn't think of it. Why didn't they think of it, your Honor? Memories. We see it with witnesses, we see it in our life. Memories fade. You're talking a decade ago."

227. On Wednesday, August 11, 2021, the NYS Plaintiffs discovered a document that Endo had produced on August 5, 2021, in an action brought by the City of San Francisco in the United States District Court for the Northern District of California (the "San Francisco Action").[11] The document, a November 11, 2009 email from Endo's then-Director of Clinical Development and Education, Linda Kitlinski to her husband, was a proverbial "smoking gun" (the "Kitlinski Email").

228. Kitlinski stated in her email, which was entitled "Note to LK's Personal File," that she was "taking this documentation step in the event I am 'let go' in what might appear to be a 'business-related head count reduction,' but which would actually be related to my 'conservative'

---

[11] The San Francisco Action is captioned *City and County of San Francisco v. Purdue Pharma LP, et al.*, No. 3:18-cv-07591 (N.D. Cal.).

interpretation of what is/is not appropriate when it comes to Endo's educational grant making practices." In the email, Kitlinski further stated that she was sending the email to her husband's personal account "lest the notes be purged from my Endo email account in the event I am discharged from the company."

229.    In the Kitlinski Email, Kitlinski wrote, "I have become increasingly concerned over the past months . . . there is among Endo's senior leadership (VP level on up) ever-increasing pressure to link independent education directly to Endo's Commercial business/branded products." Kitlinski further stated that

> The Clinical Affairs team tried to assure wherever possible that we did not 'cross the line' when it came to blurring the line between Medical/Promotional activities by focusing on therapeutics areas instead of specific products, but this became increasingly difficult as we entered 2010 planning . . . . Because the Clinical Affairs team and I raised concerns, there appeared to be recognition of the fact that it was unwise to 'leave email trails,' yet I believe this was more of a 'wink, wink, nod, nod' acknowledgement of the issues since the pressure to link to the brands continued.

* * *

> Because of my increasing concerns over the pressures to 'cross the line,' I raised these issues with my direct manager, Bert DeJong, as well as Nancy Santilli, the project leader, and at one point, even expressed a concern to one of our compliance staff. Not long thereafter, Bert DeJong called me into his office and told me that the Exec VP of R&D Ivan Gergel . . . regarded me as 'negative,' and that a member(s) of the Executive Team . . . had told Ivan that I was an 'impediment to the business.' Bert warned me that it was only through his intervention the previous July that I had not been 'let go' in the downsizing due to the perception that I was 'not support of the business,' and he cautioned me that I needed to stop 'playing policeman' so that the Commercial/Executive Team's perception of me changed."

230.    The belated disclosure of the Kitlinski Email was a bombshell for multiple reasons. For example, on January 15, 2019, Kitlinski had testified during a sworn deposition that Endo always abided by the "standards for independent education" and that Endo didn't internally view

grant funding of medical education as a marketing tool for its drugs. The Kitlinski Email flatly contradicted this testimony and strongly suggested that Kitlinski had perjured herself during her deposition.

231.    In addition, Endo had expressly pointed to Kitlinski's deposition testimony as evidence supporting Endo's contention that it always abided by applicable laws and regulations. Specifically, on June 30, 2021, during his opening statement, Endo's counsel stated that Endo always adhered to guidance from its federal regulators. Endo's counsel then provided evidence supporting this point by designating Kitlinski's deposition as part of the trial record. Kitlinski's testimony was published to the jury on August 3, 2021, *two days* before Endo produced the Kitlinski email in the San Francisco Action. Endo did not provide any notice to the NYS Plaintiffs of the Kitlinski email, plainly because they hoped the plaintiffs would be too distracted with trial preparation to notice it.

232.    During trial proceedings on August 11, 2021, the Suffolk Court gave Endo's discovery counsel, Redgrave, the opportunity to investigate why the Kitlinski email had not been properly disclosed to the NYS Plaintiffs. Redgrave stated that he was "pretty sure" that, generally, materials produced in other opioid litigations work their way through the MDL process and eventually are disclosed in some manner to the NYS Plaintiff.

233.    When the Suffolk Court noted that Endo had provided the plaintiffs in the San Francisco Action with notice of productions "separate and apart" from the MDL process, Redgrave responded—inaccurately—that a cover letter had been generated prior to August 11 notifying the NYS Plaintiffs of the production that included the Kitlinski Email. Redgrave also conceded that, had the Kitlinski Personal Memo been disclosed to the NYS Plaintiffs, "it would have been certainly the object or the basis for another examination[.]" When the Suffolk Court pressed Redgrave concerning the

prejudice caused to Plaintiffs by Endo and its counsel's conduct concerning the Kitlinski Email, Redgrave stated, "It is what it is."

234.    On August 12, 2021, in the Chicago Action, however, Redgrave represented that the Kitlinski Email had been designated as privileged in June 2021 by a "first-level reviewer," and then quickly de-designated. Then, five days later, Redgrave reported to Chicago Plaintiffs (but *not* the NYS Plaintiffs) that the Kitlinski Email originally had been improperly "designated nonresponsive" by a "contract reviewer" *as part of the OAG Opana ER Investigation in 2014*.

235.    Endo eventually admitted sworn affidavits and statements to the Suffolk Court that the Kitlinski Email had been reviewed in 2014 as part of the OAG Opana ER Investigation. Shockingly, Endo further admitted that it had not produced the Kitlinski Email in connection with that investigation even though the email detailed improper marketing of Endo Opioids. Endo repeated its claim that a contract attorney had inadvertently classified the email as "not responsive" to the Suffolk Court. Although this justification is barely more believable than Endo claiming that an attorney's dog ate the email, it confirmed either Endo had intentionally withheld the email or that its statement that it had searched for all relevant documents was knowingly false, since even a rudimentary search would have revealed the email.

236.    On Friday, August 13, 2021, the NYS Plaintiffs discovered additional evidence demonstrating how Endo had used CME materials to illicitly and improperly promote opioids. On August 23, 2007, Kitlinski had sent an email questioning a new review process for Continuing Medical Education materials, including "why would a CME brochure have to be pre-approved by Marketing? This would be against guidelines." The email had been produced by Endo to the Florida Attorney General's counsel on July 23, 2021, and then slipped in the Ohio MDL production database on July 29, 2021. The NYS Plaintiffs were not alerted to the email, even as Kitlinksi's

deposition testimony was read into the record on August 3, 2021 in support of Endo's claim that the Company *always* followed the applicable laws, regulations, and guidelines.

237.    Then, on Monday, August 16, 2021, the NYS Plaintiffs discovered *another* document involving Kitlinski that had been added to the Ohio MDL production without notice to the NYS Plaintiffs. The document had produced to the Alabama Attorney General's counsel on May 28, 2021, and was slipped into the Ohio MDL production on June 1, 2021. The document was a January 20, 2011 email from Ms. Kitlinski to executives of other opioid makers, in which she admitted that the Pain Care Forum, an industry front group in which she participated on behalf of Endo, was not independent from the companies running it. Kitlinski also forwarded a request to study how marketing can be used to change physician behavior, specifically regarding opioid prescribing. This email not only provided evidence that directly contradicted Kitlinski's deposition testimony and demonstrated how Endo and other opioid manufacturers had used front groups and marketing to induce opioid prescriptions, but the email also demonstrated that Kitlinski had given in to Endo, decided to stop "playing policeman" and had started "playing ball."

238.    Endo had begun surreptitiously producing documents to plaintiffs in other opioid-related actions without notice to the NYS Plaintiffs shortly after the Default Judgment in the Staubus Action. In all, from April 21, two weeks after the Default Judgment, to July 31, 2021, Endo produced over 272,000 documents from the files of 322 different custodians. These productions of massive amounts of relevant documents showed that although Endo had represented to the NYS Plaintiffs that it would conduct a reasonable search of all pertinent customer relationship management systems *in July 2019*, it had not conducted any such search at that time and did not attempt any such search until after the Tennessee Default. These productions continued after the NYS Plaintiffs alerted the Suffolk Court to Endo's misconduct on July 27,

2021. In fact, in August 2021 alone, the NYS Plaintiffs received and processed approximately 55,000 new documents, consisting of over 290,000 pages and other unpaginated data.

239.    On August 25, 2021, the Suffolk Court held a hearing on the motions for contempt and orders to show cause the NYS Plaintiffs had filed against Endo that month. The Suffolk Court also found that Endo had failed to comply with the August 3, 2021 Order to Show Cause, and that "the deadline came and went" for Endo to comply with that order by providing the NYS Plaintiffs with a "list identifying the bates number and the dates, persons, entities and repositories establishing the chain of custody of each responsive document produced by Endo or any such other party after the close of discovery in" the New York State Actions.

240.    The Suffolk Court reserved judgment on whether to sanction, hold in contempt, or issue a default judgment against Endo, and instead appointed a referee (the "New York Referee") to "review and report . . . findings, conclusions and recommendations to the court statements made in connection with the subject matter" of the motions and orders to show cause. Nevertheless, the Suffolk Court made it clear that it was likely to issue severe sanctions against Endo for its campaign to obstruct the New York State Actions, including a default judgment. In fact, when the NYS Plaintiffs' counsel objected to the appointment of the referee, the Court responded, "It should be abundantly clear that *the proverbial sword of Damocles is hanging over the head of Endo*."

241.    Before the New York Referee could complete his review, and to avoid being sanctioned or defaulted by the Suffolk Court, on September 9, 2021, Endo entered into a $50 million settlement to resolve the claims against it in the New York State Actions.

242.    On October 15, 2021, several weeks after the settlement, the New York Referee's report was publicly released (the "Referee Report"). The Referee Report expressly stated that the New York Referee had not made any conclusion about Defendant Endo's conduct in the New York

State Actions solely because Endo had settled those actions, *i.e.*, not for lack of evidence of misconduct by Endo. The Referee Report did confirm, however, the existence of a campaign to obstruct the New York State Actions that prejudiced the NYS Plaintiffs.

243.    For example, the Referee Report stated that "APKS, as counsel for the same defendant Endo/Par in Tennessee, as they are in this Court, they should have known the full extent of the contents of those documents for which they were criticized and sanctioned in Tennessee over a year ago," *i.e.*, in May 2020.

244.    The Referee Report also concluded that APKS likely engaged in the discovery misconduct *intentionally*, finding that "APKS thereafter disclosed those same documents to the federal court in San Francisco, and slipped those voluminous documents into the MDL, while failing to give this Court notice of their existence, *perhaps in the hope that the plaintiffs' counsel was preoccupied with the ongoing trial to notice them*."

245.    The Referee Report further concluded that "[p]lacing those documents in the federal MDL document database, while accessible to the plaintiffs' counsel, did not give them or the Court timely notice of their existence for possible use in this trial." Accordingly, "APKS was deficient in not timely disclosing those documents" and thus "all of the plaintiffs were prejudiced by this delay and accordingly, the Court should fashion an equitable remedy for this failure to timely disclose those documents."

246.    The Referee Report also concluded that there was no benign explanation for APKS's misconduct on behalf of Endo. Specifically, the Referee Report found that "while APKS as counsel for Endo/Par have submitted through their counsel explanations for the delays in submitting the ordered discovery in a timely manner due to misfiling in the various data retrieval

systems employed by them directly or through a contractor *such explanations are insufficient and inconsistent with the facts concerning the timing and substance of those disclosures*."

247.    The New York Referee recommended that the Suffolk Court award costs, including attorney fees, to the plaintiffs in connection with their multiple orders to show cause and for contempt and stated that it was in the Suffolk Court's discretion to award monetary sanctions against APKS. The New York Referee also recommended against barring APKS from representing Endo, barring a particular partner from representing Endo, or referring the partner for discipline.

248.    Shortly after the release of the Referee Report, Endo replaced APKS with Skadden Arps Slate Meagher & Flom LLP as its counsel in the opioid-related actions.

       *iii.*       <u>*The Chicago Actions*</u>

249.    Endo's coordinated campaign to obstruct litigation of the merits of the opioid-related actions also involved an action brought by the City of Chicago (the "Chicago Action").[12]

250.    In March 2013, the City of Chicago ("Chicago") served a Civil Investigative Demand ("Chicago CID") on Endo in connection with sales of Endo's opioids. Among other things, the Chicago CID demanded all "notes" and records of the sales calls made by Endo's salesforce since January 1, 2006. Two months later, in May 2013, Chicago served a revised Chicago CID in the form of an investigative subpoena that sought all records of Endo's sales calls. Endo produced documents in response to the Chicago CID and investigative subpoena.

251.    In June 2014, Chicago sued Endo initiated the Chicago Action in the Northern District of Illinois alleging that Endo and other opioid manufacturers had fraudulently marketed its opioids through detailing, phony CMEs, KOLs, and misleading marketing materials. Chicago expressly alleged, among other things, that Endo had influenced and corrupted the process for

---

[12] The Chicago Action is captioned *City of Chicago v. Purdue Pharma*, No. 14-cv-04361 (N.D. Ill.).

obtaining educational and scientific grants as part of its campaign to create and disseminate misleading, opioid messaging.

252.    Chicago sought the Company's call notes for its opioids in discovery. The call notes were important to the Chicago Plaintiffs because they were contemporaneous records of sales representatives' interactions prepared for their supervisors and to remind sales representatives of prior communications and follow up.

253.    APKS partner Joshua Davis, who, as alleged above, had also represented Endo in the Lidoderm investigation and OAG Opana ER Investigation, and was representing Endo in the Staubus Action and New York State Actions, was the lead lawyer representing Endo on discovery in the Chicago Action. In June 2017, Davis, on behalf of Endo, proposed custodians and search terms for discovery. Linda Kitlinski, Endo's former Director of Clinical Development and Education, and numerous other national-level Endo executives and managers were among the custodians. In negotiating custodians and search terms, Endo and APKS *never* advised the Chicago Plaintiffs that custodial files that purportedly had been searched by Endo in connection with the Chicago CID and investigative subpoena would not be searched again.

254.    In October 2017, Endo produced call notes to the Chicago Plaintiffs. The call notes only covered sales calls starting in 2008, even though Endo sales representatives had been detailing opioids with healthcare practitioners for nearly a decade before that. In addition, the call notes Endo produced in 2017 lacked any information concerning the actual messages Endo's salespeople delivered to healthcare practitioners. The "Messages" and "Comments" fields in the data sheet Endo produced were blank

255.    On November 16, 2017, the court in the Chicago Action (the "Chicago Court") stayed discovery pending decision on transfer by the Judicial Panel on Multidistrict Litigation to

then-proposed Ohio MDL. The case was formally transferred to the Ohio MDL on December 20, 2017. Following transfer, MDL the court (the "MDL Court") authorized discovery in a set of cases designated as the "Track One" litigation. Certain discovery in the Ohio MDL was to be conducted at a national level, while discovery was limited to the "Track One" litigation, which included the Chicago Plaintiffs.

256.    As part of the "Track One" proceedings, the Chicago Plaintiffs again sought Endo's call notes, as well as the data, documents, and information evidencing Endo's branded and unbranded promotion of Opioids (including materials distributed, medical education efforts, speaker programs, and work with professional associations and patient groups that served as front groups). The Chicago Plaintiffs also sought data and records evidencing Endo's awareness of, and efforts to monitor for, diversion, abuse, and misuse of opioids, e.g., Reports of Suspected Diversion.

257.    Pursuant to discovery orders entered by the MDL Court, the Chicago Plaintiffs (and other Track One plaintiffs) engaged in discovery discussions with Endo in the Spring and Summer of 2018. One specific purpose of that process was to identify "noncustodial data sources containing potentially relevant ESI," or "electronically stored information. Endo was expressly directed by the Chicago Plaintiffs to review document productions in prior litigation and government investigations involving the marketing or distribution of opioids so that relevant materials collected in the past could be re-produced in the MDL.

258.    In 2018 and 2019, the Chicago Plaintiffs repeatedly and expressly asked Endo to search prior productions, e-discovery platforms, and archives for responsive materials.   In particular, the MDL Plaintiffs asked Endo to look at materials that were collected, reviewed, and/or produced in connect with the Lidoderm Investigation. The Chicago Plaintiffs specifically pointed

to the Lidoderm Investigation (and related *qui tam* actions) because the qui tam actions contained allegations concerning Opana ER *and* Lidoderm; Lidoderm Investigations involved the same salespeople who also were promoting Endo Opioids in the same sales calls as those used to promote Lidoderm; it is typical in "off-label promotion" disputes to collect and review call notes to review what sales representatives communicated to healthcare practitioners, and Endo had collected, reviewed, and produced materials in the Lidoderm Investigations in 2008 or 2009, when the Company would have been more likely to have complete data from databases, applications, and platforms it was still using.

259.    As described above, Endo's lead counsel in the Chicago Action, APKS, represented Endo in the Lidoderm Investigation, and APKS partner Joshua Davis, who led discovery in the Chicago Action, *represented Endo in the Lidoderm Investigation and related litigation*.

260.    In 2018 and 2019, Endo, APKS, and Davis himself categorically denied that there were *any* call notes concerning Opana or Endo Opioids in files concerning the Lidoderm Investigation. In addition, Endo, APKS, and Davis confirmed that the Chicago Plaintiffs had "everything" Endo had with respect to opioid sales activities. Finally, on May 10, 2019, Endo specifically certified pursuant to an order from the MDL Special Master that it had completed its production of multiple data categories, including "call notes." These representations were *false*. Endo was withholding call notes stored in connection with the Lidoderm Investigation that expressly referred to Opana and Endo Opioids.

261.    In March 2021, after it had been held in contempt in the Staubus Action and just before the Staubus Court issued the Default Judgment, Endo began to disclose to the Chicago Plaintiffs that prior discovery representations were false. As the Chicago Plaintiffs were preparing to depose a former Endo "Medical Science Liaison," the Company advised it had located new data

90

concerning the activities of Endo's Medical Science Liaisons. Endo said the data had been located in Endo's commercial data warehouse—a data repository Endo had *never previously disclosed*.

262.    After a series of meet and confers, the parties agreed that Endo would provide a sworn written statement responding to the Chicago Plaintiffs' questions about the commercial data warehouse, and Endo provided a sworn written statement from an outside consultant, Brandon Leatha, dated July 8, 2021. The statement confirmed that the commercial data warehouse was created by Endo in 2014 and contains data as far back as 2008. Leatha averred commercial data warehouse "was created to provide a centralized repository of interactions with HCPs [healthcare professionals]." Although a central issue in the Chicago Action was Endo's sales calls, meetings, and communications with HCPs, Endo did not even disclose the existence of the CDW until March 2021.

263.    On June 15, 2021, Endo advised the Chicago Plaintiffs that they had identified "opioid product Call Data from 2002 to 2007" obtained from the Lidoderm Investigation, which the Chicago Plaintiffs had repeatedly asked Endo to search. This data included *1.5 million rows of call notes* from 2002-2007. Endo had categorically (and falsely) denied that production in the Lidoderm Investigation and related litigations contained call notes, or any responsive documents, concerning Endo Opioids. These early call notes were essential to the Chicago Action (as well as the New York State Actions alleged *supra* and the San Francisco Action alleged *infra*) because they recorded in "free text" what Endo's salespeople were seeing and saying in the doctors' offices.

264.    In early July 2021, Endo produced more call notes data to the Chicago Plaintiffs, this time for the period of 2008 to 2015. In addition, Endo confessed that the call notes it had produced earlier were missing all of the "message" data stored in the commercial data warehouse. This meant that the call notes Endo had produced—and sworn were complete—in 2017 and 2018

only described which sales representatives saw which healthcare practitioners on which days, and left out the critical records of what those sales representatives actually said to those healthcare practitioners to promote Endo Opioids. The Chicago Action (and the New York State actions alleged *supra*) centered on the misleading messages Endo's sales representatives communicated to healthcare professionals. Although Endo had access to millions of lines of call notes for the period of 2002 to 2007 and a commercial data warehouse storing detailed call note entries for 2008 onward, it either failed to search for those documents or search for the documents and withheld them.

265.    Later in July 2021, Endo produced still more sets of call notes data to the Chicago Plaintiffs. One set was for the period of 2008 to 2012 and was found on one of Endo's own database servers using an Endo business record called a "Commercial Data Archive Current State Assessment." A second set came from files concerning the Lidoderm Investigation.

266.    In late July 2021, Endo also produced a data set to the Chicago Plaintiffs concerning "Materials Dropped" for the 2013 to 2015 period. "Materials Dropped" refers to the promotional materials Endo's salespeople left with doctors' offices.

267.    In addition to the millions of lines of new data productions, in July 2021 Endo produced tens of thousands of pages of documents from the custodial files of witnesses whose files Endo and APKS were required to have searched in 2018 and 2019 in the Chicago Action. Many of these witnesses had been deposed in 2019, but Endo had withheld or failed to search for the documents and allowed the depositions to proceed. For example, as described above, the productions included the Kitlinski Email, which directly contradicted Kitlinski's deposition testimony. These actions constituted yet another example of Endo seeking to capitalize on its misconduct and prevent the opioid-related actions from being litigated on the merits.

268.     In an August 24, 2021 letter to the Chicago Plaintiffs, Endo asserted that it had collected Kitlinski's custodial file in 2014 and reviewed it in connection with the OAG Opana ER Investigation. The letter further asserted that Endo had reviewed Kitlinski's custodial file in 2014 for "issues" relevant to the Chicago Action, three years before the Chicago Plaintiffs served their document requests. As described above, Endo had proposed Kitlinski as a custodian to the Chicago Plaintiffs in 2017 and the Ohio MDL Plaintiffs generally in 2018. While Endo never disclosed that it would *only* search documents marked as responsive to the OAG Opana ER Investigation, the August 24, 2021, letter effectively asserts that any portion of Kitlinksi's custodial file that was not identified in 2014 as "relevant" was never looked at again. Accordingly, Endo and APKS withheld for years files concerning Kitlinski—and likely many other Endo employees, directly relevant to the Chicago Action.

269.     Chicago's counsel met and conferred with Redgrave and APKS on August 5, 2021. After the parties failed to reach an agreement, the Chicago Plaintiffs moved to compel full disclosure from Endo and APKS with respect to the document/data collection and production process, including privilege logging, as well as depositions of the individual lawyers involved. The Chicago Plaintiffs further demanded that Endo consent to, and pay for, experts to conduct a forensic examination of Endo's systems and to examine the commercial data warehouse. Endo objected that the Chicago Plaintiffs were improperly seeking "discovery on discovery," and moved for the appointment of a special master.

270.     On September 8, 2021, a magistrate overseeing the Chicago Action appointed a special master. The magistrate further held that discovery on discovery—or more specifically, discovery on Endo's compliance with its discovery obligations—was warranted, but denied the Chicago Plaintiffs' motion without prejudice as premature.

**J.    Defendants Minimized Endo's Misconduct, Downplayed the Scope of the Company's Liability As a Result of its Role in the Opioid Crisis, and Concealed the Company's Campaign to Obstruct the Opioid-Related Actions**

271.    Rather than acknowledge the truth—that Endo had engaged in a litany of deceptive marketing practices and that the Company potentially faced billions in liability, including for insurance fraud—Defendants instead misleadingly downplayed the allegations and failed to disclose that Endo had (i) engaged in deceptive advertising in promoting its opioids; (ii) trained their sales representatives specifically to target healthcare professionals most likely to prescribe the most opioids without regardless of whether those prescriptions were legitimate; (iii) failed to implement a meaningful or effective system to identify and report opioid orders that had the hallmarks the government associated with drug diversion (*i.e.*, attempts to obtain or use prescription medicines illegally); and (iv) promoted one of its most profitable opioids, Opana ER, as safe and resistant to tampering when the Company knew it was ***impossible*** to prevent abusers from liquifying and injecting the drug.

272.    In addition, throughout the Class Period, Defendants assured investors that they would vigorously contest the merits of the opioid-related actions, that allegations of wrongdoing by Endo were "patently offensive," and that they were "proud to discuss their business practices." As litigation of the opioid-related actions began in earnest, however, rather than vigorously contest the merits of the opioid-related actions, Defendants embarked on a widespread and pervasive campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, not "patently offensive," and otherwise prevent litigation of the merits of the opioid-related actions.

273.    For example, at the start of the Class Period, on August 8, 2017, Endo disclosed in its quarterly report on Form 10-Q for the second quarter of 2017 ("2017 10-Q") that at least 13 different actions had been filed by state and local governments against Endo in connection with

the Company's sales and marketing practices for opioids. The 2017 10-Q gave no hint of the Company's misdeeds in marketing and selling Endo Opioids or the tsunami of liability facing the Company and downplayed the allegations by simply stating unequivocally that "*[w]e intend to contest the lawsuits identified above vigorously*."

274.    This pattern of false and misleading statements to investors that downplayed the allegations in opioid-related actions against Endo, refused to acknowledge Endo's misconduct, and did not fully convey the extent of liability facing the Company for its sales and marketing of Endo Opioids continued throughout the Class Period. For example, on November 6, 2017, after the state of Kentucky announced that it had filed a lawsuit to "seek to hold Endo responsible for illegally building a market for the long-term use of opioids in the state as part of an effort to boost corporate profits," Defendant Maletta responded to *Reuters*, which was covering the lawsuit, that the accusations were "***patently offensive***." Similarly, in December 2018, by which point over ***1,500*** cases had been filed by states, counties, municipalities, hospitals and individuals, Defendant Maletta told *The Philadelphia Inquirer*, which was covering opioid litigation involving Endo, that "***[o]ur view is that we've done everything properly***," he added. "***We deny the allegations in the complaints and we're proud to talk about our business practices***."

275.    In addition, while these statements communicated to investors that Defendants were contesting the opioid-related actions using legitimate means so that they could be litigated on their merits, they failed to disclose that Endo was concurrently engaging in a secret campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

276.    The extent of Endo's exposure to liability was a chief concern for investors throughout the Class Period.  For example, on November 9, 2017, an analyst for Mizuho Securities USA asked Defendants Campanelli and Coleman directly, "The opioid litigation *tends to be pretty scary to people*, and quite frankly, I just wanted to see if we can just get our arms around what is it that the range of risks is. And so is it just off-label marketing on your branded opioid products such as OPANA and PERCOCET over a particular period of time? Is it something else? Is it something more punitive or criminal?" Rather than disclose the truth, however, Defendants declined to comment.

277.    Similarly, on May 21, 2018, Defendant Campanelli participated in the "UBS Global Healthcare Conference." During a question-and-answer session, an attendee asked Defendant Campanelli to "talk about the various stages of litigation and any upcoming catalyst that may come out of those?" Rather than disclose the truth about the Company's misconduct with regard to marketing Endo Opioids and the liability Endo faced, including for insurance fraud, Defendant Campanelli stated that he did not believe that the litigation, which sought to hold Endo accountable for its role in creating and furthering the opioid epidemic, was an effective way to respond to the opioid epidemic. Specifically, Defendant Campanelli said,

> The one that most people are focused on is on opioids, as you would expect. And I would say we are, from the magnitude of a societal issue, we really are at a very early stage with respect to potential resolution. We've gotten a lot of questions over this morning, meeting some one on ones in terms how we kind of view that . . . . So it's early. It's a little bit of staying in tune and having belief that all parties can settle the societal issue because *I don't believe that litigation is a means to dealing with the opioid issue in the United States*. I mean, this is a large, seriously challenging issue for a lot of people in this great country and we really just need to get our hands wrapped around it from a -- from really, in my opinion, a societal point of view.

Defendant Campanelli's self-serving description of the opioid litigation was plainly designed to downplay the extent of Endo's wrongdoing to attendees, but also to suggest that the actions, which sought to hold Endo and its executives accountable for their role in the opioid crisis were actually *preventing* recovery from the opioid epidemic and were actively obstructing litigation of the opioid-related actions.

278.    Similarly, on February 28, 2019, on an earnings call to report the Endo's earnings for the fourth quarter and full year 2018, another analyst asked Defendants Campanelli and Coleman, another analyst asked, "One question I have is ***we got a lot of thoughts on people on this opioid litigation trial that's coming up***. I don't know if the date has been changed, but last we checked, it was September 3. So just curious, what are your expectations here? And ***how can you help us think about the potential liability to you***?" Defendant Campanelli again downplayed the allegations and omitted the Company's exposure to insurance fraud claims and responded, "[W]e're not going to be able to quantify. We're—***that's something that we're not going to do***. We always like to say that we've had discussions. And ***if there's a way to settle, that's always something that we would consider***. But at this point in time, ***we need to be prepared to go to trial if we are a part of track 1***."

279.    Defendant Campanelli's reference to a potential settlement did not give investors any sense of the merit to the claims asserted by plaintiffs in the opioid actions, or the scope of Endo's wrongdoing, because Endo's annual report on Form 10-K, which was filed with the SEC on the same day and signed by Defendants Campanelli and Coleman, advised investors that the Company "***may also voluntarily settle cases even if we believe that we have meritorious defenses because of the significant legal and other costs that may be required to defend such actions***." Read in conjunction with that warning, Defendant Campanelli's statements to investors

downplayed the opioid-related actions by suggesting that the Company would consider settling the plaintiffs' claims in those actions simply to avoid costly litigation. In addition, Defendant Campanelli's statement that the Company needed to be prepared to go to trial suggested that Endo was legitimately contesting the opioid-related actions, not engaging in a secret campaign to obstruct that litigation and conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

280.    Even when the Company did begin to advise investors, mid-way through the Class Period, that opioid-related actions could affect the Company's revenues, it attributed that litigation to negative publicity and overzealous journalists, not Endo's own misconduct. Endo's annual report on Form 10-K for the year 2017, which was filed on February 27, 2018, for example, included a "Risk Factor" advising investors that, "*unfavorable media coverage* of opioid pharmaceuticals could negatively affect our business, financial condition and results of operations. In recent years, opioid drug abuse has received *a high degree of media coverage* . . . . *such negative publicity* could have an adverse effect on the potential size of the market for our drug candidates." These and other statements to investors by Defendants misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, utterly failed to apprise investors of the Company's exposure to claims for insurance fraud in New York and elsewhere and concealed Endo's campaign to obstruct the opioid-related actions and conceal Endo's wrongdoing.

281.    In addition, as opioid-related actions continued to be filed against Endo, the Company's Board released an "Independent Directors Report" on November 30, 2018 ("Directors' Report"), designed to assure patients, healthcare providers, insurers and investors that the

Company was taking opioid-related actions seriously and had always had systems in place to identify problems with Endo Opioids.

282.    The Directors' Report assured investors that the Board was "oversee[ing] the management of risks associated with the evolving opioid litigation," and that, as part of that oversight, Defendant Maletta, as CLO, "provide[d] the Board with a comprehensive report of all material litigation matters affecting Endo on at least a quarterly basis" and separately engage[d] in regular discussions with individual Board members on litigation matters." In addition, the Directors' Report, emphasized that Defendant Campanelli, as CEO, held "regular teleconferences with individual Board members and a teleconference with the full Board on at least a monthly basis" where he discussed "the risks associated with the evolving opioid litigation."

283.    Finally, Directors' Report admitted that the Company had always known about adverse events associated with Opana ER and other Endo Opioids because, "[w]hen the Company promoted its opioid medications to [healthcare providers], it also monitored a number of secondary surveillance databases (including the NAVIPPRO and RADARS databases) and the FDA Adverse Reporting System for signs of potential abuse and/or misuse of certain branded opioid products."

284.    Defendant Campanelli was rewarded for—personally and on Endo's behalf—downplaying the allegations against Endo in the opioid-related actions and downplaying how the Company had fraudulently promoted Endo Opioids, trained its sales staff to push Endo Opioids on healthcare providers who were at high risk of writing fraudulent prescriptions or were not experienced in treating chronic paid, and failed to implement a meaningful system for identifying potentially fraudulent prescriptions. In May 2019, journalists covering the pharmaceutical industry reported that Campanelli had received a special $5 million bonus from Endo's Board, which had awarded the bonus in 2017, but actually granted the bonus in 2018. The bonus had struck industry

observers as odd because "Endo's stock price hasn't at all recovered from a sharp decline thanks to generics price erosion and a gloomy outlook for the company's business," and "Endo's total revenues dropped 15% [in 2018] to $2.95 billion." The potential for the special bonus clearly gave Defendant Campanelli the motivation to downplay the opioid litigation against Endo to investors, obfuscate Endo's wrongdoing, and conceal Endo's potentially enormous liability for insurance fraud, as the Board would not have granted him that bonus had the Company's stock price not been inflated by Defendants' misrepresentations.

285.    The truth about the Company's misconduct and its liability for that misconduct slowly leaked into the market throughout the Class Period, as over *2,500* cases detailing the Company's misconduct were filed during the Class Period. They were also belied by Endo's suddenly sharp increase in disclosure of fatalities regarding opioids. On April 10, 2019, the Philadelphia Inquirer reported that from "Endo suddenly began to tell the FDA about a tidal wave of fatalities associated with Opana, and painkillers made by other companies. From November 2017 through August 2018, Endo reported 20,115 deaths to the FDA."

286.    Then, on September 10, 2019, the Governor of New York, Andrew Cuomo, announced that the New York State Department of Financial Services ("DFS") was "taking action" against, among others, the opioid manufacturers and distributors "to secure $2 billion for New York consumers who have shouldered the cost of the ongoing opioid epidemic in the form of higher insurance premiums." This announcement thus put Defendants on notice that DFS was going to investigate the Company's role in the opioid epidemic, in particular its training of sales representatives to market Endo Opioids, including Opana ER, to healthcare professionals and insurers. The announcement also confirmed for Defendants that Endo faced billions in liability for insurance fraud since the announcement stated that DFS has "clear statutory authority to impose

fines of up to *$5,000 per offense in addition to the amount of the fraudulent claim*." Accordingly, all the Individual Defendants had to do to understand the scope of the liability the Company faced was to review records to which they had access to identify representations made to private insurance providers and the number of prescriptions filled by private insurers.

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

287.    Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations and prospects. Specifically, Defendants failed to disclose that Endo had (i) engaged in deceptive advertising in promoting its opioids; (ii) trained their sales representatives specifically to target healthcare professionals most likely to prescribe the most opioids without regardless of whether those prescriptions were legitimate; (iii) failed to implement a meaningful or effective system to identify and report opioid orders that had the hallmarks the government associated with drug diversion (*i.e.*, attempts to obtain or use prescription medicines illegally); and (iv) promoted one of its most profitable opioids, Opana ER, as safe and resistant to tampering when the Company knew it was *impossible* to prevent abusers from liquifying and injecting the drugs; and (v) that, as a result, the Company's public statements were materially false and misleading at all relevant times.

### A.    2017 Misstatements

288.    The Class Period begins on August 8, 2017, when the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2017 (the "2Q17 10-Q"). The 2Q17 10-Q was signed by Defendants Campanelli and Coleman.

289.    In a section entitled "Opioid-Related Litigations, Subpoenas and Document Requests," the 2Q17 10-Q listed at least 13 specific actions pending nationwide against Endo and its subsidiaries concerning the Company's marketing and sales practices with respect to opioid products. At the end of the list, the 2Q17 10-Q stated unequivocally that "*[w]e intend to contest the lawsuits identified above vigorously*." Elsewhere in the 2Q17 10-Q, however, with regard to other litigation that did ***not*** concern Endo's opioid products, Endo took pains to advise investors that "[i]n certain of these matters, ***the Company believes that a loss is probable*** and we have incorporated our best estimate of this loss into our reserve for loss contingencies." The 2017 10-Q, however, did not use this qualification in advising investors of the opioid-related actions facing the Company.

290.    Defendants' statements misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made because:

- Defendants knew that Endo had engaged in an over decade-long campaign to misrepresent the safety, efficacy and addictiveness of Endo Opioids by using sales representatives, KOLs, Front Groups, [CMEs], books, patient materials and print and web-advertising based to convince patients, healthcare providers, and insurers that the risks of opioid addiction were insignificant, patients that exhibited signs of addiction were actually suffering from "pseudoaddiction," which could be effectively treated, and patients most likely to become addicted could be identified and managed;

- Defendants knew that Endo had trained its sales representatives specifically to target healthcare professionals most likely to prescribe the most opioids without regardless of whether those prescriptions were legitimate;

- Defendants knew that Endo and/or its subsidiaries had failed to implement a meaningful or effective system to identify and report opioid orders that had the hallmarks the government associated with drug diversion (*i.e.*, attempts to obtain or use prescription medicines illegally), as required by the CSA;

- Defendants knew that Endo had engaged in a years-long campaign to specifically misrepresent the safety and efficacy of Opana ER that included (i) falsely portraying Opana ER as "crush-resistant," when it was not, (ii) misrepresenting that Endo had evidence to support its contention that Reformulated Opana ER was less susceptible to abuse than the original Opana ER, when Endo knew it was *impossible* to prevent opioid abusers from liquifying and injecting Opana ER intravenously.

- Defendants knew that the Company had directed sales representatives to capitalize on addictive behavior in patients, like repeatedly calling early for prescription refills, by citing that behavior as reasons to for physicians to increase prescriptions.

- Defendants knew that the Company's "call notes" showed sales representatives continuing to detail healthcare practitioners who were operating offices that bore the tell-tale signs of being pill mills.

- Defendants knew that although the Company faced potentially billions in liability in connection with opioid-related actions, its precarious financial position as a result of its declining revenues and increased leverage meant that the Company lacked sufficient capital to address liabilities arising from opioid-related actions.

291.    In addition, Defendants' statements were misleading because they failed to disclose that Endo was concurrently engaging in a secret campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

292.    Additionally, the 2Q17 10-Q contained generic, boilerplate representations regarding Endo's supposed view of the risks associated with these opioid-related legal proceedings and investigations. For example, the 2Q 2017 10-Q advised investors that:

> We and certain of our subsidiaries are involved in various claims, legal proceedings, internal and governmental investigations (collectively, proceedings) that arise from time to time in the ordinary course of our business, including, among others, those relating to product liability, intellectual property, regulatory compliance and commercial matters. While we cannot predict the outcome of these proceedings and we intend to defend vigorously our position, an adverse outcome in any of these proceedings could have a material adverse effect on our current and future financial position, results of operations and cash flows. Matters that are not being disclosed herein are, in the opinion of our management,

103

> immaterial both individually and in the aggregate with respect to our financial position, results of operations and cash flows. If and when such matters, in the opinion of our management, become material either individually or in the aggregate, we will disclose such matters.

The 2Q 2017 10-Q advised investors that:

> Investigations and lawsuits similar to the foregoing matters may be brought by others. We are unable to predict the outcome of these investigations or litigations, which may involve additional requests for information. We are also unable to predict the ultimate legal and financial liability, if any, and at this time cannot reasonably estimate the possible loss or range of loss for these investigations or litigations, if any, but will explore all options as appropriate in our best interests.

293.     The warnings in paragraph 292 above were generic "catch-all" provisions that were not tailored to Endo's actual known risks with respect to the significant potential for further opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud, and were materially false or misleading for the reasons alleged above at paragraph 290. These warnings were also misleading because they failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

294.     The 2Q17 10-Q also attributed, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than to Defendants' own misconduct. For example, in a section entitled "Risk Factors," the 2Q17 10-Q asserted that, "in the age of social media, plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients for litigation, including using judgments against other pharmaceutical companies in a product liability or mass tort litigation as an advertising tool"; that, "[t]hus, we could expect that any significant product liability or mass tort in which

[Defendants] are a defendant will have a larger number of plaintiffs than such actions have seen historically and [Defendants] could expect to see an increase in number of cases filed against [them] because of the increasing use of widespread and media-varied advertising."

295.    The statements alleged above in paragraph 294 characterizing Endo's litigation risk as merely a reflection of the fact that "plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients for litigation, including using judgments against other pharmaceutical companies in a product liability or mass tort litigation as an advertising tool," rather than the Company's misconduct, communicated to or gave investors the impression that the claims in opioid-related actions were a result of greater advertising capabilities of plaintiffs' lawyers rather than Endo's significant misconduct in promoting Endo Opioids, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced billions in liability in New York (and elsewhere). The statements were false and misleading when made for the reasons alleged above at paragraph 290. These warnings were also misleading because they failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

296.    Additionally, the 2Q17 10-Q contained generic, boilerplate representations regarding Endo's supposed view of its liquidity risks. The 2Q17 10-Q disclosed that:

> We expect cash generated from operations together with our cash, cash equivalents, restricted cash and the revolving credit facilities to be sufficient to cover cash needs for working capital and general corporate purposes, contingent liabilities, payment of contractual obligations, principal and interest payments on our indebtedness, capital expenditures, ordinary share repurchases and any regulatory

and/or sales milestones that may become due over the next year. However, on a longer term basis, we may not be able to accurately predict the effect of certain developments on the rate of sales growth, such as the degree of market acceptance, patent protection and exclusivity of our products, the impact of competition, the effectiveness of our sales and marketing efforts and the outcome of our current efforts to develop, receive approval for and successfully launch our product candidates. Additionally, we may not be successful in implementing, or may face unexpected changes or expenses in connection with our strategic direction, including the potential for opportunistic corporate development transactions. Any of the above could adversely affect our future cash flows.

297. The warning in paragraph 296 above was a generic "catch-all" provision that was not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud. The statements were materially false or misleading. Defendants knew that although the Company faced potentially billions in liability in connection with opioid-related actions, its precarious financial position as a result of its declining revenues and increased leverage meant that the Company lacked sufficient capital to address liabilities arising from opioid-related actions.

298. Appended as exhibits to the 2Q17 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Campanelli and Coleman certified that "[t]he [2Q17 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [2Q17 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the 2Q17 10-Q, as set forth in paragraphs 289–297 above, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, did not advise investors that the Company faced liability in opioid-related actions due to its misconduct, as well as billions in liability in New York for

insurance fraud, failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

299.    On August 31, 2017, The Philadelphia Inquirer reported that Pennsylvania municipality Bensalem Township had sued opioid manufacturers, including Endo, to force the companies to "change their practices and reimburse localities for expenses such as police activity related to addiction." The article stated that when asked for comment, an Endo spokeswoman said in an email that

> At Endo . . . our top priorities include patient safety and ensuring that patients with chronic pain have access to safe and effective therapeutic options. We share in the FDA's goal of appropriately supporting the needs of patients with chronic pain while preventing misuse and diversion of opioid products. It is Endo's policy not to comment on current litigation.

300.    As Campanelli, as Endo's then-CEO, Coleman, as Endo's then-CFO and Maletta, as Endo's then-CLO, had ultimate authority over the Endo spokeswoman's statement. The spokeswoman's statement communicated to or gave investors the impression to investors that the Company's highest priority was patient safety, yet failed to acknowledge that for at least a decade, it had initiated and funded a campaign which deceitfully marketed Endo Opioids, trained its sales representatives to market Endo Opioids to healthcare providers that were not experienced in treating chronic paid and without regard to whether those healthcare providers were writing legitimate prescriptions, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis.

These statements were false and misleading when made, however, for the reasons alleged above at paragraph 290.

301.    On November 9, 2017, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2017 (the "3Q17 10-Q"). The 3Q17 10-Q was signed by Defendants Campanelli and Coleman.

302.    In a section entitled "Opioid-Related Matters," the 3Q17 10-Q listed dozens specific actions pending nationwide against Endo and its subsidiaries concerning the Company's marketing and sales practices with respect to opioid products. At the end of the list, the 3Q17 10-Q flatly stated that "*We intend to contest the lawsuits identified above vigorously*." Elsewhere in the 3Q17 10-Q, with regard to other litigation that did *not* concern Endo's opioid products, Endo took pains to advise investors that "[i]n certain of these matters, *the Company believes that a loss is probable* and we have incorporated our best estimate of this loss into our reserve for loss contingencies." The 3Q17 10-Q, however, did not use this qualification in advising investors of the opioid-related actions facing the Company.

303.    Defendants' statements misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 290. In addition, Defendants' statements were misleading because they failed to disclose that Endo was concurrently engaging in a secret campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

304.    Additionally, the 3Q17 10-Q contained generic, boilerplate representations regarding Endo's supposed view of the risks associated with these opioid-related legal proceedings and investigations. For example, the 3Q 2017 10-Q advised investors that:

> We and certain of our subsidiaries are involved in various claims, legal proceedings, internal and governmental investigations (collectively, proceedings) that arise from time to time in the ordinary course of our business, including, among others, those relating to product liability, intellectual property, regulatory compliance and commercial matters. While we cannot predict the outcome of these proceedings and we intend to vigorously prosecute or defend our position, as appropriate, an adverse outcome in any of these proceedings could have a material adverse effect on our current and future financial position, results of operations and cash flows. Matters that are not being disclosed herein are, in the opinion of our management, immaterial both individually and in the aggregate with respect to our financial position, results of operations and cash flows. If and when such matters, in the opinion of our management, become material either individually or in the aggregate, we will disclose such matters.

The 3Q 2017 10-Q advised investors that:

> Additional investigations and lawsuits similar to the foregoing matters may be brought by others or the foregoing matters may be expanded. We are unable to predict the outcome of these investigations or litigations, which may involve additional requests for information. We are also unable to predict the ultimate legal and financial liability, if any, and at this time cannot reasonably estimate the possible loss or range of loss for these investigations or litigations, if any, but will explore all options as appropriate in our best interests.

305.    The warnings in paragraph 304 above were generic "catch-all" provisions that were not tailored to Endo's actual known risks with respect to the significant potential for further opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud, and were materially false or misleading for the reasons alleged above at paragraph 290. These warnings were also misleading because they failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the

opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions. These warnings were also misleading because they failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

306.    Additionally, the 3Q17 10-Q contained generic, boilerplate representations regarding Endo's supposed view of its liquidity risks. The 3Q17 10-Q, modified the disclosure in the 2017 10-Q, disclosed that:

> We expect cash generated from operations together with our cash, cash equivalents, restricted cash and the revolving credit facilities to be sufficient to cover cash needs for working capital and general corporate purposes, contingent liabilities, payment of contractual obligations, principal and interest payments on our indebtedness, capital expenditures, ordinary share repurchases and any regulatory and/or sales milestones that may become due over the next year. However, on a longer term basis, we may not be able to accurately predict the effect of certain developments on the rate of sales growth, such as the degree of market acceptance, patent protection and exclusivity of our products, the impact of competition, the effectiveness of our sales and marketing efforts and the outcome of our current efforts to develop, receive approval for and successfully launch our product candidates. **Additionally, we may not be successful in implementing, or may face unexpected changes or expenses in connection with our strategic direction, including the potential for opportunistic corporate development transactions. Any of the above could adversely affect our future cash flows.**

307.    The language in bold in paragraph 306 above was a generic "catch-all" provision that was not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud. The statements were

materially false or misleading. Defendants knew that although the Company faced potentially billions in liability in connection with opioid-related actions, its precarious financial position as a result of its declining revenues and increased leverage meant that the Company lacked sufficient capital to address liabilities arising from opioid-related actions.

308.    The 3Q17 10-Q also attributed, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than to Defendants' own misconduct. For example, in a section entitled "Risk Factors," the 3Q17 10-Q asserted that, "in the age of social media, plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients for litigation, including using judgments  against other pharmaceutical companies in a product liability or mass tort litigation as an advertising tool"; that, "[t]hus, we could expect that any significant product liability or mass tort litigation in which [Defendants] are a defendant will have a larger number of plaintiffs than such actions have seen historically and [Defendants] could expect to see an increase in number of cases filed against [them] because of the increasing use of widespread and media-varied advertising"; and that, "a ruling against other pharmaceutical companies in product liability or mass tort litigation in which we are not a defendant could have a negative impact on pending litigation where we are a defendant."

309.    The statements alleged above in paragraph 308 characterizing Endo's litigation risk as merely a reflection of the fact that "plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients for litigation, including using judgments  against other pharmaceutical companies in a product liability or mass tort litigation as an advertising tool," rather than the Company's misconduct, communicated to or gave investors the impression that the claims in opioid-related actions were a result of greater advertising capabilities of plaintiffs'

lawyers rather than Endo's significant misconduct in promoting Endo Opioids, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced billions in liability in New York for insurance fraud. The statements were false and misleading when made for the reasons alleged above at paragraph 290.

310. Appended as exhibits to the 3Q17 10-Q were signed certifications pursuant to SOX, wherein Defendants Campanelli and Coleman certified that "[t]he [3Q17 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [3Q17 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the 3Q17 10-Q, as set forth in paragraphs 301–09 above, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced liability in opioid-related actions due to its misconduct, as well as billions in liability in New York for insurance fraud, failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

311. On November 6, 2017, the State of Kentucky filed a lawsuit accusing Endo of using deceptive marketing to sell Opana ER. On that same day, *Reuters* published an article describing the lawsuit and its allegations. The article quoted Defendant Maletta as responding that allegations that Endo was trying to profit at the expense of people's health were "patently offensive," and that

Endo "intend[s] to vigorously defend the company against the claims set forth in [the Kentucky] lawsuit."

312.    Defendant Maletta's statements in paragraph 311 above misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 290. In addition, Defendants' statements were misleading because they failed to disclose that Endo was concurrently engaging in a secret campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

## B.    2018 Misstatements

313.    On January 11, 2018, during pre-market hours, Endo issued a press release announcing that it had "received a grand jury subpoena from the United States Attorney's Office for the Southern District of Florida seeking documents and information relating to products containing oxymorphone" (the "January 2018 Press Release"). That press release disclosed, in relevant part:

> The subpoena broadly requests documents including, among others, those produced in past or pending lawsuits and those relating to product safety and efficacy, overdoses, diversion, thefts, overprescribing, abuse/misuse, dependency or tolerance, withdrawal, addictiveness, adverse events and manipulation. The subpoena also requests distribution and other third party agreements, together with sales and marketing, training, financial, compensation and corporate information, as well as documents relating to interactions with various government agencies, including the U.S. Food and Drug Administration, Drug Enforcement Administration, Veterans Administration, Federal Trade

Commission, Department of Health & Human Services, Medicare and Medicaid. Endo and EPI intend to be responsive to the subpoena and cooperate with any related government investigation.

314. Although Defendants knew that Endo had engaged in a campaign for over a decade to falsely market its opioids as safe and non-addictive and turned a blind eye to opioid abuse, they nevertheless in the January 2018 Press Release falsely assured investors that, "[i]n all circumstances, it is Endo's policy to comply with applicable laws, rules, regulations and industry guidance governing the sale and marketing of pharmaceutical products."

315. By unequivocally informing investors that it was Endo's policy to comply "*[i]n all circumstances*" with the rules and regulations governing the pharmaceutical industry, Defendants statement communicated to or gave investors the impression that the company complied with the law with respect to its marketing and sale of opioids, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 290. In addition, Defendants' statements were misleading because they failed to disclose that Endo was concurrently engaging in a secret campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

316. On February 27, 2018, the Company filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K was signed by Defendants Campanelli and Coleman.

317. In a section entitled "Opioid-Related Matters," the 2017 10-K disclosed that:

Since 2014, multiple U.S. states, counties, other governmental persons or entities and private plaintiffs have filed suit against our subsidiaries EHSI and EPI, in some instances the Company and/or our subsidiary Par Pharmaceutical, Inc. (PPI), and/or various other manufacturers, distributors and/or others, asserting claims relating to defendants' alleged sales, marketing and/or distribution practices with respect to prescription opioid medications, including certain of our products. As of February 20, 2018, the cases of which we were aware include, but are not limited to, cases filed by the states of Delaware, Kentucky, Mississippi, Missouri, New Mexico and Ohio; approximately ***465 cases*** filed by counties, cities, Native American tribes and/or other government-related persons or entities in Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Washington, West Virginia, Wisconsin and Puerto Rico; approximately ***25 cases*** filed by hospitals, health systems, unions, health and welfare funds or other third-party payers; and approximately ***eight cases*** alleging personal injury and/or wrongful death.

318.    After this disclosure, the 2017 10-K unequivocally stated that "***We will continue to vigorously defend the foregoing matters and to explore other options as appropriate in our best interests***." Defendants' statement misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 290. In addition, Defendants' statements were misleading because they failed to disclose that Endo was concurrently engaging in a secret campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

319. The 2017 10-K also attributed, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than to Defendants' own misconduct. For example, in a section entitled "Risk Factors," the 2017 10-K asserted that, "in the age of social media, plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients for litigation, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool"; that, "[f]or these or other reasons, any significant product liability or mass tort litigation in which [Defendants] are a defendant could have a larger number of plaintiffs than such actions have seen historically and [Defendants] could also see an increase in number of cases filed against [them] because of the increasing use of widespread and media-varied advertising"; and that, "a ruling against other pharmaceutical companies in product liability or mass tort litigation in which we are not a defendant could have a negative impact on pending litigation where we are a defendant."

320. The statements alleged above in paragraph 319 characterizing Endo's litigation risk as merely a reflection of the fact that "plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool," rather than the Company's misconduct, communicated to or gave investors the impression that the claims in opioid-related actions were a result of greater advertising capabilities of plaintiffs' lawyers rather than Endo's significant misconduct in promoting Endo Opioids, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced billions in liability in New York for insurance fraud. The statements were false and misleading when made for the reasons alleged above at paragraph 290. These warnings were also misleading because they failed to disclose the material risks to the Company caused by Endo's

campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

321.    The 2017 10-K also attributed the Company's risks arising out of the opioid crisis to negative media coverage, rather than Endo's own misconduct. For example, the 2017 10-K stated that:

> [U]nfavorable media coverage of opioid pharmaceuticals could negatively affect our business, financial condition and results of operations. In recent years, opioid drug abuse has received a high degree of media coverage. Unfavorable publicity regarding, for example, the use or misuse of oxycodone or other opioid drugs, the limitations of abuse-deterrent forms (ADFs), public inquiries and investigations into prescription drug abuse, litigation or regulatory activity could adversely affect our reputation. Such negative publicity could have an adverse effect on the potential size of the market for our drug candidates and decrease revenues and royalties, which would adversely affect our business and financial status. Additionally, such increased scrutiny of opioids generally, whether focused on our products or otherwise, could negatively impact our relationship with healthcare providers and other members of the healthcare community.

322.    The statements alleged above in paragraph 321 characterizing Endo's business risk as merely a reflection of "a high degree of media coverage," "unfavorable publicity," and "increased scrutiny of opioids generally"—rather than the Company's severe misconduct—downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not apprise investors that the Company's prior conduct could result in billions in liability in New York (and elsewhere). By making these statements, which attributed the risk to Endo from the opioid epidemic to media coverage, Defendants had an obligation to disclose all facts necessary to make their statements not misleading. In addition, the statements were false and misleading when made for the reasons alleged above at paragraph 290. These warnings were also misleading because they failed to disclose the material risks to the

Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

323.    Additionally, the 2017 10-K contained generic, boilerplate representations regarding Endo's supposed view of its liquidity risks. The 3Q17 10-Q, modified the disclosure in the 2017 10-Q, disclosed that:

> We expect cash generated from operations together with our cash, cash equivalents, restricted cash and the revolving credit facilities to be sufficient to cover cash needs for working capital and general corporate purposes, contingent liabilities, payment of contractual obligations, principal and interest payments on our indebtedness, capital expenditures, ordinary share repurchases and any regulatory and/or sales milestones that may become due over the next year. However, on a longer term basis, we may not be able to accurately predict the effect of certain developments on the rate of sales growth, such as the degree of market acceptance, patent protection and exclusivity of our products, pricing pressures (including those due to the impact of competition), the effectiveness of our sales and marketing efforts and the outcome of our current efforts to develop, receive approval for and successfully launch our product candidates. We may also face unexpected expenses in connection with our business operations, ***including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities***. Furthermore, we may not be successful in implementing, or may face unexpected changes or expenses in connection with our strategic direction, including the potential for opportunistic corporate development transactions. Any of the above could adversely affect our future cash flows.

324.    The warning in bold in paragraph 323 above was a generic "catch-all" provision that was not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud. The generic statement that the Company's ability to fund its operations because of a variety of issue, "including expenses related to our ongoing and future legal proceedings and governmental investigations and other

contingent liabilities" was materially false or misleading because Defendants knew that although the Company faced potentially billions in liability in connection with opioid-related actions, its precarious financial position as a result of its declining revenues and increased leverage meant that the Company lacked sufficient capital to address liabilities arising from opioid-related actions.

325.    Appended as exhibits to the 2017 10-K were signed certifications pursuant to SOX, wherein Defendants Campanelli and Coleman certified that "[t]he [2017 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [2017 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the 2017 10-K, as set forth in paragraphs 316–24 above, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced liability in opioid-related actions due to its misconduct, as well as billions in liability in New York for insurance fraud, failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

326.    On May 8, 2018, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2018 (the "1Q18 10-Q"). The 1Q18 10-Q was signed by Defendants Campanelli and Coleman.

327.    In a section entitled "Opioid-Related Matters" the 1Q18 10-Q disclosed that:

Since 2014, multiple U.S. states, counties, other governmental persons or entities and private plaintiffs have filed suit against our

subsidiaries Endo Health Solutions Inc. (EHSI) and EPI, in some instances the Company and/or our subsidiaries Par Pharmaceutical, Inc. (PPI), Vintage Pharmaceuticals, LLC and/or Generics Bidco I, LLC, and/or various other manufacturers, distributors and/or others, asserting claims relating to defendants' alleged sales, marketing and/or distribution practices with respect to prescription opioid medications, including certain of our products. As of May 1, 2018, the cases of which we were aware include, but are not limited to, approximately **10 cases** filed by states; approximately **780 cases** filed by counties, cities, Native American tribes and/or other government-related persons or entities; approximately **50 cases** filed by hospitals, health systems, unions, health and welfare funds or other third-party payers; and approximately **20 cases** filed by individuals.

328.    After this disclosure, the 1Q18 10-Q unequivocally stated that "***We will continue to vigorously defend the foregoing matters and to explore other options as appropriate in our best interests***." Elsewhere in the 1Q18 10-Q, with regard to other litigation that did ***not*** concern Endo's opioid products, Endo took pains to advise investors that the Company had concluded "***that a loss is probable*** with respect to these matters." The 1Q18 10-Q, however, did not use this qualification in advising investors of the opioid-related actions facing the Company.

329.    Defendants' statements misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 290. In addition, Defendants' statements were misleading because they failed to disclose that Endo was concurrently engaging in a secret campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

330.     Additionally, the 1Q18 10-Q directed investors to the 2017 10-K "[f]or a discussion of our risk factors, see the information in Item 1A. 'Risk Factors' in our Annual Report on Form 10-K for the year ended December 31, 2017 (Annual Report). There have been no material changes in our risk factors from those described in our Annual Report, except as set forth below." The 1Q18 10-Q thus incorporated the risk factor in the 2017 10-K that attributed, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than to Defendants' own misconduct as described in paragraphs 320–21 above. The 1Q18 10-Q also incorporated the risk factor in the 2017 10-K that attributed, in part, the risks to the Company's business from the opioid epidemic to negative media publicity. Accordingly, by incorporating the disclosure from the 2017 10-K the 1Q18 10-Q misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. The statements were false and misleading when made for the reasons alleged above at paragraph 290. These warnings were also misleading because they failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

331.     Additionally, the 1Q18 10-Q contained generic, boilerplate representations regarding Endo's supposed view of its liquidity risks. The 1Q18 10-Q, disclosed that:

> We expect cash generated from operations together with our cash,
> cash equivalents, restricted cash and the revolving credit facilities to
> be sufficient to cover cash needs for working capital and general
> corporate purposes, contingent liabilities, payment of contractual

obligations, principal and interest payments on our indebtedness, capital expenditures, ordinary share repurchases and any regulatory and/or sales milestones that may become due over the next year. However, on a longer term basis, we may not be able to accurately predict the effect of certain developments on the rate of sales growth, such as the degree of market acceptance, patent protection and exclusivity of our products, pricing pressures (including those due to the impact of competition), the effectiveness of our sales and marketing efforts and the outcome of our current efforts to develop, receive approval for and successfully launch our product candidates. We may also face unexpected expenses in connection with our business operations, ***including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities.*** Furthermore, we may not be successful in implementing, or may face unexpected changes or expenses in connection with our strategic direction, including the potential for opportunistic corporate development transactions. Any of the above could adversely affect our future cash flows.

332.    The warning in bold in paragraph 331 above was a generic "catch-all" provision that was not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud. The generic statement that the Company's ability to fund its operations because of a variety of issue, "including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities" was materially false or misleading because Defendants knew that although the Company faced potentially billions in liability in connection with opioid-related actions, its precarious financial position as a result of its declining revenues and increased leverage meant that the Company lacked sufficient capital to address liabilities arising from opioid-related actions.

333.    Appended as exhibits to the 1Q18 10-Q were signed certifications pursuant to the SOX, wherein Defendants Campanelli and Coleman certified that "[t]he [1Q18 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [1Q18 10-Q] fairly presents, in all material respects,

the financial condition and results of operations of the Company." These statements were false and misleading because the 1Q18 10-Q, as set forth in paragraphs 326–32 above, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, did not advise investors that the Company faced liability in opioid-related actions due to its misconduct, as well as billions in liability in New York for insurance fraud, failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

334.    On August 8, 2018, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2018 (the "2Q18 10-Q"). The 2Q18 10-Q was signed by Defendants Campanelli and Coleman.

335.    In a section entitled "Opioid-Related Matters" the 2Q18 10-Q disclosed that:

> Since 2014, multiple U.S. states, counties, other governmental persons or entities and private plaintiffs have filed suit against certain of our subsidiaries, including Endo Health Solutions Inc. (EHSI), EPI, Par Pharmaceutical, Inc. (PPI), Par Pharmaceutical Companies, Inc. (Par), Vintage Pharmaceuticals, LLC and/or Generics Bidco I, LLC and, in some instances, the Company, as well as various other manufacturers, distributors and/or others, asserting claims relating to defendants' alleged sales, marketing and/or distribution practices with respect to prescription opioid medications, including certain of our products. As of July 31, 2018, the cases of which we were aware include, but are not limited to, approximately *11 cases* filed by states; approximately *1,221 cases filed* by counties, cities, Native American tribes and/or other government-related persons or entities; approximately *78 cases* filed by hospitals, health systems, unions, health and welfare funds or other third-party payers; and approximately *26 cases* filed by individuals. Certain of the cases have been filed as putative class actions.

336.    After this disclosure, the 2Q18 10-Q unequivocally stated that "*We will continue to vigorously defend the foregoing matters and to explore other options as appropriate in our best interests*." Elsewhere in the 2Q18 10-Q, with regard to other litigation that did *not* concern Endo's opioid products, Endo took pains to advise investors that the Company had concluded "*that a loss is probable* with respect to these matters." The 2Q18 10-Q, however, did not use this qualification in advising investors of the opioid-related actions facing the Company.

337.    Defendants' statements misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 290. In addition, Defendants' statements were misleading because they failed to disclose that Endo was concurrently engaging in a secret campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

338.    Additionally, the 2Q18 10-Q directed investors to the 2017 10-K and 1Q18 10-Q "[f]or a discussion of our risk factors . . . . There have been no material changes in our risk factors from those described therein." The 2Q18 10-Q thus incorporated the risk factor in the 2017 10-K that attributed, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than to Defendants' own misconduct as described in paragraph 320–21 above. The 2Q18 10-Q also incorporated the risk factor in the 2017 10-K that attributed, in part, the risks to the Company's business from the opioid epidemic to negative media publicity. Accordingly, by incorporating the disclosures from the 2017 10-K and

the 1Q18 10-Q, the 2Q18 10-Q Defendants' statements misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. By making these statements, which attributed the risk to Endo from the opioid epidemic to media coverage, Defendants had an obligation to disclose all facts necessary to make their statements not misleading. In addition, the statements were false and misleading when made for the reasons alleged above at paragraph 290. These warnings were also misleading because they failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

339.    Additionally, the 2Q18 10-Q contained generic, boilerplate representations regarding Endo's supposed view of its liquidity risks. The 2Q18 10-Q, disclosed that:

> We expect cash generated from operations together with our cash, cash equivalents, restricted cash and the revolving credit facilities to be sufficient to cover our principal liquidity requirements over the next year. However, on a longer term basis, we may not be able to accurately predict the effect of certain developments on our sales and gross margins, such as the degree of market acceptance, patent protection and exclusivity of our products, pricing pressures (including those due to the impact of competition), the effectiveness of our sales and marketing efforts and the outcome of our current efforts to develop, receive approval for and successfully launch our product candidates. We may also face unexpected expenses in connection with our business operations, ***including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities***. Furthermore, we may not be successful in implementing, or may face unexpected changes or expenses in connection with our strategic direction, including the potential for opportunistic corporate development transactions. Any of the above could

adversely affect our future cash flows.

340.    The warning in bold in paragraph 339 above was a generic "catch-all" provision that was not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud. The generic statement that the Company's ability to fund its operations because of a variety of issue, "including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities" was materially false or misleading because Defendants knew that although the Company faced potentially billions in liability in connection with opioid-related actions, its precarious financial position as a result of its declining revenues and increased leverage meant that the Company lacked sufficient capital to address liabilities arising from opioid-related actions.

341.    Appended as exhibits to the 2Q18 10-Q were signed certifications pursuant to the SOX, wherein Defendants Campanelli and Coleman certified that "[t]he [2Q18 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [2Q18 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the 2Q18 10-Q, as set forth in paragraphs 334–40 above, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, did not advise investors that the Company faced liability in opioid-related actions due to its misconduct, as well as billions in liability in New York for insurance fraud, failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the

126

opioid-related actions, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

342.    On November 8, 2018, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2018 (the "3Q18 10-Q"). The 3Q18 10-Q was signed by Defendants Campanelli and Coleman.

343.    In a section entitled "Opioid-Related Matters,"

> Since 2014, multiple U.S. states, counties, other governmental persons or entities and private plaintiffs have filed suit against certain of our subsidiaries, including Endo Health Solutions Inc. (EHSI), EPI, Par Pharmaceutical, Inc. (PPI), Par Pharmaceutical Companies, Inc. (Par), Vintage Pharmaceuticals, LLC and/or Generics Bidco I, LLC and, in some instances, the Company, as well as various other manufacturers, distributors and/or others, asserting claims relating to defendants' alleged sales, marketing and/or distribution practices with respect to prescription opioid medications, including certain of our products. As of November 1, 2018, the cases of which we were aware include, but are not limited to, approximately **11 cases** filed by or on behalf of states; approximately **1,505 cases** filed by counties, cities, Native American tribes and/or other government-related persons or entities; approximately **112 cases** filed by hospitals, health systems, unions, health and welfare funds or other third-party payers; and approximately **48 cases** filed by individuals. Certain of the cases have been filed as putative class actions.

344.    After this disclosure, the 3Q18 10-Q unequivocally stated that "***We will continue to vigorously defend the foregoing matters and to explore other options as appropriate in our best interests***."

345.    Defendants' statement misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 290.

In addition, Defendants' statements were misleading because they failed to disclose that Endo was concurrently engaging in a secret campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

346.    Additionally, the 3Q18 10-Q downplayed the scope of Defendants' wrongdoing and responsibility for the opioid-related actions by attributing, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than to Defendants' own misconduct. For example, in a section entitled "Risk Factors," the 3Q18 10-Q asserted that, "in the age of social media, plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients for litigation, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool"; that, "[f]or these or other reasons, any significant product liability or mass tort litigation in which [Defendants] are a defendant could have a larger number of plaintiffs than such actions have seen historically and [Defendants] could also see an increase in number of cases filed against [them] because of the increasing use of widespread and media-varied advertising"; and that, "a ruling against other pharmaceutical companies in product liability or mass tort litigation in which we are not a defendant could have a negative impact on pending litigation where we are a defendant."

347.    The statements alleged above in paragraph 346 characterizing Endo's litigation risk as merely a reflection of the fact that "plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool," rather than the Company's misconduct, rather than the Company's misconduct, communicated to or gave investors the impression that the claims in opioid-related actions were a result of greater advertising capabilities of plaintiffs' lawyers

rather than Endo's significant misconduct in promoting Endo Opioids, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced billions in liability in New York for insurance fraud. The statements were false and misleading when made for the reasons alleged above at paragraph 290. These warnings were also misleading because they failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

348.    The 3Q18 10-Q also included a "risk factor" that attributed risks to Endo's business from the opioid epidemic to "public concern," "media stories," and "novel" uses of laws by "government and private persons and entities," rather than Defendants' own misconduct. The 3Q18 10-Q stated that:

> ***Public concern around the abuse of opioids, including law enforcement concerns over diversion and marketing of opioids, and regulatory efforts to combat abuse, could result in costs to our business.***
>
> Media stories regarding prescription drug abuse and the diversion of opioids and other controlled substances are commonplace. Aggressive enforcement and unfavorable publicity regarding, for example, the use or misuse of opioid drugs; the limitations of abuse-deterrent formulations; the ability of drug abusers to discover previously unknown ways to abuse our products; public inquiries and investigations into prescription drug abuse; litigation; or regulatory activity regarding sales, marketing, distribution or storage of opioids could have a material adverse effect on our reputation and impact on the results of litigation.
>
> Opioid manufacturers have been the subject of significant current civil and criminal investigatory and enforcement action. In addition, numerous governmental and private persons and entities are pursuing civil litigation against opioid manufacturers and distributors, invoking current laws and regulations relating to

opioids and/or other prescription medicines, as well as novel uses of
other laws that seek to hold accountable opioid manufacturers for
opioid misuse.

349.    The statements alleged above in paragraph 348 characterizing Endo's business risk

as merely a reflection of "*[p]ublic concern around the abuse of opioids*," "*media stories* regarding

prescription drug abuse and the diversion of opioids," and "civil litigation against opioid

manufacturers and distributors, invoking current laws and regulations relating to opioids and/or

other prescription medicines, as well *as novel uses of other laws*," rather than the Company's

severe misconduct, misleadingly downplayed the allegations in the actions, did not fully apprise

investors of the extent of the Company's misconduct in marketing and selling opioids, and did not

advise investors that the Company faced billions in liability in New York for insurance fraud as a

result of Endo's misconduct with regard to the opioid crisis. By making these statements, which

attributed the risk to Endo from the opioid epidemic to media coverage, Defendants had an

obligation to disclose all facts necessary to make their statements not misleading. In addition, the

statements were false and misleading when made for the reasons alleged above at paragraph 290.

These warnings were also misleading because they failed to disclose the material risks to the

Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal

evidence documenting their business practices that demonstrated that the allegations of

wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

350.    Additionally, the 3Q18 10-Q contained generic, boilerplate representations

regarding Endo's supposed view of its liquidity risks. The 3Q18 10-Q, disclosed that:

> We expect cash generated from operations together with our cash,
> cash equivalents, restricted cash, restricted cash equivalents and the
> revolving credit facilities to be sufficient to cover our principal
> liquidity requirements over the next year. However, on a longer term
> basis, we may not be able to accurately predict the effect of certain
> developments on our sales and gross margins, such as the degree of
> market acceptance, patent protection and exclusivity of our

130

products, pricing pressures (including those due to the impact of competition), the effectiveness of our sales and marketing efforts and the outcome of our current efforts to develop, receive approval for and successfully launch our product candidates. We may also face unexpected expenses in connection with our business operations, ***including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities***. Furthermore, we may not be successful in implementing, or may face unexpected changes or expenses in connection with our strategic direction, including the potential for opportunistic corporate development transactions. Any of the above could adversely affect our future cash flows.

351.    The warning in bold in paragraph 350 above was a generic "catch-all" provision that was not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud. The generic statement that the Company's ability to fund its operations because of a variety of issue, "including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities" was materially false or misleading because Defendants knew that although the Company faced potentially billions in liability in connection with opioid-related actions, its precarious financial position as a result of its declining revenues and increased leverage meant that the Company lacked sufficient capital to address liabilities arising from opioid-related actions.

352.    Appended as exhibits to the 3Q18 10-Q were signed certifications pursuant to SOX, wherein Defendants Campanelli and Coleman certified that "[t]he [3Q18 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [3Q18 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the 3Q18 10-Q, as set forth in paragraphs 342–51 above, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related

proceedings, did not advise investors that the Company faced liability in opioid-related actions due to its misconduct, as well as billions in liability in New York for insurance fraud, failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

353.    On December 7, 2018, the Philadelphia Inquirer published an article entitled, "Managing the Risks of Opioids: Endo outlines how it takes accountability in selling addictive drugs." The article quoted Defendant Maletta as saying, "Our view is that *we've done everything properly*," he added. "We deny the allegations in the complaints and we're proud to talk about our business practices. Hopefully, other companies will follow suit."

354.    Defendants Maletta's statement that "*we've done everything properly*" and "*[w]e deny the allegations* in the complaints," communicated to or gave investors the impression that Endo had not engaged in any misconduct in connection with the opioid crisis, misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 290. In addition, Defendants' statements were misleading because they failed to disclose that Endo was concurrently engaging in a secret campaign to obstruct litigation of the opioid-related actions, conceal evidence

documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

### C.    2019 Misstatements

355.    On February 28, 2019, the Company filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Campanelli and Coleman.

356.    In a section entitled "Opioid-Related Matters," the 2018 10-K listed disclosed that:

> Since 2014, multiple U.S. states, counties, other governmental persons or entities and private plaintiffs have filed suit against us and/or certain of our subsidiaries, including Endo Health Solutions Inc. (EHSI), EPI, Par Pharmaceutical, Inc. (PPI), Par Pharmaceutical Companies, Inc., Vintage Pharmaceuticals, LLC, Generics Bidco I, LLC and DAVA Pharmaceuticals, LLC, as well as various other manufacturers, distributors and/or others, asserting claims relating to defendants' alleged sales, marketing and/or distribution practices with respect to prescription opioid medications, including certain of our products. As of February 21, 2019, the cases of which we were aware include, but are not limited to, approximately *12 cases* filed by or on behalf of states; approximately *1,711 cases* filed by counties, cities, Native American tribes and/or other government-related persons or entities; approximately *121 cases* filed by hospitals, health systems, unions, health and welfare funds or other third-party payers and approximately *56 cases* filed by individuals. Certain of the cases have been filed as putative class actions.

357.    After this disclosure, the 2018 10-K unequivocally stated that "***We will continue to vigorously defend the foregoing matters and to explore other options as appropriate in our best interests***."

358.    Defendants' statement misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for

insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 290. In addition, Defendants' statements were misleading because they failed to disclose that Endo was concurrently engaging in a secret campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

359.    The 2018 10-K also attributed the Company's risks arising out of the opioid crisis to negative media coverage, rather than Endo's own misconduct. For example, the 2018 10-K stated that:

> [U]nfavorable media coverage of opioid pharmaceuticals could negatively affect our business, financial condition and results of operations. In recent years, opioid drug abuse has received a high degree of media coverage. Unfavorable publicity regarding, for example, the use or misuse of oxycodone or other opioid drugs, the limitations of abuse-deterrent forms, public inquiries and investigations into prescription drug abuse, litigation or regulatory activity could adversely affect our reputation. Such negative publicity could have an adverse effect on the potential size of the market for our drug candidates and decrease revenues and royalties, which would adversely affect our business and financial status. Additionally, such increased scrutiny of opioids generally, whether focused on our products or otherwise, could negatively impact our relationship with healthcare providers and other members of the healthcare community.

360.    The statements alleged above in paragraph 359 characterizing Endo's business risk as merely a reflection of "a high degree of media coverage," "unfavorable media coverage," "negative publicity" and "increased scrutiny of opioids generally"—rather than the Company's severe misconduct—downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not apprise investors that the Company's prior conduct could result in billions in liability in New York (and elsewhere). By making these statements, which attributed the risk to Endo from the opioid epidemic to media coverage,

Defendants had an obligation to disclose all facts necessary to make their statements not misleading. In addition, the statements were false and misleading when made for the reasons alleged above at paragraph 290. These warnings were also misleading because they failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

361.    Additionally, the 2018 10-K downplayed the scope of Defendants' wrongdoing and responsibility for the opioid-related actions by attributing, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than to Defendants' own misconduct. For example, in a section entitled "Risk Factors," the 2018 10-K asserted that, "in the age of social media, plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients for litigation, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool"; that, "[f]or these or other reasons, any significant product liability or mass tort litigation in which [Defendants] are a defendant could have a larger number of plaintiffs than such actions have seen historically and [Defendants] could also see an increase in number of cases filed against [them] because of the increasing use of widespread and media-varied advertising"; and that, "a ruling against other pharmaceutical companies in product liability or mass tort litigation in which we are not a defendant could have a negative impact on pending litigation where we are a defendant."

362.    The statements alleged above in paragraph 361 characterizing Endo's litigation risk as merely a reflection of the fact that "plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients, including using judgments obtained in litigation against other

pharmaceutical companies as an advertising tool," rather than the Company's misconduct, communicated to or gave investors the impression that the claims in opioid-related actions were a result of greater advertising capabilities of plaintiffs' lawyers rather than Endo's significant misconduct in promoting Endo Opioids, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced billions in liability in New York for insurance fraud. The statements were false and misleading when made for the reasons alleged above at paragraph 290. These warnings were also misleading because they failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

363.    The 2018 10-K also included a "risk factor" that attributed risks to Endo's business from the opioid epidemic to "public concern," "media stories," and "novel" uses of laws by "government and private persons and entities," rather than Defendants' own misconduct. The 2018 10-K stated that:

> ***Public concern around the abuse of opioids, including law enforcement concerns over diversion and marketing of opioids, and regulatory efforts to combat abuse, could result in costs to our business.***
>
> Media stories regarding prescription drug abuse and the diversion of opioids and other controlled substances are commonplace. Aggressive enforcement and unfavorable publicity regarding, for example, the use or misuse of opioid drugs; the limitations of abuse-deterrent formulations; the ability of drug abusers to discover previously unknown ways to abuse our products; public inquiries and investigations into prescription drug abuse; litigation or regulatory activity regarding sales, marketing, distribution or storage of opioids could have a material adverse effect on our reputation and impact on the results of litigation.
>
> Manufacturers of prescription opioid medications have been the

subject of significant civil and criminal investigatory and enforcement action even in cases where such medications have received approval from the FDA or similar regulatory authorities. In addition, numerous governmental and private persons and entities are pursuing civil litigation against opioid manufacturers and distributors, invoking current laws and regulations relating to opioids and/or other prescription medicines, as well as novel uses of other laws that seek to hold accountable opioid manufacturers for opioid misuse. See Note 15. Commitments and Contingencies in the Consolidated Financial Statements included in Part IV, Item 15 of this report for more information.

364.    The statements alleged above in paragraph 363 characterizing Endo's business risk as merely a reflection of "*[p]ublic concern around the abuse of opioids*," "*media stories* regarding prescription drug abuse and the diversion of opioids," and "civil litigation against opioid manufacturers and distributors, invoking current laws and regulations relating to opioids and/or other prescription medicines, as well *as novel uses of other laws*," rather than the Company's severe misconduct, misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. By making these statements, which attributed the risk to Endo from the opioid epidemic to media coverage, Defendants had an obligation to disclose all facts necessary to make their statements not misleading. In addition, the statements were false and misleading when made for the reasons alleged above at paragraph 290. These warnings were also misleading because they failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

365.    The 2018 10-K, for the first time, included the following risk factor:

*Our ability to fund our operations, maintain liquidity and meet our*

*financing obligations is reliant on our operations, which are subject to significant risks and uncertainties.*

We rely on cash from operations as well as access to the financial markets to fund our operations, maintain liquidity and meet our financial obligations. Our operations are subject to many significant risks and uncertainties, such as the risks described in this "Risk Factors" section, several of which may be outside of our control.

. . . .

Additionally, we face significant risks and uncertainties relating to our outstanding and future legal proceedings and governmental investigations, including those related to our sale, marketing and/or distribution of prescription opioid medications. See the risk factor "We have been, continue to be and may be the subject of lawsuits, product liability claims, other significant legal proceedings, government investigations or product recalls for which we may be unable to obtain or maintain insurance adequate to cover potential liabilities" for more information.

. . . .

If we are unable to fund our operations and liquidity needs, such as future capital expenditures and payment of our indebtedness, we may be required to refinance all or part of our then-existing indebtedness, sell assets, reduce or delay capital expenditures, seek to raise additional capital, pursue one or more internal reorganizations and/or other restructuring activities, strategic corporate alignment and cost-saving initiatives or other significant corporate transactions, any of which could have a material adverse effect on our operations and financial condition. Any refinancing of our substantial indebtedness could be at significantly higher interest rates, which will depend on the conditions of the markets and our financial condition at such time, and may require us to comply with more onerous covenants, which could further restrict our business operations. In addition, the terms of existing or future debt agreements may restrict us from adopting any of these alternatives. Likewise, any internal reorganizations and/or other restructuring activities, strategic corporate alignment and cost-saving initiatives or other significant corporate transactions may be complex, could entail significant costs and charges or could otherwise negatively impact shareholder value and there can be no assurance that we will be able to accomplish any of these alternatives on terms acceptable to us, or at all. The failure to generate sufficient liquidity or to achieve any of these alternatives could materially adversely affect our business, financial condition and results of operations.

366.    Additionally, the 2018 10-K contained generic, boilerplate representations regarding Endo's supposed view of its liquidity. The 2018 10-K, disclosed that:

> We expect cash generated from operations together with our cash, cash equivalents, restricted cash, restricted cash equivalents and the revolving credit facilities to be sufficient to cover our principal liquidity requirements over the next year. However, on a longer term basis, we may not be able to accurately predict the effect of certain developments on our sales and gross margins, such as the degree of market acceptance, patent protection and exclusivity of our products, pricing pressures (including those due to the impact of competition), the effectiveness of our sales and marketing efforts and the outcome of our current efforts to develop, receive approval for and successfully launch our product candidates. We may also face unexpected expenses in connection with our business operations, ***including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities***. Furthermore, we may not be successful in implementing, or may face unexpected changes or expenses in connection with our strategic direction, including the potential for opportunistic corporate development transactions. Any of the above could adversely affect our future cash flows.

367.    Read together, the warnings above in paragraphs 365–66 above were not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud. The statement "we face significant risks and uncertainties relating to our outstanding and future legal proceedings and governmental investigations, including those related to our sale, marketing and/or distribution of prescription opioid medications" directed investors to a risk factor that misleadingly attributed the Company's exposure to liability to overzealous plaintiffs' attorneys and downplayed the Company's misconduct. In addition, the warnings were misleading because they did not disclose that Defendants knew that the Company already lacked sufficient liquidity to address the full scope of the liability it was facing in opioid-related actions.

139

368.    Appended as exhibits to 2018 10-K were signed certifications pursuant to SOX, wherein Defendants Campanelli and Coleman certified that "[t]he [2018 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [2018 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the 2018 10-K, as set forth in paragraphs 355–67 above, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, did not advise investors that the Company faced liability in opioid-related actions due to its misconduct, as well as billions in liability in New York for insurance fraud, failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

369.    On April 10, 2019, The Philadelphia Inquirer reported that Endo had "suddenly" begun "tell[ing] the FDA about a tidal wave of fatalities associated with Opana, and painkillers made by other companies." The article went on to state that after reporting only approximately ***250*** deaths over the prior ten years, "[f]rom November 2017 through August 2018, Endo reported ***20,115 deaths*** to the FDA." The article stated that "the thousands of deaths span roughly two decades" and noted that Endo had begun submitting the reports two months after it had voluntarily discontinued Opana ER at the FDA's request. In the article, Endo spokesperson Heather Zoumas Lubeski denied that all the reports concerned Endo's products. She also stated that Endo, ***"is vigorously defending these lawsuits, denies that it has any liability to the plaintiffs***, and continues

to work with the FDA to submit appropriate reports." Defendant Campanelli, as Endo's CEO, Defendant Coleman, as Endo's CFO, and Defendant Maletta, as CLO had ultimate authority over Lubeski's statement because they authorized her to make it and approved its content.

370. Defendants statements, made through Lubeski, that Endo "*is vigorously defending these lawsuits [and] denies that it has any liability to the plaintiffs*" misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 290. In addition, Defendants' statements were misleading because they failed to disclose that Endo was concurrently engaging in a secret campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

371. On May 9, 2019, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2019 (the "1Q19 10-Q"). The 1Q19 10-Q was signed by Defendants Campanelli and Coleman.

372. In a section entitled "Opioid-Related Matters" the 1Q18 10-Q disclosed that:

> Since 2014, multiple U.S. states, counties, other governmental persons or entities and private plaintiffs have filed suit against us and/or certain of our subsidiaries, including Endo Health Solutions Inc. (EHSI), EPI, PPI, Par Pharmaceutical Companies, Inc. (PPCI), Vintage Pharmaceuticals, LLC, Generics Bidco I, LLC and DAVA Pharmaceuticals, LLC, as well as various other manufacturers, distributors and/or others, asserting claims relating to defendants' alleged sales, marketing and/or distribution practices with respect to prescription opioid medications, including certain of our products. As of May 2, 2019, the cases of which we were aware include, but

are not limited to, approximately *13 cases* filed by or on behalf of states; approximately *1,925 cases* filed by counties, cities, Native American tribes and/or other government-related persons or entities; approximately *136 cases* filed by hospitals, health systems, unions, health and welfare funds or other third-party payers and approximately *59 cases* filed by individuals. Certain of the cases have been filed as putative class actions.

373.    After this disclosure, the 1Q19 10-Q unequivocally stated that "*We will continue to vigorously defend the foregoing matters and to explore other options as appropriate in our best interests*."

374.    Defendants' statement misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 290. In addition, Defendants' statements were misleading because they failed to disclose that Endo was concurrently engaging in a secret campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

375.    Additionally, the 1Q19 10-Q downplayed the scope of Defendants' wrongdoing and responsibility for the opioid-related actions by attributing, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than to Defendants' own misconduct. For example, in a section entitled "Risk Factors," the 1Q19 10-Q asserted that, "in the age of social media, plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients for litigation, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool"; that, "[f]or these or other reasons, any significant product liability or mass tort litigation in which

[Defendants] are a defendant could have a larger number of plaintiffs than such actions have seen historically and [Defendants] could also see an increase in number of cases filed against [them] because of the increasing use of widespread and media-varied advertising"; and that, "a ruling against other pharmaceutical companies in product liability or mass tort litigation in which we are not a defendant could have a negative impact on pending litigation where we are a defendant." Moreover, the 1Q19 attributed the risks to Endo's business as a result of the opioid epidemic to negative publicity, rather than the Company's own conduct, stating that "we and other manufacturers of prescription opioid medications have been, and will likely continue to be, subject to negative publicity and press, which could harm our brand and the demand for our products."

376.    The statements alleged above in paragraph 375 characterizing Endo's litigation risk as merely a reflection of the fact that "plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool," rather than the Company's misconduct, communicated to or gave investors the impression that the claims in opioid-related actions were a result of greater advertising capabilities of plaintiffs' lawyers rather than Endo's significant misconduct in promoting Endo Opioids, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced billions in liability in New York for insurance fraud. The statements were false and misleading when made for the reasons alleged above at paragraph 290. In addition, by making these statements, which attributed the risk to Endo from the opioid epidemic to media coverage, Defendants had an obligation to disclose all facts necessary to make their statements not misleading. These warnings were also misleading because they failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions,

conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

377.    Additionally, the 1Q19 10-Q contained generic, boilerplate representations regarding Endo's supposed view of its liquidity risks. The 1Q19 10-Q, disclosed that:

> We expect cash generated from operations together with our cash, cash equivalents, restricted cash, restricted cash equivalents and the Revolving Credit Facility to be sufficient to cover our principal liquidity requirements over the next year. However, on a longer term basis, we may not be able to accurately predict the effect of certain developments on our sales and gross margins, such as the degree of market acceptance, patent protection and exclusivity of our products, pricing pressures (including those due to the impact of competition), the effectiveness of our sales and marketing efforts and the outcome of our current efforts to develop, receive approval for and successfully launch our product candidates. We may also face unexpected expenses in connection with our business operations, ***including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities***. Furthermore, we may not be successful in implementing, or may face unexpected changes or expenses in connection with our strategic direction, including the potential for opportunistic corporate development transactions. Any of the above could have a material adverse effect on our business, financial condition, results of operations and cash flows.

378.    The statement in bold in paragraph 377 above, when read together with the statements in paragraphs 359–63 above, which were incorporated by reference from the 2018 10-K, were not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud. The statement "we face significant risks and uncertainties relating to our outstanding and future legal proceedings and governmental investigations, including those related to our sale, marketing and/or distribution of prescription opioid medications" directed investors to a risk factor that misleadingly attributed the Company's exposure to liability to overzealous plaintiffs' attorneys and downplayed the

Company's misconduct. In addition, the warnings were misleading because they did not disclose that Defendants knew that the Company already lacked sufficient liquidity to address the full scope of the liability it was facing in opioid-related actions.

379.    Appended as exhibits to the 1Q19 10-Q were signed certifications pursuant to the SOX, wherein Defendants Campanelli and Coleman certified that "[t]he [1Q19 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [1Q19 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the 1Q19 10-Q, as set forth in paragraphs 371–78 above, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, did not advise investors that the Company faced liability in opioid-related actions due to its misconduct, as well as billions in liability in New York for insurance fraud, failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

380.    Late in the day on June 28, 2019, a Friday, Endo filed an 8-K (the "July 2019 8-K"), which was signed by Defendant Maletta. The 8-K announced that Endo had drawn—*i.e.*, borrowed—$300 million from its $1 billion revolving credit facility through its subsidiary Endo Luxembourg Finance Company I S.à r.l. Defendant Campanelli, as Endo's CEO, and Defendant Coleman, as Endo's CFO, made the decision to draw on the revolving credit facility.

381.    The 8-K stated that Endo's draw had effectively "maxed out" the credit facility because covenants in the Company's credit agreements contained "certain conditions that limit the Company's ability to incur additional secured indebtedness" beyond what Endo had just drawn on the revolver. The 8-K also stated that Endo "expects to use the proceeds from the borrowing under the Revolving Credit Facility for purposes consistent with the Company's previously stated capital allocation priorities, including for general corporate purposes." The Company also told the market that it had borrowed the $300 million to "provide additional flexibility and strategic optionality."

382.    The investment press quickly questioned the Company's timing and reasons for drawing on the credit facility. On July 1, 2019, *i.e.*, the following Monday, Bloomberg Senior Credit Analyst Mike Holland told investors that "[a]nnouncing a max revolver drawing late on a summer Friday without any explanation generally doesn't bode well for a company's stock and bond prices Monday morning." And on July 1, 2019 Barron's Online published an article noting pointedly that while one analyst had claimed to believe that the drawdown was not related to the opioid settlement, "the company did not respond to [Barron's] query if the loan was taken to pay for an opioid settlement."

383.    Defendants' statements in the July 2019 8-K were false and misleading because the loan was clearly to provide the Company with the liquidity it needed to enter into opioid settlements. Describing the loan as for settlement purposes would have disclosed to the market that Defendants knew that the Company faced extensive liability for its role in the opioid crisis. Once Defendants decided to explain *why* it was taking out the loan, Defendants had an obligation to disclose the full truth about the loan. Defendants violated this duty by failing to disclose that it was, in whole or in part, for the purposes of resolving claims against Endo for its role in the opioid crisis.

384.    On August 5, 2019, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2019 (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Defendants Campanelli and Coleman.

385.    In a section entitled "Opioid-Related Matters" the 1Q18 10-Q disclosed that:

> Since 2014, multiple U.S. states, counties, other governmental persons or entities and private plaintiffs have filed suit against us and/or certain of our subsidiaries, including Endo Health Solutions Inc. (EHSI), EPI, PPI, Par Pharmaceutical Companies, Inc. (PPCI), Endo Generics Holdings, Inc. (EGHI), Vintage Pharmaceuticals, LLC, Generics Bidco I, LLC and DAVA Pharmaceuticals, LLC, as well as various other manufacturers, distributors and/or others, asserting claims relating to defendants' alleged sales, marketing and/or distribution practices with respect to prescription opioid medications, including certain of our products. As of July 29, 2019, the cases of which we were aware include, but are not limited to, approximately *18 cases* filed by or on behalf of states; approximately *2,300 cases* filed by counties, cities, Native American tribes and/or other government-related persons or entities; approximately *153 cases* filed by hospitals, health systems, unions, health and welfare funds or other third-party payers and approximately *131 cases* filed by individuals. Certain of the cases have been filed as putative class actions.

386.    After this disclosure, the 2Q19 10-Q unequivocally stated that "*We will continue to vigorously defend the foregoing matters and to explore other options as appropriate in our best interests*."

387.    Defendants' statement misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 290. In addition, Defendants' statements were misleading because they failed to disclose that Endo was concurrently engaging in a secret campaign to obstruct litigation of the opioid-related actions,

conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

388.    The 2Q19 10-Q also included a "risk factor" that attributed risks to Endo's business from the opioid epidemic to "public concern," "media stories," and "novel" uses of laws by "government and private persons and entities," rather than Defendants' own misconduct. The 2Q19 10-Q stated that:

> **Public concern around the abuse of opioids, including law enforcement concerns over diversion and marketing of opioids, and regulatory efforts to combat abuse, could result in costs to our business.**
>
> Media stories regarding prescription drug abuse and the diversion of opioids and other controlled substances are commonplace. Aggressive enforcement and unfavorable publicity regarding, for example, the use or misuse of opioid drugs; the limitations of abuse-deterrent formulations; the ability of drug abusers to discover previously unknown ways to abuse our products; public inquiries and investigations into prescription drug abuse; litigation or regulatory activity regarding sales, marketing, distribution or storage of opioids could have a material adverse effect on our reputation, on the results of litigation and on our ability to attract or maintain relationships with third-party partners, including suppliers, vendors, advisors, distributors, manufacturers, collaboration partners, administrators and agents.
>
> Manufacturers of prescription opioid medications have been the subject of significant civil and criminal investigatory and enforcement action even in cases where such medications have received approval from the FDA or similar regulatory authorities. In addition, numerous governmental and private persons and entities are pursuing civil litigation against opioid manufacturers and distributors, invoking current laws and regulations relating to opioids and/or other prescription medicines, as well as novel uses of other laws that seek to hold accountable opioid manufacturers for opioid misuse.

389.    The statements alleged above in paragraph 388 characterizing Endo's business risk as merely a reflection of "*[p]ublic concern around the abuse of opioids*," "*media stories* regarding prescription drug abuse and the diversion of opioids," and "civil litigation against opioid

manufacturers and distributors, invoking current laws and regulations relating to opioids and/or other prescription medicines, as well *as novel uses of other laws*," rather than the Company's severe misconduct, misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. By making these statements, which attributed the risk to Endo from the opioid epidemic to media coverage, Defendants had an obligation to disclose all facts necessary to make their statements not misleading. In addition, the statements were false and misleading when made for the reasons alleged above at paragraph 290. These warnings were also misleading because they failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

390.    Additionally, the 2Q19 10-Q directed investors to the 2018 10-K:

> For a discussion of our risk factors, see the information in Part 1, Item 1A. 'Risk Factors' in our Annual Report and the information in Part II, Item 1A under the caption "Risk Factors" of our Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2019. There have been no material changes in our risk factors from those described in our Annual Report, except as set forth below.

The 2Q19 10-Q thus incorporated the risk factor in the 2018 10-K that attributed, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than to Defendants' own misconduct as described in paragraphs 359–63 above. The 2Q19 10-Q also incorporated the risk factor in the 2018 10-K that attributed, in part, the risks to the Company's business from the opioid epidemic to negative media publicity. Accordingly, by incorporating the disclosure from the 2018 10-K, the 2Q19 10-Q misleadingly

downplayed the allegations in the actions, did not fully apprise investors of the extent of the

Company's misconduct in marketing and selling opioids, and did not advise investors that the

Company faced billions in liability in New York for insurance fraud as a result of Endo's

misconduct with regard to the opioid crisis. The statements were false and misleading when made

for the reasons alleged above at paragraph 290. These warnings were also misleading because they

failed to disclose the material risks to the Company caused by Endo's campaign to obstruct

litigation of the opioid-related actions, conceal evidence documenting their business practices that

demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the

merits of the opioid-related actions.

391.    Additionally, the 2Q19 10-Q contained generic, boilerplate representations

regarding Endo's supposed view of its liquidity risks. The 2Q19 10-Q, disclosed that:

> We expect our operating cash flows, together with our cash, cash
> equivalents, restricted cash and restricted cash equivalents to be
> sufficient to cover our principal liquidity requirements over the next
> year. However, on a longer term basis, we may not be able to
> accurately predict the effect of certain developments on our sales
> and gross margins, such as the degree of market acceptance, patent
> protection and exclusivity of our products, pricing pressures
> (including those due to the impact of competition), the effectiveness
> of our sales and marketing efforts and the outcome of our current
> efforts to develop, receive approval for and successfully launch our
> product candidates. We may also face unexpected expenses in
> connection with our business operations, ***including expenses
> related to our ongoing and future legal proceedings and
> governmental investigations and other contingent liabilities***.
> Furthermore, we may not be successful in implementing, or may
> face unexpected changes or expenses in connection with our
> strategic direction, including the potential for opportunistic
> corporate development transactions. Any of the above could have a
> material adverse effect on our business, financial condition, results
> of operations and cash flows.

392.    The statements in bold in paragraph 290 above, when read together with the

statements in paragraphs 359–63 above, which were incorporated by reference from the 2018 10-

K, were not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud. The statement "we face significant risks and uncertainties relating to our outstanding and future legal proceedings and governmental investigations, including those related to our sale, marketing and/or distribution of prescription opioid medications" directed investors to a risk factor that misleadingly attributed the Company's exposure to liability to overzealous plaintiffs' attorneys and downplayed the Company's misconduct. In addition, the warnings were misleading because they did not disclose that Defendants knew that the Company already lacked sufficient liquidity to address the full scope of the liability it was facing in opioid-related actions.

393.    Appended as exhibits to the 2Q19 10-Q were signed certifications pursuant to the SOX, wherein Defendants Campanelli and Coleman certified that "[t]he [2Q19 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [2Q19 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the 2Q19 10-Q, as set forth in paragraphs 384–92 above, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, did not advise investors that the Company faced liability in opioid-related actions due to its misconduct, as well as billions in liability in New York for insurance fraud, failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the

opioid-related actions, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

394.    On November 4, 2019, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2019 (the "3Q19 10-Q"). The 3Q19 10-Q was signed by Defendants Campanelli and Coleman.

395.    In a section entitled "Opioid-Related Matters" the 3Q18 10-Q disclosed that:

> Since 2014, multiple U.S. states, counties, other governmental persons or entities and private plaintiffs have filed suit against us and/or certain of our subsidiaries, including Endo Health Solutions Inc. (EHSI), EPI, PPI, Par Pharmaceutical Companies, Inc. (PPCI), Endo Generics Holdings, Inc. (EGHI), Vintage Pharmaceuticals, LLC, Generics Bidco I, LLC and DAVA Pharmaceuticals, LLC, as well as various other manufacturers, distributors, pharmacies and/or others, asserting claims relating to defendants' alleged sales, marketing and/or distribution practices with respect to prescription opioid medications, including certain of our products. As of October 29, 2019, the cases of which we were aware include, but are not limited to, approximately *18 cases* filed by or on behalf of states; approximately *2,500 cases* filed by counties, cities, Native American tribes and/or other government-related persons or entities; approximately *240 cases* filed by hospitals, health systems, unions, health and welfare funds or other third-party payers and approximately *140 cases* filed by individuals. Certain of the cases have been filed as putative class actions.

396.    After this disclosure, the 3Q19 10-Q unequivocally stated that "***We will continue to vigorously defend the foregoing matters and to explore other options as appropriate in our best interests***."

397.    Defendants' statements misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 290.

In addition, Defendants' statements were misleading because they failed to disclose that Endo was concurrently engaging in a secret campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

398.    Additionally, the 3Q19 10-Q directed investors to the 2018 10-K, 2Q19 10-Q and 1Q19 10-Q:

> For a discussion of our risk factors, see the information in Part 1, Item 1A. "Risk Factors" in the Annual Report and the information in Part II, Item 1A under the caption "Risk Factors" of our Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2019 and June 30, 2019.

The 3Q19 10-Q thus incorporated risk factors in the 2018 10-K, 2Q19 10-Q and 1Q19 10-Q, set forth in paragraphs 359–63, 375–76, and 388–89 above that attributed, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than to Defendants' own misconduct. The 3Q19 10-Q also incorporated the risk factor in the 2018 10-K that attributed, in part, the risks to the Company's business from the opioid epidemic to negative media publicity. Accordingly, by incorporating the disclosure from the 2018 10-K, 2Q19 10-Q and 1Q19 10-Q, the 3Q19 10-Q misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. The statements were false and misleading when made for the reasons alleged above at paragraph 290. These warnings were also misleading because they failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

399.    Additionally, the 3Q19 10-Q contained generic, boilerplate representations regarding Endo's supposed view of its liquidity risks. The 3Q19 10-Q, disclosed that:

> We expect our operating cash flows, together with our cash, cash equivalents, restricted cash and restricted cash equivalents to be sufficient to cover our principal liquidity requirements over the next year. However, on a longer term basis, we may not be able to accurately predict the effect of certain developments on our sales and gross margins, such as the degree of market acceptance, patent protection and exclusivity of our products, pricing pressures (including those due to the impact of competition), the effectiveness of our sales and marketing efforts and the outcome of our current efforts to develop, receive approval for and successfully launch our product candidates. We may also face unexpected expenses in connection with our business operations, ***including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities***. Furthermore, we may not be successful in implementing, or may face unexpected changes or expenses in connection with our strategic direction, including the potential for opportunistic corporate development transactions. Any of the above could have a material adverse effect on our business, financial condition, results of operations and cash flows.

400.    The statements in bold in paragraph 399 above, when read together with the statements in paragraphs 359–63 above, which were incorporated by reference from the 2018 10-K, were not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud. The statement "we face significant risks and uncertainties relating to our outstanding and future legal proceedings and governmental investigations, including those related to our sale, marketing and/or distribution of prescription opioid medications" directed investors to a risk factor that misleadingly attributed the Company's exposure to liability to overzealous plaintiffs' attorneys and downplayed the Company's misconduct. In addition, the warnings were misleading because they did not disclose

that Defendants knew that the Company already lacked sufficient liquidity to address the full scope of the liability it was facing in opioid-related actions.

401.    Appended as exhibits to the 3Q19 10-Q were signed certifications pursuant to SOX, wherein Defendants Campanelli and Coleman certified that "[t]he [3Q19 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [3Q19 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the 3Q19 10-Q, as set forth in paragraphs 394–400 above, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, did not advise investors that the Company faced liability in opioid-related actions due to its misconduct, as well as billions in liability in New York for insurance fraud, failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

### D.    2020 Misstatements

402.    On February 26, 2020, the Company filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2019 (the "2019 10-K"). The 2019 10-K was signed by Defendants Campanelli and Coleman.

403.    In a section entitled "Opioid-Related Matters" the 2019 10-K disclosed that:

> Since 2014, multiple U.S. states and other governmental persons or entities and private plaintiffs in the U.S. and Canada have filed suit against    us    and/or    certain    of    our    subsidiaries,

including EHSI, EPI, PPI, PPCI, Endo Generics Holdings, Inc. (EGHI), Vintage Pharmaceuticals, LLC, Generics Bidco I, LLC and DAVA Pharmaceuticals, LLC, and in Canada, Paladin, as well as various other manufacturers, distributors, pharmacies and/or others, asserting claims relating to defendants' alleged sales, marketing and/or distribution practices with respect to prescription opioid medications, including certain of our products. As of February 18, 2020, the cases in the U.S. of which we were aware include, but are not limited to, approximately ***20 cases*** filed by or on behalf of states; approximately ***2,700 cases*** filed by counties, cities, Native American tribes and/or other government-related persons or entities; approximately ***280 cases*** filed by hospitals, health systems, unions, health and welfare funds or other third-party payers and approximately ***160 cases*** filed by individuals. Certain of the cases have been filed as putative class actions.

404. After this disclosure, the 2019 10-K stated unequivocally that "***We will continue to vigorously defend the foregoing matters and to explore other options as appropriate in our best interests***."

405. Defendants' statements misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 290. In addition, Defendants' statements were misleading because they failed to disclose that Endo was concurrently engaging in a secret campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

406. The 2019 10-K also attributed the Company's risks arising out of the opioid crisis to negative media coverage, rather than Endo's own misconduct. For example, the 2019 10-K stated that:

In recent years, opioid abuse has received a high degree of media

coverage. Unfavorable publicity regarding, for example, the use or misuse of oxycodone or other prescription opioid medications, the limitations of abuse-deterrent forms, public inquiries and investigations into drug abuse, including the abuse of prescription products, litigation or regulatory activity could adversely affect our reputation. Additionally, increased scrutiny of opioids generally, whether focused on our products or otherwise, could negatively impact our relationship with healthcare providers and other members of the healthcare community. Such negative publicity could have an adverse effect on the potential size of the market for new or existing products and could decrease revenues and royalties, any of which could have a material adverse effect on our business, financial condition, results of operations and cash flows.

407.    The statements alleged above in paragraph 406 characterizing Endo's business risk as merely a reflection of "a high degree of media coverage," "unfavorable media coverage," "negative publicity" and "increased scrutiny of opioids generally"—rather than the Company's severe misconduct—downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not apprise investors that the Company's prior conduct could result in billions in liability in New York (and elsewhere). By making these statements, which attributed the risk to Endo from the opioid epidemic to media coverage, Defendants had an obligation to disclose all facts necessary to make their statements not misleading. In addition, the statements were false and misleading when made for the reasons alleged above at paragraph 290. These warnings were also misleading because they failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

408.    The 2019 10-K also included a "risk factor" that attributed risks to Endo's business from the opioid epidemic to "public concern" and "media stories," rather than Defendants' own misconduct. The 2019 10-K stated that:

***Public concern around the abuse of opioids or other products, including without limitation law enforcement concerns over diversion or marketing practices, regulatory efforts to combat abuse, and litigation could result in costs to our business.***

Media stories regarding drug abuse and diversion, including the abuse and diversion of prescription opioid medications and other controlled substances, are commonplace. Aggressive enforcement and unfavorable publicity regarding, for example, the use or misuse of opioids, the limitations of abuse-deterrent formulations, the ability of abusers to discover previously unknown ways to abuse our products, public inquiries and investigations into drug abuse or litigation or regulatory or enforcement activity regarding sales, marketing, distribution or storage of opioids could have a material adverse effect on our reputation, on the results of litigation and on our ability to attract or maintain relationships with third-party partners, including suppliers, vendors, advisors, distributors, manufacturers, collaboration partners, administrators and agents.

Manufacturers of prescription opioid medications have been the subject of significant civil and criminal investigatory and enforcement actions even in cases where such medications have received approval from the FDA or similar regulatory authorities. Numerous governmental and private persons and entities are pursuing litigation against opioid manufacturers, including us, as well as distributors and others, asserting alleged violations of various laws and regulations relating to opioids and/or other prescription medicines, relying on common law theories, and seeking to hold the defendants accountable for, among other things, societal costs associated with the misuse and abuse of prescription opioid medications as well as non-prescription opioids.

409. The statements alleged above in paragraph 408 characterizing Endo's business risk as merely a reflection of "***[p]ublic concern around the abuse of opioids***," and "***media stories regarding prescription drug abuse and the diversion of opioids***" misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. By making these statements, which attributed the risk to Endo from the opioid epidemic to media coverage, Defendants had an obligation to disclose all facts necessary to make their

statements not misleading. In addition, the statements were false and misleading when made for the reasons alleged above at paragraph 290. These warnings were also misleading because they failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

410.    Additionally, the 2019 10-K downplayed the scope of Defendants' wrongdoing and responsibility for the opioid-related actions by attributing, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than to Defendants' own misconduct. For example, in a section entitled "Risk Factors," the 2019 10-K asserted that, "in the age of social media, plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients for litigation, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool"; that, "[f]or these or other reasons, any significant product liability or mass tort litigation in which [Defendants] are a defendant could have a larger number of plaintiffs than such actions have seen historically and [Defendants] could also see an increase in number of cases filed against [them] because of the increasing use of widespread and media-varied advertising"; and that, "a ruling against other pharmaceutical companies in product liability or mass tort litigation in which we are not a defendant could have a negative impact on pending litigation where we are a defendant."

411.    The statements alleged above in paragraph 410 characterizing Endo's litigation risk as merely a reflection of the fact that "plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool," rather than the Company's misconduct,

communicated to or gave investors the impression that the claims in opioid-related actions were a result of greater advertising capabilities of plaintiffs' lawyers rather than Endo's significant misconduct in promoting Endo Opioids, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced billions in liability in New York for insurance fraud. The statements were false and misleading when made for the reasons alleged above at paragraph 290. These warnings were also misleading because they failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

412.    The 2019 10-K also included the following risk factor:

> ***Our ability to fund our operations, maintain liquidity and meet our financing obligations is reliant on our operations, which are subject to significant risks and uncertainties.***
>
> We rely on cash from operations as well as access to the financial markets to fund our operations, maintain liquidity and meet our financial obligations. Our operations are subject to many significant risks and uncertainties, such as the risks described in this "Risk Factors" section, including those related to generic competition and legal challenges that could impact our key products, including VASOSTRICT®, outstanding and future legal proceedings and governmental investigations, including those related to our sale, marketing and/or distribution of prescription opioid medications, and others.
>
> . . . .
>
> Any refinancing of our substantial indebtedness could be at significantly higher interest rates, which will depend on the conditions of the markets and our financial condition at such time, and may require us to comply with more onerous covenants, which could further restrict our business operations. Any refinancing may also increase the amount of our secured indebtedness. In addition, the terms of existing or future debt agreements may restrict us from adopting any of these alternatives. Likewise, any internal

> reorganizations, restructuring activities, strategic corporate alignments, cost-saving initiatives or asset sales may be complex, could entail significant costs and charges or could otherwise negatively impact shareholder value and there can be no assurance that we will be able to accomplish any of these alternatives on terms acceptable to us, or at all, or that they will result in their intended benefits.

413.    Additionally, the 2019 10-K contained generic, boilerplate representations regarding Endo's supposed view of its liquidity risks. The 2019 10-K, disclosed that:

> We expect our operating cash flows, together with our cash, cash equivalents, restricted cash, and restricted cash equivalents, to be sufficient to cover our principal liquidity requirements over the next year. However, on a longer term basis, we may not be able to accurately predict the effect of certain developments on our sales and gross margins, such as the degree of market acceptance, patent protection and exclusivity of our products, pricing pressures (including those due to the impact of competition), the effectiveness of our sales and marketing efforts and the outcome of our current efforts to develop, receive approval for and successfully launch our product candidates. We may also face unexpected expenses in connection with our business operations, ***including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities***. Furthermore, we may not be successful in implementing, or may face unexpected changes or expenses in connection with our strategic direction, including the potential for opportunistic corporate development transactions. Any of the above could have a material adverse effect on our business, financial condition, results of operations and cash flows.

414.    Read together, the statements in paragraphs 412–13 above were not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud. In addition, the warnings were misleading because they did not disclose that Defendants knew that the Company already lacked sufficient liquidity to address the full scope of the liability it was facing in opioid-related actions.

415.    Appended as exhibits to the 2019 10-K were signed certifications pursuant to SOX, wherein Defendants Campanelli and Coleman certified that "[t]he [2019 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [2019 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the 2019 10-K, as set forth in paragraphs 402–14 above, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, did not advise investors that the Company faced liability in opioid-related actions due to its misconduct, as well as billions in liability in New York for insurance fraud, failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

416.    On May 7, 2020, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2020 (the "1Q20 10-Q"). The 1Q20 10-Q was signed by Defendants Coleman and Bradley.

417.    In a section entitled "Opioid-Related Matters" the 1Q20 10-Q disclosed that:

> Since 2014, multiple U.S. states as well as other governmental persons or entities and private plaintiffs in the U.S. and Canada have filed suit against us and/or certain of our subsidiaries, including Endo Health Solutions Inc. (EHSI), Endo Pharmaceuticals Inc. (EPI), Par Pharmaceutical, Inc. (PPI), Par Pharmaceutical Companies, Inc. (PPCI), Endo Generics Holdings, Inc. (EGHI), Vintage Pharmaceuticals, LLC, Generics Bidco I, LLC and DAVA Pharmaceuticals, LLC, and in Canada, Paladin, as well as various other manufacturers, distributors, pharmacies and/or others, asserting claims relating to defendants' alleged sales, marketing

and/or distribution practices with respect to prescription opioid medications, including certain of our products. As of April 30, 2020, filed cases in the U.S. of which we were aware include, but are not limited to, approximately *20 cases* filed by or on behalf of states; approximately *2,780 cases* filed by counties, cities, Native American tribes and/or other government-related persons or entities; approximately *280 cases* filed by hospitals, health systems, unions, health and welfare funds or other third-party payers and approximately *160 cases* filed by individuals. Certain of these cases have been filed as putative class actions.

418.    After this disclosure, the 1Q20 10-Q unequivocally stated that "***We will continue to vigorously defend the foregoing matters and to explore other options as appropriate in our best interests***."

419.    Defendants' statement misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 290. In addition, Defendants' statements were misleading because they failed to disclose that Endo was concurrently engaging in a secret campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

420.    The 1Q20 10-Q also attributed, in part, the risks to the Company's business from the opioid epidemic to negative media publicity. The 1Q20 stated, "we and other manufacturers of prescription opioid medications have been, and will likely continue to be, subject to negative publicity and press, which could harm our brand and the demand for our products."

421.    The statements alleged above in paragraph 420 characterizing Endo's business risk as merely a reflection of "***negative publicity and press***" misleadingly downplayed the allegations

in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. By making these statements, which attributed the risk to Endo from the opioid epidemic to media coverage, Defendants had an obligation to disclose all facts necessary to make their statements not misleading. In addition, the statements were false and misleading when made for the reasons alleged above at paragraph 290. These warnings were also misleading because they failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

422.    Additionally, the 1Q20 10-Q downplayed the scope of Defendants' wrongdoing and responsibility for the opioid-related actions by attributing, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than to Defendants' own misconduct. For example, in a section entitled "Risk Factors," the 1Q20 10-Q asserted that, "in the age of social media, plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients for litigation, including using judgments and settlements obtained in litigation against [them] or other pharmaceutical companies as an advertising tool"; that, "[f]or these or other reasons, any product liability or other litigation in which [Defendants] are a defendant could have a larger number of plaintiffs than such actions have seen historically and [Defendants] could also see an increase in number of cases filed against [them] because of the increasing use of widespread and media-varied advertising"; and that, "a

ruling against other pharmaceutical companies in product liability or other litigation in which we are not a defendant could have a negative impact on pending litigation where we are a defendant."

423.    The statements alleged above in paragraph 422 characterizing Endo's litigation risk as merely a reflection of the fact that "plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool," rather than the Company's misconduct, communicated to or gave investors the impression that the claims in opioid-related actions were a result of greater advertising capabilities of plaintiffs' lawyers rather than Endo's significant misconduct in promoting Endo Opioids, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced billions in liability in New York for insurance fraud. The statements were false and misleading when made for the reasons alleged above at paragraph 290. These warnings were also misleading because they failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

424.    Additionally, the 1Q20 10-Q contained generic, boilerplate representations regarding Endo's supposed view of its liquidity risks. The 1Q20 10-Q, disclosed that:

> While we currently expect our operating cash flows, together with our cash, cash equivalents, restricted cash and restricted cash equivalents, to be sufficient to cover our principal liquidity requirements over the next year, the extent to which COVID-19 could impact our business, financial condition, results of operations and cash flows in the short- and medium-term cannot be predicted with certainty, but such impact could be material. Although we did not experience significant disruptions to our business during the three months ended March 31, 2020 from COVID-19, we have since experienced and expect that we, and our industry as a whole, will

continue to experience a greater impact going forward. To the extent COVID-19 has resulted in any increase to our Cash and cash equivalents, including as a result of any increase in revenues as described above, such increase could be temporary. Additionally, on a longer term basis, we may not be able to accurately predict the effect of certain developments on our sales and gross margins, such as the degree of market acceptance, patent protection and exclusivity of our products, pricing pressures (including those due to the impact of competition), the effectiveness of our sales and marketing efforts and the outcome of our current efforts to develop, receive approval for and successfully launch our product candidates. We may also face unexpected costs in connection with our business operations, ***our ongoing and future legal proceedings, governmental investigations and other contingent liabilities***, ***including potential costs related to settlements and judgments, as well as legal defense costs***, and the implementation of our COVID-19 related policies and procedures. Furthermore, we may not be successful in implementing, or may face unexpected changes or expenses in connection with our strategic direction, including the potential for opportunistic corporate development transactions. Any of the above could have a material adverse effect on our business, financial condition, results of operations and cash flows and require us to seek additional sources of liquidity and capital resources as described below. For information regarding the impact of COVID-19 on the Company, including on our liquidity and capital resources, please refer to "Risk Factors" in Part II, Item 1A.

425.    The statements in bold in paragraph 424 above, when read together with the statements in paragraphs 406–11 above, which were incorporated by reference from the 2019 10-K, were not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud. The statement "we may also face unexpected expenses in connection with our business operations, our ongoing and future legal proceedings, governmental investigations and other contingent liabilities, including potential costs related to settlements and judgments, as well as legal defense costs" directed investors to a risk factor that misleadingly attributed the Company's exposure to liability to overzealous plaintiffs' attorneys and downplayed the Company's misconduct. In addition, the warnings were misleading

because they did not disclose that Defendants knew that the Company already lacked sufficient liquidity to address the full scope of the liability it was facing in opioid-related actions.

426.    Appended as exhibits to the 1Q20 10-Q were signed certifications pursuant to the SOX, wherein Defendants Coleman and Bradley certified that "[t]he [1Q20 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [1Q20 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." statements were false and misleading because the 1Q20 10-Q, as set forth in paragraphs 416–25 above, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, did not advise investors that the Company faced liability in opioid-related actions due to its misconduct, as well as billions in liability in New York for insurance fraud, failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

427.    On August 6, 2020, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2020 (the "2Q20 10-Q"). The 2Q20 10-Q was signed by Defendants Coleman and Bradley.

428.    In a section entitled "Opioid-Related Matters" the 2Q20 10-Q disclosed that:

> Since 2014, multiple U.S. states as well as other governmental persons or entities and private plaintiffs in the U.S. and Canada have filed suit against us and/or certain of our subsidiaries, including Endo Health Solutions Inc. (EHSI), Endo Pharmaceuticals Inc. (EPI), Par Pharmaceutical, Inc. (PPI), Par Pharmaceutical Companies, Inc. (PPCI), Endo Generics Holdings, Inc. (EGHI),

Vintage Pharmaceuticals, LLC, Generics Bidco I, LLC and DAVA Pharmaceuticals, LLC, and in Canada, Paladin, as well as various other manufacturers, distributors, pharmacies and/or others, asserting claims relating to defendants' alleged sales, marketing and/or distribution practices with respect to prescription opioid medications, including certain of our products. As of July 30, 2020, filed cases in the U.S. of which we were aware include, but are not limited to, approximately *20 cases* filed by or on behalf of states; approximately *2,840 cases* filed by counties, cities, Native American tribes and/or other government-related persons or entities; approximately *290 cases* filed by hospitals, health systems, unions, health and welfare funds or other third-party payers and approximately *165 cases* filed by individuals. Certain of these cases have been filed as putative class actions.

429.    After this disclosure, the 2Q20 10-Q unequivocally stated that "*We will continue to vigorously defend the foregoing matters and to explore other options as appropriate in our best interests*."

430.    Defendants' statements misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 290. In addition, Defendants' statements were misleading because they failed to disclose that Endo was concurrently engaging in a secret campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

431.    Additionally, the 2Q20 10-Q directed investors to the 2019 10-K and 1Q20 10-Q:

For a discussion of our risk factors, see the information in Part 1, Item 1A. "Risk Factors" in the Annual Report and in Part II, Item 1A. "Risk Factors" of our First Quarter 2020 Form 10-Q.

The 2Q20 10-Q thus incorporated risk factors in the 2019 10-K and 1Q20 10-Q, set forth in paragraphs 406–11 and 420–23 above that attributed, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than to Defendants' own misconduct. The 2Q20 10-Q also incorporated the risk factor in the 2019 10-K that attributed, in part, the risks to the Company's business from the opioid epidemic to negative media publicity. Accordingly, by incorporating the disclosure from the 2019 10-K and 1Q20 10-Q, the 2Q20 10-Q misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. The statements were false and misleading when made for the reasons alleged above at paragraph 290. These warnings were also misleading because they failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

432.    Additionally, the 2Q20 10-Q contained generic, boilerplate representations regarding Endo's supposed view of its liquidity risks. The 2Q20 10-Q, disclosed that:

> While we currently expect our operating cash flows, together with our cash, cash equivalents, restricted cash and restricted cash equivalents to be sufficient to cover our principal liquidity requirements over the next year, the extent to which COVID-19 could impact our business, financial condition, results of operations and cash flows in the short- and medium-term cannot be predicted with certainty, but such impact could be material. To the extent COVID-19 has resulted in any increase to our Cash and cash equivalents, including as a result of any increase in revenues as described above, such increase could be temporary. Additionally, on a longer term basis, we may not be able to accurately predict the effect of certain developments on our sales and gross margins, such

as the degree of market acceptance, patent protection and exclusivity of our products, pricing pressures (including those due to the impact of competition), the effectiveness of our sales and marketing efforts and the outcome of our current efforts to develop, receive approval for and successfully launch our product candidates. We may also face unexpected expenses in connection with our business operations*, including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities, including related to settlements and judgments, as well as legal defense costs*, and the implementation of our COVID-19 related policies and procedures. Furthermore, we may not be successful in implementing, or may face unexpected changes or expenses in connection with our strategic direction, including the potential for opportunistic corporate development transactions. Any of the above could have a material adverse effect on our business, financial condition, results of operations and cash flows and require us to seed additional sources of liquidity and capital resources as described below.

433.    The statements in bold in paragraph 432 above, when read together with the statements in paragraphs 412–13 above, which were incorporated by reference from the 2019 10-K, were not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud. In addition, the warnings were misleading because they did not disclose that Defendants knew that the Company already lacked sufficient liquidity to address the full scope of the liability it was facing in opioid-related actions.

434.    Appended as exhibits to the 2Q20 10-Q were signed certifications pursuant to SOX, wherein Defendants Coleman and Bradley certified that "[t]he [2Q20 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [2Q20 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the 2Q20 10-Q, as set forth in paragraphs 427–33 above, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, did

not advise investors that the Company faced liability in opioid-related actions due to its misconduct, as well as billions in liability in New York for insurance fraud, failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

435.    On November 6, 2020, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2020 (the "3Q20 10-Q"). The 3Q20 10-Q was signed by Defendants Coleman and Bradley.

436.    In a section entitled "Opioid-Related Matters" the 1Q20 10-Q disclosed that:

> Since 2014, multiple U.S. states as well as other governmental persons or entities and private plaintiffs in the U.S. and Canada have filed suit against us and/or certain of our subsidiaries, including Endo Health Solutions Inc. (EHSI), Endo Pharmaceuticals Inc. (EPI), Par Pharmaceutical, Inc. (PPI), Par Pharmaceutical Companies, Inc. (PPCI), Endo Generics Holdings, Inc. (EGHI), Vintage Pharmaceuticals, LLC, Generics Bidco I, LLC and DAVA Pharmaceuticals, LLC, and in Canada, Paladin, as well as various other manufacturers, distributors, pharmacies and/or others, asserting claims relating to defendants' alleged sales, marketing and/or distribution practices with respect to prescription opioid medications, including certain of our products. As of October 30, 2020, filed cases in the U.S. of which we were aware include, but are not limited to, approximately *20 cases* filed by or on behalf of states; approximately *2,870 cases* filed by counties, cities, Native American tribes and/or other government-related persons or entities; approximately *295 cases* filed by hospitals, health systems, unions, health and welfare funds or other third-party payers and approximately *175 cases* filed by individuals. Certain of these cases have been filed as putative class actions.

437.    After this disclosure, the 3Q20 10-Q unequivocally stated that "*We will continue to vigorously defend the foregoing matters and to explore other options as appropriate in our best interests*."

438.    Defendants' statements misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 290. In addition, Defendants' statements were misleading because they failed to disclose that Endo was concurrently engaging in a secret campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

439.    Additionally, the 3Q20 10-Q directed investors to the 2019 10-K and 1Q20 10-Q:

> For a discussion of our risk factors, see the information in Part 1, Item 1A. "Risk Factors" in the Annual Report and in Part II, Item 1A. "Risk Factors" of our First Quarter Form 10-Q.

The 3Q20 10-Q thus incorporated risk factors in the 2019 10-K and 1Q20 10-Q, set forth in paragraphs 406–11, 420–23, and 431 above that attributed, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than to Defendants' own misconduct. The 3Q20 10-Q also incorporated the risk factor in the 2019 10-K that attributed, in part, the risks to the Company's business from the opioid epidemic to negative media publicity. Accordingly, by incorporating the disclosure from the 2019 10-K and 1Q20 10-Q, the 3Q20 10-Q misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance

fraud as a result of Endo's misconduct with regard to the opioid crisis. The statements were false and misleading when made for the reasons alleged above at paragraph 290. These warnings were also misleading because they failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

440.    Additionally, the 3Q20 10-Q contained generic, boilerplate representations regarding Endo's supposed view of its liquidity risks. The 2Q20 10-Q, disclosed that:

> While we currently expect our operating cash flows, together with our cash, cash equivalents, restricted cash and restricted cash equivalents to be sufficient to cover our principal liquidity requirements over the next year, the extent to which COVID-19 could impact our business, financial condition, results of operations and cash flows in the short- and medium-term cannot be predicted with certainty, but such impact could be material. To the extent COVID-19 has resulted in any increase to our Cash and cash equivalents, including as a result of any increase in revenues as described above, such increase could be temporary. Additionally, on a longer term basis, we may not be able to accurately predict the effect of certain developments on our sales and gross margins, such as the degree of market acceptance, patent protection and exclusivity of our products, pricing pressures (including those due to the impact of competition), the effectiveness of our sales and marketing efforts and the outcome of our current efforts to develop, receive approval for and successfully launch our product candidates. We may also face unexpected expenses in connection with our business operations, ***including expenses related to our ongoing and future legal proceedings and governmental investigations and other contingent liabilities, including related to settlements and judgments, as well as legal defense costs***, and the implementation of our COVID-19 related policies and procedures. Furthermore, we may not be successful in implementing, or may face unexpected changes or expenses in connection with our strategic direction, including the potential for opportunistic corporate development transactions. Any of the above could have a material adverse effect on our business, financial condition, results of operations and cash flows and require us to seed additional sources of liquidity and capital resources as described below.

441.    The statements in bold in paragraph 440 above, when read together with the statements in paragraphs 412–13 above, which were incorporated by reference from the 2019 10-K, were not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud. The statement "we face significant risks and uncertainties relating to our outstanding and future legal proceedings and governmental investigations, including those related to our sale, marketing and/or distribution of prescription opioid medications" directed investors to a risk factor that misleadingly attributed the Company's exposure to liability to overzealous plaintiffs' attorneys and downplayed the Company's misconduct. In addition, the warnings were misleading because they did not disclose that Defendants knew that the Company already lacked sufficient liquidity to address the full scope of the liability it was facing in opioid-related actions.

442.    Appended as exhibits to the 3Q20 10-Q were signed certifications pursuant to SOX, wherein Defendants Coleman and Bradley certified that "[t]he [3Q20 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [3Q20 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the 3Q20 10-Q, as set forth in paragraphs 435–41 above, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, did not advise investors that the Company faced liability in opioid-related actions due to its misconduct, as well as billions in liability in New York for insurance fraud, failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the

allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

**E.    2021 Misstatements**

443.    On February 26, 2021, the Company filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2020 (the "2020 10-K"). The 2020 10-K was signed by Defendants Coleman and Bradley.

444.    In a section entitled "Opioid-Related Matters" the 2020 10-K disclosed that:

> Since 2014, multiple U.S. states and other governmental persons or entities and private plaintiffs in the U.S. and Canada have filed suit against us and/or certain of our subsidiaries, including EHSI, EPI, PPI, PPCI, Endo Generics Holdings, Inc. (EGHI), Vintage Pharmaceuticals, LLC, Generics Bidco I, LLC and DAVA Pharmaceuticals, LLC, and in Canada, Paladin, as well as various other manufacturers, distributors, pharmacies and/or others, asserting claims relating to defendants' alleged sales, marketing and/or distribution practices with respect to prescription opioid medications, including certain of our products. As of February 18, 2021, the cases in the U.S. of which we were aware include, but are not limited to, approximately ***20 cases*** filed by or on behalf of states; approximately ***2,890 cases*** filed by counties, cities, Native American tribes and/or other government-related persons or entities; approximately ***300 cases*** filed by hospitals, health systems, unions, health and welfare funds or other third-party payers and approximately ***185 cases*** filed by individuals. Certain of the cases have been filed as putative class actions.

445.    After this disclosure, the 2020 10-K stated unequivocally that ***"We will continue to vigorously defend the foregoing matters and to explore other options as appropriate in our best interests."***

446.    Defendants' statements misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling

opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 290. In addition, Defendants' statements were misleading because they failed to disclose that Endo was concurrently engaging in a secret campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

447.    The 2020 10-K also attributed the Company's risks arising out of the opioid crisis to negative media coverage, rather than Endo's own misconduct. For example, the 2020 10-K stated that:

> In recent years, opioid abuse has received a high degree of media coverage. Unfavorable publicity regarding, for example, the use or misuse of oxycodone or other prescription opioid medications, the limitations of abuse-deterrent forms, public inquiries and investigations into drug abuse, including the abuse of prescription products, litigation or regulatory activity could adversely affect our reputation. Additionally, increased scrutiny of opioids generally, whether focused on our products or otherwise, could negatively impact our relationship with healthcare providers and other members of the healthcare community. Such negative publicity could have an adverse effect on the potential size of the market for new or existing products and could decrease revenues and royalties, any of which could have a material adverse effect on our business, financial condition, results of operations and cash flows.

448.    The statements alleged above in paragraph 447 characterizing Endo's business risk as merely a reflection of "a high degree of media coverage," "unfavorable media coverage," "negative publicity" and "increased scrutiny of opioids generally"—rather than the Company's severe misconduct—downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not apprise investors that the Company's prior conduct could result in billions in liability in New York (and elsewhere). By making these

statements, which attributed the risk to Endo from the opioid epidemic to media coverage, Defendants had an obligation to disclose all facts necessary to make their statements not misleading. In addition, the statements were false and misleading when made for the reasons alleged above at paragraph 290. These warnings were also misleading because they failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

449.    The 2020 10-K also included a "risk factor" that attributed risks to Endo's business from the opioid epidemic to "public concern" and "media stories," rather than Defendants' own misconduct. The 2020 10-K stated that:

> *Public concern around the abuse of opioids or other products, including without limitation law enforcement concerns over diversion or marketing practices, regulatory efforts to combat abuse, and litigation could result in costs to our business.*
>
> Media stories regarding drug abuse and diversion, including the abuse and diversion of prescription opioid medications and other controlled substances, are commonplace. Aggressive enforcement and unfavorable publicity regarding, for example, the use or misuse of opioids, the limitations of abuse-deterrent formulations, the ability of abusers to discover previously unknown ways to abuse our products, public inquiries and investigations into drug abuse or litigation or regulatory or enforcement activity regarding sales, marketing, distribution or storage of opioids could have a material adverse effect on our reputation, on the results of litigation and on our ability to attract or maintain relationships with third-party partners, including suppliers, vendors, advisors, distributors, manufacturers, collaboration partners, administrators and agents.
>
> Manufacturers of prescription opioid medications have been the subject of significant civil and criminal investigatory and enforcement actions even in cases where such medications have received approval from the FDA or similar regulatory authorities. Numerous governmental and private persons and entities are pursuing litigation against opioid manufacturers, including us, as

well as distributors and others, asserting alleged violations of various laws and regulations relating to opioids and/or other prescription medicines, relying on common law theories, and seeking to hold the defendants accountable for, among other things, societal costs associated with the misuse and abuse of prescription opioid medications as well as non-prescription opioids.

450.     The statements alleged above in paragraph 449 characterizing Endo's business risk as merely a reflection of "*[p]ublic concern around the abuse of opioids*," and "*media stories* regarding prescription drug abuse and the diversion of opioids" misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. By making these statements, which attributed the risk to Endo from the opioid epidemic to media coverage, Defendants had an obligation to disclose all facts necessary to make their statements not misleading. In addition, the statements were false and misleading when made for the reasons alleged above at paragraph 290. These warnings were also misleading because they failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

451.     Additionally, the 2020 10-K downplayed the scope of Defendants' wrongdoing and responsibility for the opioid-related actions by attributing, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than to Defendants' own misconduct. For example, in a section entitled "Risk Factors," the 2020 10-K asserted that, "in the age of social media, plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients for litigation, including using judgments

obtained in litigation against other pharmaceutical companies as an advertising tool"; that, "[f]or these or other reasons, any significant product liability or other litigation in which [Defendants] are a defendant could have a larger number of plaintiffs than such actions have seen historically and [Defendants] could also see an increase in number of cases filed against [them] because of the increasing use of widespread and media-varied advertising"; and that, "a ruling against other pharmaceutical companies in product liability or other litigation, or any related settlement, in which we are not a defendant could have a negative impact on pending litigation where we are a defendant."

452.    The statements alleged above in paragraph 451 characterizing Endo's litigation risk as merely a reflection of the fact that "plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool," rather than the Company's misconduct, communicated to or gave investors the impression that the claims in opioid-related actions were a result of greater advertising capabilities of plaintiffs' lawyers rather than Endo's significant misconduct in promoting Endo Opioids, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced billions in liability in New York for insurance fraud. The statements were false and misleading when made for the reasons alleged above at paragraph 290. These warnings were also misleading because they failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

453.    The 2020 10-K also included the following risk factor:

***Our ability to fund our operations, maintain liquidity and meet our financing obligations is reliant on our operations, which are subject to significant risks and uncertainties.***

We rely on cash from operations as well as access to the financial markets to fund our operations, maintain liquidity and meet our financial obligations. Our operations are subject to many significant risks and uncertainties, such as the risks described in this "Risk Factors" section, including those related to generic competition and legal challenges that could impact our key products, including VASOSTRICT®, outstanding and future legal proceedings and governmental investigations, including those related to our sale, marketing and/or distribution of prescription opioid medications, and others.

. . . .

Any refinancing of our substantial indebtedness could be at significantly higher interest rates, which will depend on the conditions of the markets and our financial condition at such time, and may require us to comply with more onerous covenants, which could further restrict our business operations. Any refinancing may also increase the amount of our secured indebtedness. Negative developments in legal or other proceedings could also make it more difficult to consummate any of these transactions. In addition, the terms of existing or future debt agreements may restrict us from adopting any of these alternatives. Likewise, any reorganizations or restructuring activities, corporate realignments, asset sales or divestitures, strategic partnerships or other actions that we take may be complex, could entail significant costs and charges or could otherwise negatively impact shareholder value, and there can be no assurance that we will be able to accomplish any of these alternatives on terms acceptable to us, or at all, or that they will result in their intended benefits.

454.    Additionally, the 2020 10-K contained generic, boilerplate representations regarding Endo's supposed view of its liquidity risks. The 2020 10-K, disclosed that:

While we currently expect our operating cash flows, together with our cash, cash equivalents, restricted cash and restricted cash equivalents, to be sufficient to cover our principal liquidity requirements over the next year, the extent to which COVID-19 could impact our business, financial condition, results of operations and cash flows in the short- and medium-term cannot be predicted with certainty, but such impact could be material. To the extent COVID-19 has resulted in any increase to our Cash and cash

equivalents, including as a result of any increase in revenues as described above, such increase could be temporary. Additionally, on a longer term basis, we may not be able to accurately predict the effect of certain developments on our sales and gross margins, such as the degree of market acceptance, patent protection and exclusivity of our products, pricing pressures (including those due to the impact of competition), the effectiveness of our sales and marketing efforts and the outcome of our current efforts to develop, receive approval for and successfully launch our product candidates. We may also face unexpected costs in connection with our business operations, ***our ongoing and future legal proceedings, governmental investigations and other contingent liabilities, including potential costs related to settlements and judgments, as well as legal defense costs***, and the implementation of our COVID-19 related policies and procedures. Furthermore, we may not be successful in implementing, or may face unexpected changes or expenses in connection with, our strategic direction, including the potential for opportunistic corporate development transactions. Any of the above could have a material adverse effect on our business, financial condition, results of operations and cash flows and require us to seek additional sources of liquidity and capital resources as described below.

455. Read together, the statements in paragraphs 453–54 above were not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud. In addition, the warnings were misleading because they did not disclose that Defendants knew that the Company already lacked sufficient liquidity to address the full scope of the liability it was facing in opioid-related actions.

456. Appended as exhibits to the 2020 10-K were signed certifications pursuant to SOX, wherein Defendants Coleman and Bradley certified that "[t]he [2020 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [2020 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the 2020 10-K, as set forth in paragraphs 443–55 above, downplayed the scope of the

Company's wrongdoing and potential liability with respect to the opioid-related proceedings, did not advise investors that the Company faced liability in opioid-related actions due to its misconduct, as well as billions in liability in New York for insurance fraud, failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

457.    On May 7, 2021, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2021 (the "1Q21 10-Q"). The 1Q21 10-Q was signed by Defendants Coleman and Bradley.

458.    In a section entitled "Opioid-Related Matters" the 1Q21 10-Q disclosed that:

> Since 2014, multiple U.S. states as well as other governmental persons or entities and private plaintiffs in the U.S. and Canada have filed suit against us and/or certain of our subsidiaries, including Endo Health Solutions Inc. (EHSI), Endo Pharmaceuticals Inc. (EPI), Par Pharmaceutical, Inc. (PPI), Par Pharmaceutical Companies, Inc. (PPCI), Endo Generics Holdings, Inc. (EGHI), Vintage Pharmaceuticals, LLC, Generics Bidco I, LLC and DAVA Pharmaceuticals, LLC, and in Canada, Paladin, as well as various other manufacturers, distributors, pharmacies and/or others, asserting claims relating to defendants' alleged sales, marketing and/or distribution practices with respect to prescription opioid medications, including certain of our products. As of April 29, 2021, filed cases in the U.S. of which we were aware include, but are not limited to, approximately *20 cases* filed by or on behalf of states; approximately *2,900 cases* filed by counties, cities, Native American tribes and/or other government-related persons or entities; approximately *300 cases* filed by hospitals, health systems, unions, health and welfare funds or other third-party payers and approximately *190 cases* filed by individuals. Certain of these cases have been filed as putative class actions.

459.    After this disclosure, the 1Q21 10-Q unequivocally stated that "***We will continue to vigorously defend the foregoing matters, including but not limited to the Staubus matter, and to explore other options as appropriate in our best interests***."

460.    Defendants' statement misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements were false and misleading when made, however, for the reasons alleged above at paragraph 290. In addition, Defendants' statements were misleading because they failed to disclose that Endo was concurrently engaging in a secret campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

461.    Additionally, the 1Q21 10-Q directed investors to the 2020 10-K:

> For a discussion of our risk factors, see the information in Part 1, Item 1A. "Risk Factors" in the Annual Report.

The 1Q21 10-Q thus incorporated risk factors in the 2019 10-K, set forth in paragraphs 447–51 above that attributed, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical companies, rather than to Defendants' own misconduct. The 1Q21 10-Q also incorporated the risk factor in the 2019 10-K that attributed, in part, the risks to the Company's business from the opioid epidemic to negative media publicity. Accordingly, by incorporating the disclosure from the 2019 10-K, the 1Q21 10-Q misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's

misconduct with regard to the opioid crisis. The statements were false and misleading when made for the reasons alleged above at paragraph 290. These warnings were also misleading because they failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

462.    Additionally, the 1Q21 10-Q contained generic, boilerplate representations regarding Endo's supposed view of its liquidity risks. The 3Q1Q21 19 10-Q, disclosed that:

> While we currently expect our operating cash flows, together with our cash, cash equivalents, restricted cash and restricted cash equivalents to be sufficient to cover our principal liquidity requirements over the next year, the extent to which COVID-19 could impact our business, financial condition, results of operations and cash flows in the short- and medium-term cannot be predicted with certainty, but such impact could be material. To the extent COVID-19 has resulted in any increase to our Cash and cash equivalents, including as a result of any increase in revenues as described above, such increase could be temporary. Additionally, on a longer term basis, we may not be able to accurately predict the effect of certain developments on our sales and gross margins, such as the degree of market acceptance, patent protection and exclusivity of our products, pricing pressures (including those due to the impact of competition), the effectiveness of our sales and marketing efforts and the outcome of our current efforts to develop, receive approval for and successfully launch our product candidates. We may also face unexpected expenses in connection with our business operations, ***our ongoing and future legal proceedings, governmental investigations and other contingent liabilities***, ***including potential costs related to settlements and judgments, as well as legal defense costs***, and the implementation of our COVID-19 related policies and procedures. Furthermore, we may not be successful in implementing, or may face unexpected changes or expenses in connection with our strategic direction, including the potential for opportunistic corporate development transactions. Any of the above could have a material adverse effect on our business, financial condition, results of operations and cash flows and require us to seek additional sources of liquidity and capital resources as described below.

463.    The statements in bold in paragraph 461 above, when read together with the statements in paragraphs 453–54 above, which were incorporated by reference from the 2020 10-K, were not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York, much less investigations and proceedings related to insurance fraud. In addition, the warnings were misleading because they did not disclose that Defendants knew that the Company already lacked sufficient liquidity to address the full scope of the liability it was facing in opioid-related actions.

464.    Appended as exhibits to the 1Q21 10-Q were signed certifications pursuant to SOX, wherein Defendants Coleman and Bradley certified that "[t]he [1Q21 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [1Q21 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the 1Q21 10-Q, as set forth in paragraphs 457–63 above, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, did not advise investors that the Company faced liability in opioid-related actions due to its misconduct, as well as billions in liability in New York for insurance fraud, failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

465.    On August 6, 2021, the Company filed a quarterly report on Form 10-Q with the

SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2021

(the "2Q21 10-Q"). The 2Q21 10-Q was signed by Defendants Coleman and Bradley.

466.    In a section entitled "Opioid-Related Matters" the 2Q21 10-Q disclosed that:

> Since 2014, multiple U.S. states as well as other governmental
> persons or entities and private plaintiffs in the U.S. and Canada have
> filed suit against us and/or certain of our subsidiaries, including
> Endo Health Solutions Inc. (EHSI), Endo Pharmaceuticals Inc.
> (EPI), Par Pharmaceutical, Inc. (PPI), Par Pharmaceutical
> Companies, Inc. (PPCI), Endo Generics Holdings, Inc. (EGHI),
> Vintage Pharmaceuticals, LLC, Generics Bidco I, LLC and DAVA
> Pharmaceuticals, LLC, and in Canada, Paladin, as well as various
> other manufacturers, distributors, pharmacies and/or others,
> asserting claims relating to defendants' alleged sales, marketing
> and/or distribution practices with respect to prescription opioid
> medications, including certain of our products. As of July 29, 2021,
> filed cases in the U.S. of which we were aware include, but are not
> limited to, approximately *20 cases* filed by or on behalf of states;
> approximately *2,920 cases* filed by counties, cities, Native
> American tribes and/or other government-related persons or entities;
> approximately *310 cases* filed by hospitals, health systems, unions,
> health and welfare funds or other third-party payers and
> approximately *190 cases* filed by individuals. Certain of these cases
> have been filed as putative class actions.

467.    After this disclosure, the 2Q21 10-Q unequivocally stated that "*We will continue

to vigorously defend the foregoing matters and to explore other options as appropriate in our

best interests*."

468.    Defendants' statement misleadingly downplayed the allegations in the actions, did

not fully apprise investors of the extent of the Company's misconduct in marketing and selling

opioids, and did not advise investors that the Company faced billions in liability in New York for

insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. These statements

were false and misleading when made, however, for the reasons alleged above at paragraph 290.

In addition, Defendants' statements were misleading because they failed to disclose that Endo was

concurrently engaging in a secret campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

469.    The 2Q21 10-Q also attributed, in part, the risks to the Company's business from the opioid epidemic to negative media publicity. The 2Q21 stated, "we and other manufacturers of prescription opioid medications have been, and will likely continue to be, subject to negative publicity and press, which could harm our brand and the demand for our products."

470.    The statements alleged above in paragraph 469 characterizing Endo's business risk as merely a reflection of "***negative publicity and press***" misleadingly downplayed the allegations in the actions, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. By making these statements, which attributed the risk to Endo from the opioid epidemic to media coverage, Defendants had an obligation to disclose all facts necessary to make their statements not misleading. In addition, the statements were false and misleading when made for the reasons alleged above at paragraph 290. These warnings were also misleading because they failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

471.    Additionally, the 2Q21 10-Q downplayed the scope of Defendants' wrongdoing and responsibility for the opioid-related actions by attributing, in part, the Company's risk of litigation to, among other things, potential plaintiffs, their lawyers, and other pharmaceutical

companies, rather than to Defendants' own misconduct. For example, in a section entitled "Risk Factors," the 2Q21 10-Q asserted that, "in the age of social media, plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients for litigation, including using judgments and settlements obtained in litigation against [them] or other pharmaceutical companies as an advertising tool"; that, "[f]or these or other reasons, any product liability or other litigation in which [Defendants] are a defendant could have a larger number of plaintiffs than such actions have seen historically and [Defendants] could also see an increase in number of cases filed against [them] because of the increasing use of widespread and media-varied advertising"; and that, "a ruling against other pharmaceutical companies in product liability or other litigation in which we are not a defendant could have a negative impact on pending litigation where we are a defendant."

472.    The statements alleged above in paragraph 471 characterizing Endo's litigation risk as merely a reflection of the fact that "plaintiffs' attorneys have a wide variety of tools to advertise their services and solicit new clients, including using judgments obtained in litigation against other pharmaceutical companies as an advertising tool," rather than the Company's misconduct, communicated to or gave investors the impression that the claims in opioid-related actions were a result of greater advertising capabilities of plaintiffs' lawyers rather than Endo's significant misconduct in promoting Endo Opioids, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, and did not advise investors that the Company faced billions in liability in New York for insurance fraud. The statements were false and misleading when made for the reasons alleged above at paragraph 290. These warnings were also misleading because they failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their

business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions.

473.    Additionally, the 2Q21 10-Q contained generic, boilerplate representations regarding Endo's supposed view of its liquidity risks. The 2Q21 10-Q, disclosed that:

> While we currently expect our operating cash flows, together with our cash, cash equivalents, restricted cash and restricted cash equivalents, to be sufficient to cover our principal liquidity requirements over the next year, the extent to which COVID-19 could impact our business, financial condition, results of operations and cash flows in the short- and medium-term cannot be predicted with certainty, but such impact could be material. To the extent COVID-19 has resulted in any increase to our Cash and cash equivalents, including as a result of any increase in revenues as described above, such increase could be temporary. Additionally, on a longer term basis, we may not be able to accurately predict the effect of certain developments on our sales and gross margins, such as the degree of market acceptance, patent protection and exclusivity of our products, pricing pressures (including those due to the impact of competition), the effectiveness of our sales and marketing efforts and the outcome of our current efforts to develop, receive approval for and successfully launch our product candidates. We may also face unexpected costs in connection with our business operations, ***our ongoing and future legal proceedings, governmental investigations and other contingent liabilities***, ***including potential costs related to settlements and judgments, as well as legal defense costs***, and the implementation of our COVID-19 related policies and procedures. Furthermore, we may not be successful in implementing, or may face unexpected changes or expenses in connection with our strategic direction, including the potential for opportunistic corporate development transactions. Any of the above could have a material adverse effect on our business, financial condition, results of operations and cash flows and require us to seek additional sources of liquidity and capital resources as described below.

474.    The statements in bold in paragraph 473 above, when read together with the statements in paragraphs 447–51 above, which were incorporated by reference from the 2020 10-K, were not tailored to Endo's actual known risks with respect to the significant liability in connection with opioid-related legal proceedings against the Company, particularly in New York,

much less investigations and proceedings related to insurance fraud. The statement "we may also face unexpected expenses in connection with our business operations, our ongoing and future legal proceedings, governmental investigations and other contingent liabilities, including potential costs related to settlements and judgments, as well as legal defense costs" directed investors to a risk factor that misleadingly attributed the Company's exposure to liability to overzealous plaintiffs' attorneys and downplayed the Company's misconduct. In addition, the warnings were misleading because they did not disclose that Defendants knew that the Company already lacked sufficient liquidity to address the full scope of the liability it was facing in opioid-related actions.

475.    Appended as exhibits to the 2Q21 10-Q were signed certifications pursuant to the SOX, wherein Defendants Coleman and Bradley certified that "[t]he [2Q21 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)," and that "[t]he information contained in the [2Q21 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." statements were false and misleading because the 2Q21 10-Q, as set forth in paragraphs 465–74 above, downplayed the scope of the Company's wrongdoing and potential liability with respect to the opioid-related proceedings, did not advise investors that the Company faced liability in opioid-related actions due to its misconduct, as well as billions in liability in New York for insurance fraud, failed to disclose the material risks to the Company caused by Endo's campaign to obstruct litigation of the opioid-related actions, conceal evidence documenting their business practices that demonstrated that the allegations of wrongdoing were true, and otherwise prevent litigation of the merits of the opioid-related actions, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Endo.

## VI.    THE TRUTH SLOWLY EMERGES

476.    Facts contradicting Defendants' misrepresentations and omissions leaked out to the investing public slowly over the course of the Class Period, beginning on November 6, 2017. During intraday trading hours, *Reuters* reported that Kentucky was the latest state to sue Endo over its role in the opioid epidemic. Specifically, the article stated that "Kentucky accused units of Endo International Plc on Monday of contributing to drug overdoses and an opioid epidemic by deceptively marketing its painkiller Opana ER, the latest lawsuit by state or local governments against the drugmaker"; that "Kentucky Attorney General Andy Beshear said the lawsuit would seek to hold Endo responsible for illegally building a market for the long-term use of opioids in the state as part of an effort to boost corporate profits"; and that "[t]he lawsuit, filed in a state court in Kentucky, said Endo sought to overstate the benefits of using Opana for the long-term treatment of chronic pain while downplaying the risk of addiction, helping to fuel a public health epidemic."

477.    On this news, Endo's Ordinary share price fell $0.08 per share, or 1.27%, to close at $6.24 per share on November 6, 2017. As the market continued to digest this information, the Company's shares fell an additional $0.31 per share, or 4.97%, to close at $5.93 per share on November 7, 2017—a total decline 6.17% over two trading days. Despite this drop in the price of Endo's Ordinary shares, those shares continued to trade at artificially inflated prices throughout the remainder of the Class Period as a result of Defendants' continued misstatements and omissions related to the true scope and magnitude of Endo's wrongdoing and liability with respect to the opioid epidemic, including, but not limited to, Defendant Maletta's forceful repudiation of the merits of the case as described in paragraphs 311–12 above.

478.    Then, on January 11, 2018, during pre-market hours, Defendants issued the January 2018 Press Release, which disclosed that Endo had "received a grand jury subpoena from the United States Attorney's Office for the Southern District of Florida seeking documents and

information relating to products containing oxymorphone," but denied that the Company had engaged in any wrongdoing, assuring investors that, "[i]n all circumstances, it is Endo's policy to comply with applicable laws, rules, regulations and industry guidance governing the sale and marketing of pharmaceutical products."

479.    On this news, Endo's Ordinary share price fell $0.15 per share, or 1.86%, to close at $7.92 per share on January 11, 2018. Despite this drop in the price of Endo's Ordinary shares, those shares continued to trade at artificially inflated prices throughout the remainder of the Class Period as a result of Defendants' continued misstatements and omissions related to the true scope and magnitude of Endo's wrongdoing and liability with respect to the opioid epidemic. As set forth in paragraphs 316–25, the misstatements that continued to artificially inflate Endo's share price included those in the 2017 10-K.

480.    On March 29, 2018, during after-market hours, *Reuters* reported that "Arkansas' attorney general on Thursday joined the widening mass of litigation against opioid manufacturers, accusing three drugmakers," including Endo, "of promoting addictive painkillers in ways that falsely denied or trivialized their risks." According to *Reuters*, "[t]he lawsuit contended the drugmakers spent millions of dollars on promotional activities that downplayed the risks of addiction associated with opioids while falsely touting the benefits of using the drugs to treat chronic pain." On this news, Endo's Ordinary share price fell $0.27 per share, or 4.55%, to close at $5.67 per share the following trading day, on April 2, 2018.

481.    On August 16, 2018, *Reuters* reported during intraday trading hours that President Donald J. Trump's ("Trump") administration "proposed that U.S. drugmakers cut production quotas of the six most abused opioids by 10 percent next year to fight a nationwide addiction crisis"; that, "[i]n a statement, the U.S. Justice Department and Drug Enforcement Administration

(DEA) said the proposed cut would be in keeping with President Donald Trump's effort to cut opioid prescription fills by one-third within three years"; and that "Trump on Thursday also pressed U.S. Attorney General Jeff Sessions to sue drug manufacturers over the opioid crisis." The *Reuters* article also mentioned four manufacturers of opioids by name, one of which was Endo, noting in tandem that "[h]undreds of lawsuits have been filed by states, counties and cities against opioid manufacturers." Over two trading days, Endo's Ordinary share price fell $0.42 per share, or 2.62%, to close at $15.64 per share on August 17, 2018. Despite this drop in the price of Endo's Ordinary shares, those shares continued to trade at artificially inflated prices throughout the remainder of the Class Period as a result of Defendants' continued misstatements and omissions related to the true scope and magnitude of Endo's wrongdoing and liability with respect to the opioid epidemic. As set forth in paragraphs 355–67, the misstatements that continued to artificially inflate Endo's share price included those in the 2018 10-K.

482.    News of Endo's precarious financial condition in the face of the opioid-related actions was revealed to investors on March 4, 2019, when Reuters reported that opioid manufacturer "Purdue Pharma LP is exploring ***filing for bankruptcy to address potentially significant liabilities*** from roughly 2,000 lawsuits alleging the drugmaker contributed to the deadly opioid crisis sweeping the United States." The article further reported that "[s]hares of Endo International Plc and Insys Therapeutics Inc, two companies that like Purdue have been named in lawsuits related to the U.S. opioid epidemic, ***closed down 17 percent*** and more than 2 percent, respectively," in the wake of the report.

483.    The next day, March 5, 2019, an analyst with SVB Leerink LLC Research downgraded Endo from "outperform" to "market perform" in part because "it is clear that Endo is front and center in terms of exposure to this headline risk, and while Endo may not be a specific

plaintiff in the state cases and multi-district litigation (MDL) expected to kick off later this year, *we believe case updates are more likely than not to be negative* read-through for Endo. Further, we see few other positive catalysts for Endo this year." The analyst then emphasized that

> In the event of a penalty ensuing from the an opioid trial or settlement, Endo *may need to raise additional capital* which may be costly: Endo currently trades at 8x EV/'20E EBITDA and *it is already ~5.5x levered*, and so *this leaves very little equity value cushion to raise incremental debt to fund potential payments ensuing from an opioid trial/ settlement*. We believe that Endo's term loan covenants allow for additional unsecured indebtedness arising out of judgments, but given the current >11% yield of Endo's notes, *we see risk of an additional debt raise at a substantial interest rate*. We also do not rule out the possibility of an equity component in a capital raise depending on the size of the liability.

On this news, Endo's share price fell from $9.33 on March 4, 2019 to $8.72 on March 5, 2019, a decline of 6.5%.

484.    On April 10, 2019, the market began to better understand that Endo may have downplayed its role in the opioid crisis, as well as its knowledge of the harm caused by its opioids, when *The Philadelphia Inquirer* reported that Endo had "suddenly" begun "tell[ing] the FDA about a tidal wave of fatalities associated with Opana, and painkillers made by other companies." The article went on to state that after reporting only approximately *250* deaths over the prior ten years, "[f]rom November 2017 through August 2018, Endo reported *20,115 deaths* to the FDA." The article stated that "the thousands of deaths span roughly two decades" and noted that Endo had begun submitting the reports two months after it had voluntarily discontinued Opana ER at the FDA's request. Although the article quoted Endo's spokesperson Heather Zoumas Lubeski as denying that all the reports concerned Endo's products, the market clearly understood that Endo was acknowledging to a government regulator that the Company's chief opioid had been directly associated with thousands of deaths. In the two days following the article, Endo's share price plummeted from $8.31 per share to $7.54 per share, or 9.3%.

194

485. The Tennessee Complaint was unsealed on Friday, June 7, 2019, and, on this news, Endo's share price declined that day from its opening price of $5.11 per share to close at $4.89, or 4.3%. Over the next two trading days, Endo's share price fell still further to $4.49 per share, or a total decline of 12.1%. In addition, on July 4, 2019, *The Jackson [Tennessee] Sun* published an expose based in part on allegations in the Tennessee Complaint ("TTP Article"). The TTP Article revealed that Endo Pharmaceuticals had "specifically advertised the reformulated Opana ER as safer and harder to abuse than the drug's original formulation, which it introduced to compete with Purdue Pharma's popular opioid painkiller OxyContin." The article reported that, in spite of this, however, in August 2012, only six months after Endo began selling Opana ER in February 2012, a nephrologist had reported a startling increase in thrombotic thrombocytopenic purpura ("TTP"), a rare disorder associated with intravenous drug use that could lead to sepsis, seizures, coma or loss of limbs. According to the article, all but one of the TTP sufferers had recently injecting dissolved tablets of Opana ER. The article also reported that "[b]y the time the Tennessee cases were reported, Endo already had received two reports of similar cases in North Carolina," according to a recently unsealed lawsuit. In addition, at about the same time, Endo Vice President for Regulatory Affairs Robert Barto submitted to the FDA a communication that summarized the TTP cases and indicated that, despite advertising otherwise, "Endo knew the tablet could be dissolved and injected." On this news, Endo's share price declined from $4.61 to $4.34, or 5.9%.

486. On the July 15, 2019, Morgan Stanley analyst David Risinger release a report downgrading Endo from "Underweight" to "Equal-weight" and described the Company and its peer, Teva Pharmaceuticals, as "potentially more exposed to opioid litigation because they *promoted brands to physicians/patients* and have more concerning financial leverage." Because of this, Risinger said, he was cutting his price target for Endo from $8 to $3, which was the lowest

on Wall Street at the time. That day, Bloomberg reported that "Endo shares sank as much as 8.9% after Risinger downgraded his rating." Over the next three trading sessions, Endo's share price plummeted from $3.95 to $3.34 per share, or 15.4%. Risinger's downgrade in part confirmed for the market what Defendants had been denying, *i.e.*, that the Company had engaged in misconduct with regard to the opioid epidemic, that Defendants' denial of those allegations was likely false and misleading, and that Company was likely to face massive liability for its role in the opioid crisis.

487.     The investment media immediately noted the plunge in Endo's share price and attributed it to investors beginning to understand, in spite of Defendants' consistent denials, the scope of liability the Company faced. For example, on August 27, 2019, Bloomberg reported that "Teva Pharmaceutical Industries Ltd. and Endo International Plc reversed initial gains to trade near recent lows on Tuesday as Wall Street came to grips with just how much the opioid crisis could cost the manufacturers of those drugs." The article reported that, "Endo fell as much as 10%" and "almost 20% of Endo shares [available for trading] are being shorted."

488.     On September 5, 2019, during intraday trading hours, Endo issued a press release announcing that its subsidiaries EPI, EHS, PPI, and PPCI had executed a settlement agreement with two counties in Ohio and related persons in connection with what the Company termed "Track 1 Cases," which included claims "arising from or otherwise relating to the manufacturing, marketing, distribution, supply, sale, prescribing, use and/or abuse of branded and generic opioid medications." According to that press release:

> Under the Settlement Agreement, Endo will pay a total sum of $10 million and will provide up to $1 million of its Vasostrict® and Adrenalin® products free of charge, to be initially allocated by and between the two Plaintiffs counties as follows: Cuyahoga County will receive $6.2 million in cash and up to $620,000 of Vasostrict® and/or Adrenalin®; and Summit County will receive $3.8 million in

cash and up to $380,000 of Vasostrict® and/or Adrenalin®. The two Plaintiffs counties may further apportion and use the foregoing amounts in their sole discretion. Further, in the event of a comprehensive resolution of government-related opioid claims, the Company has agreed that the two Plaintiffs counties will receive the value they would have received under such resolution less the total value of the Settlement Agreement. The Settlement Agreement includes no admission of wrongdoing, fault or liability of any kind by the Endo Entities and avoids litigation risk and associated costs. It is important to note that the value of the Settlement Agreement should not be extrapolated to any other opioid-related cases or claims.

On this news, Endo's Ordinary share price fell $0.08 per share, or 3.28%, to close at $2.36 per share on September 5, 2019. The announcement further alerted investors to the Company's misconduct with regard to the opioid crisis, that Defendants' denial of those allegations was likely false and misleading, and that Company was likely to face massive liability for its role in the opioid crisis.

489.    A few days later, on September 10, 2019, Governor Cuomo announced that DFS was investigating opioid manufacturers and distributors, among others, for insurance fraud. The September 2019 Press Release also listed the opioid manufacturers and distributors implicated by the announcement, including EHS, EPI, PPCI, and PPI. However, given that at least thirty other opioid manufacturers and distributors were listed alongside Endo's subsidiaries in the press release, that no specific acts of wrongdoing were assigned to any one of those entities in particular, and that Endo itself (*i.e.*, Endo International plc) was not mentioned within the September 2019 Press Release, the extent of Endo's role in the opioid epidemic and the magnitude of the risks that the Company accordingly faced remained unknown to investors. Accordingly, the Company's share price did not decline following the press release's publication, and continued to trade at artificially inflated prices throughout the remainder of the Class Period, while being further buoyed by Defendants' continued misstatements and omissions.

490.    The following spring, on February 26, 2020, investors gained new information that illuminated how the Company lacked the liquidity to withstand a major award in opioid-related actions. The Company's 10-K, filed that day, indicated that the Company had approximately $1.45 billion in cash on hand. During an earnings call before the markets opened for trading that day, an analyst asked Defendants, "[i]t seems that settlement talks for others that seem to have gotten traction tend to involve either the use of *a ton of cash* or on the case of Purdue and Mallinckrodt, *the tool of bankruptcy*. So, I guess my question is, *do you see flexibility* for companies to deal with this liability without either of those things?" Defendant Coleman responded:

> at this stage, we've been fairly clear on what our strategy is, which is to remain open to a constructive resolution and defend as needed. In terms of the tools and options that are available to people, what may be needed, what may not be needed, *we know what our strategy is. We feel good about our flexibility that we have to deal with that*. And so, that's exactly how we're going to move forward.

491.    Investors understood that Defendant Coleman's statement was designed to communicate that the Company had the $1.45 billion cash on hand to settle the opioid cases, which was a fraction of the overall liability the Company faced. For example, FiercePharma, a website covering the pharmaceutical industry, published an article the date of the call entitled, "Endo Touts Financial 'Flexibility' as Massive Opioid Settlements Mount Industrywide." The article stated that "With the industry favoring massive opioid settlements—and, increasingly, bankruptcy—Endo's new leader [Coleman] thinks the drugmaker has the formula to weather the storm" and reported that "Coleman said he expected to stay the course on Endo's opioid plan with $1.5 billion in cash reserves on hand at year-end." Investors saw Coleman's statement for what it was, an acknowledgement that the Company may not have the liquidity to withstand the massive liability it was facing in the opioid-related cases. On that news, Endo's share price fell from $6.53 per share to $6.35, a decline of 2.8%. The following day, as the markets digested Defendant Coleman's

statement, the Company's share price sank from $6.35 to $5.63 per share, or 11%. In total, the Company's share price fell nearly 14% in the wake of Coleman's disclosure.

492.     The truth fully emerged on June 10, 2020, when Governor Cuomo announced the NYDFS Charges against Endo in connection with its role in the opioid crisis. The charges alleging that Endo fraudulently misrepresented the safety and efficacy of its opioid drugs while minimizing the risk of addiction and other ill effects. Specifically, DFS alleged that Endo had committed a "fraudulent insurance act"; that, "[a]t least since the mid-2000s, [Endo and its subsidiaries] have knowingly and with intent to defraud caused to be presented to an insurer or any agent thereof written statements or other physical evidence as part of or in support of claims for payment, services or other benefit pursuant to a health insurance policy or private or public health plan," which "they knew to (a) contain materially false information concerning any material fact thereto; or (b) conceal, for the purpose of misleading, information concerning any factor material thereto"; that Endo "knowingly and with intent to defraud made numerous misrepresentations, directly or through third parties, concerning the safety and efficacy of opioids"; that "[t]hose misrepresentations caused healthcare providers to present false claims for payment to insurers regulated by DFS on multiple and continuous occasions over the past decades in the form of written prescriptions for opioid medications and related documentation"; that "[s]uch prescriptions carried with them express and/or implied representations that the opioid drugs being prescribed were medically necessary, legitimate and/or appropriate"; that Endo and its subsidiaries "were aware that such representations were, for the majority of the opioid prescriptions written during the relevant time period, false," and "[t]he falsity of these representations was material to the successful claims for payment"; and that, "[i]n the alternative, to the extent that third parties engaged in conduct that violated" New York laws, "including without limitation prescribing

doctors who wrote fraudulent prescriptions and patients who sought and obtained such fraudulent prescriptions," Endo and its subsidiaries "are liable for such conduct because they, knowingly and with an intent to defraud, solicited, requested, commanded, importuned and/or intentionally aided such third parties in such conduct."

493.    The NYDFS Charges also alleged that Endo and its subsidiaries "have committed a fraudulent insurance act as that term is defined in New York Insurance Law §403"; that DFS "is entitled to levy a civil penalty not to exceed five thousand dollars ($5,000) plus the amount of each claim paid, for each violation"; and that, "[i]n this case, each fraudulent prescription constitutes an independent violation."  The NYDFS Charges thereby revealed to investors for the first time the full scope and magnitude of a previously unknown, substantial legal liability that Endo itself specifically faced, which was unknown before the full charges were made publicly available.

494.    In addition, the NYDFS Charges alleged that "through their marketing, promotion, manufacture and supply of opioids drugs to patients for whom such drugs were not medically necessary, legitimate, and appropriate," Endo and its Subsidiaries "committed acts of intentional fraud or intentional misrepresentation of material facts with respect to claims for insurance products or services or involving any person offering to provide or providing financial products or services"; that they, "with the intent to defraud, made knowingly false representations about the safety and efficacy of opioid drugs"; that "[t]hese misrepresentations were made with the intent of increasing the demand for opioids into areas of treatment that were not medically necessary, legitimate, and appropriate"; that Endo and its subsidiaries "were aware that the increase in demand would cause fraudulent claims to be made to insurance companies"; and concluded that, as a result, Endo and its subsidiaries "committed intentional fraud and/or made intentional misrepresentations of material facts with respect to a financial product or service and are thus liable

to pay a civil penalty of up to five thousand dollars ($5,000) per offense," with "each fraudulent prescription constitut[ing] an independent offense"; thereby also revealing to investors for the first time the full scope and magnitude of a previously unknown, substantial legal liability that Endo itself specifically faced, which was similarly unknown before the full Statement of Charges was made publicly available. On this news, Endo's Ordinary share price fell $0.66 per share, or 14.63%, to close at $3.85 per share on June 10, 2020.

495.    The market began to learn of Defendants' campaign to obstruct the opioid-related actions and prevent their litigation on the merits in May of 2020. On May 4, 2020, the Staubus Court issued an order holding Endo and its counsel in contempt, directing Endo to produce records, and reserving judgment on sanctions. On this news, Endo's share price fell from 4.32 to 4.165 (3.5%).

496.    A year later, the risks associated with Defendants' campaign to obstruct the opioid-related actions and conceal evidence of Endo's improper conduct began to materialize. On April 7, 2021, before the market opened, Endo announced the Default Judgment. On this news, the Company's share price opened down $0.19, or 2.6%. Over the course of trading that day, the market digested the Staubus Court's holding that "Endo and its counsel at Arnold & Porter willfully withheld responsive records," and that there was "a coordinated strategy between Endo and its counsel to delay these proceedings, deprive plaintiffs of information that would support their case, and interfere with the administration of justice." Endo's share price plummeted $0.44, or 6.1%, on unusually high trading volume.

497.    On August 6, 2021, the market learned that Endo's campaign to obstruct the opioid-related litigation was not limited to the Staubus Action when the Suffolk Court held an over four-hour long hearing concerning Endo's misconduct in the New York Actions, including withholding

documents, misrepresenting searches for relevant documents, and shamelessly capitalizing on that misconduct at trial. discovery violations in those actions. On that news, Endo's share price fell from $4.69 to $4.31, or 8.1%.

498.    On August 11, 2021, the undisclosed risk caused by Endo's misconduct materialized when the Suffolk Court stated that it was contemplating a "head shot" against Endo, *i.e.*, granting the NYS Plaintiffs a default judgment akin to the Default Judgment in the Staubus Action. Specifically, after considering the NYS Plaintiffs' motions for contempt and orders to show cause, the Suffolk Court scheduled a second hearing for August 25, 2021, and stated, "I put together a menu of seven remedies, one through seven. I'm not going to publish them . . . . They go from nothing to essentially a head shot." Endo's share price had closed at $4.35 on August 10, 2021, the day before the Suffolk Court announced that it was considering granting the NYS Plaintiffs a default judgment. After the court's statements, the Company's share price sank to $3.88 on August 11, 2021, or a decline of 10.8%. Endo, however, continued to prop up its stock price by vigorously denying any wrongdoing and contesting the appropriateness of a default judgment.

499.    The impact on Endo's business of Endo's misconduct in marketing opioids, false statements to investors about that misconduct, and obstruction of the litigation of the opioid-related actions on their merits began to materialize on August 20, 2021. Early that morning, Dow Jones reported that Endo had retained a financial "restructuring adviser" to assist the company in evaluating its options for dealing with opioid lawsuits, *i.e.*, to prepare for a bankruptcy filing. The retention of this adviser confirmed to the market both that Defendants' misconduct presented an existential threat to the Company, and that the Company had massively insufficient liquidity to address the opioid litigation, even though it had been assuring investors that it did.

500.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## VII.    LOSS CAUSATION

501.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs and the Class to suffer substantial losses. During the Class Period, Plaintiffs and the Class purchased Endo common stock at artificially inflated prices and were damaged thereby when the price of Endo common stock declined when the truth was revealed. The price of Endo common stock significantly declined (causing investors to suffer losses) when Defendants' misrepresentations, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the risks that had been fraudulently concealed by the Defendants materialized.

502.    Throughout the Class Period, Defendants issued a series of misleading statements and omissions that misleadingly downplayed the allegations in opioid-related actions against Endo, did not fully apprise investors of the extent of the Company's misconduct in marketing and selling opioids, and did not advise investors that the Company faced billions in liability in New York for insurance fraud as a result of Endo's misconduct with regard to the opioid crisis. Defendants' misleading statements and omissions further misled Plaintiffs and other investors concerning Endo's involvement in, or knowledge of, the campaign by opioid manufacturers, including Endo, to exaggerate the benefits and downplay the risks of opioids, which has an impact on Endo's business operations and financial results, including the Company's.

503.    Defendants' misleading statements and omissions caused and maintained artificial inflation in the price of Endo's common stock throughout the Class Period until facts about the Company's true condition were revealed to the market. The timing and magnitude of Endo's

common stock price declines, as detailed herein, negate any inference that the losses suffered by Plaintiffs and the Class was caused by changed market conditions or other macroeconomic factors unrelated to Defendants' fraudulent conduct. The market for the Company's common stock promptly digested current information with respect to Endo from all publicly available sources and reflected such information in the price of the Company's common stock.

504.    The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other members of the Class was a direct result of the relevant truth about Defendants' scheme being revealed to the market in a series of partial adverse disclosures and third-party reports in the media. When Defendants' prior misleading statements and omissions were corrected and became apparent, and the risks concealed by them materialized, investors suffered losses as the price of Endo common stock declined because the price inflation was removed. As a result of their purchases of Endo common stock during the Class Period, Plaintiffs and the other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## VIII.    ADDITIONAL SCIENTER ALEGATIONS

505.    As alleged above, Defendants each had scienter as to the false and misleading nature of their statements because they knew or, at a minimum, recklessly disregarded the facts described in Sections IV and V above for the following reasons.

- As admitted in the Directors' Report to assist the Board in "oversee[ing] the management of risks associated with the evolving opioid litigation" Defendant Maletta, as CLO, "provide[d] the Board with a comprehensive report of all material litigation matters affecting Endo on at least a quarterly basis" and separately engage[d] in regular discussions with individual Board members on litigation matters." The opioid litigations were plainly material to Endo because the company disclosed the existence of those cases in every SEC filing during the Class Period, and each SEC filing indicated that the Company was disclosing matters that were material "in the opinion of . . . management." To brief the Board on all material litigation matters and discuss "risks associated with the evolving opioid litigation, Defendant Maletta had to familiarize himself with the allegations and underlying facts at issue in opioid cases filed against Endo.

- As admitted in the Directors' Report, Defendant Campanelli, as CEO, held "regular teleconferences with individual Board members and a teleconference with the full Board on at least a monthly basis" where he discussed "the risks associated with the evolving opioid litigation." To discuss these actions with the Board, Defendant Campanelli had familiarize himself with the allegations and underlying facts at issue in opioid cases filed against Endo.

- As admitted in the Directors' Report, "[w]hen the Company promoted its opioid medications to [healthcare providers], it also monitored a number of secondary surveillance databases (including the NAVIPPRO and RADARS databases) and the FDA Adverse Reporting System for signs of potential abuse and/or misuse of certain branded opioid products." Accordingly, Defendants knew of, used, analyzed, had access to, and/or recklessly ignored the data from these sources showing that Reformulated Opana ER had in fact caused a rise in intravenous abuse of the drug, as well as the health hazards associated with intravenous abuse of the drug.

- Defendant Campanelli abruptly resigned as CEO of Endo in November 2019, only six months after he had entered into a contract to serve as the Company's President and CEO for the next three years. Defendant Campanelli's resignation occurred only *eight weeks* after DFS announced that it was investigating whether the Company had engaged in insurance fraud in connection with its marketing of Endo Opioids, or, in other words, roughly the amount of time for the Board to understand the extent of the Company's exposure to insurance fraud in New York. The suspicious timing of Defendant Campanelli's resignation, when considered holistically with his knowledge of the Company's role in furthering the opioid crisis and the Company's enabling of healthcare professionals to write fraudulent prescriptions for Endo Opioids, which potentially exposed the Company to liability for insurance fraud, supports a strong inference of scienter.

- The Staubus Court expressly found in the Default Judgment that APKS and *Endo itself* had engaged in an *intentionally coordinated strategy* to disrupt the action and prevent litigation of the Staubus Plaintiffs' claims on the merits. For example, while the Staubus Court stated that Endo "repeatedly tried to characterize its discovery misconduct as a simply misunderstanding between Plaintiffs' counsel and defense counsel in the discovery process," the court expressly held that "it is clear to the Court that *Endo and its counsel at Arnold & Porter willfully withheld responsive records* in violation of this Court's September 28, 2018 Order to Compel, in violation of this Court's February 12, 2020 Certification Order, and (more generally) in derogation of Plaintiffs' reasonable documents requests and Endo's discovery obligations," "*Endo intended to defend itself at trial by touting its anti-diversion measures, while simultaneously depriving Plaintiffs of evidence that would have undercut that defense*," and "*this was part of a coordinated strategy between Endo and its counsel* to delay these proceedings, deprive Plaintiffs of information that would support their case, and interfere with the administration of justice." Endo and the Individual Defendants' intentional misconduct is powerful evidence of their scienter.

- As found in the Referee's Report, in summer 2020 Endo's counsel "slipped . . . voluminous" documents into production database for the federal multidistrict opioid litigation. The New York Referee expressly found that Endo's counsel appeared to have

taken those steps "in the hope that the [New York Plaintiffs were too ] preoccupied with the ongoing trial to notice them." In addition, the New York Referee found that "[p]lacing those documents in the federal MDL document database, while accessible to the plaintiffs' counsel, did not give them or the Court timely notice of their existence for possible use in this trial," therefore Endo's counsel was "deficient in not timely disclosing those documents. Consequently, all of the [New York Plaintiffs] were prejudiced by this delay and accordingly, the Court should fashion an equitable remedy for this failure to timely disclose those documents."

506.    A witness who agreed to speak with Plaintiffs on the condition of anonymity, CW1,[13] described how Campanelli, other individual defendants, and Endo's Board met "constantly" to discuss the opioid-related actions, and specifically discussed Opana as litigation of the opioid-related actions heated up. CW1 served as an executive assistant to Endo's Executive Vice President & Chief Compliance Officer, Corporate Compliance & Business Practices Jon Smollen ("CCO") Jon Smollen from February 2016 to September 2016 at Endo's U.S. headquarters in Malvern, Pennsylvania.

507.    According to CW1, Endo's compliance department was made up of between six to ten people during the time she worked there. CW1 stated that she managed correspondence between Smollen, the Endo Board of Directors, and the executive team, *i.e.*, each of the Individual Defendants. CW1 also assisted Smollen in preparing to present metrics and various reports in regular meetings with these colleagues. CW1 prepared highly confidential documentation and coordinated meetings and depositions with counsel, the executive officers, human resources, and others. CW1 also screened and processed all Smollen's incoming calls and inquiries.

508.    CW1 said that it was clear from the day she began working at Endo of the severity of the legal issues the Company was facing. Smollen, who she described as the Company's head attorney, constantly met with then CEO Rajiv De Silva and later Defendant Campanelli. CEO De Silva and Smollen met daily, often with the full team of executive leadership. CW1 scheduled and

---

[13] CW1 is referred to in the feminine to preserve her anonymity.

attended meetings between the executive leadership team and board members. She planned and coordinated the company's quarterly Board meetings, including travel to Dublin, Ireland. According to CW1, Defendant Campanelli assumed leadership at Endo just as "things got really, really bad. CW stated that after replacing De Silva, Defendant Campanelli met with CCO Smollen, CFO Suketu Upadhyay, and the other executive team members daily. Defendant Campanelli also met one-on-one with Smollen every day.

509.    CW1 stated that extensive internal records on Opana were consulted during some of these meetings. CW1 knew about the records because Smollen had her bring massive binders containing those records into the conference rooms where the meetings took place. The records included Risk Evaluation and Mitigation Strategy documentation and records required to be kept by the federal government.

510.    Smollen left Endo in approximately September 2016 and Endo Vice President & U.S. Compliance Officer Susan Williamson assumed Smollen's role as senior vice president and chief compliance officer. CW1 then supported CCO Williamson as she had supported Smollen from September 2016 to January 2017.

511.    In addition to the above allegations, which on their own create a strong inference of scienter, Individual Defendants were active and culpable participants in the fraud alleged herein, each of the Individual Defendants acted with scienter in that each knew or recklessly disregarded that each of his or her respective public statements alleged in Sections IV and V above was materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of each such statement as a primary violator of Section 10(b) of the Exchange Act. In addition to the specific facts alleged above, including in Sections I, III, IV, and V, Defendants' scienter is further evidenced by the following facts:

512.    In a deposition taken in the Ohio MDL on March 19, 2019, which was not unsealed until December 2019, Defendant Campanelli admitted that "[i]n September 2016, [he] would have become aware" with "what was going on at Endo," *i.e.*, that he had familiarized himself with Endo's operations. During that same deposition Defendant Campanelli admitted that "[w]e were aware in 2016 when the product [*i.e.*, Endo Opioids] was abused or misused it would lead or could lead to deaths." Defendant Campanelli further testified that by 2016 or 2017, he was aware that Reformulated Opana ER was being abused by intravenous drug users, and that it had been linked to incidences of HIV (as well as Hepatitis and TPP, a dangerous blood disorder).

513.    In other words during his deposition, Defendant Campanelli admitted that he was aware that Endo opioids had contributed to the epidemic and, given the importance of Endo Opioids to the Company's bottom line, his position as COO and/or CEO at Par when auditors concluded that Par lacked a SOM System, and his statement in December 2016, as alleged in paragraph 134, *supra*, that he was undertaking a product-by-product review of Endo Opioids, he knew, reviewed, and/ or had access to, information concerning Endo's misconduct in promoting its opioids, failing to maintain a meaningful SOM system, false promoting of Opana ER and the Company's precarious financial position ***up to eleven months*** before the start of the Class Period. In spite of this knowledge, Defendant Campanelli nevertheless continued to downplay Endo's role in the opioid epidemic and the allegations in opioid-related actions to investors throughout the Class Period.

514.    The September 10, 2019, announcement by Governor Cuomo that DFS was "taking action" against, among others, the opioid manufacturers and distributors "to secure $2 billion for New York consumers who have shouldered the cost of the ongoing opioid epidemic in the form of higher insurance premiums" put Defendants on notice that DFS was going to investigate Endo's

role in the opioid epidemic, in particular its training of sales representatives to market Endo Opioids to healthcare professionals that the Company believed would write the most opioid prescriptions, without regard to whether those prescriptions were fraudulent or the healthcare professionals' experience in treating chronic pain, as well as the Company's failure to implement an effective system to identify prescriptions and orders that were likely designed to obtain opioids under false pretenses. The announcement also confirmed for Defendants that Endo faced billions in liability for insurance fraud since the announcement stated that DFS has "clear statutory authority to impose fines of up to *$5,000 per offense in addition to the amount of the fraudulent claim*." Accordingly, all the Individual Defendants had to do to gain an understanding of the scope of the liability the Company faced was to review records to which they had access to identify representations made to private insurance providers and the number of prescriptions filled by private insurers.

515. As executive officers of Endo, each of the Individual Defendants was responsible for and had a substantial role in issuing the material misrepresentations and omissions alleged herein. Among other things, each of Defendants Campanelli and Maletta was directly quoted in press releases and/or made public statements during the Company's earnings calls and industry conferences on behalf of Endo.

516. Each of the Defendants also received and/or had access to detailed information concerning the business operations and financial condition of the Company, including information regarding the misconduct by Endo sales representatives, which meant that Endo was likely in violation of Section 403 of the New York Insurance Law and thus had engaged in insurance fraud in the state of New York; the attributes and abuse associated with Reformulated Opana ER that contradicted Endo's public statements about the safety and efficacy of the drug; and the allegations

of misconduct by Endo, its executives, and its employees in connection with convincing patients, healthcare providers, and insurers contained in the over *3,000* actions filed against Endo.

517.    Public statements made by the Defendants during the Class Period also give rise to a strong inference that each had detailed knowledge of or access to the material facts and information that they misrepresented or concealed. The vast majority of the Defendants' misrepresentations pertain to allegations in the over *3,000 cases* brought against Endo concerning the Company, its executive and its employees' roles in engaging in a campaign to exaggerate the safety and downplay the risks of Endo Opioids to patients, healthcare professionals and insurers, and the Individual Defendants made statements and answered questions regarding these actions, and opioid litigation involving Endo in general, during earnings calls and investor conferences during the Class Period. In that regard, each of the Defendants is presumed to have knowledge of and/or access to the information about which he or she made public statements, and each Defendant controlled the contents of his or her statements made on behalf of the Company during the Class Period.

518.    In addition, as Endo's CEO, CFO, and General Counsel, Defendants Campanelli, Coleman, Bradley, and Maletta were each provided with, or had access to, copies of the SEC filings alleged herein to be false or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or to cause them to be corrected. As CEO, CFO Defendants Campanelli, Coleman and Bradley each signed certifications pursuant to the SOX and Exchange Act Rule 13a-14(a) in connection with Endo's Forms 10-Q and Forms 10-K filed with the SEC during the Class Period. As signatories of both: (i) the SOX certification representing that "the information contained in th[e] [SEC filings] fairly presents, in all material respects, the financial condition and results of operations of Endo"; and (ii) the Rule 13a-14(a) certification

representing that the Company's SEC filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading," Defendants Campanelli, Coleman, and Bradley each had a duty to monitor any conduct or information that threatened to undermine the veracity of the representations made in these filings, including all material facts concerning opioid litigation involving Endo and Endo's business.

519.    Defendant Campanelli also received a $5 million special bonus from the Board midway through the Class Period, in 2018. Defendant Campanelli's bonus was so large that it attracted the attention of industry press. For example, the industry web site FiercePharma.com published an article on May 3, 2019, entitled, "Endo CEO Campanelli nabs almost $20M in 2018 pay, thanks to special 2017 bonus." The article noted that while Endo's share price "hasn't recovered at all from a sharp decline" that analysts attributed in part to "concerns around the potential opioid liability." Defendant Campanelli's outsized "special bonus" supports a strong inference of his scienter because would not have been awarded that bonus had he fully disclosed the scope of the Company's involvement in the opioid epidemic and disclosed that the Company faced potentially billions in liability to New York for insurance fraud.

520.    Given the amount of liability that the Endo potentially faced in connection with the actions brought against the Company arising out of its role in the opioid epidemic, and, as disclosed in the Company's SEC filings toward the end of the Class Period, the opioid litigation against Endo had the potential to bankrupt the company. Accordingly, the allegations, underlying facts, and legal issues asserted in those actions were core matters of central importance to the Company. In addition, the potential for liability arising from claims for engaging in insurance fraud in New York was a core matter of central importance to the Company because, under Sections 404 and 408(a)(1)(A) of the New York Financial Services Law, the state could levy civil penalties on Endo

of up to $5,000 per offense, since millions of fraudulent prescriptions for Endo Opioids covered by Section 403 of the New York Insurance Law had been written by healthcare providers, the Company's potential liability for insurance fraud likely threatened the Company's existence as well.

## IX.     PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

521.     The market for Endo's common stock was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or omissions made by Defendants and alleged herein, Endo's common stock traded at artificially inflated prices during the Class Period. On October 16, 2018, the Company's stock closed at a Class Period high of $18.30 per share. Plaintiffs and the other members of the Class purchased or otherwise acquired the Company's common stock relying upon the integrity of the market price of Endo's common stock and market information relating to Endo, and have been damaged thereby.

522.     During the Class Period, the artificial inflation of Endo's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing the damages sustained by Plaintiffs and the other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements or omissions about Endo's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Endo and its business, operations, and prospects, thus causing the price of the Company's common stock to be artificially inflated at all relevant times, and when the truth was disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and the other members of the Class purchasing the Company's common stock at such artificially inflated prices, and each of them has been damaged as a result.

523.    At all relevant times, the market for Endo's common stock was an efficient market for the following reasons, among others:

- Endo common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market, under the ticker symbol "ENDP";

- as a registered and regulated issuer of securities, Endo filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information;

- Endo regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

- Endo was followed by numerous securities analysts employed by major brokerage firms, including Morgan Stanley, Piper Jaffray, RBC Capital Markets, William Blair, Susquehanna Financial Group, and others, who wrote reports that were distributed to those brokerage firms' sales force and certain of their customers, and that were publicly available and entered the public marketplace.

524.    As a result of the foregoing, the market for Endo's common stock promptly digested current information regarding Endo from all publicly available sources and reflected such information in Endo's public stock price. Under these circumstances, all purchasers of Endo's common stock during the Class Period suffered similar injury through their purchase of Endo's common stock at artificially inflated prices and a presumption of reliance applies.

525.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants material omissions. Because this action involves Defendants' failure to disclose material adverse information identified above, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making

investment decisions. Specifically, Defendants misled Plaintiffs and other investors regarding the risk that Endo would be implicated in regulatory investigations or actions related unlawful anticompetitive conduct; and, the extent to which Endo's business operations and financial results were and would be impacted by anticompetitive market conduct in the generic drug industry. Given the importance of these facts, that requirement is satisfied.

## X.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

526.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

527.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, the Individual Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Endo who knew that the statement was materially false or misleading when made. Accordingly, any arguably forward-looking statements cannot be protected under the PSLRA safe harbor.

## XI.    PLAINTIFFS' CLASS ACTION ALLEGATIONS

528.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Endo common stock during the Class Period (the "Class"); and were damaged upon the

revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

529.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, shares of Endo common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Endo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

530.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

531.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

532.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

- whether the statements and omissions made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations and management of Endo;

- whether the Individual Defendants caused Endo to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of shares of Endo common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

533. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

534. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- shares of Endo common stock are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold shares of Endo common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

535.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

536.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

### COUNT I

### (VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS)

537.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

538.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

539.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and other Class

members, as alleged herein; (ii) artificially inflate and maintain the market price of Endo common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Endo common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

540.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Endo common stock. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Endo's finances and business prospects.

541.    By virtue of their positions at Endo, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

542.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers

and/or directors of Endo, the Individual Defendants had knowledge of the details of Endo's internal affairs.

543.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Endo. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Endo's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Endo common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Endo's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Endo common stock at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

544.    During the Class Period, Endo common stock were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Endo common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and

the Class, the true value of Endo common stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Endo common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

545.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

546.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

## (VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS)

547.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

548.    During the Class Period, the Individual Defendants participated in the operation and management of Endo, and conducted and participated, directly and indirectly, in the conduct of Endo's business affairs. Because of their senior positions, they knew the adverse non-public information about Endo's misstatement of income and expenses and false financial statements.

549.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Endo's

financial condition and results of operations, and to correct promptly any public statements issued by Endo which had become materially false or misleading.

550.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Endo disseminated in the marketplace during the Class Period concerning Endo's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Endo to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Endo within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Endo common stock.

551.    Each of the Individual Defendants, therefore, acted as a controlling person of Endo. By reason of their senior management positions and/or being directors of Endo, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Endo to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Endo and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

552.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Endo.

## XII.    <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## XIII.        DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:  November 15, 2021                      Respectfully submitted,

POMERANTZ LLP

*/s/ Brian Calandra*
Gustavo F. Bruckner
Jeremy A. Lieberman
(admitted *pro hac vice*)
Brian Calandra
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
gfbruckner@pomlaw.com
jalieberman@pomlaw.com
bcalandra@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
(*pro hac vice* application forthcoming)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
Peretz Bronstein
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, NY 10165

Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com

*Attorneys for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 15, 2021, I electronically filed the foregoing ***Amended***

***Class Action Complaint for Violations of the Federal Securities Laws*** with the Clerk of Court

using the CM/ECF system, which will send notification of such to all CM/ECF participants.

POMERANTZ LLP


*/s/ Brian Calandra*
Brian Calandra
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
bcalandra@pomlaw.com